08:33:05

                    UNITED STATES DISTRICT COURT

              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

                    DALE S. FISCHER, U.S. DISTRICT JUDGE


DEBORAH MOLLER, et al.,        )
                               )
            Plaintiffs,        )
                               )
            vs.                )
                               )    5:22-CV-1306-DSF
COUNTY OF SAN BERNARDINO, et   )
al.,                           )
                               )
            Defendants.        )
_____)
                               )
                               )


                REPORTER'S TRANSCRIPT OF JURY TRIAL

                            VOLUME I

                    Los Angeles, California

                   Tuesday, August 13, 2024



            _____

                    AMY DIAZ, RPR, CRR, FCRR
                    Federal Official Reporter
                   350 West 1st Street, #4455
                     Los Angeles, CA 90012


        *Please order court transcripts here:  www.amydiazfedreporter.com*

```
1        APPEARANCES OF COUNSEL:

2

         For the Plaintiffs:
3

4                        CONLOGUE LAW LLP
                         By:  Kevin Conlogue, Attorney at Law
5                             Ashley Conlogue, Attorney at Law
                         8383 Wilshire Boulevard, Suite 822
6                        Beverly Hills, California 90211

7

8        For the Defendants:

9                        LYNBERG & WATKINS APC
                         By:  Shannon Gustafson, Attorney at Law
10                            Amy Margolies, Attorney at Law
                         1100 Town and Country Road, Suite 1450
11                       Orange, California 92868

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | 08:33:06 | THE CLERK:  Calling Item Number 1, Case Number |
| 2 | 08:33:11 | EDCV-22-1306-DSF, Deborah Moller vs. County of San |
| 3 | 08:33:19 | Bernardino, et al. |
| 4 | 08:33:19 | Counsel, state your appearances. |
| 5 | 08:33:23 | MS. CONLOGUE:  Good morning.  Ashley Conlogue on |
| 6 | 08:33:25 | behalf of the plaintiff. |
| 7 | 08:33:26 | THE COURT:  Good morning. |
| 8 | 08:33:27 | MR. CONLOGUE:  Good morning, Your Honor.  Kevin |
| 9 | 08:33:28 | Conlogue for Plaintiff. |
| 10 | 08:33:29 | THE COURT:  Good morning. |
| 11 | 08:33:31 | MS. GUSTAFSON:  Good morning, Your Honor.  Shannon |
| 12 | 08:33:33 | Gustafson for Defendant. |
| 13 | 08:33:33 | THE COURT:  Good morning. |
| 14 | 08:33:35 | MS. MARGOLIES:  Good morning, Your Honor.  Amy |
| 15 | 08:33:37 | Margolies, also on behalf of defendant. |
| 16 | 08:33:38 | THE COURT:  Good morning to all of you. |
| 17 | 08:33:40 | And who do we have sitting over here? |
| 18 | 08:33:44 | MS. CONLOGUE:  Yes, Your Honor, this is plaintiff, |
| 19 | 08:33:48 | Deborah Moller, and her mother. |
| 20 | 08:33:50 | THE COURT:  All right.  Why is she not sitting with |
| 21 | 08:33:53 | you? |
| 22 | 08:33:54 | MS. CONLOGUE:  She wished to sit with her mother in |
| 23 | 08:33:55 | the gallery, but she can sit at counsel table if that's what |
| 24 | 08:33:58 | you would prefer. |
| 25 | 08:34:01 | THE COURT:  I don't know.  Nobody has ever not |

108:34:04   wanted the plaintiff there.  She can certainly sit with her

208:34:08   mother -- welcome to you, Mother, but -- and whoever is over

308:34:12   here.  Are these people with you?

408:34:14          MS. GUSTAFSON:  At the end of the table is Deputy

508:34:17   Breana Fite and then this is our consultant, Molly Murphy.

608:34:20          THE COURT:  Do you know who these people are out

708:34:22   here?

808:34:23          MS. GUSTAFSON:  Steve Ruiz is with my office.  He

908:34:27   was just helping bringing in the exhibits and the depo

1008:34:29   copies.

1108:34:29          THE COURT:  All right.

1208:34:34          MR. REID:  Good morning, Your Honor.  Michael Reid.

1308:34:34   I represent Loma Linda in the corollary case.  I'm just here

1408:34:35   to observe.

1508:34:35          THE COURT:  Good morning to all of you.  When the

1608:34:37   jurors come up, you are all going to have to move to that

1708:34:41   back area, and of course, make sure that you're not mingling

1808:34:45   with any jurors during breaks, not showing any facial

1908:34:52   expressions, gestures, comments, things like that.

2008:34:58          Are we ready to go?

2108:35:01          MS. GUSTAFSON:  Yes, Your Honor.

2208:35:03          THE COURT:  All right.  Anything we need to discuss

2308:35:05   before we call the jury?

2408:35:08          MS. CONLOGUE:  No, Your Honor.

2508:35:10          MS. GUSTAFSON:  No, Your Honor.

1  08:35:11          THE COURT:  All right.  I've given you the voir

2  08:35:18   dire.  I will be asking those questions myself, and then I'll

3  08:35:24   give each of you a few minutes, four or five minutes, to

4  08:35:28   follow up if you want it.  Don't feel compelled to ask more

5  08:35:32   questions.

6  08:35:35          Ms. Kim, do we have any idea what the status is in

7  08:35:39   the jury room?

8  08:35:41          THE CLERK:  Not at this time.  They did inform me

9  08:35:43   yesterday that the earliest they would be available is

10 08:35:46   9 a.m., but I'll reach out and see if they can send them up

11 08:35:49   earlier.

12 08:35:50          THE COURT:  Okay.  Why don't you -- when you have

13 08:35:53   that answer, you can just tell counsel, and you can Teams me;

14 08:35:58   and otherwise, we may be on a break for a while.

15 08:36:01          (Thereupon, there was a brief recess.)

16 09:32:08          THE COURT:  I think we're ready.

17 09:32:08          THE CLERK:  Are you ready, Your Honor?

18 09:32:24          THE COURT:  We're ready.

19 09:32:26          THE CLERK:  All rise.

20 09:32:26          (Thereupon, the prospective jurors entered the

21 09:33:45   courtroom.)

22 09:33:45          THE COURT:  Counsel, you may be seated.

23 09:33:50          Good morning.  Now that you've had a seat, I'm going

24 09:33:55   to ask you to stand again and raise your right hand.

25 09:34:00          Ms. Kim, would you swear in our jurors.

1  09:34:06            (Thereupon, the jury panel was sworn.)

2  09:34:22            THE COURT:  Thank you.  Have a seat.

3  09:34:24            I've given you -- or Ms. Kim has given you a long

4  09:34:29    list of questions and names.  Don't look at those now.

5  09:34:35    You'll have plenty of time to look at them later.  But now I

6  09:34:38    have some instructions that I need to talk to you about.

7  09:34:42            Welcome to Courtroom 7D of the United States

8  09:34:47    District Court, and we all want to thank you in advance to

9  09:34:50    the time and attention that you'll be giving to our case.

10 09:34:54            Before we start, please turn off all your cellphones

11 09:34:59    or other mobile devices.  I don't mean put them on silent.

12 09:35:05    Turn them off.

13 09:35:08            We're here to select a jury to try a civil case that

14 09:35:12    we refer to as Deborah Moller versus County of San Bernardino

15 09:35:17    and Deputy Breana Fite.

16 09:35:20            Counsel, I ask you to introduce yourselves and the

17 09:35:24    people with you.

18 09:35:26            MS. CONLOGUE:  Good morning.  My name is Ashley

19 09:35:29    Conlogue.  My client, Deborah Moller, and her mother are in

20 09:35:33    the courtroom with me this morning.

21 09:35:35            MR. CONLOGUE:  My name is Kevin Conlogue.  I

22 09:35:37    represent Plaintiff Debby Moller as well.

23 09:35:40            You can go ahead and stand up and say hi.

24 09:35:43            Thank you.

25 09:35:43            THE COURT:  From this side?

09:35:46          MS. GUSTAFSON:  Good morning.  My name is Shannon

09:35:48   Gustafson.  I have with me Brian Stever, Molly Murphy, and my

09:35:52   colleague.  I'll let her introduce herself.

09:35:53          MS. MARGOLIES:  Good morning.  Amy Margolies.

09:35:56          MS. GUSTAFSON:  And then we have Deputy Breana Fite.

09:36:02          THE COURT:  Thank you.

09:36:02          Has anyone heard anything about this case, by any

09:36:05   chance, before you came into the courtroom?

09:36:07          All right.  Now I'm going to introduce you to our

09:36:10   Court staff.  I'm Judge Fischer, our courtroom deputy clerk

09:36:16   is Patricia Kim, and our court reporter is Amy Diaz.

09:36:22          You'll be given a phone number to call in case an

09:36:26   emergency arises and you need to contact us.  Please make

09:36:31   every effort to be on time.  Now that you have been sworn in

09:36:35   as our panel of prospective jurors, we can't get started

09:36:40   until everyone is here.

09:36:43          So if we take a break and one of you is slow getting

09:36:47   back, there will be 29 pairs of eyes looking down the hall

09:36:52   for you.

09:36:53          If something beyond your control happens, please

09:36:57   call and let us know when you will be able to get here.

09:37:02   Don't just assume that if you can't get here quickly, you

09:37:06   won't be on our jury anymore.  Depending on where we are in

09:37:10   the trial, we may decide to wait for you, even if you cannot

09:37:15   get here the same day.  So it's important that we know how to

1 09:37:19  reach you.

2 09:37:19           Is anyone having any trouble hearing me?

3 09:37:25           I don't see any hands -- oh, yes.  Do I see a hand

4 09:37:28  there?  Yes.  Stand up.

5 09:37:33           A PROSPECTIVE JUROR:  I can hear you.

6 09:37:34           THE COURT:  You can?  Okay.  Great.

7 09:37:35           If you do have trouble hearing me or any of the

8 09:37:38  attorneys or the witnesses during the course of the trial,

9 09:37:40  let us know immediately so we can make sure that we get you

10 09:37:46  an assistive listening device or that we just speak louder.

11 09:37:51           We really need for you to hear everything that's

12 09:37:55  going on in the courtroom unless, of course, the attorneys

13 09:37:58  and I are having a discussion at what we call sidebar.  You

14 09:38:03  may have seen that if you watch any court-related television

15 09:38:08  programs or movies.

16 09:38:12           When we do have a sidebar either now or during the

17 09:38:15  trial, you can stand and stretch.  Please don't leave your

18 09:38:18  seats.  We try to keep those as short as possible.

19 09:38:23           Also, if we're having a sidebar in the courtroom,

20 09:38:26  which means we would just go over there and speak into the

21 09:38:30  microphone, Ms. Diaz is listening to us from her desk, so

22 09:38:35  please keep your voices down so she can hear what we are

23 09:38:38  saying.

24 09:38:40           And I know it's annoying when you're sitting in the

25 09:38:42  jury room or sitting here in the courtroom waiting while the

attorneys and I talk about things that you can't hear, and one of the most stressful things about my job is taking the time to do that because I know you have places you would rather be and things that you would rather be doing.

But sometimes it's necessary for the attorneys and I to discuss things that you can't hear. We aren't trying to keep things from you, but occasionally, it's necessary for me to decide how to handle evidence or other issues before they are presented to you.

We try to keep the conferences as short as possible and to have as few as possible. If an attorney asks for a conference and I deny the request, that shouldn't influence you in any way. It's not an indication of my opinion of the case or what your verdict should be.

We estimate that the trial may last six to eight days. That's just an estimate, not a promise, but that should work for us. Those of you who believed you had a reason to be excused from jury service had an opportunity to present your excuse or a request to continue that service to one of our magistrate judges, so unless something happened on the way up here from the jury room, all or most of you should be available for this trial.

In a moment, I'm going to ask if serving on a jury for that length of time would be a personal or a financial hardship for any of you. Before I ask, let me tell you that

09:40:25    we'll be generally in session from 8:00 a.m. to 2:30 every

09:40:30    day.  We won't take a lunch break, but we will take three

09:40:36    15-minute breaks.  So you can bring a snack or something to

09:40:39    eat or drink for the breaks if you like.  You can go back to

09:40:42    work in the afternoon if you need to.

09:40:45         Because we're starting later today, we'll stay today

09:40:48    until about 4:30 or 5:00 when we'll take -- we got started a

09:40:55    little later.  We'll take a break for lunch, and we'll take

09:40:57    an afternoon break.  We won't be in session on Monday because

09:41:03    I handle matters unrelated to my other cases -- to this case

09:41:10    on Mondays, unless, by chance, we're done with the evidence.

09:41:15    So please be flexible about coming in on Monday.

09:41:20         Once the testimony and the arguments have been

09:41:23    completed, you will be deliberating every day, including

09:41:26    Mondays, because you won't need me to be available.  So when

09:41:30    I ask if serving on this trial would be a hardship, please

09:41:34    tell me about anything that would cause you a problem between

09:41:38    now and Monday, August 26th.  That should be a safe date.

09:41:44         And I will try to be fair, but I must also be firm

09:41:48    in excusing jurors for hardships.  Please understand that the

09:41:52    plaintiff and the defendant have a right to a trial by jury

09:41:57    drawn from a fair cross-section of our community, and that

09:42:01    right would be meaningless if we excused everyone who would

09:42:05    prefer to be somewhere else.

09:42:06         If you're requesting an excuse based on a financial

1 09:42:10  hardship, it should be a significant hardship.  The fact that

2 09:42:15  your employer will not pay you for some or all of the time is

3 09:42:19  not necessarily enough.

4 09:42:21          Also, please keep in mind that a hardship to your

5 09:42:24  employer is not a hardship to you.  Important meetings,

6 09:42:29  training sessions, out-of-town trips, et cetera, is not a

7 09:42:33  reason for me to excuse you, and if you're chosen for the

8 09:42:37  jury, it's very unlikely that I could adjust the schedule to

9 09:42:41  allow you to participate in whatever it is that you're trying

10 09:42:46  to go do.

11 09:42:47          Many of you have already exercised the option of

12 09:42:50  postponing your jury service, and this is the day you picked

13 09:42:54  to be here.  Others decided not to postpone their service,

14 09:43:00  even though something important for them is scheduled,

15 09:43:03  because you figured you wouldn't get chosen.

16 09:43:06          That's your decision to make, but if you are chosen

17 09:43:11  for our jury, I will not be able to excuse you.

18 09:43:15          If something unexpected comes up during the trial,

19 09:43:19  please let Ms. Kim know as soon as possible.  If you tell us

20 09:43:23  about something at 2:30 as you're leaving, there won't be

21 09:43:27  anything I can do about it, and you will have to return the

22 09:43:31  next day.

23 09:43:32          And I apologize for having to do this, but I have no

24 09:43:35  alternative in order to ensure fairness to the parties and to

25 09:43:40  your fellow jurors and citizens.

09:43:43          As I said, you need to be available through

09:43:46   August 26th, and I assure you I will do my best to use every

09:43:50   moment of your time to ensure that it's completed in that

09:43:54   time or earlier.

09:43:56          If serving on a jury would be a personal or

09:43:59   financial hardship for you, please raise your hand, and I'll

09:44:04   ask you to tell me just your first name and the first initial

09:44:09   of your last name.

09:44:16          Is anybody...

09:44:16          Okay.  Great.  Now I have some preliminary questions

09:44:20   for you.

09:44:23          Does anyone know or recognize any of the attorneys

09:44:26   or the parties they mentioned or any of the Court staff or

09:44:31   me?

09:44:34          I don't see any hands.

09:44:36          And there is a list of names that you have with you.

09:44:41   Those are some of the witnesses you might see.  I'll be

09:44:45   asking you if you're in our jury box whether you know those

09:44:48   people, but don't be frightened by the number of names on

09:44:54   that list.  We won't be calling all of those people.

09:44:58          But it might be necessary that some other witness

09:45:01   that we weren't expecting to call is eventually called.  If

09:45:06   you know that person, even though I haven't asked you today,

09:45:09   please let us know immediately.

09:45:13          Would the fact that a party, an attorney or a

109:45:17 witness may come from a particular national, racial or

209:45:22 religious group or may have a lifestyle different from your

309:45:26 own affect your judgment or the weight or credibility you

409:45:30 would give to that person's testimony?

509:45:34        Thank you.

609:45:35        Will you have any difficulty evaluating the

709:45:39 testimony of all the witnesses in the same way regardless of

809:45:44 who they are?  And I will give you some instructions that

909:45:48 will help you evaluate the testimony of witnesses and things

1009:45:52 you should consider, but it's pretty much the way you decide

1109:45:56 if someone is telling you the truth when you're outside the

1209:46:00 courtroom.

1309:46:03        I'm going to give you a summary, very brief summary,

1409:46:06 of the case to help you understand a little bit some of the

1509:46:11 questions we are asking.

1609:46:13        On August 18, 2021, in Redlands, California, Bret

1709:46:21 Breunig was killed by a moving train.  Plaintiff Deborah

1809:46:26 Moller, the mother of Bret Breunig, alleges that Defendant

1909:46:31 Breana Fite, a San Bernardino County Sheriff's deputy, was

2009:46:36 negligent with Mr. Breunig, and that her negligence caused

2109:46:41 Mr. Breunig's death.

2209:46:43        Deputy Fite denies those allegations and alleges

2309:46:47 that Mr. Breunig's own negligence was the cause of his death.

2409:46:53        It's the duty of the Court -- and when we judges

2509:46:58 refer to ourselves, we call ourselves the Court.  It's the

| | |
|---|---|
| 1 09:47:02 | duty of the Court to instruct the jury on the law that |
| 2 09:47:05 | applies to the case, and it's the duty of jurors to follow |
| 3 09:47:10 | those instructions whether or not they agree with them or |
| 4 09:47:14 | approve or disapprove of them.  You may not substitute your |
| 5 09:47:22 | own idea of what you think the law should be. |
| 6 09:47:24 | Is there anyone who will have any difficulty |
| 7 09:47:27 | following my instructions and applying the law to this case, |
| 8 09:47:32 | whether you approach or disapprove of the law, as I stated to |
| 9 09:47:37 | you in those instructions? |
| 10 09:47:40 | Great. |
| 11 09:47:41 | A PROSPECTIVE JUROR:  Is that a question? |
| 12 09:47:43 | THE COURT:  Is there a hand? |
| 13 09:47:44 | A PROSPECTIVE JUROR:  That question that you're |
| 14 09:47:46 | asking. |
| 15 09:47:47 | THE COURT:  Just a minute.  Let me get you a |
| 16 09:47:49 | microphone. |
| 17 09:47:51 | Tell me your first name, sir, and the initial of |
| 18 09:47:53 | your last name. |
| 19 09:47:54 | A PROSPECTIVE JUROR:  First name Derrick, initial K. |
| 20 09:47:57 | THE COURT:  Okay.  And what did you say? |
| 21 09:48:00 | A PROSPECTIVE JUROR:  I'm asking, is that a question |
| 22 09:48:02 | that you're asking? |
| 23 09:48:03 | THE COURT:  Yes, I asked a question.  Did you |
| 24 09:48:07 | understand the question?  Do you want me to repeat it? |
| 25 09:48:09 | A PROSPECTIVE JUROR:  Yeah, can you repeat it? |

THE COURT:  Okay.  I'm asking if there is anyone
here who will have any difficulty following my instructions
and applying the law to the case, whether you approve or
disapprove of the law, as I stated to you in those
instructions.

So what's going to happen is I'm going to give you
some instructions before we start.  You'll hear evidence in
the case, the attorneys will be able to argue to you and tell
you about their views of the evidence, and then I'm going to
give you some more instructions.  I'm going to tell you what
the law is that jurors must apply to the case, and then you
will go back, if you are on our jury, into the jury room, and
you will decide what the facts are, and then you will apply
those facts that you decide to the law that I give you.

So it's kind of a combination process.  The jury
decides what the facts are, then they apply the law that I
give them, but they have to apply the law as I state it.
They can't say, "No, we don't think that should be the law.
We want to do something else."

Do you understand that?

A PROSPECTIVE JUROR:  Yes.

THE COURT:  Will you apply the law as I stated to
you?

A PROSPECTIVE JUROR:  I'll do my best.

THE COURT:  Okay.  That's what we ask of everybody,

01  09:49:29   to do your best.

02  09:49:31          If there is some point when you conclude that you

03  09:49:35   can't follow my instructions, will you let me know right

04  09:49:39   away?

05  09:49:39          A PROSPECTIVE JUROR:  Yes.

06  09:49:40          THE COURT:  All right.

07  09:49:43          We have another hand.

08  09:49:49          A PROSPECTIVE JUROR:  I'm sorry, I'm not feeling

09  09:49:51   well, and I think I'm having anxiety.

10  09:49:53          THE COURT:  Okay.  We'll have you go right back to

11  09:49:54   the jury room.  Just tell --

12  09:50:03          THE CLERK:  What's your first name?

13  09:50:03          A PROSPECTIVE JUROR:  Paula.

14  09:50:03          THE CLERK:  Paula?  First letter of your last name?

15  09:50:06          A PROSPECTIVE JUROR:  (Inaudible.)

16  09:50:06          THE COURT:  All right.  We have a nurse we can call

17  09:50:08   for you down there.

18  09:50:17          Anybody else have a question?

19  09:50:19          Okay.  I may have already asked this, but is there

20  09:50:21   anyone who would have any difficulty keeping an open mind

21  09:50:25   until you've heard all the evidence and the arguments of

22  09:50:28   counsel and until I've given you all the instructions?

23  09:50:33          Great.

24  09:50:33          We're now going to begin selecting the jury.  The

25  09:50:37   purpose of the jury is to find and determine the facts.

109:50:41    Under our system of justice, you are the sole judges of the

209:50:46    facts, therefore, it's extremely important that you perform

309:50:51    your duty diligently and consciously.

409:50:58          In the trial of this case, each side is entitled to

509:51:00    have a fair unbiased and unprejudiced jury.  The goal of jury

609:51:04    selection is to choose jurors who can be fair and impartial

709:51:08    jurors to both sides in this case and who will be able to

809:51:13    decide the questions presented to them based solely on the

909:51:17    evidence presented during the course of the trial.

1009:51:21          As we go through the process of jury selection, if

1109:51:25    there's any fact or reason why any of you might be biased or

1209:51:29    prejudiced in any way, you must disclose the facts or reasons

1309:51:33    when you're asked to do so.  It is your duty to make that

1409:51:38    disclosure.

1509:51:39          During jury selection, the Court and counsel will

1609:51:43    ask you about your background and experience to help us

1709:51:47    determine whether you are qualified to be a juror in the

1809:51:50    case, and qualified just means that you can be a fair and

1909:51:55    impartial juror, and you can decide the case based on the

2009:51:59    evidence presented in the courtroom and on nothing else.

2109:52:03          There's no such thing as a right or wrong answer.

2209:52:08    Answers are only complete or incomplete.  Please err on the

2309:52:13    side of giving too much information rather than too little.

2409:52:18          If you don't fully understand a question, please ask

2509:52:21    me to explain.  And of course, you have sworn to tell the

1 09:52:25    truth.

2 09:52:26        I'm going to ask the first group of jurors called to

3 09:52:31    provide the information listed on the piece of paper on the

4 09:52:34    chairs in the jury box.  That's your general area of

5 09:52:38    residence, the highest level of education or any specialized

6 09:52:42    training you have, your employer and occupation, your marital

7 09:52:49    status, whether you're married, single, divorced, widowed,

8 09:52:54    have some other adult with a similar relationship living with

9 09:53:00    you.

10 09:53:01        I'll ask the occupation of your spouse or former

11 09:53:04    spouse or other person with a similar close relationship to

12 09:53:07    you, the occupation of any adults living in the same

13 09:53:12    residence, and whether you have adult children, and as I

14 09:53:16    said, their occupations.

15 09:53:17        I'll ask whether you have served on a jury before,

16 09:53:21    and if so, whether the case was civil or criminal and the

17 09:53:27    type of claim or charge.  I will ask whether you reached a

18 09:53:31    verdict.  Don't tell us what the verdict was.  We just want

19 09:53:35    to know whether you reached one.

20 09:53:36        After you answer those initial questions, then I'll

21 09:53:41    review the list of questions that Ms. Kim gave you.  I may

22 09:53:46    also ask some followup questions, and then the attorneys will

23 09:53:48    have a couple of minutes to ask you some questions if they

24 09:53:51    want to.

25 09:53:52        I know it can be rather boring sitting out there

109:53:56   while the rest of us are focusing on the 16 people that we're

209:53:59   going to be calling up here, but it's very important that you

309:54:03   pay close attention to all of my questions and make a mental

409:54:09   note of the answers you would give if the questions were

509:54:11   being put to you.

609:54:12        It's possible that the jurors initially called will

709:54:15   be excused and will be replaced by others of you who will

809:54:20   then have to answer the same questions, and it saves time if

909:54:25   I can just ask whether your answers would be substantially

1009:54:28   the same or which questions you have "yes" answers to.

1109:54:32        Please understand that in asking the questions,

1209:54:36   we're only trying to select a fair, impartial and unbiased

1309:54:42   jury.  We're not trying to pry, but it's very important that

1409:54:47   you be honest in your answers, and you have taken an oath to

1509:54:50   answer truthfully and fully.

1609:54:53        Some of the questions call for rather personal

1709:54:57   information.  If you feel that any answer may be

1809:55:01   embarrassing, you may ask to answer privately, and we'll hear

1909:55:05   your answer at sidebar.  That's sort of semiprivate because

2009:55:10   the attorneys are entitled to hear your answer, and our court

2109:55:15   reporter is required to record it.  We don't want to

2209:55:18   embarrass anyone, but we do need to have all of our questions

2309:55:22   answered.

2409:55:23        Please don't ask for a sidebar to tell us that your

2509:55:27   brother-in-law's uncle's friend had a DUI in New York

10 years ago.  The lawyers and I have heard it all, so unless the information is extremely personal or would really cause you to be embarrassed, please just tell us about it from your seat.

As we ask questions, our court reporter is taking down every word that is said in the courtroom.  To assist her in getting an accurate transcript, please answer out loud. Don't just nod or shake your head or shrug your shoulders. Please try to say "yes" or "no," rather than "uh-huh" or "huh-uh," because it's very difficult to tell what you mean.

And also, as terrific as she is, Ms. Diaz can only take down one person at a time, so please be patient and let me finish my question before you respond, and I'll try not to interrupt your answer.

Ms. Kim, would you get us started by filling those 16 seats.  We're going to start with seat number 1 here.  So come all the way down this row and sit in seat number 1. We're going to fill up that row, 1 through 8, and then number 9, we'll head up to the chair closest to me on the second row.

THE CLERK:  Juror Number 1 will be Bryan G.

Juror Number 2, Gianna G.

Juror Number 3, Maria M.

Juror Number 4, Anna M.

Juror Number 5, Meranda D.

| | | |
|---|---|---|
| 1 | 09:57:49 | Juror Number 6, Juliana S. |
| 2 | 09:57:58 | Juror Number 7, Cecilia S. |
| 3 | 09:58:08 | Juror Number 8, Joshua C. |
| 4 | 09:58:16 | And Juror Number 9 in the second row, Lydia A. |
| 5 | 09:58:34 | Juror Number 10, Jazmyn D. |
| 6 | 09:58:41 | Juror Number 11, Evelyn L. |
| 7 | 09:58:53 | Juror Number 12, Daniela P. |
| 8 | 09:59:05 | Juror Number 13, Raul M. |
| 9 | 09:59:13 | Juror Number 14, Terry M. |
| 10 | 09:59:26 | Juror Number 15, Jobe J. |
| 11 | 09:59:32 | And Juror Number 16, Devaansh S. |

12  09:59:56   THE COURT:  All right.  So we're going to start off
13  09:59:59  with just that one sheet of paper, and Juror Number 1's going
14  10:00:07  to show us how it's done.  Don't wait for me to ask the
15  10:00:11  individual questions.  Just start us off and go right down
16  10:00:15  that sheet.

17  10:00:16       A PROSPECTIVE JUROR:  My residence is Pomona,
18  10:00:20  California.  My employer is Ultimate Internet Access, and I
19  10:00:26  am an operator.  And that's basically it.

20  10:00:32       THE COURT:  Okay.  Tell me again about your
21  10:00:34  employer.

22  10:00:35       A PROSPECTIVE JUROR:  It's Ultimate Internet Access.
23  10:00:37  It's a fiberoptic company.

24  10:00:39       THE COURT:  Oh, okay.  And what do you do as an
25  10:00:41  operator?

10:00:42    A PROSPECTIVE JUROR:  I operate machinery, like

10:00:45    construction machinery, just, like, excavators, skid steers

10:00:50    and stuff like that.

10:00:50    THE COURT:  Are you single?

10:00:52    A PROSPECTIVE JUROR:  Yes, I am.

10:00:53    THE COURT:  Okay.  Any prior jury service?

10:00:54    A PROSPECTIVE JUROR:  No.

10:00:54    THE COURT:  All right.  Juror Number 2.

10:00:57    A PROSPECTIVE JUROR:  I reside in Long Beach.  I'm

10:01:00    currently in my last semester for college.  I am a dance

10:01:05    instructor at Kimberly's Dance Studio.  I am single.  And I

10:01:10    have no prior jury service.

10:01:14    THE COURT:  And what are you studying in college?

10:01:17    A PROSPECTIVE JUROR:  I'm a dance major.

10:01:18    THE COURT:  Excellent.  Okay.  Thank you.

10:01:19    Juror Number 3?

10:01:21    A PROSPECTIVE JUROR:  Downey, California.  Didn't

10:01:25    finish college.  Divorced.  Two adult children.  I have done

10:01:33    jury duty.  I believe it was criminal.  And we did reach a

10:01:37    verdict.

10:01:38    THE COURT:  What was the charge, do you remember?

10:01:39    A PROSPECTIVE JUROR:  I don't remember.

10:01:40    THE COURT:  Okay.  And what did your spouse do when

10:01:43    you were together?

10:01:44    A PROSPECTIVE JUROR:  Worked for the City.

1 10:01:47                THE COURT:  In what capacity?

2 10:01:49                A PROSPECTIVE JUROR:  I don't remember.

3 10:01:51                THE COURT:  Okay.  And do your two adult children

4 10:01:55    work?

5 10:01:55                A PROSPECTIVE JUROR:  Go to school.

6 10:01:56                THE COURT:  Okay.  Juror Number 4?

7 10:01:59                A PROSPECTIVE JUROR:  I live in Reseda, California.

8 10:02:04    12th grade.  I'm self-employed.  I'm an interior decorator.

9 10:02:09    Divorced.  One adult child that goes to community college for

10 10:02:14   nursing.  I have never done jury service.

11 10:02:19                THE COURT:  What did your spouse do when you were

12 10:02:20   together?

13 10:02:21                A PROSPECTIVE JUROR:  He was a delivery driver for a

14 10:02:24   graphics company.

15 10:02:25                THE COURT:  Thank you.

16 10:02:26                Juror Number 5?

17 10:02:28                A PROSPECTIVE JUROR:  From Oxnard, California.  I am

18 10:02:33   an assistant director of nursing, registered nurse, at Four

19 10:02:37   Seasons Healthcare Center.  I'm divorced.  Have two adult

20 10:02:41   children.  I did prior jury service.  It was criminal.  We

21 10:02:45   did reach a verdict.

22 10:02:46                THE COURT:  Do you remember what the charge was?

23 10:02:47                A PROSPECTIVE JUROR:  No.

24 10:02:49                THE COURT:  And what did your spouse do while you

25 10:02:52   were together?

1  10:02:52          A PROSPECTIVE JUROR:  He was in the Navy.

2  10:02:53          THE COURT:  And your children, what do they do?

3  10:02:56          A PROSPECTIVE JUROR:  One just finished college; the

4  10:02:58  other, he works for Amazon.

5  10:03:00          THE COURT:  I'm sorry, I didn't hear that.

6  10:03:02          A PROSPECTIVE JUROR:  He works for Amazon.

7  10:03:04          THE COURT:  Thank you.

8  10:03:05          All right.  Juror Number 6?

9  10:03:07          A PROSPECTIVE JUROR:  I stay in Huntington Park.  I

10 10:03:11  got a GED.  I'm single.  I have no kids.  I work for AT&T.

11 10:03:21  And this is my first jury service.

12 10:03:24          THE COURT:  What do you do for AT&T?

13 10:03:28          A PROSPECTIVE JUROR:  I'm a sales representative.

14 10:03:29          THE COURT:  Thank you.

15 10:03:30          Juror Number 7?

16 10:03:31          A PROSPECTIVE JUROR:  I live in Woodland Hills,

17 10:03:33  California.  I completed high school and some college.  I

18 10:03:35  work for Centene Healthcare.  I am appeals and grievance

19 10:03:41  manager.  My husband -- I am married, and my husband is a

20 10:03:44  senior data analyst for Quest Diagnostics.  I have no adult

21 10:03:49  children.  And no prior jury service.

22 10:03:51          THE COURT:  Thank you.

23 10:03:52          Juror Number 8?

24 10:03:53          A PROSPECTIVE JUROR:  I live in Palmdale,

25 10:03:56  California.  I'm currently a nursing major in college.  I'm

1  10:04:00  employed by the City of Palmdale, and I'm a lifeguard.  And I

2  10:04:03  have prior -- some prior medical training.  I'm single.  And

3  10:04:08  I have no prior jury service.

4  10:04:10        THE COURT:  Thank you.

5  10:04:12        Juror Number 9?

6  10:04:13        A PROSPECTIVE JUROR:  I live in Chatsworth,

7  10:04:18  California -- sorry, Chatsworth, California.  Finished

8  10:04:23  bachelor's in nursing.  I'm retired now.  I worked with

9  10:04:28  Children's Hospital LA, their neonatal intensive care.

10  10:04:33        I'm divorced.  My children, one is a respiratory

11  10:04:37  therapist, and one works with cryptocurrency online, online

12  10:04:45  talks.  And yes, they are all adults.  And I had prior jury

13  10:04:48  service.  It was criminal.  We reach a -- it was about drugs.

14  10:04:54  We reach -- yeah.

15  10:04:57        THE COURT:  Thank you.  What did your spouse do when

16  10:04:59  you were together?

17  10:05:00        A PROSPECTIVE JUROR:  He was with a newspaper

18  10:05:02  business.

19  10:05:02        THE COURT:  Thank you.

20  10:05:03        Juror Number 10?

21  10:05:05        A PROSPECTIVE JUROR:  I live in downtown Los

22  10:05:07  Angeles.  I have a bachelor's degree.  I work for LADWP.  I'm

23  10:05:11  an analyst.  I am divorced.  My -- I have two adult children.

24  10:05:17  One is still in college, one graduated from UCLA and works in

25  10:05:21  E-commerce.  I did have prior jury service.  I was on a civil

| | |
|---|---|
| 1 10:05:25 | case and a criminal case.  The civil was employment issues, a |
| 2 10:05:32 | wrongful termination case.  Criminal was, I think, like a |
| 3 10:05:37 | counterfeit case, like for jeans, or something.  Both reached |
| 4 10:05:44 | verdicts. |
| 5 10:05:44 | THE COURT:  What did your spouse do when you were |
| 6 10:05:46 | together? |
| 7 10:05:46 | A PROSPECTIVE JUROR:  He worked for a biotech |
| 8 10:05:49 | company.  Like Baxter, for, like, blood plasma. |
| 9 10:05:53 | THE COURT:  Thank you. |
| 10 10:05:53 | Juror Number 11? |
| 11 10:05:54 | A PROSPECTIVE JUROR:  I live in Simi Valley.  I have |
| 12 10:05:57 | a teaching credential.  I work for LAUSD.  I am single.  I |
| 13 10:06:01 | have a 14-year-old daughter.  She's in high school.  I have |
| 14 10:06:05 | no prior jury service. |
| 15 10:06:09 | THE COURT:  Okay.  Juror Number 12? |
| 16 10:06:11 | A PROSPECTIVE JUROR:  I live in Eagle Rock.  I |
| 17 10:06:16 | graduated high school.  I work at a dental office as a dental |
| 18 10:06:18 | assistant.  And I'm single. |
| 19 10:06:22 | THE COURT:  Any jury service? |
| 20 10:06:24 | A PROSPECTIVE JUROR:  No. |
| 21 10:06:24 | THE COURT:  Thank you. |
| 22 10:06:26 | Juror Number 13? |
| 23 10:06:27 | A PROSPECTIVE JUROR:  I live in Pasadena.  I have a |
| 24 10:06:33 | master's degree.  I work for Kaiser Permanente.  I'm a |
| 25 10:06:37 | director of analytics.  I am married.  I have one adult child |

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:06:44    who does not live with me.  My wife's occupation is artist.

2 10:06:49    She works for LA Opera.  Never had any prior jury service.

3 10:06:55           THE COURT:  Okay.  And what does the adult child do?

4 10:06:59           A PROSPECTIVE JUROR:  She works in the restaurant

5 10:07:00    business and also part-time student.

6 10:07:01           THE COURT:  Okay.  Great.  Thank you.

7 10:07:02           Juror Number 14?

8 10:07:04           A PROSPECTIVE JUROR:  I live in Santa Clarita,

9 10:07:09    California.  I have an associate degree in science.  Retired.

10 10:07:13   Married.  Wife is also retired.  No children.  And I have

11 10:07:19   served on a jury, but I don't remember what the case was.

12 10:07:25           THE COURT:  Okay.

13 10:07:26           A PROSPECTIVE JUROR:  Decades ago.

14 10:07:27           THE COURT:  All right.  What did you do before you

15 10:07:30   retired?  Did you tell us?

16 10:07:32           A PROSPECTIVE JUROR:  Automotive mechanic.

17 10:07:34           THE COURT:  And what did your wife do before she

18 10:07:37   retired?

19 10:07:37           A PROSPECTIVE JUROR:  Elementary school teacher.

20 10:07:40           THE COURT:  Juror Number 15?

21 10:07:41           A PROSPECTIVE JUROR:  I am Jobe Janzen.  I am

22 10:07:49   single.  I work for Metropolitan Theaters part-time.  I live

23 10:07:55   with my parents currently.  And no children.  I already said

24 10:08:03   single.

25 10:08:04           THE COURT:  And what area do you live in?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:08:07          A PROSPECTIVE JUROR:  Goleta.

2 10:08:11          THE COURT:  Okay.  Thank you.  What do your parents

3 10:08:13  do?  Or what did they do, if they are retired?

4 10:08:17          A PROSPECTIVE JUROR:  Both my parents are not

5 10:08:18  retired.  My father is a tax accountant.  My mom is a data

6 10:08:26  analyst for the Federal Reserve Bank.

7 10:08:29          THE COURT:  Okay.  Thank you.

8 10:08:30          Juror Number 16?

9 10:08:32          A PROSPECTIVE JUROR:  I live in Hermosa Beach.  My

10 10:08:36  employer is a tax law firm.  I'm a CPA.  I'm single.  No

11 10:08:41  kids.  And I have previously served in a civil trial.

12 10:08:44          THE COURT:  Do you remember what the case was about?

13 10:08:47          A PROSPECTIVE JUROR:  I do, but I don't know what

14 10:08:49  the type of claim was.

15 10:08:50          THE COURT:  Just tell us what it was.  What was it

16 10:08:53  about?

17 10:08:53          A PROSPECTIVE JUROR:  I think it was an eviction

18 10:08:55  something.

19 10:08:55          THE COURT:  Pardon?

20 10:08:56          A PROSPECTIVE JUROR:  An eviction notice.

21 10:08:57          THE COURT:  Eviction?  Okay.  That was probably

22 10:08:58  civil.

23 10:08:59          Was there a verdict?

24 10:09:00          A PROSPECTIVE JUROR:  Yes.

25 10:09:01          THE COURT:  Thank you.

1  10:09:02    All right.  Then we are going to move on to that

2  10:09:05    longer list of questions.  And I'm going to read the first --

3  10:09:14    read the questions, and then ask if anyone has a "yes"

4  10:09:19    answer.

5  10:09:21    For some questions, we'll have a couple of hands;

6  10:09:24    for some, we won't have any.  You don't need to leave your

7  10:09:27    hand hanging in the air while I'm asking other people that

8  10:09:29    also have their hands up.  I'll keep asking if anyone else

9  10:09:33    has a "yes" answer until nobody has a hand up anymore.

10 10:09:39    And then after I have read them a couple of times,

11 10:09:45    then I'll just ask if anybody else has a "yes" answer,

12 10:09:53    without spending too much time on the question.

13 10:09:55    So the first question is:  Have you or anyone close

14 10:09:59    to you had law enforcement training or experience or had any

15 10:10:05    involvement in law enforcement?

16 10:10:08    Anybody have a "yes" answer?

17 10:10:10    Okay.  I see just -- okay.  Let's start with Juror

18 10:10:13    Number 3.

19 10:10:15    A PROSPECTIVE JUROR:  I have cousins that are police

20 10:10:21    officers.

21 10:10:21    THE COURT:  Locally?

22 10:10:22    A PROSPECTIVE JUROR:  Yes.

23 10:10:23    THE COURT:  Okay.  Do you know what kind of -- what

24 10:10:27    city or county they are with?

25 10:10:28    A PROSPECTIVE JUROR:  I have -- all over.

1  10:10:30          THE COURT:  All over?

2  10:10:31          A PROSPECTIVE JUROR:  LA, San Bernardino, Riverside.

3  10:10:35  And I have lots of friends that are cops, too.

4  10:10:37          THE COURT:  Okay.  Obviously the defendant here is a

5  10:10:43  police officer, but our jurors need to be neutral and fair to

6  10:10:49  both sides.  Can you be fair to both sides in this case, even

7  10:10:54  though you have lots of relatives that are police officers?

8  10:10:58          A PROSPECTIVE JUROR:  I'll try, yes.

9  10:11:01          THE COURT:  Is there any reason you think you can't

10 10:11:02  do that?

11 10:11:10          A PROSPECTIVE JUROR:  No, I should be fine.

12 10:11:12          THE COURT:  Okay.  Thank you.

13 10:11:13          And I saw another -- anybody else in this first row?

14 10:11:17  Then let's move to the back there.

15 10:11:18          Juror Number 15?

16 10:11:24          A PROSPECTIVE JUROR:  My uncle and my former martial

17 10:11:32  arts teacher, who I was fairly close with, used to -- not

18 10:11:35  used to -- currently work in law enforcement.

19 10:11:38          My uncle is in Kansas, so it's not relevant, I

20 10:11:44  assume, but my former martial arts teacher was either a

21 10:11:47  deputy or a sheriff.

22 10:11:52          THE COURT:  Do you know where?

23 10:11:53          A PROSPECTIVE JUROR:  Oh, I -- Goleta, where I live.

24 10:11:57          THE COURT:  Okay.  Thank you.  Is there anything

25 10:12:02  about that that makes you think you can't be fair in this

1  10:12:04   case?

2  10:12:05           A PROSPECTIVE JUROR:  No.

3  10:12:05           THE COURT:  Thank you.

4  10:12:06           Did I get everybody?  Okay.

5  10:12:08           Question Number 2:  Have you or anyone close to you

6  10:12:13   ever been treated badly by the government, by law

7  10:12:16   enforcement, or by the courts?  Anybody have that state of

8  10:12:19   mind?  Okay.

9  10:12:20           Juror Number 4?

10 10:12:22           A PROSPECTIVE JUROR:  Yeah.  So I got pulled over by

11 10:12:26   the police.  Me, my daughter, and my senior citizen mom.  Me

12 10:12:33   and my daughter were made to lay on the floor, as there was,

13 10:12:38   like, cops all over.  And they were trying to make my mom

14 10:12:42   also, but she's got -- has diabetes, and she's older, so they

15 10:12:46   allowed her not to, as they were searching.  And they had us

16 10:12:50   on the floor for, I don't know, like half an hour.

17 10:12:53           THE COURT:  So you got pulled over?  You were in a

18 10:12:55   car?

19 10:12:56           A PROSPECTIVE JUROR:  Uh-huh.

20 10:12:56           THE COURT:  And what do you mean by "floor"?

21 10:12:58           A PROSPECTIVE JUROR:  In the middle of the street.

22 10:13:00           THE COURT:  Okay.  On the ground.

23 10:13:01           A PROSPECTIVE JUROR:  On the ground.

24 10:13:02           THE COURT:  Okay.

25 10:13:03           A PROSPECTIVE JUROR:  And asking "Why?  What

1 10:13:06   happened?" And they wouldn't answer nothing. And then all

2 10:13:08   of a sudden they just left, without telling us anything.

3 10:13:12          THE COURT: Well, that was very unfortunate. Could

4 10:13:14   you set that aside and be fair to both sides in this case?

5 10:13:17          A PROSPECTIVE JUROR: Well, no, there's been other

6 10:13:19   instances where police officers have just been very -- I

7 10:13:25   don't know. Just with the power they have, I just feel that

8 10:13:31   they are just very rude.

9 10:13:34          THE COURT: Okay. Again, the question is: Can you

10 10:13:37  put what happened outside the courtroom aside and judge this

11 10:13:40  case just based on what you hear in this courtroom and treat

12 10:13:46  both sides fairly?

13 10:13:47          A PROSPECTIVE JUROR: I don't hold law enforcement

14 10:13:52  very highly, so I don't know.

15 10:13:55          THE COURT: Well, that is okay. Everybody is

16 10:13:58  entitled to their own opinion, so long as in this case, in

17 10:14:02  this court, you can treat both sides fairly. If you can't do

18 10:14:06  that, just let us know.

19 10:14:07          A PROSPECTIVE JUROR: I don't think I can.

20 10:14:09          THE COURT: Okay. Thank you.

21 10:14:13          Anybody else have a "yes" answer?

22 10:14:19          All right. Question 3: Have you or anyone close to

23 10:14:28  you been employed by, volunteered for, worked with, or had

24 10:14:32  any particularly positive or particularly negative

25 10:14:36  experiences with the County of San Bernardino, including the

1 10:14:41    San Bernardino County Sheriff's Department?  And then a

2 10:14:45    related question:  Have you formed any opinion, positive or

3 10:14:49    negative, about law enforcement in general?

4 10:14:54            I think we probably can hear from Juror Number 4,

5 10:14:58    but did you have anything specific with San Bernardino

6 10:15:02    police?

7 10:15:03            A PROSPECTIVE JUROR:  No.

8 10:15:04            THE COURT:  Anything other than what you already

9 10:15:05    said?

10 10:15:06           A PROSPECTIVE JUROR:  No.

11 10:15:07           THE COURT:  Okay.  So who else -- anybody else in

12 10:15:09    the first row?  Anybody in back?

13 10:15:12           Okay.  Juror Number 16?

14 10:15:14           A PROSPECTIVE JUROR:  I don't have any personal

15 10:15:16    experience, but from what I hear in the news, I generally

16 10:15:18    have a negative view on law enforcement.

17 10:15:21           THE COURT:  Okay.  And that's -- as I said,

18 10:15:24    everybody is entitled to their opinion.  Can you put that

19 10:15:28    aside and judge this case and the facts?

20 10:15:31           A PROSPECTIVE JUROR:  I'm not really sure how I'm

21 10:15:33    supposed to do that.

22 10:15:34           THE COURT:  Pardon?

23 10:15:34           A PROSPECTIVE JUROR:  I'm not really sure how I'm

24 10:15:36    supposed to do that.

25 10:15:38           THE COURT:  I don't know, but we have millions of

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:15:41  trials in this country every year, and people manage to do

2 10:15:44  it.  But if you think you can't be fair, and you're going to

3 10:15:50  bring that view in this courtroom and not be able to separate

4 10:15:54  it, then that's exactly what we need to know.

5 10:15:57       So is that your state of mind, it doesn't matter

6 10:16:00  what you hear here, you're going to put your thumb on the --

7 10:16:03       A PROSPECTIVE JUROR:  Yes.

8 10:16:03       THE COURT:  Okay.  Thank you.

9 10:16:08       Anybody else?

10 10:16:12      Okay.

11 10:16:13      Question Number 4:  Would you have any difficulty

12 10:16:18  measuring the testimony of law enforcement officers by the

13 10:16:21  same standards that you use to judge the credibility of any

14 10:16:26  other witness?

15 10:16:30      All right.  Juror Number 15, I see a hand.

16 10:16:35      A PROSPECTIVE JUROR:  I wasn't fully aware of the

17 10:16:39  interpretation, so I'll just answer as clearly as I can.

18 10:16:43      THE COURT:  Okay.

19 10:16:44      A PROSPECTIVE JUROR:  I believe that in a lot of

20 10:16:48  cases, specifically drug ones, the police have a vested

21 10:16:53  interest in making certain calls, whether it be for or

22 10:17:00  against, depending on the people involved, and so I believe

23 10:17:04  that I would hold them to as -- different level of scrutiny,

24 10:17:09  or at the very least a level of scrutiny that I might hold

25 10:17:12  for someone else, another witness, who would have a vested

1 10:17:17    interest in telling the story one way or another.

2 10:17:23            THE COURT:  So does that apply to drug cases?  This

3 10:17:28    case isn't going to really have much relation to drug cases,

4 10:17:33    or is that in all instances?

5 10:17:36            A PROSPECTIVE JUROR:  I would say yes.

6 10:17:38            THE COURT:  So -- I want to be clear.  So if -- you

7 10:17:42    may hear from one or more -- you will certainly hear from at

8 10:17:46    least one law enforcement officer.  You may hear from more.

9 10:17:49    Are you telling me that you would judge them differently and

10 10:17:55    more harshly than you would judge the nonlaw enforcement

11 10:17:58    witnesses?

12 10:18:00            A PROSPECTIVE JUROR:  Yes, based on their -- yes.

13 10:18:03            THE COURT:  Just because they are law enforcement

14 10:18:05    officers, you're not going to be willing to just listen to

15 10:18:08    their testimony and evaluate them the same way you would

16 10:18:11    other witnesses?

17 10:18:12            A PROSPECTIVE JUROR:  I believe that I would be able

18 10:18:14    to listen to them and take their words at heart, but I

19 10:18:18    believe that I would also hold them to a different level of

20 10:18:22    scrutiny, based on any connections that -- or beliefs that

21 10:18:28    they might have for loyalty to their fellow officers.

22 10:18:33            THE COURT:  Okay.  I think I understand that.

23 10:18:35            All right.  Anybody else?  Did I miss some hands?

24 10:18:40            No?  Okay.

25 10:18:42            All right.  Let's take Question Number 5 and look at

10:18:46    that longer list of questions.  You've heard -- you've

10:18:51    already answered for Breana Fite, who is with us, and you've

10:18:56    heard about Bret Breunig, and Deborah Moller is here with us

10:19:02    as well.

10:19:02            Does anybody know any of these other people?  Any of

10:19:07    those names look familiar?

10:19:09            All right.  Yes, Juror Number 10.

10:19:12            A PROSPECTIVE JUROR:  Going back to the question

10:19:14    before, I actually agree with Juror 15, that I don't know

10:19:19    if -- I think there would be -- I believe there is

10:19:22    impartiality -- or credibility when police officers testify

10:19:25    for other police officers.  So I think I also agree with that

10:19:30    sentiment.

10:19:31            THE COURT:  So do you not trust your ability to

10:19:35    determine whether people are telling the truth or not telling

10:19:40    the truth?  Are you --

10:19:42            A PROSPECTIVE JUROR:  I think that I would

10:19:44    automatically assume that an officer testifying on behalf of

10:19:50    another officer would lie for the sake of the blue badge.

10:19:59            THE COURT:  All right.  So I think what you're

10:20:01    saying is you're assuming going in that the officer would lie

10:20:06    to help a colleague --

10:20:07            A PROSPECTIVE JUROR:  I think -- I believe that.  So

10:20:09    I don't know if I would --

10:20:11            THE COURT:  Could you be dissuaded if the person --

```
1 10:20:14   the other officer comes and testifies and appears credible to

2 10:20:18   you?

3 10:20:18            A PROSPECTIVE JUROR:  Maybe.  I would try to be

4 10:20:20   impartial.

5 10:20:22            THE COURT:  All right.  Well, that's what we need

6 10:20:24   people to be.  We need them to be impartial.

7 10:20:29            So now I need to know what you're telling me.  Do

8 10:20:34   you think you can be impartial in this case?

9 10:20:36            A PROSPECTIVE JUROR:  I will do it to the best of my

10 10:20:39  ability.

11 10:20:39           THE COURT:  Okay.  Thank you.

12 10:20:41           All right.  Did I miss any hands on recognition of

13 10:20:49  those names?

14 10:20:49           Okay.

15 10:20:50           Question 6:  Are you particularly familiar with the

16 10:20:56  Loma Linda or Redlands area of San Bernardino?  And I don't

17 10:21:00  mean do you drive through there, do you have a friend there.

18 10:21:03  Is there anything about that that you're particularly

19 10:21:07  familiar with?

20 10:21:09           Yes, Juror Number 7?

21 10:21:12           A PROSPECTIVE JUROR:  My first husband's grandmother

22 10:21:14  lived there, so for about 15 years, we would go twice a month

23 10:21:19  to visit her.  So we would always just go around.  I think,

24 10:21:22  if I recall, there is an apple orchard area, so we would also

25 10:21:27  go there for, you know, lunches and stuff.  So we often were
```

1  10:21:30    in Redlands.

2  10:21:30            THE COURT:  Okay.  Just generally driving?

3  10:21:32            A PROSPECTIVE JUROR:  Correct.

4  10:21:33            THE COURT:  All right.  Thank you.

5  10:21:34            Anybody else?

6  10:21:37            Okay.

7  10:21:38            7:  Have you or anyone close to you ever had a drug

8  10:21:41    or alcohol dependency or addiction problem or had a negative

9  10:21:47    experience involving drugs or alcohol?  And a related

10 10:21:52    question:  Do you have any particularly positive or

11 10:21:55    particularly negative views regarding people with drug or

12 10:21:59    alcohol addictions?

13 10:22:02            Anybody have that state of mind?

14 10:22:03            Let's start in the first row.  Juror Number 3.

15 10:22:08            A PROSPECTIVE JUROR:  My husband was an alcoholic,

16 10:22:10    my ex-husband.

17 10:22:13            THE COURT:  All right.  Alcohol isn't an issue here,

18 10:22:17    but there may be addiction-related issues.  Do you think that

19 10:22:24    that would interfere with your ability to be fair to both

20 10:22:27    sides in this case?

21 10:22:28            A PROSPECTIVE JUROR:  I don't like alcoholics,

22 10:22:31    but...

23 10:22:31            THE COURT:  Okay.  Well, I don't think alcohol is

24 10:22:34    the issue.

25 10:22:35            A PROSPECTIVE JUROR:  Then that's fine.

1  10:22:37          THE COURT:  You good with that, then?

2  10:22:38          A PROSPECTIVE JUROR:  Yeah.

3  10:22:39          THE COURT:  Okay.  Who else in the first row?

4  10:22:44          Juror Number 7.

5  10:22:45          A PROSPECTIVE JUROR:  My cousin was a heroin addict

6  10:22:49  and passed away.  I have no negative feelings.  I just feel

7  10:22:56  very poorly because, you know, it is -- it is -- to me, you

8  10:23:01  know, it's a crisis, and -- we tried to save him, and there

9  10:23:04  was just nothing we could do.  So I have a -- I feel poorly

10 10:23:11  for those that have an addiction to drugs.

11 10:23:14          THE COURT:  Thank you.

12 10:23:16          Anybody in the first row, anybody I missed?

13 10:23:19          Anybody in the second row?

14 10:23:20          Juror Number 9.

15 10:23:23          A PROSPECTIVE JUROR:  My brother is a drug addict.

16 10:23:26  He has been living with that for years, and it has a lot of

17 10:23:29  negative impact on the family, my parents and my -- yeah,

18 10:23:36  just all over the household.  He doesn't live with me, but he

19 10:23:40  can't get it straight.  He's been in jail, too.  And my

20 10:23:47  feelings about addiction is really sad.  I feel like they're

21 10:23:52  really, really sick and ill, that they need help, but there

22 10:23:55  is just not enough resource places to go to.

23 10:24:00          THE COURT:  All right.  Thank you.

24 10:24:02          Anybody else in the back row?

25 10:24:05          Juror Number 15?

1 10:24:06          A PROSPECTIVE JUROR:  After what you said about -- I

2 10:24:13    forget who it was, but what you said about alcohol, I'm not

3 10:24:16    sure how relevant it is anymore, but better safe than sorry.

4 10:24:21    For a little while, my dad was a very heavy drinker after his

5 10:24:30    father's death.  I wasn't around for that, but it definitely

6 10:24:34    does get brought up a bit.  I would classify that as an

7 10:24:40    addiction.  I don't really feel any positive nor negative

8 10:24:47    connotations to alcohol, however.  That's about it.

9 10:24:50          THE COURT:  Thank you.

10 10:24:51         Juror Number 16.

11 10:24:52          A PROSPECTIVE JUROR:  Yes.  I'm an addict.  The only

12 10:24:56    reason why I'm here is I found God.

13 10:24:59          THE COURT:  Excellent.  Thank you.

14 10:25:04         Did I miss anybody?

15 10:25:07         No?  Okay.

16 10:25:08         Juror Number -- Question Number 8:  Have you or

17 10:25:12    anyone close to you ever experienced homelessness?  And the

18 10:25:17    related question:  Do you have any particularly positive or

19 10:25:21    particularly negative views regarding homelessness or

20 10:25:25    homeless people?

21 10:25:28         Anybody in the first row?

22 10:25:30         Juror Number 7.

23 10:25:32          A PROSPECTIVE JUROR:  So, yes, my cousin who was a

24 10:25:34    heroin addict was also homeless.  It's kind of a double-edged

25 10:25:38    sword.  You know, when I see -- we obviously have a homeless

1  10:25:41  issue crisis in LA, and they're all over our neighborhood

2  10:25:44  right now.  It can be annoying, but at the same time, you see

3  10:25:47  it as these people are trying, or they are addicted to drugs,

4  10:25:51  and it's usually -- in my neighborhood, it is a lot of drug

5  10:25:55  addicts, because you see the meth and the heroin happening.

6  10:25:57        So I have a positive and a negative view of it.  The

7  10:26:02  positivity is that you just feel poorly for them and wish

8  10:26:05  there was more additional resources.  So that's pretty

9  10:26:09  much --

10  10:26:09        THE COURT:  Thank you.

11  10:26:10        Anybody else in the first row?

12  10:26:12        How about the back row?

13  10:26:16        Juror Number 9?

14  10:26:17        A PROSPECTIVE JUROR:  I got assaulted by a homeless

15  10:26:19  person walking from shopping, and he just spit in my face,

16  10:26:25  and this was at the height of COVID, so I was still wearing a

17  10:26:31  mask and glasses.  But he was just very assaultive.

18  10:26:36        So my feelings are it's, like, I try to avoid having

19  10:26:41  any contact with them.  So it's quite negative.

20  10:26:44        THE COURT:  All right.  Thank you.

21  10:26:45        Anybody else?

22  10:26:49        I see -- Juror Number 3?

23  10:26:50        A PROSPECTIVE JUROR:  I'm also afraid of homeless

24  10:26:56  people.  I feel sorry for them, but I don't like to be around

25  10:27:00  them.  They scare me.

1 10:27:02            THE COURT:  Okay.  Thank you.

2 10:27:03            Anybody else?

3 10:27:06            All right.  Question Number 9:  Have you or anyone

4 10:27:09    close to you ever dealt with mental health issues?  And

5 10:27:13    again, do you have any particularly positive or particularly

6 10:27:17    negative views regarding people with mental health issues?

7 10:27:23            And let's see.  We have Juror Number 5, I think.

8 10:27:28            A PROSPECTIVE JUROR:  My sister served in the

9 10:27:30    military, so she has depression and PTSD.  She is getting

10 10:27:35    help for it.  She's on medication, so -- and we're all a

11 10:27:40    support to her.

12 10:27:41            THE COURT:  I'm sorry to hear that, and thank her

13 10:27:43    for her service when you talk to her.  Thank you.

14 10:27:46            Anybody else in the first row?

15 10:27:48            7.

16 10:27:49            A PROSPECTIVE JUROR:  So again, starting with my

17 10:27:50    cousin had mental health issues.  My brother-in-law is also a

18 10:27:54    retired marine.  He was in the Coast Guard.  He did two tours

19 10:28:00    in Iraq and suffers with different mental health issues.

20 10:28:04            I don't have a positive or negative view regarding.

21 10:28:10            THE COURT:  And again, thank him for his service.

22 10:28:12            Anybody else in the first row?

23 10:28:15            Okay.  Second row?

24 10:28:18            Juror Number 12.

25 10:28:20            A PROSPECTIVE JUROR:  I deal with mental health

```
1  10:28:25  issues.  I went through an episode of psychosis during COVID,
2  10:28:29  where I was in a mental hospital for long periods of weeks
3  10:28:34  under medication.  Last year, I was getting treated for my
4  10:28:39  bipolar disorder and other things, but currently not taking
5  10:28:43  anything.  But I do feel my waves of emotional instability.
6  10:28:49           THE COURT:  All right.  Are you able to participate
7  10:28:53  in this trial with us, and listen to the facts and the
8  10:28:56  evidence, or is that --
9  10:28:58           A PROSPECTIVE JUROR:  No.
10 10:28:58           THE COURT:  No?  So what is preventing you from
11 10:29:01  doing that?
12 10:29:02           A PROSPECTIVE JUROR:  I believe my mental and
13 10:29:05  emotional well-being.  I feel like I process and think and
14 10:29:11  feel things in a different way.
15 10:29:15           THE COURT:  What do you mean by "different"?
16 10:29:17           A PROSPECTIVE JUROR:  It just depends on my mood.
17 10:29:21  Like I'll go -- I'll decide how I will act or do something
18 10:29:27  based on my mood.
19 10:29:29           THE COURT:  Okay.  Thank you for telling us that.
20 10:29:32           And somebody -- anybody else in the back row?
21 10:29:36           All right.  Juror -- Question Number 10:  And I know
22 10:29:39  we have some of -- I'm sorry, did I miss somebody?
23 10:29:42           Juror Number 15.
24 10:29:43           A PROSPECTIVE JUROR:  Hello.  It's me again.
25 10:29:45           THE COURT:  Okay.
```

1 10:29:46         A PROSPECTIVE JUROR:  Yeah, my -- most of my

2 10:29:50   friends, my father's side of the family, and me, all struggle

3 10:29:55   with mental health issues.  Mostly being -- the most

4 10:30:00   prevalent being depression and anxiety, but -- except for my

5 10:30:05   uncle, who had learning disabilities, like ADHD, but it was

6 10:30:12   at a time where he was treated very poorly for that.

7 10:30:15         And as for myself, I struggled through very heavy

8 10:30:20   depression at a very young age.  So if the trial would

9 10:30:25   involve any of that, I feel like I would look towards them

10 10:30:28   with more sympathy.  But I think that is about it.

11 10:30:31         THE COURT:  If it would involve any of what?

12 10:30:36         A PROSPECTIVE JUROR:  Oh, anything -- people

13 10:30:37   involving, like, depression and other mental illnesses, like

14 10:30:42   anxiety.  I suppose that is all.

15 10:30:46         THE COURT:  So you would be more sympathetic toward

16 10:30:49   that person?

17 10:30:50         A PROSPECTIVE JUROR:  Yes.  But I also don't believe

18 10:30:54   it would be an excuse for whatever would happen, or anything

19 10:30:58   like that, so I believe I would still be able to be

20 10:31:02   impartial.  I would just, like --

21 10:31:03         THE COURT:  All right.  Thank you.  We need to know

22 10:31:05   that information.  Thank you.

23 10:31:06         And anybody I missed?

24 10:31:08         All right.  Let's go to 10.  Who has medical

25 10:31:13   training or experience?  I know we've had a couple.

1  10:31:17          Juror Number 5.

2  10:31:20          A PROSPECTIVE JUROR:  I'm a registered nurse.  I

3  10:31:22  have dealt -- we deal with a lot of people who have bipolar,

4  10:31:28  schizophrenia, depression, dementia, so...

5  10:31:31          THE COURT:  All right.  Thank you.

6  10:31:34          Anybody else in the first row?

7  10:31:36          Juror Number 8.

8  10:31:37          A PROSPECTIVE JUROR:  I have a few just, like,

9  10:31:38  medical certifications, like CPR, basic first aid, and

10 10:31:42  injection certifications.  And I've also had experience

11 10:31:46  working in physical therapy and lifeguarding and stuff like

12 10:31:51  that.

13 10:31:51          THE COURT:  Great.  Thank you.

14 10:31:52          Anybody in the back row?

15 10:31:55          Juror Number 9?

16 10:31:56          A PROSPECTIVE JUROR:  I worked in intensive care of

17 10:32:04  neonates, and the parents are the ones that I had a lot of

18 10:32:11  conflicts or -- because they do have a lot of struggles.

19 10:32:15          THE COURT:  All right.  Thank you.

20 10:32:17          Anybody else in the back row?

21 10:32:19          All right.  Question 11:  Have you or anyone close

22 10:32:22  to you ever supported or participated in an organization that

23 10:32:28  takes a position on law enforcement?  And have you or anyone

24 10:32:33  close to you ever publically taken a position on law

25 10:32:38  enforcement?  Protests, anything like that?

1 10:32:40          Anybody in the first row?

2 10:32:42          Juror Number 8?

3 10:32:44          A PROSPECTIVE JUROR:  I haven't supported any

4 10:32:46   organization, but I publically support law enforcement,

5 10:32:51   because I've had a couple situations in my life where they've

6 10:32:54   had a positive impact on me.  When I was in high school,

7 10:32:58   there was an active shooter at my school, and the police

8 10:33:02   really helped out during that time, and they just have an

9 10:33:05   overall positive impact on me.

10 10:33:07          THE COURT:  All right.  And can you be fair to both

11 10:33:10   sides in this case, even though you've had probably a

12 10:33:15   terrifying but positive experience with law enforcement?

13 10:33:19          A PROSPECTIVE JUROR:  Yes.  I support them, but I

14 10:33:20   can be impartial, too.

15 10:33:22          THE COURT:  All right.  Thank you.

16 10:33:23          Anybody else?

17 10:33:26          Okay.  12:  Have you or anyone close to you ever

18 10:33:32   been a party to or a witness in a lawsuit?

19 10:33:37          Don't see any -- yes?

20 10:33:41          A PROSPECTIVE JUROR:  Yes, I was in a lawsuit.

21 10:33:42          THE COURT:  Tell us a little bit about that.

22 10:33:44          A PROSPECTIVE JUROR:  I was terminated from an

23 10:33:46   employment due to my pregnancy, and I sued my former

24 10:33:50   employer.

25 10:33:51          THE COURT:  All right.  Was that here locally?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:33:53          A PROSPECTIVE JUROR:  That was, I think, in Van

2 10:33:56  Nuys.

3 10:33:56          THE COURT:  Okay.  On state court?

4 10:33:58          A PROSPECTIVE JUROR:  You know, I think we went

5 10:34:00  through arbitration.  So I'm not sure if that is the same.

6 10:34:03          THE COURT:  All right.  Anything about that

7 10:34:05  experience that makes you think that you couldn't be fair in

8 10:34:07  this case?

9 10:34:08          A PROSPECTIVE JUROR:  No.

10 10:34:08          THE COURT:  All right.  Anybody I missed?

11 10:34:11          Juror Number 16?

12 10:34:13          A PROSPECTIVE JUROR:  Yes.  I was a witness in a

13 10:34:20  lawsuit.

14 10:34:22          THE COURT:  What kind of lawsuit?

15 10:34:23          A PROSPECTIVE JUROR:  It was a criminal theft

16 10:34:27  lawsuit thing.

17 10:34:28          THE COURT:  Okay.  And was that locally?

18 10:34:31          A PROSPECTIVE JUROR:  Yeah.  Yeah.

19 10:34:33          THE COURT:  All right.  How long ago was that?

20 10:34:36          A PROSPECTIVE JUROR:  Seven, eight years ago.

21 10:34:39          THE COURT:  Anything about that experience that

22 10:34:41  makes you think you can't be fair in this case?

23 10:34:43          A PROSPECTIVE JUROR:  No.  But I do -- as I have

24 10:34:48  previously stated, I do have a negative view on law

25 10:34:50  enforcement, and I really -- I mean, that should come at a

1 10:34:53  cost.  So the cost being my partiality towards the other

2 10:34:58  side, I guess.

3 10:35:00        THE COURT:  Well, as I said, that is okay outside

4 10:35:03  the courtroom.  Here, we need impartial jurors.  And I think

5 10:35:07  you indicated to me that you would not be impartial.

6 10:35:10        A PROSPECTIVE JUROR:  It has to be -- that is the

7 10:35:12  cost.

8 10:35:12        THE COURT:  All right.  Anybody I missed?

9 10:35:17        Question 13:  Have you or anyone close to you ever

10 10:35:21  witnessed a serious injury or death caused by an accident?

11 10:35:25  And has anyone close to you ever died as a result of an

12 10:35:29  accident?  Anybody have that kind of experience?

13 10:35:32        Juror Number 15?

14 10:35:33        A PROSPECTIVE JUROR:  I -- me and my family was --

15 10:35:44  were driving through Kansas at one point, and an accident

16 10:35:48  happened on the highway where a smaller car got hit by a

17 10:35:53  semitruck.  I did not personally see the injury, but I could

18 10:35:58  tell that they had their leg hurt.  And they had a

19 10:36:05  three-year-old with them, which we took to our car so that,

20 10:36:08  well, they didn't grow up with years of trauma, hopefully.

21 10:36:13  And they did not speak any English.

22 10:36:15        And I would say that that left a lasting impact on

23 10:36:18  me when it comes to accidents --

24 10:36:21        THE COURT:  Um-hum.  Thank you.

25 10:36:22        A PROSPECTIVE JUROR:  -- involving children.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

| | | |
|---|---|---|
| 1 | 10:36:24 | THE COURT:  All right.  Anybody else?  I thought I |
| 2 | 10:36:26 | saw another hand. |
| 3 | 10:36:27 | Yes, Juror Number 11? |
| 4 | 10:36:29 | A PROSPECTIVE JUROR:  My coworkers and I were on our |
| 5 | 10:36:33 | lunch break and we witnessed a guy was hit by a train.  He |
| 6 | 10:36:38 | was just walking. |
| 7 | 10:36:42 | THE COURT:  When was that? |
| 8 | 10:36:43 | A PROSPECTIVE JUROR:  About nine years ago. |
| 9 | 10:36:47 | THE COURT:  And so he was walking and he was on the |
| 10 | 10:36:51 | train tracks? |
| 11 | 10:36:52 | A PROSPECTIVE JUROR:  Yes. |
| 12 | 10:36:52 | THE COURT:  And then the train came along and hit |
| 13 | 10:36:54 | him?  Do you know what happened after that, or what he was |
| 14 | 10:36:57 | doing there? |
| 15 | 10:36:58 | A PROSPECTIVE JUROR:  No, because we had to go back |
| 16 | 10:37:01 | to work.  So as soon as we could, we just left, and that was |
| 17 | 10:37:06 | it. |
| 18 | 10:37:07 | THE COURT:  Well, I think -- as I said, this |
| 19 | 10:37:11 | involves Mr. Breunig was hit by a train and died.  Are you |
| 20 | 10:37:17 | going to be able to sit through this trial and evaluate the |
| 21 | 10:37:22 | facts and listen to my instructions and decide fairly? |
| 22 | 10:37:29 | A PROSPECTIVE JUROR:  To be honest, it was like the |
| 23 | 10:37:32 | last thing I thought this was going to be about, but, yeah, |
| 24 | 10:37:38 | I'll try my best. |
| 25 | 10:37:39 | THE COURT:  Okay.  Again, is there some reason you |

1 10:37:42 think you can't?

2 10:37:43          A PROSPECTIVE JUROR:  Like I said, I had not thought

3 10:37:45 about it until I saw that question, and I was like --

4 10:37:48          THE COURT:  Was it traumatic for you at the time?

5 10:37:51          A PROSPECTIVE JUROR:  Oh, yeah.  Yeah, because we

6 10:37:53 just -- we were just sitting there.  We were like, "Oh, is

7 10:37:56 he going to jump in front of the train?"  And then it just

8 10:37:59 happened right in front of us.

9 10:38:02          THE COURT:  Okay.  Thank you.

10 10:38:03          Anybody else?

11 10:38:09          Question 14:  Do you believe there are too many

12 10:38:12 lawsuits or that jury awards are too high?

13 10:38:18          Juror Number 3?

14 10:38:21          A PROSPECTIVE JUROR:  My answer is yes.

15 10:38:24          THE COURT:  And tell us a little bit about that.

16 10:38:26 What -- on what do you base your opinion?  Is it what you

17 10:38:31 read or see in the news or --

18 10:38:33          A PROSPECTIVE JUROR:  In the news, yes.  Too many

19 10:38:36 car accidents over any little bump.  Lawsuits over

20 10:38:40 everything.  That is just my opinion.  Too many.

21 10:38:45          THE COURT:  Can you put that aside and judge this

22 10:38:47 case just based on what you hear?

23 10:38:50          A PROSPECTIVE JUROR:  I will try, yes.

24 10:38:51          THE COURT:  Thank you.  Any reason you think you

25 10:38:53 can't do that?

1 10:38:53          A PROSPECTIVE JUROR:  No.

2 10:38:54          THE COURT:  All right.  Thank you.

3 10:38:55          Did I see any more hands?  Back row?  Okay.

4 10:39:01          Question 15:  I will, as I said, instruct you on the

5 10:39:06    law, including the law as it relates to damages.  Will you

6 10:39:11    have any difficulty following the law as I give it to you,

7 10:39:15    regardless of whether that means you will find in favor of

8 10:39:19    the plaintiff or in favor of the defendant?

9 10:39:25          Anybody have any concerns about that?

10 10:39:29         Okay.  Question 16:  It's the duty of the Court to

11 10:39:35    instruct the jury on the law that applies to this case, as I

12 10:39:38    said, and it's the duty of the jurors to follow those

13 10:39:42    instructions whether or not they agree with them or approve

14 10:39:46    or disapprove of them.  In other words, you may not

15 10:39:50    substitute your own idea of what the law should be.

16 10:39:53         Will you have any difficulty following my

17 10:39:56    instructions and applying the law as I state it to you,

18 10:40:00    whether you approve or disapprove of the law as I state it to

19 10:40:04    you?

20 10:40:07          I don't see any hands.

21 10:40:08          I did hear some alarm going off.  Whatever it is,

22 10:40:12    turn it off, please.

23 10:40:15          And Question 17:  Sit back and relax and look at the

24 10:40:25    attorneys and the parties here.  Ms. Moller is in the back

25 10:40:29    there, and Deputy Fite is here.  Even if I haven't been smart

10:40:35  1  enough to ask a question to bring it out, do you know of any

10:40:38  2  reason at all why you can't be a completely fair and

10:40:42  3  impartial juror in the case?

10:40:47  4          All right.  Thank you.

10:40:50  5          From the plaintiff, would you like to ask some

10:40:53  6  questions?

10:40:54  7          MR. CONLOGUE:  Yes, Your Honor.

10:41:04  8          Good morning again.  Hi.  So what we have been doing

10:41:10  9  right now has been voir dire.  I only have a few follow-up

10:41:13  10  questions.  I thought the Court hit all the questions on the

10:41:15  11  head.

10:41:15  12          With voir dire, though, it means to speak the truth.

10:41:18  13  And a lot of you have done a good job and have given us a lot

10:41:21  14  of information.  But what does that mean, to speak the truth?

10:41:25  15  Who can tell us what that means?

10:41:27  16          THE COURT:  Okay.  Ask a different question.

10:41:30  17          MR. CONLOGUE:  Yes, Your Honor.

10:41:30  18          Juror Number 4, you indicated that you can't decide

10:41:38  19  this matter fairly.  Did I hear you correctly?

10:41:41  20          A PROSPECTIVE JUROR:  Yes.

10:41:43  21          MR. CONLOGUE:  And it's because you don't hold law

10:41:47  22  enforcement highly.  Did I hear that as well?

10:41:49  23          A PROSPECTIVE JUROR:  Correct.

10:41:50  24          MR. CONLOGUE:  Do you know anything about what

10:41:51  25  happened in this case?  Or have you read any of the papers

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:41:53    about it?

2 10:41:55            A PROSPECTIVE JUROR:  No.

3 10:41:55            MR. CONLOGUE:  Is there -- have you already made up

4 10:41:58    your mind on what your decision is going to be in this case?

5 10:42:02            A PROSPECTIVE JUROR:  I mean, not really, because I

6 10:42:06    haven't heard the facts, but I -- like I said, I don't really

7 10:42:13    hold them -- I don't think of them as honest, and -- the

8 10:42:19    police, so...

9 10:42:21            MR. CONLOGUE:  And I know you had a very unfortunate

10 10:42:23    incident, but with here -- the specific facts here, have you

11 10:42:29    decided one way or another who is going to win?

12 10:42:34            A PROSPECTIVE JUROR:  Have I -- would I think

13 10:42:36    would -- what I would say?

14 10:42:38            MR. CONLOGUE:  Yeah.  Without hearing any of the

15 10:42:40    facts here so far, have you decided?

16 10:42:45            A PROSPECTIVE JUROR:  No, not really.

17 10:42:47            MR. CONLOGUE:  Thank you for your honesty.

18 10:42:47            THE COURT:  Let me follow up on that because at

19 10:42:50    least some of you haven't been on juries before.

20 10:42:52            So in a civil case -- this is a civil case -- the

21 10:42:55    plaintiff has the burden of proof on most things by a

22 10:43:00    preponderance of the evidence.  It's a lower standard than

23 10:43:05    what we always hear about in criminal cases.  That means the

24 10:43:08    plaintiff has to prove the case just a little bit more than

25 10:43:14    50 percent.  People describe it in a bunch of different ways.

1 10:43:18    Some people say just a feather on the side of the scales will

2 10:43:23    tip it in favor of the plaintiff.

3 10:43:27          There may be an issue in this case where the

4 10:43:31    defense, Officer Fite, will have the burden, and the burden

5 10:43:34    will work the same way on that particular issue.  Officer

6 10:43:40    Fite would have to convince you just a little bit more than

7 10:43:43    50 percent.

8 10:43:46          Obviously, as I said, we're going to have some law

9 10:43:50    enforcement officers, and the question for you is, knowing

10 10:43:55   you are going to have some law enforcement officers testify,

11 10:43:58   because that's what we were talking about, if the plaintiff

12 10:44:04   does not prove the case by a preponderance of the evidence,

13 10:44:09   will you still vote in favor of the plaintiff, even if she

14 10:44:15   has not met her burden of proof, just because the officers

15 10:44:21   are testifying, or there is an officer who is a defendant, or

16 10:44:26   will you be fair to both sides and judge the credibility of

17 10:44:30   the witnesses in the same way?

18 10:44:34          A PROSPECTIVE JUROR:  Yes, I will be fair.

19 10:44:36          THE COURT:  Okay.  Thank you.

20 10:44:40          MR. CONLOGUE:  Juror Number 3, if you can just pass

21 10:44:42   the microphone right over.

22 10:44:45          Thank you for sharing with us how you have several

23 10:44:49   cousins that are in law enforcement, it sounds like in Los

24 10:44:53   Angeles County, San Bernardino, Riverside.  Do any of them --

25 10:44:56   are any of them a deputy out in San Bernardino?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  10:45:01        A PROSPECTIVE JUROR:  I don't know what their roles

2  10:45:03   are.  But like I said, I go to get-togethers, and there's

3  10:45:06   always lots of officers.

4  10:45:10        I do respect them.  I do hold them to -- I know a

5  10:45:15   lot of people here said that they don't like officers or they

6  10:45:18   feel like they're not trustworthy.  I'm the opposite.  I do

7  10:45:23   like officers.  I do feel like they are trustworthy.

8  10:45:28        MR. CONLOGUE:  No, and I appreciate that, and I

9  10:45:30   thank you for your honesty.

10 10:45:32        Do you think no matter what, you will always -- with

11 10:45:36   that standard you have, that you already start with the

12 10:45:39   belief that they are honest?

13 10:45:42        A PROSPECTIVE JUROR:  Yes.

14 10:45:43        MR. CONLOGUE:  And with -- you did mention earlier

15 10:45:49   with the Court that you said you would try to be fair, and

16 10:45:52   the Court followed up with a question, you know, why --

17 10:45:56   what's the issue you're having, why, and you took a long

18 10:45:59   pause.  Why did you take a long pause?

19 10:46:03        A PROSPECTIVE JUROR:  I'm sorry, what was the

20 10:46:05   question again?

21 10:46:06        MR. CONLOGUE:  Yeah.  When you were talking with the

22 10:46:08   Court, and she asked if you could be fair, and you said that

23 10:46:10   you will try to be fair, and I think you were being honest --

24 10:46:13        A PROSPECTIVE JUROR:  Yes, I am.

25 10:46:14        MR. CONLOGUE:  -- that you would try to be fair, and

1 10:46:16   then she asked, you know -- she essentially asked why could

2 10:46:19   you not be fair in this case, and you took a long pause.

3 10:46:22         A PROSPECTIVE JUROR:  No, I will try to be fair, but

4 10:46:24   I already feel like the office's innocent.  But that's just

5 10:46:29   how I am.  I --

6 10:46:29         MR. CONLOGUE:  Okay.  And so without --

7 10:46:31         A PROSPECTIVE JUROR:  Maybe it's because of my

8 10:46:32   friends, the people I hang out with --

9 10:46:35         THE COURT:  Okay.  We're not doing that -- deciding

10 10:46:37   guilt or innocence here because this is a civil case.  But

11 10:46:39   it's kind of the flip of the question I asked Juror Number 5.

12 10:46:46   If the facts and the law establish that the plaintiff has

13 10:46:53   proved her case by a preponderance of the evidence just a

14 10:46:59   little bit more than 50 percent, are you going to find for

15 10:47:03   Officer Fite just because she's a police officer, or are you

16 10:47:07   going to follow my instruction and find for the plaintiff

17 10:47:11   because the plaintiff has proved, in my scenario, the case by

18 10:47:16   a preponderance of the evidence?

19 10:47:18         A PROSPECTIVE JUROR:  I will try to be fair, yes.

20 10:47:21         THE COURT:  Okay.  And "fair" means following my

21 10:47:25   instruction --

22 10:47:26         A PROSPECTIVE JUROR:  Following your instruction.

23 10:47:27         THE COURT:  Okay.  And "try" just makes us

24 10:47:30   nervous --

25 10:47:31         A PROSPECTIVE JUROR:  I have to hear all the facts.

1 10:47:33   Does that make sense?  I don't have -- you're asking me a

2 10:47:37   question, and I'm just trying to answer --

3 10:47:39          THE COURT:  No, no, I understand, but sometimes it's

4 10:47:42   difficult for those of us who are immersed in the law to try

5 10:47:46   to figure out what those of us who aren't are saying.

6 10:47:49          So obviously, nobody here, including me, because I

7 10:47:55   also don't know all of the facts --

8 10:47:57          A PROSPECTIVE JUROR:  Correct.

9 10:47:58          THE COURT:  -- can tell which way this case should

10 10:48:01   go.  We don't know.  I know the law, but I don't know what

11 10:48:04   the facts are, you don't know what the facts are, and you

12 10:48:07   don't even know what the law is yet because I haven't told

13 10:48:10   you.

14 10:48:11          So I can understand when you say, "I have to hear

15 10:48:13   the facts," you have to hear the facts to know what your vote

16 10:48:17   will be --

17 10:48:18          A PROSPECTIVE JUROR:  Yes.

18 10:48:18          THE COURT:  -- but you don't have to hear the facts,

19 10:48:21   I don't think, to know if you will be fair to both sides and

20 10:48:28   follow the instructions, including voting for the plaintiff

21 10:48:32   if the plaintiff has proved her case.

22 10:48:37          A PROSPECTIVE JUROR:  Correct.

23 10:48:38          THE COURT:  Okay.  So then will you be fair?

24 10:48:42          A PROSPECTIVE JUROR:  Yes.

25 10:48:42          THE COURT:  Thank you.

1 10:48:44          MR. CONLOGUE:  And to follow up on that -- so you

2 10:48:46  haven't heard any evidence yet --

3 10:48:48          A PROSPECTIVE JUROR:  Right.

4 10:48:49          MR. CONLOGUE:  Do you have Deputy Fite right now,

5 10:48:52  without hearing any evidence, a little bit having an

6 10:48:54  advantage over Plaintiff?

7 10:48:57          A PROSPECTIVE JUROR:  Yes.

8 10:48:58          MR. CONLOGUE:  Thank you.

9 10:48:59          Juror Number 5 --

10 10:49:01          If you can pass the microphone, please, down to

11 10:49:03  Juror Number 5.

12 10:49:09          You indicated you're an RN at Four Seasons.  What do

13 10:49:14  you do there specifically?

14 10:49:15          A PROSPECTIVE JUROR:  I'm an assistant director of

15 10:49:19  nursing, so managing our RNs, LVNs, CNAs.

16 10:49:25          MR. CONLOGUE:  What kind of medical care does your

17 10:49:27  group provide?

18 10:49:28          A PROSPECTIVE JUROR:  They do rehab.  Some are

19 10:49:30  living there in the facilities, and the rest are just rehab.

20 10:49:34  So they're getting rehab, and then they go home.

21 10:49:37          MR. CONLOGUE:  And that's all the questions I have

22 10:49:40  for you.  Thank you.

23 10:49:43          And then Juror Number 8, if I'm counting correctly.

24 10:49:53          You know, Juror Number 16 behind you, he indicated,

25 10:49:58  you know, he has his preconceived notion, he can't be fair,

1 10:50:01  he's against police, and he said he just can't be fair in

2 10:50:05  this matter.  In this, with what you said, you indicated, and

3 10:50:10  correct me if I'm wrong, that you have public support for law

4 10:50:13  enforcement.

5 10:50:13          A PROSPECTIVE JUROR:  Yes.

6 10:50:15          MR. CONLOGUE:  With that in mind, do you feel like

7 10:50:16  you're in the same shoes as Juror Number 16, where you can't

8 10:50:20  be fair in this specific case?

9 10:50:21          A PROSPECTIVE JUROR:  Well, obviously, I'll have my

10 10:50:23  opinions based on the past situations that I had, and I

11 10:50:27  support them, but not every law enforcement is the same, so

12 10:50:32  I'll try to be impartial -- or I will be impartial.

13 10:50:37          MR. CONLOGUE:  And Juror Number 3, she indicated

14 10:50:40  that the -- Deputy Fite has an advantage without any evidence

15 10:50:43  being heard yet.  Do you believe that as well?

16 10:50:45          A PROSPECTIVE JUROR:  Yes, I believe that.

17 10:50:48          MR. CONLOGUE:  Thank you.  Thank you --

18 10:50:50          THE COURT:  Well, let me follow up again with the

19 10:50:52  same question.  You're going to hear a lot of testimony,

20 10:50:57  you're going to hear testimony presented by the plaintiff and

21 10:50:59  testimony presented by the defense, and again, if the

22 10:51:06  plaintiff proves her case by just the weight of a feather,

23 10:51:12  then the jury must find for the plaintiff.

24 10:51:16          Are you telling me that if the plaintiff does meet

25 10:51:19  her burden, that you will nevertheless find for the defendant

1 10:51:23   because the defendant is a police officer?

2 10:51:26           A PROSPECTIVE JUROR:  No.  I'll be fair in this

3 10:51:29   case.

4 10:51:30           THE COURT:  All right.  And will you judge the

5 10:51:34   police officers who come to testify using the same rules that

6 10:51:41   you use to judge everybody else?

7 10:51:42           A PROSPECTIVE JUROR:  Yes.

8 10:51:43           THE COURT:  Thank you.

9 10:51:45           Anything further, Mr. Conlogue?

10 10:51:46          MR. CONLOGUE:  That's all the questions I have, Your

11 10:51:48   Honor.  Thank you.

12 10:51:48          THE COURT:  Thank you.

13 10:51:49          For the defense?

14 10:51:53          MS. GUSTAFSON:  Thank you, Your Honor.

15 10:51:56          The question for Juror Number 7, I believe it was.

16 10:52:06          I know you brought up your experience with your

17 10:52:08   cousin, so I just wanted to ask you, what are your thoughts

18 10:52:12   about homeless addiction and choices?  Do you think they

19 10:52:15   are -- the people who have addictions are not accountable for

20 10:52:21   their choices or that they are accountable for their choices?

21 10:52:24          A PROSPECTIVE JUROR:  I think addiction is a

22 10:52:25   disease, and I don't think that we have enough support

23 10:52:29   here -- I'll just use Los Angeles, for those that have that

24 10:52:36   disease.

25 10:52:37          Obviously, everybody has a choice, but when you're

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:52:41  going through mental health issues or you're going through

2 10:52:45  drug addiction, they can't make decisions, they can't make

3 10:52:50  choices or -- so I don't really know how to answer that.

4 10:52:57  Sorry.

5 10:52:57        MS. GUSTAFSON:  You mentioned something about

6 10:52:58  resources.  What do you believe, if any, law enforcement's

7 10:53:01  role is in helping or dealing with people that have

8 10:53:03  addictions?

9 10:53:04        A PROSPECTIVE JUROR:  I think the first thing is

10 10:53:06  just to make sure that that -- that this person is safe, and

11 10:53:10  that they're safe as well, the law enforcement agent, and

12 10:53:15  making sure that they get whatever resources they have to

13 10:53:19  whatever the situation is to deescalate, if they can, and try

14 10:53:26  to, you know, render aid to that person.

15 10:53:31        MS. GUSTAFSON:  And given the experience that you

16 10:53:33  had with your cousin, who I believe was a heroin addict, if

17 10:53:36  there is any evidence in this case involving somebody that's

18 10:53:40  addicted to heroin, do you think that would impact your

19 10:53:43  ability to decide this case fair and impartially, given the

20 10:53:46  experiences that you had with your cousin?

21 10:53:49        A PROSPECTIVE JUROR:  It's hard.  I feel very poorly

22 10:53:51  for his mother, and just kind of hearing a little bit of the

23 10:53:55  case immediately I just felt super sad about the whole

24 10:53:59  situation.

25 10:54:00        I will do my very best to be impartial, but it is

1 10:54:05   hard.  I'm an emotional person, so I can already feel my

2 10:54:09   emotions now pulling me towards the plaintiff's side.  But I

3 10:54:13   would do my very best to look at all the evidence.

4 10:54:16          MS. GUSTAFSON:  And I understand you would try to do

5 10:54:18   your very best, but I do have to ask you the question.  It

6 10:54:22   seems to me that you've indicated -- and let me know if I'm

7 10:54:25   wrong, that just sitting here you're feeling more -- your

8 10:54:28   sympathy towards Ms. Moller just based on your own life

9 10:54:31   experiences.

10 10:54:31          A PROSPECTIVE JUROR:  Correct.  Absolutely.

11 10:54:33          MS. GUSTAFSON:  And given that that's where you're

12 10:54:34   situated right now, are you able to hear all the evidence and

13 10:54:37   be fair and impartial, given that sympathy you feel towards

14 10:54:41   Ms. Moller?

15 10:54:41          A PROSPECTIVE JUROR:  I will absolutely try to be

16 10:54:44   fair and impartial, and I know "try" is a hard word here.  I

17 10:54:48   will do my absolute best to look at all the evidence and be

18 10:54:51   impartial.

19 10:54:53          MS. GUSTAFSON:  And just living the life you did,

20 10:54:54   and only you can answer this question, but -- I know you want

21 10:54:57   to try, but do you think you can be?

22 10:55:00          A PROSPECTIVE JUROR:  I think I can be, yes.

23 10:55:03          MS. GUSTAFSON:  And I wanted to go to, I think,

24 10:55:04   Juror Number 9 because you expressed some similar experiences

25 10:55:08   with your brother.

1 10:55:10          A PROSPECTIVE JUROR:  Yes.

2 10:55:11          MS. GUSTAFSON:  And so same question:  Do you

3 10:55:13   believe that somebody who has an addiction is responsible and

4 10:55:17   accountable for their choices?

5 10:55:18          A PROSPECTIVE JUROR:  It's at different levels.  I

6 10:55:23   feel like we need to identify who is -- someone who is not a

7 10:55:32   danger to themselves or to others.  And so I'm -- like the

8 10:55:35   person that assaulted me, by spitting on me, was a danger to

9 10:55:40   others.  My brother is a danger to himself.

10 10:55:46         MS. GUSTAFSON:  And given your experience with your

11 10:55:48   brother, has law enforcement ever been involved in any

12 10:55:51   situations with your brother, that you are aware of?

13 10:55:54         A PROSPECTIVE JUROR:  He was incarcerated when

14 10:55:58   the -- when they would -- back then, many years, if you are

15 10:56:03   caught with drugs in your possession, you could go to jail.

16 10:56:07   And so that is what happened to him.

17 10:56:09         But I don't think they do that now.

18 10:56:14         MS. GUSTAFSON:  And same question in terms of law

19 10:56:17   enforcement:  What do you understand or what do you believe

20 10:56:20   law enforcement's role should be with respect to those that

21 10:56:23   are dealing with addiction, like your brother?

22 10:56:25         A PROSPECTIVE JUROR:  The same thing, that I have to

23 10:56:28   identify the perpetual abusers, through others, too, because

24 10:56:38   some of the -- what I see in the street, a lot of the

25 10:56:41   homeless people there are mostly -- has either mental issue

1 10:56:46    related to drug problems.

2 10:56:49    So it's hard to find out whether -- are they a

3 10:57:00    criminal liability in the future or are they dealing with

4 10:57:03    just drugging themselves day in and day out?  So I have to

5 10:57:06    find out what kind of -- if we are talking about a homeless

6 10:57:09    person today, I need to identify at what level was that

7 10:57:13    person at?

8 10:57:17    MS. GUSTAFSON:  And I wanted to go to -- I believe

9 10:57:19    it was Juror Number 6.

10 10:57:23    I thought I saw you raise your hand on a question

11 10:57:27    about experiences with drugs and alcohol.  And maybe I missed

12 10:57:30    it, but you didn't get to speak, so I wanted to make sure if

13 10:57:34    you had something to say on that issue.

14 10:57:36    A PROSPECTIVE JUROR:  I don't really have anything

15 10:57:38    to say.  I have been part of a lot of interactions with

16 10:57:47    police throughout my life, with my family, and outside of

17 10:57:54    school, and like just walking around LA area.  I've seen a

18 10:57:59    lot, been through a lot, but I don't think any of it would,

19 10:58:03    like, have -- I don't think I'll have an issue deciding who

20 10:58:10    is guilty or not.

21 10:58:13    MS. GUSTAFSON:  Well, and you understand that this

22 10:58:15    is a civil case, and the standard is, as Your Honor described

23 10:58:19    it, a little more than not.  It's not a guilt-or-innocence

24 10:58:22    type of case.

25 10:58:23    A PROSPECTIVE JUROR:  Again, I'm not really having

1 10:58:26    an issue with that, you know.

2 10:58:28            MS. GUSTAFSON:  And what was it that caused you to

3 10:58:32    raise your hand regarding your experience that your family

4 10:58:34    had with police?  What -- can you tell me a little bit about

5 10:58:37    what that experience was?

6 10:58:38            A PROSPECTIVE JUROR:  It's -- I didn't really raise

7 10:58:46    my hand, but it's just some things that they have been

8 10:58:50    through:  drug abuse, alcohol abuse, domestic violence, and

9 10:59:01    rape.

10 10:59:04            MS. GUSTAFSON:  When you say drug abuse and alcohol

11 10:59:07    issues, were those people dealing with addiction in your

12 10:59:10    family or -- just trying to understand.

13 10:59:14            A PROSPECTIVE JUROR:  It's inside my family, and it

14 10:59:15    was outside.

15 10:59:19            MS. GUSTAFSON:  And so same question to you, then:

16 10:59:21    Do you believe that people who are dealing with addiction are

17 10:59:25    accountable for their own choices?

18 10:59:27            A PROSPECTIVE JUROR:  Yes and no.  I feel like

19 10:59:30    people that are on drug abuse, they do it to themselves.  You

20 10:59:34    know, they get addicted to it, and to the point where they

21 10:59:39    can't stop.  So I feel like there is a point where, you know,

22 10:59:43    they themselves want help.

23 10:59:45            But then again, I worked with homeless people before

24 10:59:48    as well, and I've got to talk to some of them, and they were

25 10:59:53    on drugs.  Some of them were pretty cool, and I didn't have

1 10:59:57  any problems with them.  There was others where, like other

2 10:59:59  people said, they were a danger to themselves and to other

3 11:00:07  people.  Just kind of depends on where they are at in their

4 11:00:10  state of mind.

5 11:00:11      MS. GUSTAFSON:  You said you worked with homeless

6 11:00:13  people.  In what capacity?

7 11:00:15      A PROSPECTIVE JUROR:  It's the same thing I'm

8 11:00:16  working in now, in cell services.  I used to work for Cricket

9 11:00:21  Wireless.  I worked in West Lake.  If anybody is from here,

10 11:00:24  they would know that West Lake is mostly known as a place for

11 11:00:28  homeless people, where they got tossed at.  I have seen some

12 11:00:33  cops, as well, from different cities drop off homeless people

13 11:00:36  there.

14 11:00:38      MS. GUSTAFSON:  And anything about your experience

15 11:00:40  witnessing a police officer drop off a homeless person, what

16 11:00:43  did you think when you saw that?

17 11:00:44      A PROSPECTIVE JUROR:  I kind of just laughed at it.

18 11:00:47  I mean, it's not the first time, and I doubt it's going to be

19 11:00:53  the last time.  I know there is a lot of things going on in

20 11:00:58  this world that we just can't control anymore.  So there is

21 11:01:04  just all types of issues, yeah.

22 11:01:11      MS. GUSTAFSON:  Thank you for sharing with us.

23 11:01:14  Sorry to put you on the spot there.  I thought I saw the hand

24 11:01:17  there.  My apologies to you.  But thank you for sharing.

25 11:01:17      A PROSPECTIVE JUROR:  No, you are good, you are

1 11:01:19    good.  There is a lot of opinions out here.

2 11:01:21          MS. GUSTAFSON:  If we can go to Juror Number 10,

3 11:01:23    please.  I believe I heard you say that you hold the view

4 11:01:30    that law enforcement officers will lie for other law

5 11:01:34    enforcement officers.  Did I hear that correctly?

6 11:01:36          A PROSPECTIVE JUROR:  Yes.

7 11:01:37          MS. GUSTAFSON:  And having that opinion, if there is

8 11:01:39    a law enforcement officer that is testifying in this case as

9 11:01:42    a witness, are you going to be able to listen to their

10 11:01:46    testimony and judge it based on what you hear on the stand,

11 11:01:49    or are you going to automatically continue with your view

12 11:01:52    that that person is lying because one of the other -- the

13 11:01:57    defendant in this case is a law enforcement officer?

14 11:01:59          A PROSPECTIVE JUROR:  I will listen to all

15 11:02:01    testimony, and follow the instructions.  I will say that my

16 11:02:04    daughter was a victim of sexual abuse, and the sheriff's

17 11:02:07    department helped, you know, with that case.  So I don't just

18 11:02:10    have the propensity to be against law enforcement officers,

19 11:02:12    because they have, you know, aided me as, you know, in our

20 11:02:16    situation as well.  But I will follow the instructions and

21 11:02:21    hear it as impartial, you know, as possible, obviously,

22 11:02:26    consciously, you know.

23 11:02:27          MS. GUSTAFSON:  All right.  Thank you for sharing

24 11:02:29    that.  Obviously my client's a law enforcement officer, so I

25 11:02:33    wanted to ask you that question.

11:02:34          If we could go to Juror Number 11.  I believe you

11:02:39  witnessed an accident involving a train, and it seemed to me,

11:02:44  maybe I got this -- the wrong impression from counsel's

11:02:46  table, that you were a little bit emotional or maybe even

11:02:50  teary when you discussed that.  Did that --

11:02:51          A PROSPECTIVE JUROR:  Uh-huh.  I'm sorry, yes.

11:02:54          MS. GUSTAFSON:  Knowing that there is a train

11:02:56  accident involved in this case, do you think you are able to

11:02:59  be fair and impartial to both sides given the experience

11:03:03  where you've witnessed a train accident?

11:03:05          A PROSPECTIVE JUROR:  I think so.

11:03:09          MS. GUSTAFSON:  Is it going to cause you any kind of

11:03:11  distress at all?

11:03:13          A PROSPECTIVE JUROR:  I'm feeling distressed right

11:03:15  now, but I think I could do it.

11:03:21          MS. GUSTAFSON:  And now understanding that you have

11:03:23  not heard anything about the case, and just that little bit,

11:03:26  there is going to be, obviously, more evidence and more about

11:03:29  the accident when we are going through this trial, do you

11:03:32  think that is going to cause you any kind of emotional

11:03:36  issues, given the experience that you had witnessing --

11:03:39          THE COURT:  There aren't going to be details about

11:03:41  the accident, other than that it involved a train.

11:03:49          A PROSPECTIVE JUROR:  I'm sorry, there are not going

11:03:50  to be details?

1 11:03:51        THE COURT:  You are not going to have to hear about

2 11:03:52   the accident itself.

3 11:03:54        A PROSPECTIVE JUROR:  Okay.

4 11:04:08        MS. GUSTAFSON:  If I could go to Juror Number 1,

5 11:04:10   just because we haven't talked to you.

6 11:04:17        Do you have any opinions or any views on

7 11:04:21   homelessness in the area where you live, and whether the

8 11:04:24   Government is doing enough or not enough in that situation?

9 11:04:27        A PROSPECTIVE JUROR:  I mean, out of my personal

10 11:04:30   experiences in Pomona, I mean, it's not as heavily, but

11 11:04:35   personally, myself, I just -- I do what I can to try to help.

12 11:04:41   Like I'll try to, like, feed some of the homeless, because I

13 11:04:44   do -- I've had some friends who became homeless.  And like

14 11:04:51   I've heard other people say, that it is a sad situation.  I

15 11:04:55   try to do my part and help on that cause.

16 11:04:59        But other than that, I mean, I don't have any

17 11:05:02   negative or positives on that.  I just try to do my part.

18 11:05:06        MS. GUSTAFSON:  And your friends that were

19 11:05:08   experiencing homelessness, did they have any type of

20 11:05:11   addiction issues or...

21 11:05:14        A PROSPECTIVE JUROR:  Some did.  Others just got

22 11:05:17   kicked out by their parents.  I mean, that is all I know.

23 11:05:21        MS. GUSTAFSON:  And if I could just go to Juror

24 11:05:25   Number 2 briefly.

25 11:05:25        What are your thoughts regarding homelessness in

11:05:29    your community and what is being done or not done about it?

11:05:31         A PROSPECTIVE JUROR:  So I currently live in Long

11:05:34    Beach now, and there is a lot of homeless there.  I grew up

11:05:38    in East LA, which is not the safest, I would say.  I don't

11:05:44    look at homeless negatively, just because, you know, they

11:05:50    went -- you have to go through a lot to end up there.  I do

11:05:54    think, though, that the Government does not do enough for

11:05:58    them, and that law enforcement could possibly sometimes abuse

11:06:07    their power with them, and belittle them, just because they

11:06:11    are homeless.  But, yeah.

11:06:16         MS. GUSTAFSON:  And when you say that law

11:06:18    enforcement can abuse their power, is that something you have

11:06:21    personally witnessed or just something you've heard about?

11:06:24         A PROSPECTIVE JUROR:  I have had some friends go

11:06:30    through some things.  And I have -- there was a situation

11:06:34    that occurred maybe like two years ago, and nothing got dealt

11:06:41    with with that.  I mean, the cops showed up, they asked me

11:06:45    questions, they told me they would follow up, nothing ever

11:06:49    happened.

11:06:52         That doesn't change my view on law enforcement.  I

11:06:57    will say I am more skeptical towards them, just because they

11:07:00    do hold a higher power than, I mean, us, but I can be

11:07:08    impartial to hearing both sides.

11:07:11         MS. GUSTAFSON:  Can you just tell me really briefly

11:07:14    what was the situation that you were involved in where you

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  11:07:16   said law enforcement showed up?

2  11:07:17        A PROSPECTIVE JUROR:  I was getting home, it was

3  11:07:20   probably like around 10:00 at night, and this car randomly

4  11:07:25   pulled up next to me.  And I don't know if their -- they were

5  11:07:33   trying to take my car or rob me or take me, but luckily

6  11:07:39   enough, I was quick enough to get inside my car and lock the

7  11:07:42   door.  And they pulled out a gun on me.  That was all.

8  11:07:49        MS. GUSTAFSON:  I'm sorry about that, and I'm sorry

9  11:07:51   to have to ask you about that.  I just want to make sure I

10 11:07:55   understand.  You left that believing law enforcement should

11 11:07:58   have done more?

12 11:07:58        A PROSPECTIVE JUROR:  Yes.  They -- the cops were

13 11:08:02   called, they asked about the situation, I told them.  They

14 11:08:08   didn't say that they couldn't do anything, but it's basically

15 11:08:12   like they said that.  And then my tia asked if, like --

16 11:08:19   because that was back in East LA, and like I said, it's not

17 11:08:22   the safest -- if they could get more patrol on that street.

18 11:08:26   And all they said was, "We do the best that we can."

19 11:08:30        But, yeah, like I said, I never touched on it again

20 11:08:35   after that.

21 11:08:36        MS. GUSTAFSON:  Anything about that experience that

22 11:08:38   would cause you to be not fair and impartial to a law

23 11:08:43   enforcement officer in this case?

24 11:08:44        A PROSPECTIVE JUROR:  No, not in this case.  But

25 11:08:48   like I said, I don't -- as another juror said, I don't look

1 11:08:53  at them highly.  But I am able to look at both sides and not

2 11:09:00  just, quick, act because it's a cop on the other end.

3 11:09:06          MS. GUSTAFSON:  Understood.  And thank you for

4 11:09:07  sharing.

5 11:09:08          If I could just --

6 11:09:10          THE COURT:  One more minute.

7 11:09:11          MS. GUSTAFSON:  Okay.  Back to Juror 13.

8 11:09:14          Anything that we've heard today, anything that

9 11:09:23  anyone else said that raised anything for you that you would

10 11:09:25  like to comment on?

11 11:09:27          A PROSPECTIVE JUROR:  Not really.  I mean, I think

12 11:09:31  the subjects that have been discussed include mental health,

13 11:09:34  you know, drug addiction.  I mean, I know people, you know,

14 11:09:40  in my family, but I'm not really close with them, you know,

15 11:09:45  that I don't live with them, but I'm well aware of it.  You

16 11:09:50  know, I'm well aware of the homelessness problem, too.

17 11:09:54          MS. GUSTAFSON:  Anything about your experiences that

18 11:09:56  would cause you to feel that you would not be fair and

19 11:09:59  impartial in this case just based on the limited --

20 11:10:01          A PROSPECTIVE JUROR:  No.

21 11:10:02          MS. GUSTAFSON:  -- information you have?

22 11:10:04          A PROSPECTIVE JUROR:  No.

23 11:10:04          MS. GUSTAFSON:  Thank you.

24 11:10:05          Thank you, Your Honor.

25 11:10:05          THE COURT:  All right.  Thank you.

1 11:10:12          Counsel approach.

2 11:10:13           (At the bench.)

3 11:10:48          THE COURT:  Any challenges for cause, Mr. Conlogue?

4 11:10:51          MR. CONLOGUE:  Yes, Your Honor.  Juror Number 3.

5 11:10:56          THE COURT:  Any others?

6 11:10:58          MR. CONLOGUE:  Oh, I apologize.  Juror Number 8.

7 11:11:18  And that would be it, Your Honor.

8 11:11:20          THE COURT:  All right.  Juror Number 4, Number 12,

9 11:11:29  and Number 16.

10 11:11:34          THE COURT:  I'm inclined to excuse 3, 12, and 16,

11 11:11:45  and not 8 or 4.

12 11:11:49          Anybody want to be heard?

13 11:11:51          MR. CONLOGUE:  Nothing from Plaintiff, Your Honor.

14 11:11:59          MS. GUSTAFSON:  I believe when she was first

15 11:12:01  asked -- this is Juror Number 4, that she stated she cannot

16 11:12:04  be fair to law enforcement, and she does not hold them

17 11:12:08  highly, and she does not believe they are honest.

18 11:12:10          THE COURT:  I think she was rehabilitated.

19 11:12:16          MS. GUSTAFSON:  Just given her strong feelings that

20 11:12:18  she expressed initially, I believe she expressed she would

21 11:12:23  not be fair to law enforcement in this case.

22 11:12:28          THE COURT:  All right.  So that's 3, 12, and 16, and

23 11:12:43  then we'll do peremptories.

24 11:12:45           (In open court:)

25 11:12:54          THE COURT:  We're not sick.  I'm just being extra

1 11:12:57    careful.

2 11:12:59              Juror Number 3, Juror Number 12, and Juror

3 11:13:05    Number 16, you're excused.  You're ordered to return to the

4 11:13:09    jury room.  Thank you for being with us.  Make sure you go

5 11:13:13    back to the jury room so you get credit for your service

6 11:13:16    today.

7 11:13:18              Peremptory with the plaintiff?

8 11:14:04              MR. CONLOGUE:  The plaintiff accepts the jury as

9 11:14:05    constituted, Your Honor.

10 11:14:06             THE COURT:  Peremptory with the defense?

11 11:14:10             MS. GUSTAFSON:  The defense would like to thank and

12 11:14:13    excuse Juror Number 4.

13 11:14:14             THE COURT:  Juror Number 4, thank you very much.

14 11:14:19    You're excused.  You're ordered to return to the jury room.

15 11:14:28             Peremptory with the plaintiff?

16 11:14:44             MR. CONLOGUE:  If the Court could thank and excuse

17 11:14:55    Juror Number 8, Your Honor.

18 11:14:57             THE COURT:  Juror Number 8, thank you very much.

19 11:14:59    You're excused.  You're ordered to return to the jury room.

20 11:15:10             Another peremptory with the plaintiff?

21 11:15:22             MR. CONLOGUE:  I apologize, Your Honor, Plaintiff

22 11:15:26    just went and excused Juror Number 8.

23 11:15:29             THE COURT:  I know.  Do you want to excuse anybody

24 11:15:33    else?

25 11:15:33             MR. CONLOGUE:  Oh, I apologize.  I thought it would

1 11:15:35    be the defense's turn next, Your Honor.  One second.

2 11:16:05              (Pause in proceedings.)

3 11:16:06              MR. CONLOGUE:  Plaintiff accepts the jury as

4 11:16:08    constituted, Your Honor.

5 11:16:09              THE COURT:  Peremptory with the defense?

6 11:16:17              MS. GUSTAFSON:  The defense would like to thank and

7 11:16:20    excuse Juror Number 7.

8 11:16:21              THE COURT:  Juror Number 7, thank you very much.

9 11:16:23    You're excused.  You're ordered to return to the jury room.

10 11:16:30              Peremptory with the plaintiff?

11 11:17:11              MR. CONLOGUE:  If the Court can thank and excuse

12 11:17:14    Juror Number 5, Your Honor.

13 11:17:15              THE COURT:  Juror Number 5, thank you very much.

14 11:17:18    You're excused.  You're ordered to return to the jury room.

15 11:17:23              Another peremptory with the plaintiff?

16 11:17:56              MR. CONLOGUE:  If the Court can thank and excuse

17 11:17:59    Juror Number 9.

18 11:18:01              THE COURT:  Juror Number 9, thank you very much.

19 11:18:04    You're excused.  You're ordered to return to the jury room.

20 11:18:07              Peremptory with the defense?

21 11:18:20              MS. GUSTAFSON:  The defense accepts the panel.

22 11:18:25              THE COURT:  Ladies and gentlemen, please stand and

23 11:18:27    raise your right hand.  Counsel agree that Jurors Number 1,

24 11:18:30    2, 6, 10, 11, 13, 14, and 15 are our jury?

25 11:18:38              MR. CONLOGUE:  Yes, Your Honor.

1  11:18:40          THE COURT:  Counsel?  Counsel?

2  11:18:47          MS. GUSTAFSON:  My apologies.  I had the wrong

3  11:18:50  count.  I did have a peremptory, but if I've already passed,

4  11:18:54  I guess I --

5  11:18:55          THE COURT:  You have.

6  11:18:57          MS. GUSTAFSON:  I'm sorry.  Thank you, Your Honor.

7  11:18:58          THE COURT:  All right.  Ms. Kim, would you swear in

8  11:19:00  our jury.

9  11:19:04          (Thereupon, the jury panel was sworn.)

10 11:19:15          THE COURT:  Thank you very much.

11 11:19:17          Ladies and gentlemen out in the audience, thank you

12 11:19:20  for being with us.  Sometimes we don't know whether we'll

13 11:19:24  need to seat more jurors or not -- you may have a seat up

14 11:19:28  here.  So you are all excused and ordered to return to the

15 11:19:30  jury room.

16 11:19:31          I don't know that we have another trial going on,

17 11:19:34  but if we do, they may need you to stay and send you to a

18 11:19:38  different courtroom.

19 11:19:48          Just give you some initial jury instructions and

20 11:19:52  then send you off to lunch.

21 11:20:09          Ladies and gentlemen, you are now the jurors in the

22 11:20:11  case, and I'm going to take a few minutes to tell you about

23 11:20:15  your duties as jurors and to give you some preliminary

24 11:20:18  instructions.

25 11:20:21          At the end of the trial, I will give you more

1  11:20:23  detailed instructions that will control your deliberations.

2  11:20:29        All of the Court's instructions, whether given

3  11:20:32  before, during or after the taking of testimony, including

4  11:20:37  the instructions I gave you before you were chosen as jurors,

5  11:20:42  are important.

6  11:20:43        When you deliberate, it will be your duty to weigh

7  11:20:47  and to evaluate all the evidence in the case, and in that

8  11:20:52  process, to decide the facts.  You must apply the law as I

9  11:20:58  state it to you to the facts as you determine them and in

10 11:21:02  this way arrive at your verdict.

11 11:21:05        You must decide the case solely on the evidence

12 11:21:09  received in the trial, and not from any other source, and on

13 11:21:14  the law as I have given it to you, whether you agree with the

14 11:21:19  law or not.

15 11:21:20        Perform these duties fairly and impartially.  You

16 11:21:25  should not be influenced by any person's race, color,

17 11:21:30  religious beliefs, national ancestry, sexual orientation,

18 11:21:37  gender identity, gender or economic circumstances.  Also, do

19 11:21:43  not allow yourself to be influenced by personal likes or

20 11:21:46  dislikes, sympathy, prejudice, fear, public opinion or

21 11:21:55  biases, including unconscious biases.

22 11:21:57        Unconscious biases are stereotypes, attitudes or

23 11:22:04  preferences that people may consciously reject but may be

24 11:22:07  expressed without conscious awareness, control or intention.

25 11:22:13        Like conscious bias, unconscious bias can affect how

1 11:22:21   we evaluate information and make decisions.

2 11:22:23          Do not read anything into these instructions and do

3 11:22:27   not take anything I may say or do during the trial as

4 11:22:31   indicating what I think of the evidence or what your verdict

5 11:22:35   should be.  That is a matter entirely up to you.

6 11:22:39          Before we do anything else, there are some very

7 11:22:43   important rules I need to tell you about that apply to your

8 11:22:47   conduct outside of the courtroom and the courthouse.

9 11:22:51          They described some of these in the jury assembly

10 11:22:56   room, but they are so important I need to repeat them.

11 11:22:59          I don't want to sound mean or threatening, but what

12 11:23:03   I'm going to tell you is not what I'm asking you to do.  It's

13 11:23:07   what I'm ordering you to do.  And my orders have the same

14 11:23:10   effect as laws.  If you violate those orders, it's the same

15 11:23:15   as violating the law.

16 11:23:17          And for some reason, jurors seem to have difficulty

17 11:23:21   with these, so please listen closely.  Keep an open mind

18 11:23:25   throughout the trial and do not decide what the verdict

19 11:23:29   should be until you and your fellow jurors have completed

20 11:23:32   your deliberations at the end of the case.

21 11:23:36          Because you must decide this case based only on the

22 11:23:40   evidence received in the case and on my instructions as to

23 11:23:44   the law that applies, you must not be exposed to any other

24 11:23:48   information about the case or the issues it involves during

25 11:23:53   the course of your jury service.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

11:23:56        Therefore, until the end of the case or until I tell

11:24:00  you otherwise, do not communicate with anyone outside the

11:24:06  jury about this case or about anyone who has anything to do

11:24:10  with it until the trial has ended and you have been

11:24:14  discharged as a juror.

11:24:17        Anyone includes your spouse, your partner, your

11:24:21  family, anyone at home, your employer, anyone at work, your

11:24:28  friends and neighbors, the media or the press, anyone at all.

11:24:34        You may tell them that you are a juror on a case and

11:24:40  how long the trial may last, but say nothing else about it

11:24:45  until you are discharged by the Court.

11:24:47        And this case includes anything you see or hear in

11:24:51  the courtroom, such as the testimony of witnesses, the

11:24:55  physical evidence and anything said by the lawyers, the

11:25:00  Court, Court staff, and anyone else in the courtroom, such as

11:25:03  spectators.

11:25:06        This means you're ordered not to communicate in any

11:25:09  way with the attorneys, the parties or any witness called in

11:25:14  this proceeding.

11:25:16        When you see any of these people in the hall or

11:25:18  anywhere else, you're not to greet them, don't ask for

11:25:22  directions to anywhere, don't ask how much longer the trial

11:25:26  will last.  There should be no communication of any kind.

11:25:31        Of course, you probably won't know who the witnesses

11:25:34  are, so it's best not to talk to anyone who isn't wearing a

11:25:38    juror's badge.  If you're in the hall or the restroom, and
11:25:42    you hear someone talking about the case, ask them not to talk
11:25:46    about it in your presence or simply leave.

11:25:49        Don't get into an elevator with anyone you
11:25:54    recognize, other than another juror.  The parties and the
11:25:57    attorneys will not be offended if you ignore them.  They're
11:26:02    also under orders not to speak to you.

11:26:04        So please wear your juror's badge where everyone can
11:26:08    see it so no one speaks to you accidentally.

11:26:11        Don't be concerned, though, if you see witnesses
11:26:14    talking to each other or to the attorneys.  That is
11:26:18    permissible.  Just stay far enough away from them that you
11:26:22    won't overhear any of their conversation.

11:26:26        Do not let anyone communicate with you about the
11:26:28    case or about anyone who has anything to do with it.

11:26:33        If someone does try to communicate with you about
11:26:37    it, tell them you will not speak to them, then immediately
11:26:41    inform our bailiff, when we have one, or Ms. Kim about that
11:26:45    conduct.

11:26:46        This restriction includes discussing the case in
11:26:50    person, in writing, by phone, tablet or computer, or any
11:26:57    other means, via e-mail, via text messaging or any Internet
11:27:02    chat room, blog, website or application, including but not
11:27:08    limited to, Facebook, YouTube, Twitter, X, Instagram,
11:27:16    LinkedIn, Snapchat, TikTok or any other forms of social

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 11:27:20  media.

2 11:27:21          This restriction also applies to communicating with

3 11:27:25  your fellow jurors about the case until I give you the case

4 11:27:29  for deliberation, unless I instruct otherwise.

5 11:27:32          You must not independently investigate the facts or

6 11:27:37  the law or consider or discuss facts as to which there is no

7 11:27:42  evidence.  This means, for example, that you may not visit or

8 11:27:47  view any place that you hear described in the case.  Do not

9 11:27:52  search for information on any of the parties, witnesses,

10 11:27:57  attorneys or law firms or me, at least until the case is

11 11:28:02  over.

12 11:28:03          If you look for these people, you may accidentally

13 11:28:06  find information about the case.

14 11:28:09          Do not conduct experiments, do not read, listen to

15 11:28:14  or watch any news or media accounts or commentary about the

16 11:28:19  case or about anyone who has anything to do with it, although

17 11:28:24  I don't have any information that there will be news reports

18 11:28:27  about the case.

19 11:28:27          These rules protect each party's right to have the

20 11:28:31  case decided only on evidence that has been presented here in

21 11:28:38  court.  Witnesses here in court take an oath to tell the

22 11:28:40  truth, and the accuracy of their testimony is tested through

23 11:28:44  the trial process.

24 11:28:46          If you do any research or investigation outside the

25 11:28:49  courtroom or gain any information through improper

1 11:28:54   communications, then your verdict may be influenced by

2 11:28:58   inaccurate, incomplete or misleading information that has not

3 11:29:03   been tested by the trial process.

4 11:29:06        You can't ask anyone for information relating to the

5 11:29:10   case even if you don't say that it has anything to do with

6 11:29:14   the case or that you're on a jury.  You can't even look up a

7 11:29:19   word in the dictionary if you don't know or don't all agree

8 11:29:23   on the meaning of the word.

9 11:29:25        If you have any questions at all, send them in

10 11:29:28   writing to me, and I will try to help you answer them.  Each

11 11:29:33   of the parties is entitled to a fair trial by an impartial

12 11:29:38   jury, and if you decide the case based on information not

13 11:29:42   presented in court, you will have denied the parties a fair

14 11:29:46   trial.

15 11:29:48        And remember, you have taken an oath to follow the

16 11:29:50   rules, and it's very important that you do follow these

17 11:29:54   rules.

18 11:29:55        These and my other orders are not just my

19 11:30:00   preferences or requests.  They are serious and important, and

20 11:30:03   they are the law.

21 11:30:05        The law requires these restrictions to ensure that

22 11:30:09   the parties have a fair trial with a fair and unbiased jury,

23 11:30:15   and that's a jury that will base its decision only on the

24 11:30:18   evidence presented in the courtroom.

25 11:30:21        It's common for the media, whether television,

```
 1 11:30:25   radio, newspapers or online source, to report about lawsuits,
 2 11:30:30   parties to lawsuits, witnesses in lawsuits and their lawyers,
 3 11:30:35   and the media coverage may be accurate or it may be
 4 11:30:38   inaccurate.  It might be complete and thorough or incomplete
 5 11:30:43   and not thorough.  The coverage may portray both sides of the
 6 11:30:47   story fairly or it may be one-sided.  If you do your own
 7 11:30:52   research, look on the Internet or view media coverage
 8 11:30:56   relating to the case, you will have no way of knowing whether
 9 11:30:59   what you are reading is accurate, complete or fair.
10 11:31:04         And in addition, the parties and the Court will have
11 11:31:07   no way of knowing what you've seen or read, and will be
12 11:31:12   deprived of the opportunity to confront and explain whatever
13 11:31:17   is said in those accounts.  And you will have more
14 11:31:20   information, possibly inaccurate information, than your
15 11:31:23   fellow jurors.
16 11:31:24         That is why your information about the case must be
17 11:31:28   limited to what is presented in the courtroom.  That way, all
18 11:31:32   the jurors will see and hear the same evidence, and the
19 11:31:35   parties will have an opportunity to address that evidence,
20 11:31:40   engage in what we call cross-examination, and talk to you
21 11:31:44   about the evidence in their opening statements and closing
22 11:31:47   arguments.
23 11:31:48         And you can't fix the problem by sharing with your
24 11:31:51   fellow jurors information that you shouldn't have in the
25 11:31:56   first place.  A juror who violates these restrictions
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  11:32:01  jeopardizes the fairness of these proceedings, and a mistrial

2  11:32:05  could result.

3  11:32:06      A mistrial means that no matter how far we are into

4  11:32:09  the case, we have to start over.  It means that the jurors,

5  11:32:15  the Court staff, the attorneys, and the parties will have

6  11:32:18  wasted their time.  You will also have wasted the tax

7  11:32:24  dollars, your tax dollars, that it takes to provide this

8  11:32:26  trial.

9  11:32:27      If you hear any other juror talking about having

10  11:32:30  done research, seen news coverage or learned information

11  11:32:34  about the case outside of the courtroom, or if you do so

12  11:32:38  yourself, you must inform Ms. Kim immediately so that we can

13  11:32:41  address the situation.

14  11:32:43      And I can't emphasize these rules enough.  Judges in

15  11:32:49  every court across the country advise juries of these same

16  11:32:52  rules, and yet sometimes we hear that jurors are ignoring

17  11:32:55  them.  Sometimes it's just curiosity, and sometimes it's

18  11:33:00  because jurors believe they need to know more about the case

19  11:33:04  than the lawyers have told them, in order to do their jobs as

20  11:33:07  jurors.  But there is absolutely no excuse or justification

21  11:33:12  for violating these rules.  So don't even try to think of

22  11:33:16  one.

23  11:33:17      If you have any questions about whether something

24  11:33:21  you are about to do is okay, just don't do it.

25  11:33:28      Now I'll tell you about some of the general

11:33:30    principles that apply in a trial.  When a party has the

11:33:34    burden of proof on any claim or affirmative defense by a

11:33:39    preponderance of the evidence, it means you must be persuaded

11:33:42    by the evidence that the claim or affirmative defense is more

11:33:47    probably true than not true.

11:33:51        You should base your decision on all of the evidence

11:33:54    regardless of which party presented it.

11:33:58        Evidence is the sworn testimony of witnesses, the

11:34:02    exhibits that are received into evidence, any facts to which

11:34:06    the parties agree, and any facts that I may instruct you to

11:34:11    accept as proved.

11:34:13        In deciding the facts in this case, you may have to

11:34:16    decide which testimony to believe and which testimony not to

11:34:22    believe.  You may believe everything a witness says, or part

11:34:26    of it, or none of it.

11:34:29        In evaluating the testimony of witnesses, consider

11:34:33    the following questions:  How well could the witness see or

11:34:38    hear or otherwise sense the things about which the witness

11:34:41    testified?

11:34:42        How well was the witness able to remember and

11:34:47    describe what happened?

11:34:48        What was the witness's behavior while testifying?

11:34:52        Did the witness understand the questions and

11:34:55    answered them directly?

11:34:57        Did the witness have a reason to lie, such as bias

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 11:35:01   or prejudice or personal interest in how the case is decided?

2 11:35:06        What was the witness's attitude about the case, or

3 11:35:10   about testifying?

4 11:35:11        How reasonable is the testimony when you consider

5 11:35:15   all the other evidence in the case?

6 11:35:18        Did other evidence in the case prove or disprove any

7 11:35:23   fact about which the witness testified?

8 11:35:24        Consider any other factors that bear on credibility,

9 11:35:30   and use your common sense and good judgment to evaluate the

10 11:35:35   testimony based on all the circumstances.

11 11:35:39        Sometimes a witness may say something that is not

12 11:35:42   consistent with something else he or she said.  Sometimes

13 11:35:46   different witnesses will give different versions of what

14 11:35:50   happened.  People often forget things or make mistakes in

15 11:35:54   what they remember.

16 11:35:56        Also, two people may see the same event but remember

17 11:35:59   it differently.  You may consider these differences, but do

18 11:36:05   not decide the testimony is untrue just because it differs

19 11:36:09   from other testimony.

20 11:36:12        However, if you decide that a witness has

21 11:36:15   deliberately testified untruthfully about something

22 11:36:20   important, you may choose not to believe anything that

23 11:36:23   witness said.

24 11:36:25        On the other hand, if you think the witness

25 11:36:27   testified untruthfully about some things but told the truth

1 11:36:32    about others, you may accept the part you think is true and

2 11:36:37    ignore the rest.

3 11:36:38         You must avoid bias, conscious or unconscious, based

4 11:36:45    on a witness's race, color, religious beliefs, national

5 11:36:50    ancestry, sexual orientation, gender identity, gender, or

6 11:36:55    economic circumstances in your determination of credibility.

7 11:37:01         The weight of the evidence as to a fact does not

8 11:37:05    necessarily depend on the number of witnesses who testify

9 11:37:08    about it.  What is important is how believable the witnesses

10 11:37:14    are and how much weight you think their testimony deserves.

11 11:37:20         There are two kinds of evidence:  direct and

12 11:37:25    circumstantial.  Direct evidence is direct proof of a fact,

13 11:37:29    such as testimony about what that witness personally saw or

14 11:37:34    heard or did.

15 11:37:36         Circumstantial evidence is indirect evidence.  That

16 11:37:40    is, it's proof of one or more facts from which you could

17 11:37:44    conclude that other facts exist.

18 11:37:47         For example, if you wake up in the morning and see

19 11:37:50    that the sidewalk is wet, you may find from that fact that it

20 11:37:55    rained during the night.  However, other evidence, such as a

21 11:37:58    garden hose that was left turned on may provide an

22 11:38:03    explanation for the water on the sidewalk.

23 11:38:05         Therefore, before you decide that a fact has been

24 11:38:09    proven by circumstantial evidence, you must consider all the

25 11:38:13    evidence in the light of reason, experience, and common

1 11:38:18  sense.

2 11:38:20        You are to consider direct and circumstantial

3 11:38:24  evidence.  Either can be used to prove any fact.  The law

4 11:38:29  makes no distinction between the weight to be given to either

5 11:38:33  direct or circumstantial evidence.  It's for you to decide

6 11:38:38  how much weight to give to any evidence.

7 11:38:42        The following things are not evidence, and you must

8 11:38:46  not consider them as evidence in deciding the facts of this

9 11:38:50  case:  Statements or arguments by attorneys are not evidence.

10 11:38:58  Questions and objections are not evidence.  Do not assume to

11 11:39:03  be true any insinuation suggested by a question asked a

12 11:39:09  witness.  A question may be considered only if it helps you

13 11:39:14  to understand the answer.

14 11:39:17        There are rules that control what evidence can be

15 11:39:19  presented in a case.  When an attorney asks a question or

16 11:39:24  offers an exhibit in evidence, and the attorney on the other

17 11:39:28  side thinks it's not permitted by the rules, that attorney

18 11:39:33  may object.

19 11:39:34        If a question is objected to, when the objection is

20 11:39:38  sustained, which means the witness may not respond, you must

21 11:39:43  not guess about what the answer might have been or the reason

22 11:39:47  for the objection.

23 11:39:49        If the objection is overruled, then the witness is

24 11:39:52  allowed to answer.  You may consider that answer as you would

25 11:39:56  any other evidence in the case.

1  11:39:59         And please remember that it's an attorney's duty to

2  11:40:03    object to questions that the attorney believes are not

3  11:40:06    proper.  And you should not show prejudice toward the

4  11:40:10    attorney or the side the attorney represents because the

5  11:40:14    attorney makes an objection.

6  11:40:16         I have a few more instructions to give you, but I'm

7  11:40:22    probably trying Ms. Diaz's patience, so we'll take -- you are

8  11:40:30    okay?  All right.

9  11:40:31         You cannot consider as evidence anything you may see

10 11:40:34    or hear when the Court is not in session, even if what you

11 11:40:38    see or hear is done or said by one of the parties or by one

12 11:40:42    of the witnesses.

13 11:40:44         Sometimes I may order that evidence be stricken and

14 11:40:48    that you disregard or ignore the evidence.  That means that

15 11:40:52    when you are deciding the case, you must not consider that

16 11:40:55    evidence for any purpose.  Treat it as though you had never

17 11:41:00    heard of it.

18 11:41:02         Some evidence might be admitted only for a limited

19 11:41:05    purpose.  When I tell you that certain evidence has been

20 11:41:09    admitted for a limited purpose, you may consider it for that

21 11:41:13    purpose only and not for any other purpose.

22 11:41:17         At times, I might find it necessary to direct one or

23 11:41:20    more of the attorneys to do or not to do certain things.  I

24 11:41:25    may even find it necessary to make some criticism of an

25 11:41:29    attorney's conduct.  If I do so, you must not show prejudice

11:41:35  toward the attorney or the side the attorney represents

11:41:39  simply because I have found it necessary to say something to

11:41:42  the attorney.

11:41:43       You will be given notebooks and pens.  If you wish,

11:41:48  you may take notes to help you remember the evidence.  If you

11:41:52  do take notes, keep them to yourself until you and your

11:41:57  fellow jurors go to the jury room to decide the case.

11:42:01       You should not permit note taking to distract you or

11:42:05  prevent you from listening carefully to other testimony.

11:42:09       Remember, you are judges of the believability of the

11:42:13  witnesses.  Notes are only to assist your memory, and they

11:42:18  shouldn't take the place of your memory.

11:42:20       Jurors should not be overly influenced by what that

11:42:24  juror or any other juror writes down.

11:42:28       Some testimony might have seemed unimportant at the

11:42:31  time it was presented and, therefore, was not written down,

11:42:35  but it might turn out to be important later in the trial

11:42:40  after all the evidence is submitted and you've heard the

11:42:43  arguments of counsel and the jury instructions.

11:42:46       A juror who does not take notes should rely on his

11:42:51  or her recollection of the evidence and not be influenced by

11:42:54  the fact that other jurors do take notes.

11:42:58       Leave those notebooks on your seat when you leave

11:43:01  each day and at each recess.  You will be able to take them

11:43:05  into the jury room when you deliberate.

1 11:43:07        By the way, you may see me taking notes during the

2 11:43:11 trial, but I take notes for different reasons.  So when you

3 11:43:14 see me writing something down, it doesn't necessarily mean

4 11:43:18 that you should write it down.

5 11:43:21        At the end of the trial, you will have to make your

6 11:43:24 decision based on what you recall of the evidence.  You will

7 11:43:29 not have a written transcript of the trial, so I urge you to

8 11:43:33 pay close attention to the testimony as it's given.

9 11:43:39        Sometimes there is a tendency on the part of jurors

10 11:43:41 immediately to ask the testimony of one or more witnesses be

11 11:43:46 read back.  And Ms. Diaz is doing a terrific job of taking

12 11:43:50 down everything that is said while we are on the record, but

13 11:43:54 she doesn't translate her notes into a transcript that could

14 11:43:59 be provided to you.

15 11:44:01        So if you ask for something to be read back, I would

16 11:44:04 have to read back to you all of the testimony of that

17 11:44:09 particular witness, not just a single question or answer.

18 11:44:15 And it does take a lot of time to get that together.

19 11:44:20        If you really need testimony, we'll consider your

20 11:44:23 request, but please listen carefully, and don't ask for

21 11:44:27 testimony that is not necessary to your decision.

22 11:44:30        I also ask -- I also allow jurors to ask questions.

23 11:44:39 If you have a question during the trial, write it down on a

24 11:44:42 piece of paper, and raise your hand until I or Ms. Kim

25 11:44:46 acknowledge you.  Don't sign your name.  Ms. Kim will come

1 11:44:49    and get your question.

2 11:44:52              Your question may or may not be asked.  As they do

3 11:44:55    with each other, the attorneys may have an objection to your

4 11:44:58    question.  We are not trying to hide anything from you, but

5 11:45:02    we must be sure that all of the evidence -- rules of evidence

6 11:45:06    are followed.

7 11:45:07              If the question is not asked, or it's asked and

8 11:45:11    objected to, just forget about it.  Don't speculate about

9 11:45:15    what the answer might have been or the reason for not

10 11:45:22    allowing it.

11 11:45:23              It may be that the question will be asked of another

12 11:45:26    witness, that no one knows the answer, or that the question

13 11:45:30    is not legally permissible or not a proper matter for you to

14 11:45:35    consider in the case.

15 11:45:36              If the question is answered, you may consider it as

16 11:45:39    you would any other evidence in the case.

17 11:45:42              But remember that in asking questions, you are not

18 11:45:45    to act as advocates.  We don't need any extra attorneys.  We

19 11:45:50    need impartial triers of the fact.

20 11:45:53              And you need to get our attention to ask your

21 11:45:57    question before the witness leaves, because once a witness

22 11:45:59    leaves, I can't get the witness back because you thought of a

23 11:46:02    question.

24 11:46:03              You will be permitted to separate at recesses.  You

25 11:46:08    must return following the recesses at such times as I

1 11:46:12    instruct you.

2 11:46:14          During recesses, as I said, you must not discuss

3 11:46:17    with anyone any subject connected with this trial.  You

4 11:46:22    cannot even discuss it among yourselves.  When you are

5 11:46:26    together in the hall or the jury room or anywhere else, you

6 11:46:30    must speak only of matters entirely unrelated to the trial.

7 11:46:34          And during the course of the trial, and before you

8 11:46:38    begin your deliberations, you must keep an open mind on this

9 11:46:42    case and on all of the issues that you will be asked to

10 11:46:45    decide.  In other words, you must not form or express any

11 11:46:50    opinion about the case until the matter is finally submitted

12 11:46:54    to you.

13 11:46:55          And remember all the other orders that I gave you at

14 11:46:58    the start of the proceedings.  Don't talk to anyone or allow

15 11:47:02    anyone to talk to you, and don't attempt to do research of

16 11:47:06    any kind on the Internet or otherwise on any subject

17 11:47:10    connected with the trial.

18 11:47:12          If you need to communicate with me at any time, just

19 11:47:16    give a signed note to our bailiff, when we have one, or

20 11:47:20    Ms. Kim.

21 11:47:21          And by the way, as you may know, all of our

22 11:47:25    courtrooms are public courtrooms.  People sometimes like to

23 11:47:29    come and watch trials.  That's perfectly all right.  Don't

24 11:47:33    let it distract you if people come in and out.

25 11:47:36          Also, my law clerks, whom you've already sort of

11:47:39  met, may watch portions of the trial whenever they have the

11:47:42  time.  But be sure that none of your friends or relatives are

11:47:47  present in the courtroom without my knowledge.  It's

11:47:50  particularly important that you don't hear from them what

11:47:54  happened during the times the jury is not in the courtroom,

11:47:58  and also that you don't discuss with them what happened when

11:48:00  you were present.

11:48:02      If at any time you see a friend or relative come

11:48:05  into the courtroom, you should be sure to send a note to me

11:48:08  through Ms. Kim or the bailiff at the first opportunity.

11:48:13      So now we'll take our lunch break, and when we come

11:48:17  back, we'll start the next phase of the trial, which will be

11:48:22  hearing opening statements from the parties.

11:48:28      So I will order you to return no later than 1:15,

11:48:37  and I will order you to have a good lunch.

11:48:41      Ms. Kim, do you want to talk to the jurors first?

11:48:43      THE CLERK:  Yes, please.

11:48:44      THE COURT:  Ms. Kim is going to take care of you and

11:48:46  show you where our jury room is and give you some other

11:48:49  information.  We'll see you after lunch.

11:48:50      (Thereupon, the jury retired from the courtroom.)

11:49:17      THE COURT:  You may be seated.

11:49:23      All right.  Just a reminder because it was

11:49:25  mentioned, we're not going to have details of the accident.

11:49:34  I don't want to declare a mistrial and make the offending

1 11:49:39   party pay for the other side's expenses and fees up to that

2 11:49:42   point.  So let's make sure that doesn't happen.

3 11:49:44           Also, just a reminder up front, to get it out of the

4 11:49:47   way, the jury instruction -- and I do feel for you,

5 11:49:53   Ms. Moller, and your mother.  I'm so sorry for this.  But I

6 11:50:00   do want to point out that in determining Ms. Moller's loss,

7 11:50:05   the jury is not to consider Ms. Moller's grief, sorrow or

8 11:50:11   mental anguish or her pain and suffering or her poverty or

9 11:50:15   wealth.  So let's make sure the questions don't stray into

10 11:50:19   those areas.

11 11:50:22          Anything we need to talk about?

12 11:50:26          MS. GUSTAFSON:  And, Your Honor, my apologies.  By

13 11:50:29   details, I just meant that leading up to the accident.  We

14 11:50:31   will not be getting into any of the details.

15 11:50:34          THE COURT:  I know you won't.

16 11:50:35          MS. GUSTAFSON:  Poor choice of words.  My apologies.

17 11:50:38          THE COURT:  It's okay.

18 11:50:39          MS. CONLOGUE:  Plaintiff has nothing, Your Honor.

19 11:50:40          THE COURT:  I'm having a problem with my hearing, so

20 11:50:43   please speak into the microphone.

21 11:50:44          MS. CONLOGUE:  You asked if Plaintiff had any

22 11:50:46   further issues.  We do not, Your Honor.

23 11:50:48          THE COURT:  Okay.  We'll see you at 1:00, just to

24 11:50:50   make sure everybody is set and ready in case any other

25 11:50:53   thoughts come up during the break.

1 11:51:06          (Thereupon, there was a lunch recess.)

2 13:02:52          THE COURT:  Good afternoon.  Do you have something

3 13:02:53  you wanted to discuss?

4 13:03:01          MR. CONLOGUE:  Yes, Your Honor.  It's very brief and

5 13:03:03  simple.  There is an Exhibit 14, and I was trying to get the

6 13:03:12  display to work.  Let's see if this does it.  There we go.

7 13:03:23  Which this is a Google map that has a point A, a point B and

8 13:03:32  a point C on it, Your Honor.  And the parties met and

9 13:03:37  conferred on this document any notation of the 16 minutes we

10 13:03:42  have redacted, and then there's a notation of 6.9 miles,

11 13:03:49  showing that between point A and point C, that distance is

12 13:03:53  6.9 miles.

13 13:03:56          Plaintiff has indicated to the defense that we are

14 13:03:59  willing to stipulate, stating that where it has the 6.9 miles

15 13:04:05  mentioned on this map, it's from point A to point C.

16 13:04:08          I believe the defense's position is is that that's

17 13:04:11  misleading, but they'll stipulate that it's 6.9 miles.

18 13:04:17          THE COURT:  That the distance between point A and

19 13:04:20  point C as the car drives it, not as the crow flies, as they

20 13:04:30  say.

21 13:04:30          MR. CONLOGUE:  Correct.  It's the route that's

22 13:04:32  depicted here is 6.9 miles.

23 13:04:35          THE COURT:  Okay.  So the only issue is what is this

24 13:04:37  little thing referring to?

25 13:04:38          MR. CONLOGUE:  Well, the issue is the defense

1  13:04:41    believes that that -- I guess it's the location of where the

2  13:04:44    6.9 miles is, the defense thinks that that's misleading.

3  13:04:48         THE COURT:  I agree.

4  13:04:49         MR. CONLOGUE:  Okay.  And with the other 6.9 miles

5  13:04:55    on the left side of the exhibit, should that be redacted as

6  13:04:57    well, Your Honor?  Because, again, we're stipulating that

7  13:05:03    it's 6.9 miles.

8  13:05:13         MS. GUSTAFSON:  Your Honor, the defense is willing

9  13:05:15    to have a stipulation read that the distance from point A to

10 13:05:18    point C, as depicted on the exhibit, is 6.9 miles.  My

11 13:05:23    concern is the placement on the map, or even on the side,

12 13:05:27    that it leads that it could be some other direction.

13 13:05:29         So I'm okay with the stipulation being read, but

14 13:05:32    then later the jury may forget about that stipulation.  They

15 13:05:35    have this exhibit, and there is just a concern with where the

16 13:05:38    6.9 is placed.  It makes it look like it's point B to point

17 13:05:43    C, and then on the left, it's not clear at all what that's

18 13:05:47    referring to.  It says:  Via Lawton Avenue and Beaumont

19 13:05:53    avenue.  So that is confusing.

20 13:05:53         THE COURT:  All right.

21 13:05:56         MS. GUSTAFSON: And then there's also -- I noticed at

22 13:05:59    the top, there's a 16-minute drive, a two-hour 12-minute walk

23 13:06:04    and a 39-minute bike ride that I believe should be redacted.

24 13:06:07         MR. CONLOGUE:  Agreed.

25 13:06:07         THE COURT:  That whole panel on the left?

1 13:06:10          MS. GUSTAFSON:  Yeah, I think the whole panel on the

2 13:06:11     left should be redacted, and as should the 6.9 miles, because

3 13:06:15     of its placement, but the defense is okay with the

4 13:06:18     stipulation being read that point A to point C in total is

5 13:06:23     6.9 miles.

6 13:06:24          THE COURT:  Okay.  So just take off that panel, and

7 13:06:28     then either black out -- I don't know how you've got it.  If

8 13:06:31     it's just a paper copy, you can -- there you go.  Everything

9 13:06:36     we need to know we learned in kindergarten.

10 13:07:18          Anything else?

11 13:07:19          MR. CONLOGUE:  If I can just check to see if this is

12 13:07:21     acceptable.

13 13:07:22          THE COURT:  Sure.

14 13:07:25          Everybody give their jury lists back?

15 13:07:29          MS. CONLOGUE:  We have two, Your Honor.

16 13:07:31          MS. MARGOLIES:  Ours are on the end here, Your

17 13:07:30     Honor.

18 13:07:33          THE COURT:  You need to return them.

19 13:08:10          MR. CONLOGUE:  We're good, Your Honor.

20 13:08:14          THE COURT:  All right.  So we're ready?

21 13:08:16          Do we know if we have all our jurors, Ms. Kim?

22 13:08:19          THE CLERK:  Brie just went to check.

23 13:08:19          THE COURT:  Okay.  Thank you.

24 13:08:27          THE CLERK:  They are here.

25 13:08:28          THE COURT:  All right.  Is everybody ready?  We just

1 13:08:30   need to call our jurors in a few minutes early.

2 13:08:33           MR. CONLOGUE:  Yes, Your Honor.

3 13:08:33           THE COURT:  All right.

4 13:11:50           THE CLERK:  All rise.

5 13:11:50           (Thereupon, the jury returned to the courtroom.)

6 13:12:21           THE COURT:  You may be seated.

7 13:12:22           Everyone is back, and as I said, the trial will now

8 13:12:26   begin, and each side may make an opening statement, then the

9 13:12:32   plaintiff will present evidence, and the defense may

10 13:12:35  cross-examine the witnesses called by the plaintiff, then the

11 13:12:39  defense may present evidence, and the plaintiff may

12 13:12:43  cross-examine those witnesses.

13 13:12:46          Witnesses don't necessarily testify about things in

14 13:12:49  the order in which they happened, and sometimes I may allow

15 13:12:54  witnesses to testify outside of what might seem like a

16 13:12:58  logical order to accommodate schedules.

17 13:13:01          So again, be sure you keep an open mind until you've

18 13:13:05  heard all the evidence.  After the evidence has been

19 13:13:09  presented, I will instruct you on the law that applies to the

20 13:13:13  case, and the attorneys will make their closing argument.

21 13:13:18  That's when you will go into the jury room to deliberate on

22 13:13:21  your verdict.

23 13:13:23          The lawyers will now be permitted to make an opening

24 13:13:27  statement if they choose to do so.  As I said, neither side

25 13:13:31  is required to do that.

1 13:13:33          An opening statement is not evidence.  It is also

2 13:13:36    not an argument.  Counsel are not permitted to argue the case

3 13:13:41    at this point in the proceedings.  An opening statement is

4 13:13:45    simply an outline by Counsel of what he or she expects the

5 13:13:49    evidence will show in the trial.  Its purpose is to assist

6 13:13:54    you in understanding the case as it's presented to you.

7 13:13:58          Would the plaintiff like to make an opening

8 13:14:00    statement?

9 13:14:01          MS. CONLOGUE:  Yes, Your Honor.  Thank you.

10 13:14:03          Hello again.  Deputy sheriffs are not allowed to put

11 13:14:19    people into danger.  This is a simple rule that all of us

12 13:14:23    understand.  But we are here today because Deputy Fite, the

13 13:14:28    defendant in this case, did not follow this rule.

14 13:14:32          The facts of this case involve the untimely death of

15 13:14:37    Bret Breunig, the son of my client, Deborah Moller, who is in

16 13:14:42    the courtroom today with her family.

17 13:14:44          Bret Breunig died after being struck by a train on

18 13:14:48    August 18th, 2021, after being transported against his will

19 13:14:52    to a desolate road amongst orange groves and then abandoned

20 13:14:57    by Deputy Fite.

21 13:14:59          Now, Deputy Fite first encountered the decedent on

22 13:15:05    the lawn of Loma Linda University Medical Center, an

23 13:15:08    emergency room, where she had been notified by security that

24 13:15:12    he had been kicked out.

25 13:15:15          And when she met him, the decedent was not well.

1  13:15:18   You see, six weeks earlier, on July 1st of 2021, the decedent

2  13:15:23   got into an accident, and he severely broke his right ankle.

3  13:15:29   At that time, back in July, he had been taken to Loma Linda

4  13:15:33   University Medical Center to repair it, and he ultimately

5  13:15:35   underwent two surgeries, and he was hospitalized for a period

6  13:15:39   of 10 days.

7  13:15:41        And after his surgery, he was ordered by his doctors

8  13:15:44   to not walk on his ankle for a period of two to three months

9  13:15:48   while it healed, and he was discharged on July 10, 2021, with

10 13:15:55   leg brace -- with a leg brace and crutches.

11 13:15:58        Now, on the date of the incident that brings us here

12 13:16:03   today, August 18, 2021, Bret Breunig had returned to Loma

13 13:16:10   Linda University Medical Center to seek further treatment for

14 13:16:12   that ankle.  It wasn't healing very well, and third-party

15 13:16:17   witnesses who saw Mr. Breunig in the moments before his death

16 13:16:22   describe Mr. Breunig as walking with a limp, with that ankle

17 13:16:26   swollen and red and looking bruised.

18 13:16:30        And Bret Breunig specifically told Deputy Fite

19 13:16:35   during the time that they were together that he had come to

20 13:16:37   the hospital that day because his ankle was injured, and he

21 13:16:40   wasn't able to walk on it.

22 13:16:42        But in addition to this obviously injured ankle,

23 13:16:47   there were lots of other signs that Mr. Breunig was just not

24 13:16:50   in his right mind on that day.  He was found lying on the

25 13:16:55   ground across the street from the hospital, he was wearing

only a hospital gown and a blanket, and he had no shoes on.

He didn't have any belongings with him, no backpack, no wallet, no money, no cellphone, nothing. And when deputies approach him and ask him if he's doing all right, Mr. Breunig said that he was hearing voices and that he hadn't eaten in several days. He pleads with Deputy Fite to help him.

And Deputy Fite decides that she's going to take care of Mr. Breunig, and she decides to give him a ride to a friend's house nearby, and Mr. Breunig tells her that he doesn't know the address, but he knows how to get there, and that's just fine with Deputy Fite.

Now, deputies with the County of San Bernardino, they wear audio recording devices, and they generally use that any time they're interacting with members of the public, and Deputy Fite's audio-recorder was working on this day and she had it on, and so you're going to have the opportunity to hear portions of the conversation that happened between them.

And another thing that is important to note is that the vehicles that deputies use when they're out and about on patrol, they don't have handles on the inside in the back portion. There's only handles on the outside. So once you get into that police vehicle and the door closes behind you, you're in that vehicle until a sheriff deputy lets you out.

So Deputy Fite takes Mr. Breunig to this house, as

they agreed.  However, once they get there, Deputy Fite asked Mr. Breunig if he has a key.  And, you know, Mr. Breunig didn't have any belongings with him.  And so Deputy Fite decides that she's not going to let Mr. Breunig out of the vehicle at this stop, after all.

And Mr. Breunig asks her over and over and over again to let him out of the vehicle.  And Deputy Fite tells him no.  And because that patrol car door was locked, Deputy Fite had complete control over when and how and whether Mr. Breunig was going to leave the vehicle.

So at this point, Deputy Fite decides that the place for Mr. Breunig is a hospital.  And she tells him so.  She tells him that she's going to take him to Redlands Community Hospital.  And during the drive, Mr. Breunig acknowledges that he's under the influence of drugs, and that he's withdrawing from drugs.  And so Deputy Fite says again, "You need to go to a hospital."

Now, it's important to note that deputies receive a large amount of specific training and instruction about how to spot someone who is a danger to themselves or others, how to spot someone who is under the influence of drugs, and how to spot someone who may be in need of medical assistance.

And during the course of this trial, you are going to hear from plaintiff's expert, Scott DeFoe, who has had a long and successful career in law enforcement himself.  He's

1 13:20:27  going to tell you how deputies are trained to respond -- how

2 13:20:32  to respond to someone who is going through withdrawal.

3 13:20:37        Now, Bret Breunig, he had to go to the bathroom.

4 13:20:41  And he was asking to get out of the car to go.  And Deputy

5 13:20:44  Fite again said no.  But then Deputy Fite, she says something

6 13:20:51  really important.  She says, "Look, you are withdrawing from

7 13:20:55  drugs.  You've told me so.  I cannot just leave you on the

8 13:20:59  side of the road."

9 13:21:02        However, just a few minutes after that, that is

10 13:21:06  exactly what she does.  And Deputy Fite turns on to

11 13:21:14  Alessandro Road.  That is a single-lane road that is

12 13:21:18  surrounded by orange groves on either side.  There is nothing

13 13:21:21  around.  This is a rural area.  There is no bus stops.  There

14 13:21:25  is no businesses.  There is no gas stations.  There is not

15 13:21:28  even a lot of homes around.  Nothing but orange groves and a

16 13:21:34  train track crossing the road.

17 13:21:37        And when she turned on to Alessandro Road, a train

18 13:21:40  happens to be crossing on that track.  Deputy Fite realized

19 13:21:46  that she was going to have to stop and wait for the train.

20 13:21:52  And so Deputy Fite abruptly pulls over on the side of the

21 13:21:57  road and says, "Get out."

22 13:22:00        Now, you are going to hear from witnesses to this

23 13:22:03  event.  And they are going to tell you that Deputy Fite did

24 13:22:07  not wait around, and that as soon as Mr. Breunig stepped out

25 13:22:11  of her vehicle, she made a U-turn and got out of there, back

1 13:22:16  the way that she came.  And those same witnesses are going to

2 13:22:19  tell you that within minutes, Mr. Breunig was dead.

3 13:22:27        Those same witnesses are going to tell you that they

4 13:22:29  could tell almost instantly that Mr. Breunig was not well,

5 13:22:34  that he was walking with a heavy limp, that his ankle was

6 13:22:37  obviously swollen.  They are going to tell you that even

7 13:22:41  though they never had the opportunity to get as close to

8 13:22:43  Mr. Breunig as Deputy Fite got, that they could tell right

9 13:22:47  away that he was not in his right mind.

10 13:22:50        They are going to tell you that within seconds of

11 13:22:54  being dropped off, Mr. Breunig became fixated on that passing

12 13:22:59  train, and that he walked towards it, and that he ultimately

13 13:23:03  got pulled underneath, to his death.

14 13:23:05        Now, this jury is tasked with deciding who was

15 13:23:13  responsible for his death.  At the end of this case, we are

16 13:23:18  going to ask that you find Deputy Fite negligent when she

17 13:23:21  dropped Mr. Breunig off in this desolate place in the

18 13:23:26  condition that he was in, when she was supposed to, by her

19 13:23:29  own admission, be taking him to a hospital.

20 13:23:33        Now, during this case you are going to learn that

21 13:23:37  Mr. Breunig had about 8.6 nanograms of fentanyl in his

22 13:23:42  system.  That is a toxic level.  It's a big dose.  And you

23 13:23:47  are going to learn about what fentanyl, especially in this

24 13:23:50  type of a dose, can do to the body and to the brain, and how

25 13:23:54  it can affect your executive functioning and your

1 13:23:57   decision-making, and how it can cause you to become

2 13:23:59   disoriented and confused, and how it can impact your

3 13:24:03   judgment.

4 13:24:04          And Deputy Fite, as a trained deputy, knows those

5 13:24:08   things.  But despite this knowledge, Deputy Fite left a man

6 13:24:15   without any shoes, any money, and a broken ankle, who was

7 13:24:19   withdrawing from drugs, out in the middle of an orange grove

8 13:24:23   without any means of obtaining help.

9 13:24:27          And you should keep careful track of her testimony

10 13:24:30  about that, and how her story has changed over time, because

11 13:24:34  it's a little different every time she tells it.

12 13:24:38          MS. GUSTAFSON:  Objection, argument.

13 13:24:40          THE COURT:  It is argumentative.

14 13:24:41          Go ahead.  Move on.

15 13:24:43          MS. CONLOGUE:  And that brings us forward to today.

16 13:24:46  Who is here now?  As I told you, the plaintiff in this case

17 13:24:50  is Deborah Moller.  She's the decedent's mother.  And what

18 13:24:54  this case is about is about the loss of her love and

19 13:25:02  companionship and the support with her son.

20 13:25:05          You are going to hear about the exceptional

21 13:25:07  closeness of their bond, and about how she devoted her life

22 13:25:10  to being a mother.  And you are going to hear about how, even

23 13:25:15  as adults, her children gathered together to connect as a

24 13:25:19  family, sometimes cooking and baking together, which was a

25 13:25:23  shared love.  And you are going to hear about how they used

1 13:25:27  to exchange letters and text messages, and about how the

2 13:25:31  decedent used to write her letters and cards for Mother's Day

3 13:25:35  and holidays.

4 13:25:37         And she's going to tell you about how they were in

5 13:25:40  contact nearly every single day via phone or text or in

6 13:25:44  person, and about how Mr. Breunig would just text her a funny

7 13:25:48  picture, a joke, just to make her laugh, or would stop by

8 13:25:53  spontaneously at her office to have lunch with her.

9 13:25:55         And Mr. -- Ms. Moller acknowledges that her son also

10 13:26:02  struggled in his life, like a lot of young people do, with

11 13:26:05  drugs.  And he even spent some time incarcerated.  And during

12 13:26:11  these times, Ms. Moller did what she could as a mom.  She

13 13:26:14  devoted her time to visiting him and sending him care

14 13:26:17  packages, and she encouraged him every step of the way to get

15 13:26:21  clean and to straighten his life around.  And she was really

16 13:26:24  proud to see him move forward, healthier, after he had paid

17 13:26:29  his debt to society.

18 13:26:31         A mother's love is unconditional.  And Ms. Moller is

19 13:26:37  no exception.  She didn't love her son because he was

20 13:26:42  perfect, but because she was able to see the beautiful parts

21 13:26:44  of him, the goofy, hard-working guy with the joke, who loved

22 13:26:48  her back.

23 13:26:50         But her son's life came to an end on August 18,

24 13:26:55  2021.  She's been deprived of the joy of seeing her son grow

25 13:26:59  old.  There is no more family dinners.  And she's had to

13:27:04  undertake the most unnatural thing on earth:  She's had to

13:27:10  bury her own child.  Her pain is deep and sharp --

13:27:14          MS. GUSTAFSON:  Objection, motion in limine.

13:27:16          THE COURT:  Please move on.

13:27:17          MS. CONLOGUE:  Deputy sheriffs are not allowed to

13:27:25  put people in danger, but because Deputy Fite violated this

13:27:29  rule, Ms. Moller has lost something important.  And at the

13:27:33  end of the case, we are going to ask you, the jury, to make

13:27:37  it right.

13:27:38          And one final thing.  On her official record of this

13:27:45  incident, what's called a CAD log, Deputy Fite reported that

13:27:50  she dropped Mr. Breunig off at Redlands Community Hospital.

13:27:56          Thank you for your time.

13:27:58          THE COURT:  Would the defense like to make an

13:28:00  opening statement?

13:28:02          MS. GUSTAFSON:  Yes, Your Honor.  Thank you.

13:28:03          Good afternoon, ladies and gentlemen.  As you know,

13:28:10  my name is Shannon Gustafson, and I represent Deputy Breana

13:28:15  Fite.

13:28:15          We believe the evidence will show that on

13:28:17  August 18th, 2021, Deputy Breana Fite acted reasonably.  She

13:28:22  did what she could to assist Mr. Breunig within her limited

13:28:25  authority as a law enforcement officer.

13:28:28          However, the evidence will show Mr. Breunig was

13:28:30  never under arrest and had the right to make his own choices.

1 13:28:34    It was ultimately Mr. Breunig's unforeseeable decision to

2 13:28:38    attempt to board a moving train that was the cause of his

3 13:28:41    death.  That's what we believe the evidence will show.

4 13:28:44         Now, yes, Mr. Breunig did have an injury to his

5 13:28:48    ankle.  Deputy Fite did not know about his surgery or any of

6 13:28:52    his past medical history.  She wasn't there for any of that.

7 13:28:56    That's not something that was in her knowledge.  She has to

8 13:28:59    go with what she sees and what she observes on the day when

9 13:29:02    she is presenting with Mr. Breunig.  That's the only

10 13:29:06    information she has.

11 13:29:06         So what happened that day?

12 13:29:09         On August 18th, 2021, just before noon, Deputy Fite

13 13:29:14    was patrolling the Loma Linda Medical University Center.

14 13:29:17    That was her assignment for the day.

15 13:29:19         She was advised by her dispatcher that Loma Linda

16 13:29:23    security had called them.  There was an individual sleeping

17 13:29:26    on the lawn across from the hospital, that was refusing to

18 13:29:30    leave.  It was a trespass.  That was the call.

19 13:29:33         The dispatcher also advised Deputy Fite that the

20 13:29:36    situation was Code 4.  Deputy Fite will explain to you that

21 13:29:40    in law enforcement speak, that means the situation was under

22 13:29:43    control, everyone was safe, there was no emergency.

23 13:29:46         When Deputy Fite arrived at the location, she

24 13:29:49    observed Mr. Breunig.  He was laying on his side in the

25 13:29:54    shade, under a tree, with a thin hospital blanket.

13:29:56    1    He was wearing a pullover-type hospital top and

13:30:00    2    pants with an elastic band.  There was nothing remarkable

13:30:03    3    about the weather or anything else she observed that would

13:30:06    4    indicate to her Mr. Breunig was in any type of danger upon

13:30:10    5    her approach.

13:30:10    6    At the same time that Deputy Fite arrived, her

13:30:14    7    partner, Deputy Vaca, also arrived in a separate vehicle.  As

13:30:20    8    Deputy Fite exited her vehicle, she activated her audio belt

13:30:23    9    recording.  She activated it before she made contact with

13:30:26    10   Mr. Breunig, and she did not turn it off until he walked away

13:30:30    11   from her.  The entire encounter is recorded, and you're going

13:30:32    12   to hear that recording throughout this trial.

13:30:35    13   We believe that when you listen to the recording, it

13:30:37    14   will become clear that Mr. Breunig was awake, alert,

13:30:43    15   oriented, and fully capable of making decisions.  You will

13:30:46    16   hear an individual that knew what he wanted and how to get

13:30:49    17   it.

13:30:51    18   As Deputy Fite approached Mr. Breunig, she was told

13:30:54    19   by Security Officer Miller from Loma Linda -- and you will

13:30:56    20   hear his testimony.  He told her Mr. Breunig had been

13:31:01    21   discharged from the hospital.  Mr. Breunig himself also said,

13:31:05    22   "I was at the hospital for my ankle, but I was" -- he

13:31:08    23   confirmed he was discharged.

13:31:10    24   Why is this important?

13:31:12    25   Deputy Fite will explain to you that "discharged"

13:31:14  meant to her whatever medical or mental healthcare

13:31:18  Mr. Breunig had come for at the hospital, it had been

13:31:21  received.  He was cleared to go.

13:31:22       After learning he had been discharged, Deputy Vaca

13:31:28  and Deputy Fite began talking to Mr. Breunig.  They asked

13:31:31  Mr. Breunig if he still needed medical care.  Mr. Breunig

13:31:34  informed him only that he was hearing voices, but also that

13:31:38  those voices were telling him to go on, and that he did not

13:31:40  want to hurt himself.

13:31:42       Throughout her encounter with him -- and you will

13:31:45  hear the recording -- there is no evidence that Mr. Breunig

13:31:47  was actually hearing voices, other than his statement.

13:31:51  Mr. Breunig never requested to be taken back to the hospital

13:31:54  that was across the street.  He did not ask for an ambulance.

13:31:57       What did he ask the deputies for?

13:31:59       The evidence will show he asked them for a ride down

13:32:02  the street to a friend's house, where he was staying.

13:32:05       The evidence will show at this time, because

13:32:08  Mr. Breunig was now willing to leave, he was not trespassing,

13:32:11  the reason they were originally called out, he was not under

13:32:15  arrest.

13:32:16       There will be testimony in this case from a former

13:32:19  LAPD sergeant.  His name is Mr. Scott DeFoe.  There will

13:32:23  also -- and he was hired by the plaintiff.  There will also

13:32:26  be testimony from a former chief of police, Mr. Clarence

1 13:32:30    Chapman, who has been hired by the defense.

2 13:32:33            I believe both these experts will tell you --

3 13:32:35    they're former law enforcement officers -- that deputies are

4 13:32:39    trained that they are limited in their power to make an

5 13:32:42    arrest.  There must be an arrest warrant or they must have

6 13:32:46    probable cause to believe a crime has been committed.

7 13:32:48            The evidence will show that during her contact with

8 13:32:51    Mr. Breunig across the street from the hospital, Deputy Fite

9 13:32:56    ran him through her dispatch.  He had no warrants.  Deputy

10 13:33:00    Fite will also explain to you she did not have probable cause

11 13:33:03    to arrest Mr. Breunig for any crime.  He was cooperative with

12 13:33:07    her and willing to leave, no longer trespassing.

13 13:33:10            Deputy Fite will testify she did not have any

14 13:33:13    evidence to arrest Mr. Breunig for being under the influence

15 13:33:16    of drugs.  She did not observe any of the normal symptoms you

16 13:33:20    would expect to see of somebody who was intoxicated by drugs.

17 13:33:24    He didn't have any drugs on him.  There was no drug

18 13:33:27    paraphernalia.

19 13:33:27            Yes, Mr. Breunig said he was hearing voices.  But

20 13:33:32    Deputy Fite will explain, based on her training and

21 13:33:33    experience, you cannot arrest somebody just because they say

22 13:33:37    they are hearing voices.

23 13:33:39            Yes, Mr. Breunig was laying down outside, with no

24 13:33:42    shoes and no personal belongings, other than the blanket.

25 13:33:46    She will explain to you that on her training and experience,

13:33:48  1    you cannot arrest somebody just because they appear homeless.

13:33:52  2          We anticipate that Mr. DeFoe, plaintiff's expert,

13:33:56  3    will also testify that instead of arresting Mr. Breunig,

13:34:00  4    Deputy Fite, as a trained officer, had the option of placing

13:34:02  5    a 5150 hold on him.  This is an involuntary commitment of the

13:34:08  6    person where their rights are stripped and medical care is

13:34:11  7    forced upon them.

13:34:12  8          Again, I think all the experts will testify that

13:34:14  9    this is something officers are trained that they cannot do

13:34:17  10   lightly.  A law enforcement officer must have grounds -- they

13:34:21  11   must be able to articulate grounds that the person was a

13:34:24  12   danger to themselves, a danger to others, or so mentally ill

13:34:29  13   that they are unable to make decisions for themselves.

13:34:31  14         We believe the evidence will show, based on the

13:34:33  15   recording and the testimony, that that was not Mr. Breunig.

13:34:37  16   She had no grounds to commit him.

13:34:39  17         So what did Deputy Fite do?  She gave him what

13:34:44  18   Mr. Breunig asked for.  He wanted a ride.  He asked for a

13:34:47  19   ride.  She gave him a ride.

13:34:49  20         Mr. Breunig walked from where he was laying on the

13:34:52  21   lawn to Deputy Fite's patrol car.  He voluntarily got in the

13:34:56  22   backseat.  He was not handcuffed.  He was not under arrest.

13:34:59  23   She was giving him a ride.

13:35:01  24         Now, Mr. Breunig initially told Deputy Fite that he

13:35:05  25   lived nearby near a restaurant called Taylor's.  She started

1 13:35:08   to drive towards Taylor's because she knew where it was.

2 13:35:11            As they got closer, Mr. Breunig told her he did not

3 13:35:17   actually live near Taylor's, but he could show her where to

4 13:35:20   go.  He began giving her turn-by-turn directions deep into a

5 13:35:24   residential area on the outskirts of Loma Linda, now in the

6 13:35:27   neighboring city of Redlands.

7 13:35:29            Eventually, these directions took Deputy Fite deep

8 13:35:33   into this residential area on a cul-de-sac on a street called

9 13:35:37   Cardinal Court in front of a large two-story house.

10 13:35:40            However, prior to their arrival at this residence,

11 13:35:42   Mr. Breunig had told Deputy Fite that he lived in San

12 13:35:47   Bernardino.  They weren't in San Bernardino.  He also said

13 13:35:49   that he was staying in Loma Linda with a friend near

14 13:35:53   Taylor's.  It turns out they are now well passed Taylor's.

15 13:35:57   Mr. Breunig also advised that he was homeless.

16 13:35:59            Because of these varying accounts where he lived

17 13:36:02   along the ride, Deputy Fite was concerned that maybe he did

18 13:36:05   not live at this place that he had now taken her.

19 13:36:08            Deputy Fite was also aware that Mr. Breunig had a

20 13:36:11   criminal history involving thefts, based on what her

21 13:36:14   dispatcher had informed her of.

22 13:36:16            She, therefore, told Mr. Breunig, before she let him

23 13:36:20   out, she was going to verify that he lived there.  When she

24 13:36:23   did this, it was Mr. Breunig that said he had a key.  So

25 13:36:27   Deputy Fite reasonably said, "Show me the key."

1  13:36:30        Instead of showing her a key, he began pulling

2  13:36:32   something in and out of his pocket that appeared to be a

3  13:36:34   piece of paper.  She told him, "That's not a key.  You don't

4  13:36:37   have a way into the house."

5  13:36:39        She tried to walk up to the house to verify that

6  13:36:41   Mr. Breunig did in fact live there and would not be

7  13:36:44   trespassing if she left him.

8  13:36:45        She knocked on the door.  Nobody answered.  While

9  13:36:49   she did this, Mr. Breunig was yelling from the backseat,

10 13:36:52   "Don't knock on the door.  They don't like the sheriff's

11 13:36:55   department.  They don't want you here."

12 13:36:56        That was basically telling Deputy Fite that

13 13:37:00   Mr. Breunig probably did not live at this location.

14 13:37:02        When this didn't work, and she did not let

15 13:37:06   Mr. Breunig out of the car, Mr. Breunig tried a different

16 13:37:09   tactic.  He said, "I have to go to the bathroom.  Let me out.

17 13:37:12   I have to go to the bathroom."

18 13:37:13        The words he used were actually, "Let me out or I'm

19 13:37:16   going to shit in your car."

20 13:37:17        Deputy Fite did not believe that he actually had to

21 13:37:21   use the bathroom, but that this was just another ruse to get

22 13:37:25   out of the car at the place where he did not live that he had

23 13:37:28   now taken her.  She, therefore, got back into her patrol car

24 13:37:31   and was trying to figure out where she could take

25 13:37:34   Mr. Breunig.  She started to look up more information on him

1 13:37:37   on her computer.

2 13:37:38           When she did this, she learned from his driver's

3 13:37:41   license that he lived in Beaumont.  When asked about this,

4 13:37:44   Mr. Breunig advised, "That's where my mom stays."

5 13:37:48           Well, they weren't anywhere near Beaumont.  There

6 13:37:50   was also some additional criminal history that she pulled up

7 13:37:52   related to thefts.  She didn't believe she could reasonably

8 13:37:56   leave Mr. Breunig in this neighborhood with the information

9 13:38:00   she had.  Not having any other options, she decided she was

10 13:38:03   going to take him to Redlands Community Hospital.

11 13:38:06           Why Redlands instead of Loma Linda?  Well, where

12 13:38:10   Mr. Breunig's turn-by-turn directions had now taken her were

13 13:38:14   the outskirts of Loma Linda.  They were much closer to

14 13:38:16   Redlands Community Hospital.  However, she's not a Redlands

15 13:38:20   deputy.  That's not sheriff's department jurisdiction.  She

16 13:38:23   didn't know where the hospital was, so she plugged it into

17 13:38:26   the GPS on her phone, and she began driving there.

18 13:38:28           While she was driving to the hospital, Mr. Breunig

19 13:38:33   became agitated.  He was not happy.  He told her, "I don't

20 13:38:36   want to go back to the hospital.  If you take me back to the

21 13:38:39   hospital, I'm going to refuse."

22 13:38:40           He continued to threaten that he was going to poop

23 13:38:43   in her car if she did not let him out.

24 13:38:45           She didn't feel it was reasonable to leave him in

25 13:38:48   the residential neighborhood, so she wanted to take him to a

1  13:38:50   place where she could leave him.  She told him, "You can

2  13:38:54   refuse treatment when you get there.  That's your right,

3  13:38:57   that's your choice, but I'm going to take you to the

4  13:38:59   hospital."

5  13:38:59        Mr. Breunig did say he was withdrawing from drugs,

6  13:39:02   and so Deputy Fite said, "Well, if that is the case, I'm

7  13:39:05   going to take you to the hospital."

8  13:39:07        Mr. Breunig never indicated or never said that he

9  13:39:09   had actually taken drugs or that he was under the influence.

10 13:39:12        As they drove to Redlands Community Hospital, while

11 13:39:17   she was talking with Mr. Breunig in the backseat of the car,

12 13:39:20   it was a little bit of an argument at this point, unbeknownst

13 13:39:23   to Deputy Fite, she missed the turn to Redlands Community

14 13:39:26   Hospital.

15 13:39:27        And you're going to see the map, you're going to see

16 13:39:30   the evidence in this trial.  It's not a standard left turn.

17 13:39:32   It's a very sharp -- almost a U-turn, orange groves on one

18 13:39:37   side, a sharp turn on the other.  She didn't see the turn.

19 13:39:40   She was distracted by Mr. Breunig.  She continued to drive to

20 13:39:43   what she believed was the hospital where she could let

21 13:39:46   Mr. Breunig out.

22 13:39:46        As she did this, Mr. Breunig continued to argue,

23 13:39:50   "Let me out or I'm going to shit in your car."

24 13:39:53        Now, Deputy Fite continues to the very next left

25 13:39:56   turn, the first left turn she sees called Alessandro Road.

1 13:40:01   She believes this is the left turn that goes straight to

2 13:40:04   Redlands Community Hospital.  As she makes that turn, instead

3 13:40:08   of just threatening to use the restroom, Mr. Breunig decides

4 13:40:12   to up the ante.  He now begins to groan, he begins to make

5 13:40:17   faces, and he begins to make a motion like he's pulling down

6 13:40:20   his pants, telling her, "I'm going to shit in your car."

7 13:40:23         Because she was just giving him a ride at this point

8 13:40:26   and trying to get him to the hospital, Deputy Fite did not

9 13:40:30   believe it was reasonable to let Mr. Breunig go to the

10 13:40:33   bathroom all over himself in the backseat.

11 13:40:35         So what did she do?

12 13:40:37         She could not continue driving straight down the

13 13:40:40   road that she believed led to the hospital because there was

14 13:40:43   a train blocking in front of the path and cars were starting

15 13:40:46   to line up behind that train.  There was a clearing on the

16 13:40:49   side of the road.  There was enough room for Mr. Breunig to

17 13:40:53   get out of the car.  She, therefore, decided, I'm going to

18 13:40:56   pull over, and I'm going to let him use the restroom.

19 13:41:00         When she pulled over and she opened that door,

20 13:41:02   Mr. Breunig had other plans.  He got out of the car, he

21 13:41:06   walked past Deputy Fite, walked in front of her patrol car

22 13:41:10   across the street to the other side and away from her.  It

23 13:41:14   became clear to Deputy Fite at this point that Mr. Breunig

24 13:41:17   was not withdrawing from drugs, he did not need to urgently

25 13:41:20   use the restroom, as he had been claiming, he just wanted out

1 13:41:24   of the car and away from her.

2 13:41:26           At this point, she will tell you she did not have

3 13:41:29   any grounds to arrest him, she did not have any grounds to

4 13:41:32   have him committed, he had a choice to walk away from her,

5 13:41:36   and she honored that choice.  She could not -- she had no

6 13:41:39   authority to go after him.

7 13:41:40           So she got in her car, she made a U-turn, and she

8 13:41:44   drove back to the city of Loma Linda.

9 13:41:46           There will be witnesses that were in the cars

10 13:41:50  waiting for the train that will tell you Mr. Breunig

11 13:41:53  continued to walk towards the train.  He then attempted to

12 13:41:56  jump on the train and grab on as if to get a ride.  He

13 13:42:00  stumbled the first time.  Undeterred, he jumped up again and

14 13:42:04  tried to grab on the train to get a ride.  This time he

15 13:42:07  slipped and he was killed.

16 13:42:09           Now, after Mr. Breunig died, there was an autopsy

17 13:42:14  and there were blood tests.  These blood tests showed that

18 13:42:18  Mr. Breunig did in fact have fentanyl in his system.  Deputy

19 13:42:21  Fite did not know that.  She did not have access to those

20 13:42:24  blood tests.

21 13:42:25           Ms. Moller, I believe, will testify and will tell

22 13:42:29  you her son had been using drugs since he was 21 years old.

23 13:42:32  He had been addicted to heroin.  He was an addict.  He was 33

24 13:42:35  when he died.

25 13:42:36           The defense will call Dr. Clark, a board-certified

1 13:42:40  toxicologist and UCSD emergency room physician.  He regularly

2 13:42:45  treats individuals who use fentanyl, heroin and other drugs.

3 13:42:49  He will explain to you that those who use regularly build up

4 13:42:52  what is called a tolerance.

5 13:42:53       What does that mean?

6 13:42:55       They don't experience the same symptoms of a drug

7 13:42:58  like somebody who is using it for the first time, therefore,

8 13:43:01  the symptoms are not obvious.  He will explain to you, and he

9 13:43:05  will testify, that Mr. Breunig, based on his review of the

10 13:43:09  recording, was not experiencing the obvious symptoms of

11 13:43:12  fentanyl that you would expect from somebody who had used it,

12 13:43:17  based on the blood tests.

13 13:43:18       During her transport, Mr. Breunig will -- or during

14 13:43:22  her transport of Mr. Breunig, Deputy Fite will explain to

15 13:43:26  you, and I believe the evidence will show from the recording,

16 13:43:29  there were never any signs that he was experiencing any type

17 13:43:32  of medical emergency or drug intoxication.  He never appeared

18 13:43:36  confused or disoriented, he was never in and out of

19 13:43:39  consciousness or sedated, he never showed signs or complaints

20 13:43:42  that he was having trouble breathing.  Once they left Loma

21 13:43:46  Linda, he never even complained about his ankle injury.

22 13:43:49       Instead, we believe the evidence will show

23 13:43:52  Mr. Breunig was coherent and alert and at times manipulative.

24 13:43:56  He knew what he wanted and he knew how to get it.  As Deputy

25 13:44:00  Fite will testify and the evidence will show, there was no

1 13:44:03   grounds to arrest him or have him committed when he chose to

2 13:44:06   walk away from her patrol car.

3 13:44:08          Now, there will be some evidence, I believe, and you

4 13:44:11   will hear it in the recording, that Deputy Fite, on occasion,

5 13:44:15   did use some profanity with Mr. Breunig during their

6 13:44:19   interaction on the way to the hospital.  It's recorded, she

7 13:44:21   saved that recording, she's not going to deny that, and

8 13:44:23   you're going to hear her frustrations at times with

9 13:44:28   Mr. Breunig.

10 13:44:28          Likewise, when Deputy Fite closed out her call, as

11 13:44:32   she's required to do, she did so after she left Mr. Breunig,

12 13:44:35   and before she had learned that he died, she stated that

13 13:44:38   he -- that she dropped him off at the hospital because that

14 13:44:41   was her intent.  That was where she intended to drop him off,

15 13:44:44   and she believed the hospital was just up the road on the

16 13:44:47   other side of the train.

17 13:44:48          You will see the maps that show the sharp left turn

18 13:44:51   that she missed while being distracted by Mr. Breunig, and

19 13:44:54   you will hear the reasons she believed she was near the

20 13:44:57   hospital.  You can decide whether this documentation was

21 13:45:00   accurate or if it even matters.

22 13:45:02          However, Deputy Fite own recording, which again,

23 13:45:07   captured her encounter from beginning to end with

24 13:45:10   Mr. Breunig, we believe that recording will clearly show that

25 13:45:13   Deputy Fite did not have authority to take away Mr. Breunig's

13:45:19 rights that day when he walked away from her.  Regardless of

13:45:22 Deputy Fite's decisions, the evidence will show that the sole

13:45:24 cause of Mr. Breunig's death was his unforeseeable decision

13:45:28 to try to jump aboard that moving train.

13:45:31         Thank you for your time and attention, and we look

13:45:33 forward to presenting our case to you.

13:45:36         THE COURT:  Thank you.

13:45:38         Would the plaintiff like to call a witness?

13:45:42         MR. CONLOGUE:  Yes, Your Honor.  Plaintiff calls

13:45:51 Defendant Breana Fite to the stand.

13:45:58         THE COURT:  Not that way.

13:46:13         THE CLERK:  Just stand there to be sworn.

13:46:16         Thank you.  Please raise your right hand.

13:46:18 THEREUPON:

13:46:18                       BREANA FITE,

13:46:18 Called in these proceedings, and after having been first duly

13:46:27 sworn, testifies as follows:

13:46:27         THE CLERK:  Thank you.  Take a seat.

13:46:29         Speaking into the microphone, can you please state

13:46:40 and spell your name for the record?

13:46:42         THE WITNESS:  Breana Fite, B-r-e-a-n-a, F-i-t-e.

13:46:50         THE COURT:  Before we begin, let me just explain why

13:46:53 I told Officer Fite to walk around.  This area in front of

13:46:59 my -- Ms. Kim's desk is referred to as the well.  By

13:47:06 tradition from England, similar to our black robes, which are

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:47:11  also traditional from England, no one walks in the well

2 13:47:15  except my court staff, or otherwise with my permission.

3 13:47:19          So we regularly have witnesses walk all around

4 13:47:23  instead of walking through the well.

5 13:47:24          Mr. Conlogue, you may proceed.

6 13:47:28          MR. CONLOGUE:  Thank you, Your Honor.

7 13:47:28                    DIRECT EXAMINATION

8 13:47:29  BY MR. CONLOGUE:

9 13:47:29   Q. Good afternoon.

10 13:47:34  A. Good afternoon.

11 13:47:34  Q. On August 18, 2021, you kicked Mr. Breunig out of your

12 13:47:41  car while knowing he was under the influence, correct?

13 13:47:44  A. No.

14 13:47:47  Q. You knew that he was unable to walk, correct?

15 13:47:50  A. No.

16 13:47:53  Q. And this ride that we have been talking about, is it a

17 13:48:00  courtesy ride?  What would you call it?

18 13:48:02  A. Courtesy ride.

19 13:48:03  Q. Okay.  So you gave him a courtesy ride on August 18,

20 13:48:08  2021, correct?

21 13:48:08  A. That's correct.

22 13:48:10  Q. And before we get more into the incident itself, before

23 13:48:16  this incident, did you have any prior contacts with

24 13:48:19  Mr. Breunig?

25 13:48:19  A. No, I didn't.

13:48:21  1    Q. And did you ever speak with any other deputies within the

13:48:27  2    department who had prior contacts with Mr. Breunig?

13:48:29  3    A. No.

13:48:30  4    Q. And then how long have you worked for the County?

13:48:34  5    A. About nine years.

13:48:37  6    Q. And in that entire time, is it with the sheriff's

13:48:40  7    department?

13:48:40  8    A. Yes.

13:48:41  9    Q. And is your rank still deputy?

13:48:44  10   A. Yes.

13:48:44  11   Q. And when you first started -- what year did you start?

13:48:52  12   A. 2015.

13:48:53  13   Q. And is that also when you went to the academy, before you

13:48:57  14   became a deputy?

13:48:58  15   A. Yes.

13:48:58  16   Q. Once you became a deputy, what was your first assignment?

13:49:03  17   A. I worked at West Valley Detention Center.

13:49:06  18   Q. And that detention center, is it a jail or is it a prison

13:49:13  19   where people go after they have been convicted?

13:49:15  20   A. It's a jail.

13:49:16  21   Q. And so with that jail, essentially once somebody gets

13:49:20  22   arrested, if there is any charges and they are booked, they

13:49:23  23   are taken there, and they can even be held if they don't meet

13:49:26  24   bail; is that correct?

13:49:27  25   A. Yes.

1 13:49:27  Q. And then after that assignment, what was your next

2 13:49:31  assignment?

3 13:49:32  A. Patrol at Central Station in San Bernardino.

4 13:49:36  Q. And what is Central Station?  What is the geographical

5 13:49:41  location of that?

6 13:49:41  A. Central Station consists of the unincorporated areas of

7 13:49:48  San Bernardino, Loma Linda, Grand Terrace, and there is also

8 13:49:54  a contract with Yaamava' Casino.

9 13:50:00  Q. Does it also include Redlands?

10 13:50:01  A. No.

11 13:50:02  Q. And then with the Central Station, where do you -- excuse

12 13:50:10  me.

13 13:50:22       With the Redlands -- when did you start working at

14 13:50:38  the Central Station on patrol?

15 13:50:40  A. Around 2018.

16 13:50:44  Q. And the entire time that you worked at the Central

17 13:50:46  Station, was your duties always patrol or did you have any

18 13:50:52  other assignment?

19 13:50:53  A. I had additional assignments, yes.

20 13:50:56  Q. Before this accident -- this incident, did you have any

21 13:50:59  other assignments or were your assignments always patrol?

22 13:51:03  A. It was patrol.

23 13:51:05  Q. And before this incident happened, how -- how are you

24 13:51:11  assigned to your job?  Does it change every three months?

25 13:51:16  What happens?

113:51:16    A. And just to clarify, are you speaking of which city I'm

213:51:23    assigned to?

313:51:24    Q. When you are working at the -- yeah, the Central Station,

413:51:29    did you have the same exact assignment the entire time you

513:51:32    were there or did it change, geographically, what your

613:51:36    assignment was?

713:51:36    A. The city where I work in, that is in Central Station,

813:51:45    varies, yes.  And that just depends on supervision.

913:51:48    Q. And how often would it vary, what city you are working

1013:51:52    in?

1113:51:52    A. It -- we were assigned -- our rotations are three months.

1213:51:58    So we would be assigned to a certain jurisdiction for those

1313:52:01    three months.  But depending on staffing needs, we would

1413:52:05    change variously.

1513:52:06    Q. On the date of this incident, what was your location?

1613:52:10    Where were you assigned?

1713:52:11    A. I was assigned to patrol in Loma Linda, specifically the

1813:52:18    Loma Linda University Medical Center.

1913:52:20    Q. And the way that the -- correct me if I'm wrong, the

2013:52:24    assignments out of this station for the Loma Linda University

2113:52:29    Medical Center, there is always one deputy assigned to patrol

2213:52:32    that area, correct?

2313:52:33    A. One deputy assigned to the hospital, yes.

2413:52:36    Q. And for your three-month rotation in August of 2021, was

2513:52:45    this the beginning of your rotation?  Was it the end of the

1 13:52:48    three-month rotation?

2 13:52:49    A. I don't recall.

3 13:52:52    Q. Prior to this assignment for three months, which happened

4 13:52:56    during this incident, before that, you had been assigned to

5 13:53:00    the Loma Linda University Medical Center on three-month

6 13:53:06    stints, correct?

7 13:53:06    A. Yes.

8 13:53:07    Q. How many times?  One other time?  Two other times?

9 13:53:10    A. More than one other time.

10 13:53:12    Q. And so is it safe to say you are quite familiar with Loma

11 13:53:18    Linda University Medical Center as of August 2021, correct?

12 13:53:20    A. Yes.

13 13:53:21    Q. You've had other trespassing calls that you had to

14 13:53:25    respond to there, where you had to help people get out of

15 13:53:28    that area, correct?

16 13:53:29    A. Yes.

17 13:53:29    Q. Were they normally homeless?

18 13:53:32    A. Not all the time.

19 13:53:33    Q. Some of them were, though?

20 13:53:36    A. Some of them, yes.

21 13:53:37    Q. Were some of them under the influence?

22 13:53:39    A. No.

23 13:53:40    Q. Not one?

24 13:53:41    A. No.

25 13:53:42    Q. Since this incident, you haven't been reassigned to Loma

1  13:53:54   Linda University Medical Center, true?

2  13:53:54   A. I couldn't tell you that.

3  13:53:58   Q. Have you worked there since this incident?

4  13:53:59   A. Yes.

5  13:54:00   Q. Have you had another assignment there since this

6  13:54:02   incident?

7  13:54:03   A. I've worked there, yes.

8  13:54:05   Q. So I understand you've worked there, but were you ever

9  13:54:07   assigned on a three-month stint since this incident?

10 13:54:12   A. I don't recall if I've had a three-month assignment

11 13:54:16   there, but I have worked there multiple times since this

12 13:54:18   incident.

13 13:54:18   Q. And the times that you've worked there since this

14 13:54:21   incident, you were filling in for somebody, correct?

15 13:54:23   A. Yes.

16 13:54:26   Q. And focusing on your training to be a deputy, back when

17 13:54:34   you were at the academy, you became POST certified, correct?

18 13:54:41   A. Yes.

19 13:54:41   Q. What is that?

20 13:54:42   A. POST certification is when you take your training.  It's

21 13:54:48   a six-month period in the academy where you have your

22 13:54:53   arresting powers.

23 13:54:55   Q. Apart from your arresting powers, you receive other

24 13:55:00   training to become POST certified, correct?

25 13:55:02   A. Yes.

1 13:55:03    Q. One of them is how to determine if somebody is under the

2 13:55:06    influence of drugs, correct?

3 13:55:08    A. Yes.

4 13:55:09    Q. And narcotics, correct?

5 13:55:10    A. Yes.

6 13:55:11    Q. And fentanyl, correct?

7 13:55:12    A. No.

8 13:55:14    Q. You don't learn anything about fentanyl when you are in

9 13:55:16    the academy?

10 13:55:17   A. Fentanyl is a fairly new drug that has become popular.

11 13:55:21   We didn't have direct training on fentanyl when I was in the

12 13:55:25   academy.

13 13:55:25   Q. What about post academy but before the date of this

14 13:55:29   incident, did you learn about fentanyl?

15 13:55:30   A. I never had specific training on fentanyl, no.

16 13:55:33   Q. You had training on narcotics, though, true?

17 13:55:37   A. Yes.

18 13:55:37   Q. Okay.  And your understanding is fentanyl is a narcotic,

19 13:55:42   correct?

20 13:55:42   A. Yes.

21 13:55:42   Q. And so after you received training at the academy when

22 13:55:50   you became POST certified, where you learned to recognize if

23 13:55:54   somebody was under the influence, you also had that training

24 13:55:57   again in 2020, correct?

25 13:55:59   A. I'm sorry, I don't know what you are referring to.

13:56:03  Q. Correct.  So when you are out of the academy, you are

13:56:08  working patrol.  Are you with me?

13:56:10  A. Yes, I am.

13:56:10  Q. In 2020, did you receive further training on how to

13:56:14  determine if somebody is under the influence?

13:56:16  A. I don't know what you are referring to.

13:56:20  Q. Do you recall testifying in your deposition, where you

13:56:25  were answering questions that we were asking you under oath,

13:56:28  that you received further training in about 2020 regarding

13:56:33  how to recognize if somebody is under the influence of drugs?

13:56:35  A. I don't know what you are referring to, I'm sorry.

13:56:43        MR. CONLOGUE:  Your Honor, plaintiff seeks leave of

13:56:45  Court to read into the record the deposition transcript of

13:56:48  Breana Fite, taken on April 25th, 2023, page 38, lines 18 to

13:57:03  21.

13:57:04        THE COURT:  Do I have a copy?

13:57:07        MR. CONLOGUE:  Yes.  There should be a copy up

13:57:09  there, Your Honor.

13:57:19        THE CLERK:  Is it the transcript binder?

13:57:28        MR. CONLOGUE:  And I apologize, Your Honor.  For

13:57:30  context, I'll start at line 11 on page 38, and go to line 21.

13:57:44        THE COURT:  All right.  You can proceed.

13:57:45        MR. CONLOGUE:  Yes.

13:57:46  Q. QUESTION:  Have you received any training on recognizing

13:57:50  whether an individual is under the influence of drugs?

13:57:53   1       ANSWER:  Yes.

13:57:56   2       QUESTION:  Was that while you were doing your POST

13:58:00   3  certification?

13:58:01   4       ANSWER:  Yes.

13:58:03   5       QUESTION:  And have you received any training on

13:58:07   6  that topic after you were POST certified in 2015?

13:58:12   7       ANSWER:  Yes.  I received additional training, maybe

13:58:16   8  about 2020.

13:58:23   9       When you were giving your answers in your

13:58:25  10  deposition, you knew you were testifying under the penalty of

13:58:28  11  perjury, correct?

13:58:29  12   A. That's correct.

13:58:29  13   Q. Just as if we are doing here now on the stand in front of

13:58:33  14  this jury, correct?

13:58:34  15   A. That's correct.

13:58:34  16   Q. And part of your training, as well, you also received

13:58:42  17  training on how to respond to a mental health crisis.  Is

13:58:45  18  that fair to say?

13:58:46  19   A. Yes.

13:58:46  20   Q. Now, focusing on the training that you received when

13:58:52  21  somebody is under the influence of narcotics, you were

13:58:56  22  trained that somebody under the influence, they have impaired

13:59:00  23  decision-making, correct?

13:59:01  24   A. I'm sorry, can you repeat the question?

13:59:04  25   Q. Yes.  So focusing on your training regarding narcotics.

1 13:59:08   Are you with me?

2 13:59:09   A. Yes, narcotics.

3 13:59:10   Q. You were trained that somebody under the influence of

4 13:59:13   narcotics has impaired decision-making, true?

5 13:59:18   A. That could possibly be a symptom, yes.

6 13:59:21   Q. And another possible symptom is they may have altered

7 13:59:26   perception, pursuant to your training, correct?

8 13:59:29   A. That could possibly be something, yes.

9 13:59:32   Q. When you went out into the field on August of 2021, did

10 13:59:37   you feel that you were adequately trained on how to interact

11 13:59:40   with the public?

12 13:59:41   A. Yes.

13 13:59:42   Q. And then also part of your training with somebody under

14 13:59:47   the influence of narcotics, you were trained that that could

15 13:59:49   cause hallucinations or delusions, correct?

16 13:59:52   A. That could be, possibly.

17 13:59:56   Q. And that person under the influence might do things that

18 13:59:58   they would not otherwise do, correct?

19 14:00:00   A. It varies.

20 14:00:02   Q. Well, I'm just talking about your training.  Do you

21 14:00:05   understand that?

22 14:00:05   A. Yes, the symptoms vary.

23 14:00:08   Q. And that is pursuant to your training, though, one of the

24 14:00:11   symptoms is they might do things that they would not

25 14:00:13   otherwise do, correct?

14:00:14   A. The symptoms vary, yes.

14:00:18   Q. The person may act impulsively, correct?

14:00:21   A. They could possibly, yes.

14:00:24   Q. And they also may do things that are unexpected or

14:00:29   unanticipated, correct?

14:00:30   A. I don't understand that question.

14:00:35   Q. Yeah, if you don't understand a question, let me know,

14:00:38   and I'll rephrase it or ask it again.

14:00:40        A person under the influence of narcotics, pursuant

14:00:43   to your training, you learned that that person may do things

14:00:47   unexpected or unanticipated, correct?

14:00:49   A. It could be.  It varies.

14:00:53   Q. And that's what you were trained on, true?

14:00:55   A. It varies, yes.

14:00:57   Q. And then also, somebody under the influence of narcotics,

14:01:04   they may require medical attention, pursuant to your

14:01:07   training, correct?

14:01:08   A. It varies.

14:01:11   Q. Is that a yes?

14:01:12   A. I can't tell you yes or no.  When someone is doing drugs,

14:01:17   they don't necessarily need medical attention.

14:01:25        MR. CONLOGUE:  Your Honor, Plaintiff seeks leave of

14:01:27   court to read into the record the deposition testimony of

14:01:32   Breana Fite, taken on April 25th, 2023, page 42, line 9

14:01:41   through line 12.

1  14:01:51            THE COURT:  Do you have it, Counsel?

2  14:01:54            MS. GUSTAFSON:  Which lines, again?  I'm sorry.

3  14:01:56            MR. CONLOGUE:  Line 9 through line 12.

4  14:01:59            MS. GUSTAFSON:  Okay, Your Honor.

5  14:02:00            THE COURT:  All right.

6  14:02:01            MR. CONLOGUE:  Thank you, Your Honor.

7  14:02:02  Q. Question:  Have you received any training that a person

8  14:02:06  who is under the influence of drugs may require medical

9  14:02:10  attention?

10  14:02:11            Answer:  Yes.

11  14:02:22            As you sit here today, do you forget the training

12  14:02:24  that you received?

13  14:02:26  A. No.

14  14:02:26            MS. GUSTAFSON:  Objection, argumentative.

15  14:02:27            THE COURT:  Sustained.

16  14:02:30  Q. As part of your training, somebody who is under the

17  14:02:33  influence of narcotics, you learned that somebody could be a

18  14:02:37  danger to themselves, correct?

19  14:02:38  A. I'm sorry, can you repeat the question?

20  14:02:43  Q. Yeah.

21  14:02:45            Pursuant to your training, somebody under the

22  14:02:48  influence of narcotics could be a danger to themselves,

23  14:02:51  correct?

24  14:02:51  A. Not necessarily, no.

25  14:02:56            MR. CONLOGUE:  Your Honor, Plaintiff seeks to read

14:02:58    in page 41, lines 6 through 13, of Ms. Fite's deposition

14:03:05    testimony on April 25th, 2023.

14:03:16            THE COURT:  That's fine.

14:03:21            MR. CONLOGUE:  And I apologize, it'll be lines 6

14:03:24    through line 9.

14:03:25    Q. Question:  Have you ever received any training that a

14:03:29    person who is under the influence of drugs could be a danger

14:03:33    to themselves?

14:03:34            Answer:  Yes.

14:03:38            Do you know what NARCAN is?

14:03:59    A. I have a general idea of what it is, yes.

14:04:01    Q. Are you issued NARCAN either in your patrol vehicle or on

14:04:06    your belt when you're out in the field?

14:04:08    A. Yes.

14:04:08    Q. What is NARCAN?

14:04:09    A. We have NARCAN so if someone has an overdose, then what

14:04:14    it is is the device that you put into their nasal cavity.

14:04:20    Q. It's for an opioid overdose, correct?

14:04:24    A. Yes.

14:04:26    Q. Like fentanyl, correct?

14:04:27    A. Yes.

14:04:29    Q. And have you seen individuals on fentanyl?

14:04:36    A. Yes.

14:04:39    Q. And with those individuals that you've seen on fentanyl,

14:04:50    they act abnormal, correct?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

14:04:51   A. Not necessarily.

14:04:53           MS. GUSTAFSON:   Objection.

14:04:57           I'm sorry, the objection was vague.

14:04:59           THE COURT:   It is vague.

14:05:01   Q. With the individuals you've seen on fentanyl, where have

14:05:07   you seen them on fentanyl?

14:05:08   A. On patrol.

14:05:11   Q. What about when you're in the detention center?

14:05:13   A. Occasionally, yes.

14:05:16   Q. And so even before you started patrol, back when you were

14:05:20   just working in the jails, you were familiar with how people

14:05:25   were on fentanyl, true?

14:05:26   A. Yes.

14:05:26   Q. And then between when you started patrol and the date of

14:05:30   this incident, did you become more familiar with people on

14:05:33   fentanyl when you were out on patrol?

14:05:35   A. Yes.

14:05:36   Q. And focusing on your training as well with respect to

14:05:46   withdrawal of narcotics, you were trained that a person

14:05:51   undergoing withdrawal may need medical attention, correct?

14:05:54   A. It's possible, yes.

14:05:57   Q. And one -- I know you keep saying things are possible,

14:06:04   one of these many factors.  One of these things that you do

14:06:06   as a deputy, it's an investigatory function, correct?

14:06:09   A. Correct.

1 14:06:10    Q. Your job is to investigate and find out the answer, true?

2 14:06:14            MS. GUSTAFSON:  Objection, vague.

3 14:06:15            THE COURT:  Overruled.

4 14:06:16            You can answer.

5 14:06:18            THE WITNESS:  Can you repeat it?  I'm sorry.

6 14:06:20    Q. Your job is to investigate and find out the answer, true?

7 14:06:23    A. Yes.

8 14:06:23    Q. And part of your training, you were trained that the

9 14:06:30    withdrawal process itself from illicit drugs is medically

10 14:06:34    dangerous, correct?

11 14:06:35    A. It varies -- everyone's symptoms vary, yes.

12 14:06:42    Q. So I'm sorry, is your answer yes?

13 14:06:43    A. Everyone's symptoms vary.

14 14:06:45    Q. Is your answer yes?

15 14:06:46    A. Everyone's symptoms vary.

16 14:06:52            MR. CONLOGUE:  Your Honor, Plaintiff seeks to

17 14:06:53    read --

18 14:06:53            THE COURT:  If you want to read from the deposition

19 14:06:55    again, fine.

20 14:06:56            MR. CONLOGUE:  Yes.  Page 42, line 17 to 23.

21 14:07:17            THE COURT:  You may proceed.

22 14:07:18            MR. CONLOGUE:  Thank you, Your Honor.

23 14:07:19    Q. Question:  And have you received any instruction or

24 14:07:35    training that going through the withdrawal process from

25 14:07:38    illicit drugs could be medically dangerous?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

| | |
|---|---|
| 1 14:07:41 | Answer: Yes. |
| 2 14:07:51 | And I know we already discussed how you saw people |
| 3 14:07:55 | under the influence of fentanyl while in custody.  You also |
| 4 14:07:59 | saw them going through the withdrawal process as well, |
| 5 14:08:01 | correct? |
| 6 14:08:01 | A. Occasionally, yes. |
| 7 14:08:04 | Q. And the symptoms of that withdrawal, what are they? |
| 8 14:08:08 | A. A lot of times they'll get sick, sometimes they'll have |
| 9 14:08:14 | diarrhea or vomit. |
| 10 14:08:16 | Q. Does it also include sweating? |
| 11 14:08:18 | A. That could be a symptom, yes. |
| 12 14:08:20 | Q. Hard time sleeping? |
| 13 14:08:22 | A. Usually out of discomfort. |
| 14 14:08:26 | Q. Nausea? |
| 15 14:08:27 | A. Yes. |
| 16 14:08:28 | Q. Lethargic? |
| 17 14:08:30 | A. That could be a symptom, yes. |
| 18 14:08:32 | Q. What does that mean to be lethargic? |
| 19 14:08:35 | A. Tired. |
| 20 14:08:37 | Q. Like, lying down with a blanket on you? |
| 21 14:08:42 | A. I couldn't tell you if everybody lying down on the ground |
| 22 14:08:46 | is tired. |
| 23 14:08:50 | Q. Another symptom is dilated pupils, correct? |
| 24 14:08:56 | A. Correct. |
| 25 14:08:56 | Q. Did you ever look once into Bret Breunig's pupils in his |

1 14:09:03   eyes?

2 14:09:03    A. When I was speaking to him.

3 14:09:04    Q. Well, you're familiar with what a field sobriety test is,

4 14:09:09   correct?

5 14:09:09    A. Yes.

6 14:09:10    Q. And you know what the -- I'm going to mispronounciate it,

7 14:09:14   the nystagmus test, you know, the eye-tracking test?

8 14:09:16        THE COURT:  Nystagmus.

9 14:09:20        MR. CONLOGUE:  Yeah.  Thank you, Your Honor.  I can

10 14:09:22  never say it correctly.

11 14:09:23   Q. You're familiar with the nystagmus test, correct?

12 14:09:26   A. Yes.

13 14:09:26   Q. And did you ever do that with Mr. Breunig?

14 14:09:29   A. No, I didn't.

15 14:09:30   Q. You never did any formal test on his eyes, correct?

16 14:09:32   A. No, I didn't.

17 14:09:33   Q. Were you trained that you're accountable for your actions

18 14:09:49  when you make contact with somebody in public under the

19 14:09:51  influence?

20 14:09:52   A. Yes.

21 14:09:53   Q. And that includes any inactions that you don't take as

22 14:09:58  well, correct?

23 14:09:59   A. I'm not sure what you are referring to.

24 14:10:02   Q. That's fine.

25 14:10:03        Were you trained that you're accountable for your

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

114:10:12   actions when you make contact with somebody in public under

214:10:13   the influence and you give them a transport, a courtesy ride?

314:10:16   A. I'm sorry, are we -- am I responsible for?

414:10:25   Q. Were you trained that you are accountable for your

514:10:29   actions when you make contact with a member of the public

614:10:33   under the influence and you give that person a courtesy ride?

714:10:38          MS. GUSTAFSON:  Objection, assumes facts.

814:10:41          THE COURT:  No.

914:10:43          Go ahead and answer.

1014:10:44          THE WITNESS:  I just don't agree with that whole

1114:10:47   statement.

1214:10:49   Q. So is that no, you did not receive that training?  I

1314:10:53   don't understand.

1414:10:54   A. I just don't agree with that entire statement --

1514:10:57          THE COURT:  He's asking a question about whether or

1614:11:01   not you were trained on a particular topic.  Do you

1714:11:04   understand the question?

1814:11:05          THE WITNESS:  Yes.

1914:11:05          THE COURT:  Okay.  Do you have an answer?

2014:11:07          THE WITNESS:  I'm held accountable for somebody --

2114:11:13   giving them a ride, yes.  Separately, I'm also held

2214:11:17   accountable for somebody that is under the influence.

2314:11:20   Q. Now, putting those together, are you accountable for

2414:11:23   giving somebody a ride who is under the influence?

2514:11:27          THE COURT:  Do you mean is there a separate or

14:11:29  additional training?

14:11:31        MR. CONLOGUE:  Well, yes, Your Honor.  She's

14:11:33  indicated that she --

14:11:34        THE COURT:  I know what she's indicated.  I'm asking

14:11:35  for more specificity in your question.

14:11:38        MR. CONLOGUE:  Yeah, so I'm combining the two

14:11:39  together.  So it's somebody under the influence who is now

14:11:42  receiving a courtesy ride, is she accountable for that --

14:11:48        THE COURT:  I know.  Tell her.

14:11:49        MR. CONLOGUE:  Okay.

14:11:49  Q. So combining those two together, were you trained that

14:11:53  you're accountable for giving somebody -- the actions you

14:11:57  take when you give somebody a ride who is under the

14:11:59  influence?

14:12:01        MS. GUSTAFSON:  Objection.  It still assumes facts.

14:12:04        THE COURT:  He is asking for a fact, yes or no,

14:12:09  whether she was trained on that particular topic.

14:12:13        Yes or no or you don't remember.

14:12:15        THE WITNESS:  We are held accountable for our

14:12:22  actions, yes.

14:12:23  Q. Were you trained that you can give a courtesy ride to

14:12:31  somebody who is under the influence and leave them in the

14:12:34  middle of nowhere?

14:12:37  A. We are not trained to give courtesy rides to people under

14:12:43  the influence.

1 14:12:52    Q. Were you trained that you can transport somebody with no

2 14:12:58    shoes and an inability to walk to the middle of nowhere?

3 14:13:03         THE COURT:  There is no middle of nowhere.  Why

4 14:13:04    don't you --

5 14:13:05    Q. In the middle of orange groves next to a moving train?

6 14:13:10    A. I'm able to transport any subject despite whatever

7 14:13:15    clothing they have or don't have.

8 14:13:17    Q. And whenever you give these transports, you're trained

9 14:13:23    that you're accountable for your actions where you leave that

10 14:13:27    person, correct?

11 14:13:28    A. Correct.  I am accountable for my actions.

12 14:13:30    Q. Were you trained that you can transport an individual who

13 14:13:40    is in need of medical care?

14 14:13:41    A. Am I -- I'm sorry.  Can you repeat the question?

15 14:13:49    Q. Were you trained that you can transport, give a courtesy

16 14:13:53    ride, to an individual in need of medical care?

17 14:13:55    A. It just depends on the medical care that they need, but,

18 14:14:01    yes, we are able to transport.

19 14:14:03    Q. Were you trained that you could detain somebody in your

20 14:14:13    custody who you believe needs medical care, and then you can

21 14:14:18    release that individual without obtaining medical care?

22 14:14:25    A. We can detain any subject and conduct an investigation,

23 14:14:30    yes.

24 14:14:30    Q. And so I just want to understand.  Once you believe that

25 14:14:34    person needs medical care, you were trained you can then

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 14:14:38  release that person without obtaining any medical care; is

2 14:14:41  that correct?

3 14:14:41   A. It just depends on what medical care they need.

4 14:14:45   Q. Were you trained in any situation, that whatever medical

5 14:14:53  care, that you cannot release them without obtaining medical

6 14:14:56  care?

7 14:14:56   A. If they choose not to accept it, we don't need to get it.

8 14:15:01   Q. When you were working in the jail system and there was an

9 14:15:18  inmate that is going through withdrawal of fentanyl, would

10 14:15:25  you yourself give that inmate medical care or would you get

11 14:15:29  the medical staff at the jail?

12 14:15:31   A. I would not provide medical attention.  Depending on what

13 14:15:39  their ailment is, they can request medical.

14 14:15:43   Q. So we are with the ailment of withdrawal.  Are you with

15 14:15:46  me?

16 14:15:46   A. Correct.  So the inmates have a -- there is a computer

17 14:15:50  system that they are able to either make their own

18 14:15:52  appointments or ask for medical themselves.  I do not provide

19 14:15:56  it.

20 14:15:56   Q. Okay.  And so if that inmate does need medical care, you

21 14:16:01  would defer to the medical professionals at the jail,

22 14:16:04  correct?

23 14:16:04   A. Yes.

24 14:16:13   Q. Moving on from the jails to when you started in the field

25 14:16:17  on patrol, before you did that, you received a field training

1 14:16:21  program, correct?

2 14:16:22   A. Yes.

3 14:16:23   Q. How long did that last?

4 14:16:25   A. Several weeks.

5 14:16:27   Q. And over the course of those several weeks, what is the

6 14:16:33  field training program?

7 14:16:34   A. You are paired up with a senior deputy that would be your

8 14:16:41  trainer.  You go over different investigations and different

9 14:16:46  crimes and how to deal with different types of emergencies.

10 14:16:52   Q. And one of the things that you likely went over during

11 14:17:00  this field training program was responding to trespass calls,

12 14:17:03  correct?

13 14:17:03   A. Yes.

14 14:17:04   Q. Did you ever have any field training at Loma Linda

15 14:17:09  University Medical Center?

16 14:17:09   A. Specifically at the hospital?  No.

17 14:17:15   Q. And -- well, just with the training you received in

18 14:17:18  responding to a trespass call, when you are responding,

19 14:17:23  absent, you know, some type of combat or some other crime,

20 14:17:27  it's a Code 4 response, right?

21 14:17:29   A. Depending on the situation, yes.

22 14:17:32   Q. And, yeah, usually with the trespass, where there's no --

23 14:17:37  nothing else happened, no other crimes, and you are

24 14:17:41  responding, Code 4 means no lights on, no sirens, correct?

25 14:17:45   A. Correct.

1 14:17:45    Q. And once you arrive on-scene to a trespass call, pursuant
2 14:17:52    to your field training program, that is when you investigate
3 14:17:56    to gain facts about the trespass, in addition to whatever you
4 14:18:03    heard on dispatch, correct?
5 14:18:04    A. That's correct.
6 14:18:05    Q. And to do that, you need to communicate with all parties
7 14:18:08    on-scene, correct?
8 14:18:09    A. All available parties, yes.
9 14:18:11    Q. And then once you gather all the information, you then
10 14:18:17   use that to make a determination if there was or wasn't a
11 14:18:20   trespass, correct?
12 14:18:21   A. Yes.
13 14:18:22   Q. And also during this field training program -- with the
14 14:18:32   Central Station, how do you know where to drive around when
15 14:18:37   you are on duty?
16 14:18:40   A. I'm -- I don't understand the question.
17 14:18:45   Q. So if you are responding to a call that is a Code 1 --
18 14:18:48   which Code 1 is pretty serious, right?
19 14:18:51   A. A priority 1, yes.
20 14:18:53   Q. How do you respond to that, to an address which -- let's
21 14:18:56   just say you've never been there before.  How do you go to
22 14:18:59   that address?
23 14:19:00   A. You can use a map.
24 14:19:01   Q. What do you mean, use a map?
25 14:19:03   A. You can either use your phone -- there is -- typically

1 14:19:06   everybody has a cellphone that they can use the map feature

2 14:19:11   on.

3 14:19:12   Q. What about in your patrol car?  Do you have anything in

4 14:19:15   there that can help you get to an address, that the County

5 14:19:18   issues you?

6 14:19:18   A. There is a map in the -- in the patrol vehicles.  It

7 14:19:24   varies if it's -- if it's working properly or not.

8 14:19:30   Q. In the vehicle you had on the date of this incident, was

9 14:19:33   it working?

10 14:19:34   A. I couldn't tell you.

11 14:19:35   Q. Did you try to use it?

12 14:19:36   A. No.

13 14:19:37   Q. And focus on this map that is in the vehicle.  What would

14 14:19:45   you call this system in the vehicle?  Would you call it GPS?

15 14:19:50   Onboard system?  What would you call it?

16 14:19:52   A. I really don't know what it's called.  It's similar to a

17 14:19:57   GPS system.

18 14:19:58   Q. When you were undergoing your field training program, you

19 14:20:14   also learned how to enter a call log or a CAD log, correct?

20 14:20:19   A. Yes.

21 14:20:20   Q. If you can tell the jury, what is a CAD log?

22 14:20:23   A. A CAD log -- every time there is a call for service, it

23 14:20:28   creates an incident number, which is assigned to each CAD

24 14:20:36   log.  It has a summary of the -- of every incident that

25 14:20:38   occurred.  When you are done with that call, you write a

1 14:20:43  brief summary of what that -- what happened on that call, and

2 14:20:46  that closes it out, which indicates you are free for

3 14:20:49  additional calls for service.

4 14:20:50  Q. So in your patrol car that you have, there is a computer

5 14:20:55  in there, right?

6 14:20:55  A. Yes.

7 14:20:57  Q. And you indicated you can type in what happened, correct?

8 14:21:01  A. Yes.

9 14:21:02  Q. On that computer in your patrol vehicle, correct?

10 14:21:05  A. That would be it.

11 14:21:06  Q. What would you call the computer?  Just "computer"?

12 14:21:08  A. MDC.

13 14:21:09  Q. MDC?

14 14:21:11  A. That's correct.

15 14:21:11  Q. So with this MDC, is this the same thing that has the GPS

16 14:21:17  on it?

17 14:21:17  A. Yes.

18 14:21:18  Q. And so with this MDC that has a GPS, and when you respond

19 14:21:24  to a call, I mean, you are trained that you have to type in

20 14:21:28  the disposition of what happens when you respond to a call,

21 14:21:31  correct?

22 14:21:31  A. Yes.

23 14:21:31  Q. Even before you -- well, when you are responding to a

24 14:21:35  call, when you respond on-scene, you have to push a button

25 14:21:39  showing that you are arriving on-scene, correct?

14:21:42    A. That is an option.  So you can go over the radio and tell

14:21:47    dispatch, or you can manually do it yourself, yes.

14:21:50    Q. Is there a single button that is red that allows you to

14:21:53    show you are on-scene, or do you have to type in "on-scene"?

14:21:57    A. It's a button that says "on-scene."

14:22:00    Q. What color is it?

14:22:01    A. I don't know what color, I'm sorry.

14:22:03    Q. And then once you are on-scene when you are responding to

14:22:05    a call, as you were trained during your field training

14:22:08    program, you are to record what happens during your response,

14:22:15    either in the final disposition that you type up -- correct?

14:22:19    A. Yes.

14:22:20    Q. -- or you call it in to dispatch, correct?

14:22:23    A. If, for whatever reason, there is some type of

14:22:27    malfunction, you can call dispatch and they can put it in.

14:22:31    Typically, we do dispo our calls ourself.

14:22:36    Q. Whenever you are creating these CAD logs pursuant to your

14:22:40    training, you are trained that they need to be complete and

14:22:43    accurate, correct?

14:22:43    A. That's correct.

14:22:44    Q. It cannot be untruthful, correct?

14:22:46    A. Correct.

14:22:46    Q. And the reason -- well, they also can't withhold any

14:22:51    pertinent facts, correct?

14:22:52    A. Correct.

14:22:54  Q. Why should this CAD log be truthful, with all the facts,

14:23:00  and be complete and accurate?  What was your training?  What

14:23:03  did it teach you why it should be that way?

14:23:06  A. You put in an accurate summaries, which -- to indicate to

14:23:12  your partners and/or supervisors what occurred on that call.

14:23:15  Q. Well, not only what occurred, but you are letting your

14:23:20  partners and supervisors know where you are located, correct?

14:23:23  A. I'm sorry, the disposition is different than the

14:23:27  location.

14:23:29  Q. Understood.  We are just talking about the CAD log.

14:23:32           You are to keep accurate records in the CAD log, so

14:23:36  later on you can recall what happened by looking at that CAD

14:23:40  log history, correct?

14:23:43  A. Are you referring to updating my location?

14:23:45  Q. I'm talking about, right now, how this incident happened

14:23:49  three years ago.  The CAD log, one of the purposes of it, as

14:23:52  you were trained, is to help you recall what happened during

14:23:55  the incident, correct?

14:23:55  A. Yes, it can.

14:23:59  Q. And then why you are actually out in the field making

14:24:03  entries into the CAD log is to let other deputies know where

14:24:06  you are, correct?

14:24:07  A. Yes.

14:24:07  Q. And then also to let your supervisor to know where you

14:24:11  are, correct?

1 14:24:12    A. Yes.

2 14:24:13    Q. And the reason why you need to have it accurate, or the

3 14:24:22    deputies know where you are and your supervisor knows where

4 14:24:25    you are, it's so you can be held accountable and describe

5 14:24:28    what you've done, correct?

6 14:24:29    A. Yes, the call indicates what we did on that.

7 14:24:38    Q. And then even apart from a CAD log, the training that you

8 14:24:41    received, not only in POST but also in the field training

9 14:24:46    program, whenever you are communicating with another deputy

10 14:24:49   or someone within your department about an incident, you are

11 14:24:53   to be truthful with that person, correct?

12 14:24:56   A. Yes.

13 14:24:57   Q. And you are even trained that all law enforcement, even

14 14:25:00   if it's somebody at the Redlands Police Department, when you

15 14:25:04   communicate with that person you are to be truthful, correct?

16 14:25:06   A. Yes.

17 14:25:16       MR. CONLOGUE:  I don't know what the Court's plan is

18 14:25:18   for a break.  I can keep going.

19 14:25:19       THE COURT:  Yes, go ahead and keep going.

20 14:25:21       MR. CONLOGUE:  Okay.

21 14:25:22   Q. Focusing on the date of this incident, how did you

22 14:25:26   initially learn that you needed to respond to the Loma Linda

23 14:25:31   University Medical Center?

24 14:25:31   A. I received a call for service from my San Bernardino

25 14:25:38   County dispatch regarding a subject at Loma Linda University

14:25:44   1   property that was refusing to leave.

14:25:46   2   Q. And Loma Linda University Medical Center, it's a quite

14:25:52   3   large facility, correct?

14:25:53   4   A. Correct.  It has several properties also.

14:25:57   5   Q. The address that you were told to respond to was at 11209

14:26:03   6   Anderson Street, correct?

14:26:03   7   A. Yes.

14:26:05   8   Q. And when you were responding, again, you knew from your

14:26:11   9   dispatch it was a call for trespass, correct?

14:26:13  10   A. Yes.

14:26:13  11   Q. And then when you arrived first on-scene, knowing it was

14:26:18  12   a call for trespass, you had no information about Bret

14:26:22  13   Breunig, correct?

14:26:22  14   A. I had no information about him, no.

14:26:26  15   Q. You didn't know anything about him that happened prior,

14:26:30  16   or if he had any priors at all, correct?

14:26:31  17   A. No.

14:26:32  18   Q. Is that correct?

14:26:32  19   A. That's correct, yes.

14:26:36  20   Q. And then after you arrived -- and forgive me if I'm not

14:26:42  21   pronouncing his name correctly.  Is it Deputy Vaca?

14:26:47  22   A. Yes.

14:26:48  23   Q. After you arrived, Deputy Vaca arrived on-scene a few

14:26:52  24   minutes later, correct?

14:26:53  25   A. Yes.

1  14:26:53  Q. When you arrived on-scene, you pushed that "on-scene"

2  14:26:59  button, showing you had physically arrived on-scene, correct?

3  14:27:03  A. Yes.

4  14:27:03  Q. And since this incident, you have reviewed the CAD log,

5  14:27:06  correct?

6  14:27:06  A. Yes.

7  14:27:07  Q. Multiple times, right?

8  14:27:09  A. Yes.

9  14:27:09  Q. And Deputy Vaca didn't put that he was on-scene, correct?

10 14:27:14  A. No.

11 14:27:15  Q. So did he -- did he put that he was on-scene?

12 14:27:19  A. I don't know if he -- I don't know what he did.

13 14:27:24  Q. On the call log you reviewed, did he?

14 14:27:26  A. I -- I can't speak for him.  I don't know.

15 14:27:30  Q. On the call log you reviewed, did he put that he was

16 14:27:33  on-scene?

17 14:27:33  A. I'm -- I don't know what he did.

18 14:27:42  Q. Would it refresh your memory if you look at the CAD log?

19 14:27:48  A. Yes.

20 14:27:49  Q. Okay.  There is a binder to your left over there, and

21 14:27:54  it's the first one on your right, if you want to grab that.

22 14:27:58  Yes.

23 14:28:00       And if you can turn to Exhibit 2, please.  Do you

24 14:28:04  see on the right-hand side there's --

25 14:28:05       THE COURT:  Is there a dispute about this?

1 14:28:13           MR. CONLOGUE:  I mean -- yeah.

2 14:28:13           MS. GUSTAFSON:  I think he's refreshing

3 14:28:15   recollection, but there is a dispute.

4 14:28:20           THE COURT:  All right.

5 14:28:28   Q. Go ahead and review Exhibit 2 and let me know if it

6 14:28:33   refreshes your memory if Deputy Vaca entered on the call log

7 14:28:39   that he arrived on-scene.

8 14:28:43   A. No.

9 14:28:46   Q. He didn't mark in the call log, correct?

10 14:28:50           THE COURT:  So she's told you that it does not

11 14:28:52   refresh her recollection, so ask another question.

12 14:28:55           MR. CONLOGUE:  I apologize.

13 14:28:57           Go ahead.

14 14:28:58           THE WITNESS:  No.

15 14:28:59           THE COURT:  Don't go ahead.

16 14:29:01   Q. Is it that it doesn't refresh your memory or, no, he

17 14:29:06   didn't?

18 14:29:06           THE COURT:  The question is not what's written

19 14:29:08   there.  The question is:  Do you now remember what you saw

20 14:29:11   when you looked at it last time?

21 14:29:16           THE WITNESS:  So I'm looking at -- so item number 2,

22 14:29:25   correct?

23 14:29:25   Q. Yes.

24 14:29:26   A. No, Deputy Vaca, the other deputy that is on this call,

25 14:29:34   wasn't present for any of the incident.

1 14:29:38    Q. He's not entered on the call log, correct?

2 14:29:40    A. No.

3 14:29:41    Q. Is that -- are you agreeing with me that he's not on

4 14:29:44    there?

5 14:29:45    A. I'm agreeing with you, yes.

6 14:30:19    Q. All right.  When Deputy Vaca arrived on-scene when you

7 14:30:24    were present, were you still inside your patrol car or had

8 14:30:29    you already exited?

9 14:30:30    A. I had exited.  He came a short time after.

10 14:30:35   Q. And I believe you arrived on-scene at 11:54 a.m.,

11 14:30:43   correct?

12 14:30:43   A. Yes.

13 14:30:44   Q. And when you first arrived on-scene, what did you see?

14 14:30:50   A. The Loma Linda security guard.

15 14:30:55   Q. Did you also see Bret Breunig?

16 14:30:56   A. Yes.  He was lying on the ground.

17 14:31:00   Q. And were they about 15 to 20 feet apart?

18 14:31:03   A. You could say about that much, yes.

19 14:31:06   Q. And when you first saw Bret Breunig lying on the ground,

20 14:31:11   what was he wearing?

21 14:31:12   A. A blue pair of pants and a top issued by the hospital.

22 14:31:18   Q. And you're familiar or you could tell --

23 14:31:20        THE COURT:  We are going to take a break now.

24 14:31:22        Ladies and gentlemen, don't talk about the case or

25 14:31:24   form or express any opinions about the case until it's

                    AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 14:31:26  finally submitted to you.

2 14:31:27          We'll take a 15-minute break.

3 14:31:31          THE CLERK:  All rise.

4 14:31:31          (Thereupon, the jury retired from the courtroom.)

5 14:32:03          THE COURT:  You can step down, Deputy Fite.

6 14:32:09          Now, what was the dispute about the call log that

7 14:32:12  you couldn't stipulate whether it was or was not --

8 14:32:18          MS. GUSTAFSON:  Plaintiff's counsel objected that it

9 14:32:22  was hearsay, and Your Honor found the call log to be hearsay

10 14:32:27  and asked us to meet and confer.

11 14:32:29          I asked if plaintiff's counsel intended to use the

12 14:32:32  call log for anything outside of impeachment, and the answer

13 14:32:35  was no, so I didn't realize we were going to now be using the

14 14:32:40  call card.  So I mean, originally, I was willing to stipulate

15 14:32:44  to its admissibility, and the objection was by plaintiff's

16 14:32:46  counsel.

17 14:32:52          THE COURT:  Well, if somebody is asking about a

18 14:32:55  fact, and you're stipulating based -- or you're -- the

19 14:33:00  question is admissibility, that's different, then you should

20 14:33:04  make an objection for admissibility, not have her go look at

21 14:33:10  it.  So I -- maybe I misunderstand what the issue is, but

22 14:33:16  just in -- in future, if there's something that you're not

23 14:33:19  really disputing -- and maybe this wasn't that incident, but

24 14:33:22  if -- that works for both sides, obviously --

25 14:33:26          MS. GUSTAFSON:  Your Honor, I'm not disputing use of

| | |
|---|---|
| 1 14:33:28 | the call card.  My understanding was plaintiff's counsel was |
| 2 14:33:30 | disputing it, so I was just thrown off that we were now using |
| 3 14:33:34 | it.  I wasn't sure what to do there or what the -- if we were |
| 4 14:33:37 | going to use some cards or object to others.  I'm a little |
| 5 14:33:41 | unclear. |
| 6 14:33:41 | THE COURT:  Why don't you talk about that.  We'll |
| 7 14:33:43 | see you in 15 minutes. |
| 8 14:33:44 | (Thereupon, there was a brief recess.) |
| 9 14:48:43 | THE COURT:  Deputy Fite, would you take the stand, |
| 10 14:48:46 | please. |
| 11 14:51:03 | THE CLERK:  All rise. |
| 12 14:51:03 | (Thereupon, the jury returned to the courtroom.) |
| 13 14:51:28 | THE COURT:  You may be seated.  Everyone is back. |
| 14 14:51:30 | Deputy Fite is back on the stand.  You are still under oath. |
| 15 14:51:32 | Mr. Conlogue, you may continue. |
| 16 14:51:35 | MR. CONLOGUE:  Thank you, Your Honor. |
| 17 14:51:35 | BY MR. CONLOGUE: |
| 18 14:51:35 | Q. So going back, when you arrived on-scene, you saw |
| 19 14:51:44 | Mr. Breunig lying down on the ground with hospital clothing |
| 20 14:51:50 | on him, correct? |
| 21 14:51:50 | A. Yes. |
| 22 14:51:51 | Q. And you knew it was issued by Loma Linda University |
| 23 14:51:57 | Medical Center because you're familiar with that area, and |
| 24 14:51:59 | you've seen those hospital gowns before, correct? |
| 25 14:52:02 | A. I couldn't tell if it was issued by Loma Linda |

14:52:06  1    specifically, but a hospital, yes.

14:52:08  2    Q. Okay.  Well, I mean, with all the beats you've worked at

14:52:12  3    this hospital, it looked like the gown that you've seen other

14:52:15  4    patients wearing at the hospital, true?

14:52:17  5    A. Yes.

14:52:18  6    Q. And with Mr. Breunig, when you saw him, was he wearing

14:52:27  7    shoes?

14:52:27  8    A. No.

14:52:28  9    Q. Did you see a scar on his ankle?

14:52:33  10   A. Yes.

14:52:33  11   Q. Where was the scar?

14:52:35  12   A. On -- I guess you could say vertically across his ankle.

14:52:44  13   Q. I don't know if it's possible, if you can kind of show

14:52:47  14   for us where on your ankle, if you could?

14:52:51  15          THE COURT:  No, she's not going to lift her leg up

14:52:53  16   and show --

14:52:55  17          MR. CONLOGUE:  Okay.

14:52:55  18   Q. Was it -- was it on the top of his foot?  Was it on the

14:53:00  19   front of his shin?  Between the two?

14:53:03  20   A. Well, his ankle, so above his foot, but below his calf.

14:53:11  21   Q. Was it on the front of his leg?  The back of his leg?

14:53:15  22   The sides?

14:53:17  23   A. It was on the side, on his ankle.  That's on the side of

14:53:24  24   your foot.

14:53:24  25   Q. And how big was this scar?

14:53:27  1  A. I couldn't tell you how long it was.

14:53:30  2  Q. You could tell by looking at it it was a relatively new

14:53:34  3  scar, correct?

14:53:34  4  A. I couldn't tell you how new or old it was.

14:53:42  5         MR. CONLOGUE:  Your Honor, Plaintiff seeks to read

14:53:43  6  into the record from the May 9th deposition, 2023, of

14:53:51  7  Ms. Fite, page 92, lines 7 through 6.

14:54:15  8         THE COURT:  Does counsel have that?

14:54:18  9         MS. GUSTAFSON:  I'm sorry, through what line?

14:54:21  10         MR. CONLOGUE:  So line 7 through 16.

14:54:28  11         MS. GUSTAFSON:  Okay.

14:54:28  12         THE COURT:  All right.

14:54:30  13  Q. Question:  Okay.  And what made you ask Mr. Breunig about

14:54:34  14  his ankle?

14:54:36  15         Answer:  Because of the scar.

14:54:38  16         Question:  Okay.  It wasn't in response --

14:54:44  17         Answer:  It was --

14:54:50  18         Question:  -- to Ms. Breunig --

14:54:52  19         Answer:  I'm sorry.  Because it looked like it

14:54:53  20  wasn't old.  So it wasn't, like, an old healed scar.  It was

14:54:57  21  a new.  We just didn't know how new it was.

14:55:06  22  Q. Did you ever ask Mr. Breunig how new the scar was?

14:55:09  23  A. No, I didn't.

14:55:10  24  Q. Why not?

14:55:11  25  A. It just wasn't in my questioning.

Q. You also, when you saw his leg -- his ankle where that scar was, it was swollen, correct?

A. Yes.

Q. What leg was his scar on?

A. I don't recall right now.

Q. Was Mr. Breunig wearing socks?

A. I do know he had socks with him.

Q. Were they on his feet?

A. I -- I don't remember if he was wearing both of them or not.

Q. Was a sock covering this scar that you were able to observe on his ankle?

A. No.

Q. And then did Mr. Breunig have a wallet on him when you saw him?

A. No.

Q. Did he have a cellphone?

A. No.

Q. Did he have any money?  Any cash?

A. No.

Q. When you arrived on-scene, who did you speak with first? Did you speak with Mr. Breunig or the security guard?

A. The Loma Linda security guard.

Q. Do you remember his name?

A. I don't right now.  Sorry.

1  14:56:19    Q. Have you seen him on prior occasions before this

2  14:56:23    incident?

3  14:56:23    A. Yes.

4  14:56:24    Q. And on prior occasions, were they for trespass calls?

5  14:56:31    A. Various calls.  Yes, trespassing is one of them.

6  14:56:35    Q. And then this security guard, when he told you about

7  14:56:39    Mr. Breunig, he told you both that he was discharged and that

8  14:56:44    they kicked him out earlier, correct?

9  14:56:45    A. He made those statements.

10  14:56:50   Q. Did you ever follow up with him to find out which one is

11  14:56:53   it, was he discharged or kicked out?

12  14:56:55   A. No.

13  14:56:57   Q. Those statements of whether him being discharged or

14  14:57:01   kicked out, do you know how that security guard got that

15  14:57:05   information?

16  14:57:05   A. No.

17  14:57:07   Q. Did you ever ask him?

18  14:57:08   A. No.

19  14:57:09   Q. Why not?

20  14:57:10   A. I took the security guard's -- I took his word for it.

21  14:57:17   Q. And in taking his word for it, he says, "discharged,"

22  14:57:20   meaning, you know, a medical doctor has signed off and I'm

23  14:57:24   leaving, and "kicked out," meaning security kicked him out,

24  14:57:28   how do you -- how do you rectify those two discrepancies?

25  14:57:33   A. Oftentimes patients are discharged from the hospital and

1 14:57:38  for whatever reason they decide they don't want to leave, so

2 14:57:42  security is then called to go handle that situation.

3 14:57:48  Q. Did you ever contact anybody at the hospital to find out

4 14:57:53  if he was discharged?

5 14:57:54  A. No.

6 14:57:55  Q. Where in the hospital was he discharged from?

7 14:57:58  A. I don't know where he was discharged from.

8 14:58:02  Q. And then when you were talking with this security

9 14:58:09  officer, he told you he didn't want to press charges for

10 14:58:11  trespassing, correct?

11 14:58:12  A. Correct.

12 14:58:14  Q. So in a situation like that, where you respond to a

13 14:58:17  trespassing call, the calling party says, "We don't want to

14 14:58:21  press charges," but the individual is still there, how do you

15 14:58:26  respond to that?  Do you have to remove that person?

16 14:58:28  A. Well, he was willing to leave at that point, so he was no

17 14:58:32  longer trespassing.

18 14:58:33  Q. Could Mr. Breunig walk away from Loma Linda?

19 14:58:36  A. If he had the option, yes.

20 14:58:40  Q. And this is based upon your observations of him at Loma

21 14:58:47  Linda University Medical Center, you believed he could walk,

22 14:58:50  true?

23 14:58:50  A. Yes.

24 14:58:50  Q. Let me go ahead and play your belt recorder for this

25 14:58:55  incident.  Before I do, this belt recorder, did you -- how

1 14:59:02   does it work?  Do you have to press a button to start it?  Is

2 14:59:06   it always on recording?  How does it work?

3 14:59:08    A. It's a small recorder with a button on the side that you

4 14:59:14   have to manually press.  So it stays on my belt, and it just

5 14:59:22   stays on until I manually turn it off.

6 14:59:24    Q. Okay.  So you have to manually turn it on and off,

7 14:59:28   correct?

8 14:59:28    A. Yes.

9 14:59:28    Q. So in this situation -- you've listened to your entire

10 14:59:33   belt recording for this incident, correct?

11 14:59:35    A. Yes.

12 14:59:35    Q. And where were you when you turned it on, when you pushed

13 14:59:39   that button?

14 14:59:40    A. In my patrol vehicle.

15 14:59:42    Q. And then where on your body, your uniform, would this

16 14:59:46   recorder be?  Would it be on your tie?  The belt?

17 14:59:51    A. It's on my belt.

18 14:59:52        Mr. Conlogue:  And let me go ahead and press play on

19 14:59:59   Exhibit 6, Your Honor.

20 15:00:01        THE COURT:  Counsel, do you have a transcript?

21 15:00:03        MR. CONLOGUE:  I do believe so.  If I'm not

22 15:00:07   mistaken, I think one was lodged with the Court.  If not, I

23 15:00:10   can lodge one.

24 15:00:10        THE COURT:  No, I mean the jury needs a transcript.

25 15:00:15        MR. CONLOGUE:  I mean, we have one marked, if --

| | |
|---|---|
| 1 15:00:22 | THE COURT:  The jury -- it either needs to run on |
| 2 15:00:25 | the screen or you need to have copies for the jury. |
| 3 15:00:28 | MR. CONLOGUE:  Okay.  One second, Your Honor. |
| 4 15:01:08 | Your Honor, Plaintiff would like to play |
| 5 15:01:10 | Exhibit 202, which is the audio, with a transcript at the |
| 6 15:01:15 | same time, for ease of the jury. |
| 7 15:01:16 | THE COURT:  Ladies and gentlemen, you are about to |
| 8 15:01:18 | hear a recording, and you will be able to see a transcript of |
| 9 15:01:25 | the recording.  It is the recording that is the evidence, not |
| 10 15:01:30 | the transcript.  So if you hear something that you think is |
| 11 15:01:35 | different from what is in the transcript, you must rely on |
| 12 15:01:39 | the transcript that is the actual evidence -- rely on the |
| 13 15:01:42 | recording, I'm sorry, that is the actual evidence. |
| 14 15:01:44 | So what you hear is the evidence.  The transcript is |
| 15 15:01:48 | just to assist you in listening to it. |
| 16 15:02:17 | MR. CONLOGUE:  I believe it's being displayed, Your |
| 17 15:02:19 | Honor.  I just want to confirm. |
| 18 15:02:20 | THE COURT:  Yes. |
| 19 15:02:25 | MR. CONLOGUE:  Let me press play. |
| 20 15:02:27 | (Thereupon, the audio was played.) |
| 21 15:02:40 | Q. So let me pause it right there.  It looks like it's at -- |
| 22 15:02:44 | it says a minute 4 on this transcript.  But it's 14 seconds |
| 23 15:02:50 | in the actual media file. |
| 24 15:02:55 | And so you could hear the security guard saying that |
| 25 15:02:58 | he was discharged and kicked out earlier, correct? |

15:03:01    1    A. Correct.

15:03:02    2    Q. And you just went -- after that, you went straight and

15:03:06    3    started chatting with Mr. Breunig, correct?

15:03:08    4    A. Correct.

15:03:09    5    Q. At that time, had you already made up your mind that you

15:03:12    6    were just going to get Mr. Breunig off that location?

15:03:14    7    A. I was just trying to figure out what I was going to do.

15:03:20    8    Q. Were you still investigating?

15:03:21    9    A. Yes.

15:03:21   10    Q. But you didn't ask any follow-up questions with the

15:03:25   11    security guard, correct?

15:03:26   12    A. Correct.

15:03:29   13    Q. Press play.

15:03:31   14         (Thereupon, the audio was played.)

15:03:49   15    Q. I'm sorry, let me continue.

15:03:52   16         (Thereupon, the audio was played.)

15:03:53   17    Q. Let me pause it at -- it's 31 seconds on the audio

15:03:57   18    portion.

15:03:58   19         And so Mr. -- you asked Breunig what is wrong with

15:04:01   20    his ankle, and he told you he cannot walk, correct?

15:04:04   21    A. Yes.

15:04:04   22    Q. And at this time, you could see the scar and the swollen

15:04:08   23    ankle that he has, correct?

15:04:09   24    A. Yes.

15:04:10   25    Q. Did you disbelieve him that he couldn't walk?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

15:04:12   A. I'm sorry?  I just didn't hear you.

15:04:15   Q. Do you believe that he could walk?

15:04:17   A. I didn't know if he could or couldn't.  He's just making

15:04:21   statements.

15:04:21   Q. Well, in the totality of the circumstances, with what he

15:04:25   said, you seeing the scar that is new, and his swollen ankle,

15:04:29   did you believe he could walk?

15:04:31   A. I believed so.

15:04:34   Q. What was that based upon, that you believed he could

15:04:36   walk?

15:04:36   A. Because I asked him to get up and walk.

15:04:43   Q. Let me press play.

15:04:45        (Thereupon, the audio was played.)

15:05:17   Q. So let me pause it there.

15:05:19        You are that Mr. Breunig had not eaten in a couple

15:05:23   of days, correct?

15:05:24   A. I didn't hear him make that statement, but yes, that is

15:05:27   what he said.

15:05:27   Q. Well, this belt recorder, you know, somebody is off in

15:05:31   the distance, does it pick up their voice?

15:05:33   A. Yes.

15:05:33   Q. Well, does it sound more faint when they are off in the

15:05:37   distance, like when you arrive at Cardinal Court and go away

15:05:40   from your patrol car?

15:05:41   A. I don't know the distance, but because there was a lot of

15:05:46    traffic coming by, that is why it was hard for either one of

15:05:50    us to hear each other.

15:05:51    Q. Okay.  Let me press play.

15:05:54           And I apologize, I paused it at a minute, 2 seconds.

15:05:58    Let me press play.

15:05:59           (Thereupon, the audio was played.)

15:06:03    Q. So let me pause that.

15:06:05           Right after he said he hadn't eaten in a couple of

15:06:08    days, you said, "Hey, how do you spell your first name?"

15:06:11           Were you close enough to hear him say he hadn't

15:06:15    eaten?

15:06:16    A. I was close enough, yes.  I just didn't hear him make

15:06:19    those statements.

15:06:20    Q. Let me press play.

15:06:23           I apologize, I stopped it at a minute, 5.  Let me

15:06:27    press play.

15:06:28           (Thereupon, the audio was played.)

15:06:59    Q. Let me pause it at 1 minute and 39 seconds.

15:07:06           So you ask Mr. Breunig, "What is wrong with your

15:07:09    ankle?"

15:07:09           And then that other voice there that we hear, that

15:07:11    male voice, is that Deputy Vaca?

15:07:13    A. Yes.

15:07:14    Q. Okay.  So Deputy Vaca then asked, you know, "Do you need

15:07:18    medical assistance?"

1 15:07:19        And Mr. Breunig responds, "I hear voices."

2 15:07:24        Does that, based upon your training, and even common

3 15:07:27  sense, is that a normal response to, "Do you need medical

4 15:07:30  assistance?"

5 15:07:32        MS. GUSTAFSON:  Objection, vague.

6 15:07:33        THE COURT:  Overruled.

7 15:07:37        You can answer.

8 15:07:38        THE WITNESS:  Can you repeat the question?  I'm

9 15:07:41  sorry.

10 15:07:41  Q. Yes.  So you heard Mr. Breunig answer in response to, "Do

11 15:07:48  you need medical assistance?"  And he says, "I hear voices."

12 15:07:52        Is that an abnormal response, based upon your

13 15:07:54  training?

14 15:07:55  A. I couldn't say if it was abnormal, but people often tell

15 15:08:00  us they hear voices.

16 15:08:03  Q. Well, you would agree that you have received training

17 15:08:07  that a person hearing voices is a sign of potential drug

18 15:08:11  intoxication, correct?

19 15:08:11  A. It's one of the symptoms.

20 15:08:15  Q. It could also mean that they are having -- that it's a

21 15:08:20  sign of mental illness, correct?

22 15:08:21  A. It could be a symptom.

23 15:08:22  Q. And as a duty, you are trained, to find out which one it

24 15:08:26  is, you need to investigate further, correct?

25 15:08:28  A. Correct.

1 15:08:37   Q. Did you do any field sobriety tests on Mr. Breunig at

2 15:08:42   Loma Linda?

3 15:08:43   A. No, I didn't.

4 15:08:44   Q. And I apologize, this is stopped at a minute, 39.  Let me

5 15:08:51   press play.

6 15:08:53           (Thereupon, the audio was played.)

7 15:09:07   Q. And so I have it paused at 1 minute and 51 seconds.

8 15:09:13           And so the voices were telling him to keep going.

9 15:09:17   Did you ever follow up with him on what that means?

10 15:09:20  A. I did not hear him make those statements.  At that

11 15:09:24  specific time I was talking to our dispatch.

12 15:09:29  Q. Let me go ahead and press play.

13 15:09:32          (Thereupon, the audio was played.)

14 15:10:32  Q. Let me pause it at 2 minutes, 48 seconds.

15 15:10:35          At that point, that is you calling into dispatch to

16 15:10:38  run Mr. Breunig's name and date of birth, correct?

17 15:10:40  A. Yes.

18 15:10:41  Q. Let me press play.

19 15:10:44          (Thereupon, the audio was played.)

20 15:11:16  Q. Let me pause it at 3 minutes and 20 seconds.

21 15:11:19          So you asked Mr. Breunig, "What is wrong with your

22 15:11:22  ankle?"  And he told you, "Walking on it."  Correct?

23 15:11:25  A. He said, "I don't know.  Walking on it."

24 15:11:28  Q. At that point do you think he could walk?

25 15:11:30  A. Yes.

15:11:31  1  Q. And what was that based on, after he told you that he is

15:11:37  2  having trouble walking on it?

15:11:39  3  A. I felt he could walk, because he just told me he was

15:11:44  4  walking on it.

15:11:45  5  Q. Was he still on the ground?

15:11:46  6  A. Yes.

15:11:47  7  Q. Had you seen him stand at this point?

15:11:50  8  A. No.

15:11:50  9  Q. I apologize, it's paused at 3 minutes, 20 seconds.  And

15:12:03  10  I'm going to press play.

15:12:04  11        Mr. Breunig already told you he lived in San

15:12:07  12  Bernardino, correct?

15:12:07  13  A. That's correct.

15:12:08  14  Q. All right.  I'm going to press play.

15:12:10  15        (Thereupon, the audio was played.)

15:12:35  16  Q. Let me pause it at 3 minutes and 45 seconds.

15:12:38  17        And so now Mr. Breunig has indicated he lives in

15:12:41  18  Loma Linda, not San Bernardino, correct?

15:12:43  19  A. Yes.

15:12:45  20  Q. And he has a name of a friend, who we don't know who the

15:12:48  21  friend is or the address where he lives, right?

15:12:50  22  A. That's correct.

15:12:50  23  Q. Let me press play.

15:12:53  24        (Thereupon, the audio was played.)

15:13:04  25  Q. Let me pause it at 3 minutes and 55 seconds.

15:13:11          At that point you indicated that you were going to

15:13:12    drop Mr. Breunig off at a bus stop or you could take him off

15:13:18    where he wanted to go, correct?

15:13:19    A. Yes.

15:13:20    Q. And you also said that "We are not a fucking taxi

15:13:24    service."  Correct?

15:13:24    A. Yes.

15:13:24    Q. Is that how you are trained to interact with the public?

15:13:27    A. And what specifically are you referring to?

15:13:31    Q. By telling him, "We are not a fucking taxi service."  Is

15:13:36    that how you are trained to interact with the public?

15:13:39    A. By cursing, no.

15:13:41    Q. And were you already frustrated with Mr. Breunig at this

15:13:46    point?

15:13:47    A. My frustrations were building, yes.

15:13:50    Q. And was this -- you know, before this incident, there has

15:13:57    been many other trespassing calls you've had to deal with,

15:14:00    correct?

15:14:01    A. Yes.

15:14:01    Q. Do you find them to be bothersome calls?

15:14:05    A. Not necessarily.

15:14:06    Q. A waste of your time?

15:14:08    A. Not necessarily.

15:14:14    Q. Did you believe Mr. Breunig was on drugs at this point?

15:14:17    A. No.

| | |
|---|---|
| 1 15:14:19 | Q. And so with these -- you would agree he was making |
| 2 15:14:24 | inconsistent statements to you, right? |
| 3 15:14:25 | A. Correct. |
| 4 15:14:26 | Q. And he told you he was hearing voices in his head, true? |
| 5 15:14:30 | A. That's true. |
| 6 15:14:32 | Q. What do you think was causing him to say those things, |
| 7 15:14:38 | then? |
| 8 15:14:40 | THE COURT:  What did she think at the time? |
| 9 15:14:42 | MR. CONLOGUE:  Correct. |
| 10 15:14:45 | THE COURT:  You can answer. |
| 11 15:14:46 | THE WITNESS:  I believed he may have lived at |
| 12 15:14:51 | multiple locations.  I wasn't sure. |
| 13 15:14:55 | Q. And even with your belief that he lives at multiple |
| 14 15:15:04 | locations, what about "I hear voices"?  Did that make you |
| 15 15:15:12 | think he was on drugs? |
| 16 15:15:13 | A. No. |
| 17 15:15:13 | Q. Did you think he had a mental issue? |
| 18 15:15:20 | A. No. |
| 19 15:15:21 | Q. Let me press play from 3 minutes, 55 seconds. |
| 20 15:15:28 | (Thereupon, the audio was played.) |
| 21 15:16:01 | Q. Let me pause it at 4 minutes and 26 seconds. |
| 22 15:16:07 | When you asked him if he can go to his friend's |
| 23 15:16:10 | house down the street, he told you he can't walk, correct? |
| 24 15:16:13 | A. Yes. |
| 25 15:16:13 | Q. And did you believe he could walk at that time? |

15:16:17  A. Yes.

15:16:17  Q. And, you know, we'll continue on in a little bit.  And in

15:16:22  a few moments, you actually have him in your patrol car and

15:16:25  you are driving him to his friend's house, correct?

15:16:28  A. Yes.

15:16:30  Q. If you believed he could walk, why did you put him in

15:16:33  your patrol car?

15:16:34  A. I think that there is a reasonable distance that you can

15:16:39  walk.

15:16:42  Q. What's a reasonable distance, Deputy?

15:16:44  A. Well, at this moment, there -- he was trespassing on

15:16:50  hospital property.  If he was willing to leave with a ride,

15:16:54  that was local within -- then it wasn't an issue for me to go

15:17:00  drop him off.

15:17:01  Q. He wasn't under arrest at any time for trespass, true?

15:17:06  A. No, because he was willing to leave.  There was no longer

15:17:08  a crime that was committed.

15:17:09  Q. And if he was willing to leave, and you believed he could

15:17:12  walk, why even take the burden of putting him in the back of

15:17:16  your patrol car?

15:17:17  A. Because I was just trying to help him out.

15:17:22  Q. Let me press play.

15:17:25        (Thereupon, the audio was played.)

15:17:35  Q. Let me pause it at 4 minutes and 37 seconds.

15:17:41        At this time, Mr. Breunig states he got discharged,

15:17:46  1  but he doesn't say he knows why; is that correct?

15:17:50  2   A. It appears that way, yeah.

15:17:52  3   Q. Did you hear this on the date of the incident?

15:17:54  4   A. Yes.

15:17:55  5   Q. Did you do anything to follow up on why he was

15:17:58  6  discharged?

15:17:59  7   A. No.

15:17:59  8   Q. And then there is a statement by Deputy Vaca that says,

15:18:05  9  "You just walked across the street."

15:18:07  10          Did you see him walk across the street?

15:18:09  11   A. No.

15:18:09  12   Q. Did you see anybody or talk with anybody who gave you

15:18:14  13  information that Mr. Breunig walked across the street where

15:18:16  14  you found him lying on the ground?

15:18:18  15   A. I don't know who observed him.

15:18:20  16   Q. Do you know if the security at Loma Linda kicked him out,

15:18:24  17  brought him across the street and put him on the ground

15:18:26  18  there?

15:18:26  19   A. I don't know.

15:18:30  20   Q. Let me press play, and it's at 4 minutes, 37 seconds.

15:18:36  21          (Thereupon, the audio was played.)

15:18:55  22   Q. Let me pause it at 4 minutes and 54 seconds.

15:18:58  23          At this time, Mr. Breunig tells you that he's really

15:19:00  24  sick, correct?

15:19:01  25   A. Yes.

1 15:19:02    Q. Did you believe he was sick?

2 15:19:06    A. No.

3 15:19:08    Q. Did you do anything to find out if he was sick or not

4 15:19:11    sick?

5 15:19:11    A. No.

6 15:19:12    Q. At this time, when you told you this, he was still on the

7 15:19:16    ground, correct?

8 15:19:16    A. Yes.

9 15:19:17    Q. Let me press play.

10 15:19:21              (Thereupon, the audio was played.)

11 15:19:36    Q. So let me pause it at 5 minutes and 8 seconds.

12 15:19:39              When you say, "All right.  Get up," and he says,

13 15:19:42    "You can take me," and you say, "Yeah," at that point did you

14 15:19:46    have the intention to give him a courtesy ride?

15 15:19:50    A. Yes.

16 15:19:50    Q. And with this intention of giving him a courtesy ride

17 15:19:55    with him on the ground, did you have to pick him up?

18 15:19:58    A. No.

19 15:19:58    Q. Did you have to kind of help him -- like, you know how

20 15:20:03    you see people throw somebody's arms over their shoulders and

21 15:20:06    help them walk?  Did you have to do that?

22 15:20:08    A. No.

23 15:20:08    Q. Did anyone on-scene have to do that, Deputy Vaca or a

24 15:20:13    security guard?

25 15:20:14    A. I didn't see anybody assist him.

15:20:15  Q. And I want to make sure, you saw Mr. Breunig stand up and

15:20:20  on his own volition, walk all the way over to your patrol

15:20:28  car; is that correct?

15:20:28  A. Yes.

15:20:29  Q. When he did that, was he in pain?

15:20:30  A. I couldn't tell you.  He was moving slower.

15:20:35  Q. And going back to the date of the incident, did you have

15:20:38  a belief one way or another if he had pain while walking?

15:20:41  A. I couldn't tell you.  I know he was walking slower.

15:20:47  Q. As you sit here today, do you believe he had pain while

15:20:50  walking?

15:20:51  A. I couldn't tell you.

15:20:57  Q. And I know we spent some time going over your training,

15:21:00  but one of the things is, if someone is in pain and needing

15:21:05  medical care, you were trained on that topic as well before

15:21:08  this date, true?

15:21:09  A. Yes.

15:21:09  Q. And even just common sense, if somebody is in pain, you

15:21:13  can look at somebody and know they are in pain, correct?

15:21:15  A. I couldn't tell you how much pain someone was in.

15:21:19  Q. I'm not saying how much, but that they are experiencing

15:21:23  pain, just common sense.  You don't --

15:21:25       THE COURT:  Ask another question, Counsel.

15:21:27       MR. CONLOGUE:  Yes, I'll move on, Your Honor.

15:21:28  Q. Let me press play.

1  15:21:36                (Thereupon, the audio was played.)

2  15:22:10    Q. So let me pause it at 5 minutes and 43 seconds.

3  15:22:15            So there you said, "Get up."

4  15:22:18            He said, "Can you help me?"

5  15:22:19            And you said, "Ready?"

6  15:22:23            Were you helping him at that time to get up?

7  15:22:25    A. What am I doing?

8  15:22:27    Q. Were you helping him at that time to physically get up?

9  15:22:29    A. No.

10 15:22:30    Q. So when you said, "Ready," you were standing back not

11 15:22:34    making any physical contact and you just said "Ready?"

12 15:22:37    Correct?

13 15:22:38    A. Correct.

14 15:22:45    Q. And then after he said, "Yeah" to your "Ready" question,

15 15:22:49    you said, "Okay."

16 15:22:51            Is that a sign that you were helping him -- pick him

17 15:22:54    up?

18 15:22:54    A. No, it was a sign that we were getting ready to leave.

19 15:22:58    Q. And let me press play at 5 minutes, 43 seconds.

20 15:23:04                (Thereupon, the audio was played.)

21 15:23:31    Q. Let me pause it at 6 minutes and 10 seconds.

22 15:23:36            And so during that timeframe, could you hear

23 15:23:40    Mr. Breunig making noises?

24 15:23:42    A. On the audio, yes.

25 15:23:44    Q. And were they -- I mean, did you hear him back on the

1 15:23:50   date of this incident?

2 15:23:50    A. I couldn't hear a whole lot that -- at that incident

3 15:23:55   because there was a lot of traffic going by.

4 15:23:57    Q. Understood.

5 15:23:58          Were you observing him walking?

6 15:23:59    A. Yes.

7 15:23:59    Q. And was he making any grimace faces?

8 15:24:05    A. I didn't see his face.

9 15:24:08    Q. And then, let me go ahead and press play.

10 15:24:15          Actually, before I do, you asked him, "How come the

11 15:24:18   hospital didn't give you, like, crutches?"

12 15:24:22          Is that because you thought he needed help to walk?

13 15:24:25    A. No.  Just because he was walking slower, and he was

14 15:24:30   discharged from the hospital, I was just asking if he had

15 15:24:32   any.

16 15:24:34    Q. Do you ask all these individuals who you escort off Loma

17 15:24:39   Linda if they need crutches?

18 15:24:40    A. No.

19 15:24:42    Q. With Mr. Breunig, do you believe he could walk better

20 15:24:45   with crutches?

21 15:24:46    A. I couldn't tell you.

22 15:24:51          MR. CONLOGUE:  Your Honor, Plaintiff seeks to read

23 15:24:53   in the deposition transcript of Ms. Fite taken on May 9th,

24 15:24:59   2023, page 105, line 21, to page 106, line 4.

25 15:25:17          THE COURT:  All right.

15:25:31    1        MR. CONLOGUE:  May I proceed?

15:25:32    2        THE COURT:  Yes.

15:25:32    3        MR. CONLOGUE:  Thank you, Your Honor.

15:25:33    4   Q. Question:  Okay.  Did you feel like Mr. Breunig could

15:25:39    5   walk better if he had crutches with him?

15:25:46    6        Answer:  Yeah, he could have.

15:26:05    7        I'm going to go ahead and press play from 6 minutes

15:26:08    8   and 10 seconds.

15:26:09    9        (Thereupon, the audio was played.)

15:26:33   10   Q. Let me pause it now at 6 minutes and 33 seconds.

15:26:37   11        At this time is Mr. Breunig in the back of your

15:26:40   12   patrol car and you're in the front?

15:26:42   13   A. Yes.

15:26:43   14   Q. And on the date of this incident, did you have any

15:26:48   15   partner with you in the patrol car with you, or was it just

15:26:51   16   you?

15:26:51   17   A. Just me.

15:26:52   18   Q. Before you placed Mr. Breunig in the patrol car, did you

15:26:59   19   search him?

15:26:59   20   A. I did not.

15:27:00   21   Q. Did you see anyone search him?

15:27:04   22   A. I did not.

15:27:05   23   Q. Isn't your training, if you put somebody in the back of

15:27:09   24   your patrol car, you got to first search 'em?

15:27:14   25   A. Yes, you could search him.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

15:27:15  Q. And then during this process of getting Mr. Breunig in

15:27:25  the car, did Deputy Vaca come with you to help at all?

15:27:30  A. Yes.

15:27:31  Q. And then it sounds like at this point that there's a

15:27:37  mention of Taylor's.  What is Taylor's?

15:27:39  A. Taylor's -- it's called Taylor's Bar and Grill.  It's a

15:27:46  restaurant in the city of Loma Linda.

15:27:50  Q. I want to show you -- or if you can go in that binder

15:28:12  that's in front of you, there's an Exhibit Number 14.  If you

15:28:15  can grab that same binder, it'll be Exhibit Number 14.

15:28:29      THE COURT:  Any objection to 14?

15:28:32      MS. GUSTAFSON:  May I look at it, Your Honor,

15:28:35  briefly?

15:28:39      No objection.

15:28:39      THE COURT:  All right.  That's admitted.

15:28:43      (Exhibit No. 14 received in evidence.)

15:28:43      MR. CONLOGUE:  Permission to publish, Your Honor?

15:28:45      THE COURT:  Once I admit something, you don't need

15:28:48  to ask for permission to publish.  Publish is just the

15:28:52  lawyer's way of saying, "Can I show it to the jury?"

15:28:55      MR. CONLOGUE:  Sorry, Your Honor, it's just out of

15:28:56  respect.

15:28:57      THE COURT:  That's all right.  I appreciate it.

15:29:14  Q. And so looking at Exhibit 14 here, there's a point A that

15:29:23  I drew a yellow circle around.  That's the initial contact

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

115:29:28   you made with Mr. Breunig at Loma Linda University Medical

215:29:32   Center, correct?

315:29:32    A. Yes.

415:29:34    Q. And then we'll go over the other aspects of point B and

515:29:38   point C as we go through your testimony.

615:29:42        Point B is where you ended up taking him to, which

715:29:46   was 11848 Cardinal Court, correct?

815:29:49    A. Yes.

915:29:51    Q. And then point C, way over here, is the San Timoteo

1015:30:04   Canyon Road, right where Alessandro Road intersects with it,

1115:30:11   correct?

1215:30:11    A. I'm sorry, I just don't know the question.

1315:30:15    Q. Did you drop him off there?

1415:30:17    A. Yes.

1515:30:17    Q. Okay.  And -- uh oh.

1615:30:37        Looking -- zoomed in on point C, where this

1715:30:44   Alessandro Road is, there's a faint line that I drew a line

1815:30:49   with where the railroad track crosses that road, correct?

1915:30:53    A. Personally, I couldn't tell you if that specific line is

2015:30:59   the railroad or not, but it's the general area, yeah.

2115:31:12    Q. And then just looking at this map, Redlands Community

2215:31:18   Hospital is right here where I drew a yellow circle, correct,

2315:31:22   in the middle of the map?

2415:31:24    A. Yes.

2515:31:42        MR. CONLOGUE:  And then the stipulation of the

1 15:31:44    parties, Your Honor, the distance between point A and point C

2 15:31:50    is 6.9 miles.

3 15:31:51              THE COURT:  All right.  Thank you.

4 15:31:52              Ladies and gentlemen, you must accept that fact as

5 15:31:54    true.

6 15:32:13    Q. I apologize, I forgot the most important question.

7 15:32:13              Looking at what's here on this map between point A,

8 15:32:17    point B and point C, does that accurately reflect your route

9 15:32:21    with Mr. Breunig on the date of this incident?

10 15:32:24   A. It looks like it, yes.

11 15:32:44   Q. Going back to Taylor's, you were familiar with where that

12 15:32:51   restaurant is located at, correct?

13 15:32:53   A. Yes.

14 15:32:53   Q. You have been there before?

15 15:32:55   A. Yes.

16 15:32:55   Q. And is Taylor's within the city of Loma Linda?

17 15:33:02   A. It's -- it's actually technically San Bernardino, but

18 15:33:10   it's in Loma Linda, so Loma Linda responds.

19 15:33:15   Q. And then to get to Taylor's from the medical center, you

20 15:33:20   knew how to get there without using any GPS devices, correct?

21 15:33:24   A. Yes.

22 15:33:24   Q. Including what you have inside your car, correct, the --

23 15:33:32   is it the MDA?

24 15:33:34   A. My MDC?

25 15:33:36   Q. MDC?

1 15:33:39          You didn't use your MDC to get there, correct?

2 15:33:41    A. I did not use it.

3 15:33:45    Q. And then in the call log history, though, you typed in

4 15:33:50    the address for Taylor's, correct?

5 15:33:54    A. Yes.

6 15:33:54    Q. And you entered that address into your call log while

7 15:34:06    you're still at Loma Linda University Medical Center,

8 15:34:10    correct?

9 15:34:11    A. Yes.

10 15:34:11    Q. And when you entered that address in, it was 12:04 p.m.,

11 15:34:18    correct?

12 15:34:18    A. Yes.

13 15:34:19    Q. And then once you got to Taylor's to get to this house,

14 15:34:24    Mr. Breunig, he didn't -- again, he never gave you an exact

15 15:34:28    address, correct?

16 15:34:29    A. That's correct.

17 15:34:29    Q. He just kind of said, "Hey, turn here, turn there."

18 15:34:32    Correct?

19 15:34:32    A. Correct.

20 15:34:33    Q. And during that transport as well, you learned that he

21 15:34:36    was homeless, correct?

22 15:34:37    A. That's correct.

23 15:34:39    Q. And then you go ahead, and you arrive at an address on

24 15:34:48    Cardinal Court, and then you type in the address -- the

25 15:34:52    address into your MDC for that home, correct?

15:34:55    A. That's correct.

15:34:58    Q. And that address, you know, it's what we have on

15:35:02    Exhibit 14, the 11848 Cardinal Court, correct?

15:35:07    A. Correct.

15:35:07    Q. And when you enter that address, you then put the

15:35:14    transport as complete at that address at 12:15 p.m., correct?

15:35:18    A. That's correct.

15:35:20    Q. And when you first arrived on-scene to the Cardinal Court

15:35:23    address, your intent was to leave him there at that address,

15:35:26    correct?

15:35:26    A. That's correct.

15:35:28    Q. And let me go back to Exhibit 6.  And I'm going to start

15:35:36    at -- I'm sorry, Exhibit 202.  I apologize.  Exhibit 202, at

15:35:46    17 minutes and 13 seconds.

15:36:03             I have it at 17 minutes, 11 seconds.  Let me go

15:36:24    ahead and press play.

15:36:30             (Thereupon, the audio was played.)

15:37:02    Q. Let me pause it right here at 17 minutes and 42 seconds.

15:37:07             Do you hear some clicking going on?

15:37:08    A. Yes.

15:37:09    Q. Is that you typing on your MDC in your patrol car?

15:37:12    A. Yes.

15:37:12    Q. And are you typing in this address that we just went over

15:37:16    for Cardinal Court?

15:37:17    A. Yes.

15:37:17   1   Q. To complete the call at that location, correct?

15:37:20   2   A. Yes.

15:37:21   3   Q. And so right now, at this time of 17 minutes and

15:37:26   4   42 seconds into Exhibit 202, it's around 12:15 p.m., correct?

15:37:31   5   A. Yes.

15:37:32   6   Q. I'm going to go ahead and press play.

15:37:39   7            (Thereupon, the audio was played.)

15:37:49   8   Q. So at 17 minutes and 54 seconds, I paused it.

15:37:53   9            Mr. Breunig asked to be let out.  And you said,

15:37:56  10   "Yeah, hold on."  What were you doing at that time when you

15:38:00  11   told him to hold on?

15:38:01  12   A. I think I was just still completing that inputting that

15:38:05  13   information.

15:38:06  14   Q. Let me press play.

15:38:08  15            (Thereupon, the audio was played.)

15:38:16  16   Q. And let me pause it at 18 minutes and 2 seconds.  There

15:38:19  17   is a chime that we heard, does that chime mean anything?

15:38:23  18   A. So that chime is what indicates that I actually did

15:38:29  19   complete that transport.

15:38:31  20   Q. And so you entered in the CAD log, transport complete,

15:38:35  21   and did you press enter or is there a button that you press

15:38:38  22   to say completed?

15:38:40  23   A. For transportation, yes.

15:38:45  24   Q. Let me press play.

15:38:47  25            (Thereupon, the audio was played.)

15:40:35    Q. Let me pause it at 19 minutes and 49 seconds.  During

15:40:40    this timeframe, you got out of your patrol car, you went up

15:40:43    to that address, you knocked on the door, correct?

15:40:45    A. Yes.

15:40:46    Q. There is no response, correct?

15:40:48    A. Yes.

15:40:49    Q. And then you went back to the patrol car where

15:40:52    Mr. Breunig was indicating that he had a key, and he showed

15:40:55    you something, correct?

15:40:55    A. Yes.

15:40:56    Q. What did he show you?

15:40:57    A. It looked like a wrapper of some sort.

15:41:01    Q. And then let me press play.

15:41:05          (Thereupon, the audio was played.)

15:41:14    Q. Let me pause it at 19 minutes and 57 seconds.  At this

15:41:22    time Mr. Breunig asked for you to let him out, and you say

15:41:25    no, correct?

15:41:26    A. Correct.

15:41:27    Q. At that time he is detained in the back of your vehicle,

15:41:31    correct?

15:41:31    A. Correct.

15:41:33    Q. He's not free to leave, correct?

15:41:34    A. He cannot leave, no.

15:41:37    Q. He's in your custody, correct?

15:41:38    A. Correct.

1    15:41:39    Q. And in order for him to leave or get out of the back of

2    15:41:43    your vehicle, the only way for him to get out is if somebody

3    15:41:46    from the outside opens the door for him to get out of the

4    15:41:50    backseat of your patrol car, correct?

5    15:41:51    A. That's correct.

6    15:41:53    Q. That's kind of obvious for safety reasons, so people in

7    15:41:56    custody can't get out on their own, right?

8    15:41:58    A. That's correct.

9    15:41:59    Q. Let me go ahead and press play.

10   15:42:10           (Thereupon, the audio was played.)

11   15:43:30    Q. Let me pause it at 21 minutes and 13 seconds.  At this

12   15:43:35    time you went back to the house you knocked on the door again

13   15:43:37    and there was no response, correct?

14   15:43:39    A. Correct.

15   15:43:40    Q. And then Mr. Breunig, he's still back in your patrol car,

16   15:43:44    and he starts to tell you that he has to go to the bathroom,

17   15:43:47    and he tells you I'm going to shit in your car, correct?

18   15:43:51    A. Correct.

19   15:43:51    Q. And then it sounds like you begin to walk back to your

20   15:43:54    vehicle, correct?

21   15:43:54    A. Correct.

22   15:43:55    Q. Let me go ahead and press play, and if I didn't say so it

23   15:43:58    was at 21 minutes and 13 seconds.

24   15:44:00           (Thereupon, the audio was played.)

25   15:44:41    Q. Let me pause it at 21 minutes and 51 seconds.  So at this

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 15:44:46   point, again, Mr. Breunig asks that you drop him off there

2 15:44:48   and you told him no, correct?

3 15:44:50   A. Correct.

4 15:44:51   Q. Confirming he's staying in your custody, correct?

5 15:44:54   A. Correct.

6 15:44:54   Q. Let me press play.

7 15:45:04        (Thereupon, the audio was played.)

8 15:45:10   Q. Let me pause it at 21 minutes and 57 seconds.  At this

9 15:45:16   time Mr. Breunig said, can you just let me in and out, to

10 15:45:21  shit in the backseat right here and you responded I'm going

11 15:45:24  to take you back to the hospital, correct?

12 15:45:25  A. Yes.

13 15:45:26  Q. So you had the intention of taking him to a hospital at

14 15:45:30  this time, correct?

15 15:45:30  A. Correct.

16 15:45:32  Q. While he's in your custody, correct?

17 15:45:34  A. Correct.

18 15:45:34  Q. And when you say back to the hospital, is that back at

19 15:45:40  Loma Linda?

20 15:45:41  A. I was just referring to a hospital.

21 15:45:45  Q. Okay.  So you didn't mean back to the hospital we just

22 15:45:47  came from?

23 15:45:48  A. No.

24 15:45:48  Q. Why didn't you say I'll take you to another hospital at

25 15:45:53  this time?

1 15:45:53    A. I just didn't make those statements.

2 15:45:57    Q. Did you not want him back at Loma Linda, because that was

3 15:46:01    your beat?

4 15:46:01    A. No.

5 15:46:03    Q. Did you not want to deal with him at all further that

6 15:46:06    day?

7 15:46:06    A. No, there was another hospital closer by.

8 15:46:09    Q. Let me go ahead and press play.

9 15:46:15            (Thereupon, the audio was played.)

10 15:46:18    Q. Let me pause it at 22 minutes and 1 second.  Mr. Breunig

11 15:46:23    again asked to be dropped off and you said no, correct?

12 15:46:25    A. Correct.

13 15:46:26    Q. Let me press play.

14 15:46:32            (Thereupon, the audio was played.)

15 15:47:21    Q. Let me pause it at 22 minutes and 49 seconds, you hear

16 15:47:27    yourself start to go type on your MDC correct?

17 15:47:30    A. Yes.

18 15:47:30    Q. And so what are you doing at this point on your MDC?

19 15:47:34    A. So although I ran his name over the radio and we were

20 15:47:37    able to get his information, I used the MDC to confirm who he

21 15:47:44    was, so I was able to pull up his driver's license.  So I

22 15:47:49    found out he actually had an address out of Beaumont.  And I

23 15:47:53    was able to see his picture.  So I just was able to verify,

24 15:47:57    yes, he was who he told me he was.  I was also looking up his

25 15:48:02    criminal history.

Q. Prior to this time, you were unaware of his criminal history, correct?

A. I had a brief summary of what it was.

Q. How did you have a brief summary?

A. When we run a person's name over the radio, dispatch tells us what their criminal history is in our county.  If I'm able to run it myself, I can give additional information.

Q. What criminal history did you learn when you ran his name here?

A. Vehicle theft, and drug charges.

Q. Drug charges.  What drug charges?

A. He had multiple drug paraphernalia charges.

Q. Okay.  In your attorney's opening today, she didn't mention anything about these drug charges, but you were aware when Mr. Breunig was in your custody, the back of your seat, that he had prior drug arrests, correct?

MS. GUSTAFSON:  Objection, argumentative, move to strike the first portion of that question.

THE COURT:  Sustained.  That will be stricken.

Q. So when Mr. Breunig was in the back of your seat, in your custody, you knew he had prior drug charges, correct?

A. At that point, yes, I did.

Q. Wasn't one of them just a few days before this incident?

A. I couldn't recall what date it was.  I just saw the previous charges.

15:49:29   Q. And -- well, when you are in the -- your car to see these

15:49:38   previous charges, the way you pull it up is on your MDC,

15:49:42   correct?

15:49:43   A. Yes.

15:49:44   Q. And would you agree that the most recent one for him was

15:49:48   just two days prior for drug paraphernalia?

15:49:51   A. I didn't notate the specific dates of the charges.  I

15:49:56   just looked at the charges itself.

15:49:59   Q. And then once you knew that he had these other charges,

15:50:06   did you ever tell him, hey, I can't let you out here because

15:50:10   of these other charges, these other arrests that you have,

15:50:14   correct?

15:50:15   A. I didn't tell him about his charges.

15:50:18   Q. Okay.  And just to be clear, that this criminal history

15:50:20   that you are talking about, these are only arrests that you

15:50:23   are aware of, correct?

15:50:24   A. Correct.

15:50:25   Q. There is no convictions that you are aware of, true?

15:50:28   A. I didn't see any on the criminal history, no.

15:50:32   Q. Let me go ahead and press play.

15:50:37         (Thereupon, the audio was played.)

15:50:51   Q. Let me pause it at 23 minutes and two seconds.  So as you

15:50:54   are typing on your MDC computer, Mr. Breunig says, if you

15:50:59   read in the newspaper that shit ain't me, if you read it in

15:51:03   the newspaper, that shit ain't me.  And you respond what are

1  15:51:06  you talking about?  Did you say that because he was making

2  15:51:09  some crazy statements in the back of your seat?

3  15:51:11   A. No, I believe he was trying to get my attention, because

4  15:51:17  I was looking up his criminal history.

5  15:51:25   Q. Let me back it up to, if I can, 22:57.  Let me press

6  15:51:41  play.

7  15:51:42           (Thereupon, the audio was played.)

8  15:51:46   Q. So when you -- and I am pausing it at 23:02, when you

9  15:51:53  said what are you talking about, was your voice kind of in,

10 15:51:56  you know, questioning him like this is crazy what you are

11 15:52:00  saying?

12 15:52:02   A. It was a question towards him, yes.

13 15:52:05   Q. Did you believe he was on drugs at this time?

14 15:52:07   A. No.

15 15:52:08   Q. Did you believe he had a mental illness?

16 15:52:10   A. No.

17 15:52:11   Q. Did you do anything to further investigate if he had --

18 15:52:15  if he was under the influence of drugs at this time?

19 15:52:17   A. No.

20 15:52:19   Q. Let me go ahead and press play.

21 15:52:22           (Thereupon, the audio was played.)

22 15:54:24   Q. Let me pause it at 25 minutes and four seconds, and so

23 15:54:28  that is when, you know, it looks like you are getting

24 15:54:31  information back on your MDC, and you indicate that

25 15:54:33  Mr. Breunig, that what you are getting indicates he lives in

1 15:54:37   Beaumont, correct?

2 15:54:38    A. Correct.

3 15:54:39    Q. And that is where -- and he tells you that is where his

4 15:54:43   mom lives, correct?

5 15:54:44    A. Correct.

6 15:54:44    Q. Did you ever try to make contact with her regarding

7 15:54:47   Mr. Breunig?

8 15:54:47    A. No.

9 15:54:48    Q. Have you tried to at any time?

10 15:54:49    A. No.

11 15:54:50    Q. And then with Mr. Breunig, you've already made the

12 15:54:55   decision to take him back to the hospital, he's in your

13 15:54:59   custody, you would agree at this time he hasn't mentioned

14 15:55:03   anything about withdrawal yet, correct?

15 15:55:05    A. Correct.

16 15:55:06    Q. Let me press play.  Well, before I do, why did you want

17 15:55:20   to take him back to the hospital?

18 15:55:21    A. I really didn't have a specific plan at that time, but I

19 15:55:27   also couldn't leave him in an area where he possibly also

20 15:55:31   wasn't allowed to be and just have another trespassing call.

21 15:55:34   So that was just my, the first idea that came to my head.

22 15:55:38    Q. It would be a safe place for him, you believed, correct?

23 15:55:42    A. A hospital is safe.

24 15:55:44    Q. Is part of your training that you receive when somebody

25 15:55:49   is under the influence, are you aware of certain detox

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

15:55:52    1    facilities?

15:55:52    2    A. No.

15:55:53    3    Q. And so you are not trained that if you find somebody who

15:55:56    4    is under the influence, that there is certain facilities you

15:55:59    5    should take them to if they are going through withdrawal?

15:56:02    6    A. I don't know any detox facilities.

15:56:05    7    Q. Would you take him to a hospital if you believed a person

15:56:11    8    needed to go through detox?

15:56:13    9    A. I -- I don't even know if a hospital has a detox

15:56:20    10   facility.

15:56:22    11   Q. Are you trained that if you arrest somebody -- I know

15:56:28    12   there was no arrest here, but if you arrest somebody for

15:56:30    13   under the influence, that they have to be medically cleared?

15:56:37    14   A. Yes.

15:56:38    15   Q. Where do they get medically cleared?

15:56:40    16   A. At the jail.

15:56:42    17   Q. If you arrest somebody that's publically intoxicated, and

15:57:02    18   you believe that they need medical attention for any symptoms

15:57:06    19   of the intoxication, are you trained to take them to the

15:57:09    20   hospital prior to booking at the jail?

15:57:11    21   A. If their symptoms on the -- I'm sorry, if their symptoms

15:57:17    22   are that severe for public intoxication, they might go to the

15:57:24    23   hospital.

15:57:25    24   Q. Okay.

15:57:25    25   A. I would not transport.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

| | |
|---|---|
| 1 15:57:27 | Q. Would the hospital that you would take him to be Loma |
| 2 15:57:30 | Linda? |
| 3 15:57:30 | A. If they were that severe, I wouldn't transport. |
| 4 15:57:33 | Q. How would you get them to the hospital? |
| 5 15:57:35 | A. I would call for medical. |
| 6 15:57:40 | Q. Would you wait for EMS? |
| 7 15:57:41 | A. Correct. |
| 8 15:57:49 | Q. Let me press play at 25 minutes and 4 seconds. |
| 9 15:57:54 | (Thereupon, the audio was played.) |
| 10 15:58:09 | Q. Let me press pause at 25 minutes and 17 seconds. |
| 11 15:58:13 | At this time, again, Mr. Breunig asks to be let out |
| 12 15:58:17 | at the corner and you say no, correct? |
| 13 15:58:18 | A. Correct. |
| 14 15:58:19 | Q. Confirming he's still detained and in your custody, |
| 15 15:58:24 | correct? |
| 16 15:58:24 | A. Correct. |
| 17 15:58:24 | Q. At this time, you're moving in your patrol vehicle, true? |
| 18 15:58:28 | A. Correct. |
| 19 15:58:29 | Q. And let me go ahead and press play. |
| 20 15:58:34 | (Thereupon, the audio was played.) |
| 21 15:59:36 | Q. So let me pause you at 26 minutes and 17 seconds. |
| 22 15:59:39 | At this point, he repeatedly asks you to be let out |
| 23 15:59:43 | and you keep saying no, no, no, correct? |
| 24 15:59:45 | A. Correct. |
| 25 15:59:45 | Q. And then you confirm you're taking him back to the |

15:59:48  1  hospital, correct?

15:59:48  2  A. Correct.

15:59:49  3  Q. And you have no idea where else to take him at this

15:59:52  4  moment, correct?

15:59:53  5  A. Correct.

15:59:54  6  Q. Where at the hospital were you going to take him?

15:59:56  7  A. There's a specific spot for law enforcement.

16:00:00  8  Q. Were you going to take him to the ER?

16:00:02  9  A. It's nearby.  There's a specific spot for law enforcement

16:00:06  10  where they can take him.

16:00:07  11  Q. And is that in the ER?

16:00:10  12  A. Oftentimes, yes.

16:00:14  13  Q. Was your intent to go to the ER?

16:00:15  14  A. No.

16:00:27  15  Q. Let me go ahead and press play.

16:00:31  16         (Thereupon, the audio was played.)

16:00:58  17  Q. So let me pause it right now at 26 minutes and

16:01:02  18  43 seconds.

16:01:04  19         This is where Mr. Breunig is telling you that he's

16:01:06  20  going to shit in the backseat of your patrol car, and he's

16:01:09  21  even telling you, "All right.  I'm shitting."

16:01:12  22         At that moment, you don't stop your car, pull over

16:01:14  23  and tell him to get out, true?

16:01:16  24  A. Correct.

16:01:18  25  Q. Why not?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  16:01:18    A. Because at this point, I think he's just making

2  16:01:22    statements so I can -- he can get his way, and I just let him

3  16:01:26    out of the car.

4  16:01:29    Q. And let me press play.

5  16:01:31          (Thereupon, the audio was played.)

6  16:01:39    Q. Let me pause it at 26 minutes and 51 seconds.

7  16:01:44          At this time, you indicate you're taking him to the

8  16:01:47    hospital because he is withdrawing, correct?

9  16:01:51    A. Correct.

10 16:01:52    Q. And you believed him, correct?

11 16:01:54    A. At that point, it was the best option, to take him to the

12 16:01:59    hospital.

13 16:01:59    Q. Did you believe him?

14 16:02:00    A. I believe he was making statements just to get out of the

15 16:02:04    car.

16 16:02:05          MR. CONLOGUE:  Your Honor, Plaintiff seeks to read

17 16:02:07    in the deposition transcript of Ms. Fite from May 9th, 2023,

18 16:02:12    page 117, lines 4 to 9.

19 16:02:25          THE COURT:  All right.  Go ahead.

20 16:02:28    Q. Question:  Okay.  Well, when he said that he was

21 16:02:34    withdrawing from drugs, did you believe him?

22 16:02:38          Answer:  I -- I took his word for it, basically.

23 16:02:44          Question:  So that's yes?

24 16:02:48          Answer:  Did you hear me?  Yes.

25 16:03:03    Q. Let me go ahead and press play.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 16:03:05          (Thereupon, the audio was played.)

2 16:03:16    Q. Let me pause it at 27 minutes and 1 second.

3 16:03:21          Mr. Breunig told you he was going to refuse the

4 16:03:24    hospital, and you still were taking him back to the hospital,

5 16:03:27    correct?  And you told him, "You can refuse there."  True?

6 16:03:30    A. Correct.

7 16:03:30    Q. And then he told me, "They kicked me out of there."

8 16:03:35    Correct?

9 16:03:35    A. Correct.

10 16:03:36   Q. And in response to that -- and we'll get to it, you tell

11 16:03:39   him, "I'll take you to a different hospital."  True?

12 16:03:41   A. Correct.

13 16:03:41   Q. So that's the first time you tell him that you're taking

14 16:03:44   him to a different hospital; is that correct?

15 16:03:46   A. Correct.

16 16:03:48   Q. Have you entered an address for which hospital you're

17 16:03:50   taking to him yet in the CAD log?

18 16:03:54   A. I don't believe so.

19 16:04:03          THE COURT:  You need to pick up the pace a little

20 16:04:05   bit --

21 16:04:06          MR. CONLOGUE:  I apologize --

22 16:04:06          THE COURT:  -- Mr. Conlogue.  I see we have just a

23 16:04:09   few minutes left here on this recording, but we need to --

24 16:04:13          MR. CONLOGUE:  I'll go ahead and press play.

25 16:04:16          (Thereupon, the audio was played.)

16:04:33  1    Q. Let me pause it at 27 minutes and 19 seconds.

16:04:39  2          This is where you tell Mr. Breunig -- or he tells

16:04:42  3    you to take him to San Bernardino, and you say, "Stop playing

16:04:45  4    these fucking little games."  Correct?

16:04:47  5    A. Correct.

16:04:47  6    Q. Are you frustrated with him at this time?

16:04:49  7    A. Yes, I'm frustrated.

16:04:50  8    Q. Did he seem agitated?

16:04:52  9    A. He was agitated.

16:04:53  10   Q. And aren't you trained that agitation is a symptom of

16:04:56  11   withdrawal?

16:04:57  12   A. It could be, yes.

16:04:58  13   Q. Let me press play.

16:05:02  14        (Thereupon, the audio was played.)

16:05:09  15   Q. Let me pause it at 27 minutes and 26 seconds.

16:05:12  16        Your foot was pretty heavy on that accelerator in

16:05:15  17   your car right there, right?

16:05:16  18   A. I was accelerating, yes.

16:05:20  19   Q. Well, quite quickly, correct?

16:05:22  20   A. I couldn't tell you how fast I was going, but I was

16:05:27  21   accelerating.

16:05:29  22   Q. Let me go ahead and press play.

16:05:32  23        (Thereupon, the audio was played.)

16:05:56  24   Q. Let me pause it at 27 minutes and 50 seconds.

16:06:02  25        At this time, when Mr. Breunig told you that he was

16:06:04   going through withdrawals, you believed that he needed

16:06:08   medical attention because he was going through these

16:06:11   withdrawals, correct?

16:06:12    A. I believe he could have that option, yes.

16:06:16    Q. You believe he needed that option, true?

16:06:18    A. He could have that option, yes.

16:06:20    Q. Not that he could, that he needed it, true?

16:06:22    A. I believe that he could have that option once I dropped

16:06:28   him off at the hospital.

16:06:31    Q. Do you believe he needed it?

16:06:32    A. I believe he could have that option at the hospital.

16:06:38          THE COURT:  Okay.  Stop back-and-forth with the

16:06:39   same -- he's asking you a question that has "needed" in it.

16:06:44   Answer that question.  Yes, no, I don't know.

16:06:46          THE WITNESS:  No.

16:06:50    Q. Okay.  So no, he did not need it.  That's your statement,

16:06:54   correct?

16:06:54    A. Correct.

16:06:56          MR. CONLOGUE:  Your Honor, Plaintiff seeks to read

16:06:58   in from the May 9th, 2023, deposition of Ms. Fite, page 164,

16:07:06   lines 9 through 17.

16:07:29          THE COURT:  Do you have it?

16:07:30          MR. CONLOGUE:  Yes, Your Honor.

16:07:31          THE COURT:  No, I'm talking to Ms. Gustafson.

16:07:37          MS. GUSTAFSON:  164, you said?

16:07:44    1          MR. CONLOGUE:  164, line 9 through 17.

16:07:47    2          MS. GUSTAFSON:  May I just look at Counsel's?

16:07:49    3          THE COURT:  Yes.

16:07:50    4          MS. GUSTAFSON:  Mine is missing that page number,

16:07:52    5   for some reason.

16:07:52    6          THE COURT:  Anybody want to stand and stretch and

16:07:55    7   move around a little bit.  I know it's getting a little slow

16:07:58    8   here.

16:08:04    9          MS. GUSTAFSON:  No objection.

16:08:06   10          THE COURT:  All right.  Go ahead.

16:08:09   11    Q. Question:  Okay.  And have you received training that a

16:08:13   12   person who is withdrawing from drugs could require medical

16:08:17   13   attention?

16:08:17   14          Answer:  Yes.

16:08:19   15          Question:  All right.  And did you believe, since

16:08:23   16   Mr. Breunig indicated that he was going through a withdrawal,

16:08:28   17   that he might need medical attention because of that?

16:08:31   18          Answer:  Yes.

16:08:46   19          Why did you say "no" right now?

16:08:50   20          MS. GUSTAFSON:  Objection, argumentative.

16:08:51   21          THE COURT:  Overruled.

16:08:56   22          THE COURT:  Actually, it was a different question.

16:08:59   23          MR. CONLOGUE:  Yes, Your Honor.

16:09:00   24          Let me go ahead and press play.

16:09:03   25          (Thereupon, the audio was played.)

1 16:09:28   Q. Let me pause it again.

2 16:09:30          Once you made the decision to take him to the

3 16:09:33   hospital because he was going through -- well, do you recall

4 16:09:38   testifying in your deposition that you were going to take him

5 16:09:40   to Redlands Community Hospital because he was withdrawing?

6 16:09:42   A. Yes.

7 16:09:43   Q. Let me press play.

8 16:09:48          (Thereupon, the audio was played.)

9 16:10:02   Q. Let me pause it at 28 minutes and 30 seconds.

10 16:10:05          So even now while you're driving in this car with a

11 16:10:09   long silence with Mr. Breunig, you had decided that you

12 16:10:11   needed to take him to Redlands Community Hospital because he

13 16:10:14   was withdrawing, correct?

14 16:10:15   A. Correct.  I was on my way to Redlands Community Hospital.

15 16:10:20   Q. Let me press play.

16 16:10:23          (Thereupon, the audio was played.)

17 16:11:12   Q. Let me pause it at 29 minutes and 20 seconds.

18 16:11:18          At this time, you acknowledge that Mr. Breunig told

19 16:11:21   you he's going through withdrawals, and you have made the

20 16:11:24   decision that you cannot drop him off at the side of the

21 16:11:28   road, correct?

22 16:11:29   A. Correct.

23 16:11:30   Q. And that's because he was going through withdrawal, you

24 16:11:34   still believed he needed to go to a hospital, correct?

25 16:11:37   A. Because he made those statements, yes.

1 16:11:39  Q. And at this time, did you do anything to verify one way

2 16:11:45  or another if he's going through withdrawals?

3 16:11:47  A. No.

4 16:11:48  Q. You're trained to figure out if somebody is going through

5 16:11:51  withdrawals, right?

6 16:11:51  A. I don't have medical training.

7 16:11:54  Q. Not from a medical standpoint, but from your field

8 16:11:57  training, you --

9 16:12:02  A. I don't have any training on that.

10 16:12:03  Q. And so working as a deputy, you have no idea on how to

11 16:12:07  identify if somebody is going through withdrawals?

12 16:12:09  A. I don't have training on that.

13 16:12:12  Q. What about your experience at the jail center we've

14 16:12:15  already spoken about?

15 16:12:16  A. When the subject makes statements, and we become aware of

16 16:12:22  it.

17 16:12:22  Q. Do you know what a drug recognition -- recognition expert

18 16:12:29  is?

19 16:12:29  A. Vaguely.

20 16:12:32  Q. What is your understanding of what that is?

21 16:12:36       MS. GUSTAFSON:  Objection, relevance.

22 16:12:37       THE COURT:  Sustained.

23 16:12:41  Q. Let me press play.

24 16:12:43       (Thereupon, the audio was played.)

25 16:14:03  Q. Let me pause it at 30 minutes and 39 seconds.

1 16:14:06          At this time, there is a train horn sounding in the

2 16:14:09   background, correct?

3 16:14:10   A. Correct.

4 16:14:10   Q. And also, you put your blinker on, correct?

5 16:14:15   A. Correct.

6 16:14:16   Q. And this is the moment when you have decided to make a

7 16:14:19   left-hand turn from san Matteo on to Alessandro Road,

8 16:14:26   correct?

9 16:14:26   A. Correct.

10 16:14:27   Q. That is where Alessandro Road crosses over the tracks,

11 16:14:31   correct?

12 16:14:31   A. The turn I made was not, but that road does go over the

13 16:14:36   train tracks, yes.

14 16:14:37   Q. Let me press play from 30 minutes and 39 seconds.

15 16:14:42          (Thereupon, the audio was played.)

16 16:15:02   Q. Let me pause it at 30 minutes and 58 seconds.  At this

17 16:15:07   time you say get out right here, correct?

18 16:15:09   A. Correct.

19 16:15:10   Q. You are still in your driver's seat of your patrol car,

20 16:15:14   correct?

21 16:15:14   A. When I make those statements, no.

22 16:15:18   Q. Let me press play.

23 16:15:22          (Thereupon, the audio was played.)

24 16:15:29   Q. Let me pause it at 31 minutes and five seconds, is that

25 16:15:33   you exiting your patrol car?

1 16:15:34    A. Correct.

2 16:15:35    Q. So you first tell him to get out right here when you are

3 16:15:38    in your car, correct?

4 16:15:40    A. Right.  So, yeah.

5 16:15:41    Q. And he needs you to get out and open the door to let him

6 16:15:44    out, correct?

7 16:15:45    A. Correct.

8 16:15:45    Q. When you got out, where did you go to let him out, which

9 16:15:49    door, is it the driver's side door, the rear driver's side

10 16:15:54    door or the rear passenger's door?

11 16:15:56    A. The right here passenger door.

12 16:15:58    Q. Let me press play.

13 16:16:00        (Thereupon, the audio was played.)

14 16:16:07    Q. This is cut off early, Your Honor.  And I don't know why.

15 16:16:14    I'm going to have to play Exhibit 6, the only other audio

16 16:16:17    part of that is her saying get out.  Let me start Exhibit 6

17 16:16:47    at 31 minutes and 3 seconds.

18 16:17:01        (Thereupon, the audio was played.)

19 16:17:24    Q. Let me pause it at 31 minutes and 27 seconds.  At that

20 16:17:28    point in this clip we just played, you say get out, and did

21 16:17:32    you open the door for Mr. Breunig before you said get out?

22 16:17:36    A. Almost as in all in one fluid movement.

23 16:17:42    Q. Okay.  Why did you tell him to get out?

24 16:17:44    A. Because at that point he was in the backseat, I believed

25 16:17:52    he was actually going to go to the bathroom in the backseat

1 16:17:56    of my car, so I opened my door so he could get out and go to

2 16:17:59    the bathroom.

3 16:18:00    Q. And when you opened the door, did you say get out and go

4 16:18:03    to the bathroom over there at any time?

5 16:18:05    A. No.

6 16:18:05    Q. Did you tell him anything besides get out?

7 16:18:08    A. No.

8 16:18:08    Q. Did you say I'm going to wait here until you are done

9 16:18:10    going to the bathroom and you can come back and then we'll

10 16:18:13    continue the trip to the hospital?

11 16:18:14    A. No.

12 16:18:15    Q. When you told him to get out, was that an order?

13 16:18:18    A. It wasn't an order, it was a strong suggestion.

14 16:18:23    Q. What if he didn't get out?

15 16:18:26        MS. GUSTAFSON:  Objection, speculation.

16 16:18:27        THE COURT:  Sustained.

17 16:18:29    Q. Let me press play at 31 minutes, 27 seconds.

18 16:18:35        (Thereupon, the audio was played.)

19 16:18:52    Q. Let me pause it right here at 31 minutes and 44 seconds.

20 16:18:56    At this time you got back in your car, correct?

21 16:18:58    A. Yes.

22 16:18:58    Q. And you -- how did you leave the scene?

23 16:19:03    A. I drove away and drove back towards Loma Linda.

24 16:19:09    Q. And when you went back to Loma Linda, were you facing the

25 16:19:17    train tracks when you pulled over on Alessandro Road?

1 16:19:20    A. Yes.

2 16:19:21    Q. And let me show you Exhibit 10?

3 16:19:37            MS. GUSTAFSON:  No objection.

4 16:19:38            THE COURT:  All right.  That has been admitted.

5 16:19:51            (Exhibit No. 10 received in evidence.)

6 16:19:51    Q. Can you see Exhibit 10?

7 16:19:54    A. Yes.

8 16:19:54    Q. This is a photograph of Alessandro Road in the area where

9 16:20:01    you pulled over and told Mr. Breunig to get out, correct?

10 16:20:05   A. Correct.

11 16:20:06   Q. And looking at this exhibit, the area that you stopped,

12 16:20:14   you parked your car between, well, there is this railroad

13 16:20:19   sign right here, correct?

14 16:20:22   A. Correct.

15 16:20:22   Q. And then the background, that is where the train tracks

16 16:20:27   are, correct?

17 16:20:27   A. Correct.

18 16:20:30   Q. And you parked your vehicle somewhere between those two

19 16:20:34   areas, is that correct?

20 16:20:35   A. No.

21 16:20:38   Q. Were you passed that railroad sign when you parked your

22 16:20:42   car?

23 16:20:42   A. I was just before the railroad sign in near the dirt.

24 16:20:53           MR. CONLOGUE:  Your Honor, plaintiff seeks to read

25 16:20:54   from Ms. Fite's deposition transcript taken on May 9, 2023,

1 16:21:01  pages 178, 17 through 179, 11.

2 16:21:29          MS. GUSTAFSON:  From the May 9th deposition.

3 16:21:31          MR. CONLOGUE:  Correct.

4 16:21:32          MS. GUSTAFSON:  What pages again.

5 16:21:34          MR. CONLOGUE:  178, line 17 through 179, line 11.

6 16:21:44          MS. GUSTAFSON:  Objection to that, Your Honor, I'm

7 16:21:46  not sure what screen we are referring to in the depo.

8 16:21:49          THE COURT:  What screen?

9 16:21:51          MS. GUSTAFSON:  I am just looking at, the depo

10 16:21:57  testimony.

11 16:21:57          THE COURT:  All right.  Well, you have to find that,

12 16:22:02  counsel, before it's going to mean anything to us.

13 16:22:08          MR. CONLOGUE:  I don't understand, Your Honor.  Are

14 16:22:09  you asking myself to explain?

15 16:22:12          THE COURT:  Yes.

16 16:22:13          MR. CONLOGUE:  Okay.  In the -- counsel is correct

17 16:22:55  in the deposition transcript, it's referring to Exhibit 11,

18 16:22:58  so permission to publish Exhibit 11, Your Honor.

19 16:23:01          THE COURT:  Any objection?

20 16:23:03          MS. GUSTAFSON:  No objection.

21 16:23:07          THE COURT:  All right.  That is admitted.

22 16:23:12          (Exhibit No. 11 received in evidence.)

23 16:23:12  Q. Okay.  Do you see Exhibit 11, Deputy Fite?

24 16:23:16  A. Yes.

25 16:23:16  Q. And do you see that railroad sign?

1 16:23:22    A. Yes.

2 16:23:22    Q. And then further down is where the train tracks are on

3 16:23:28    Alessandro Road, correct?

4 16:23:29    A. Correct.

5 16:23:30    Q. And looking back at Exhibit 10, that's the same yellow

6 16:23:43    sign, correct?

7 16:23:46    A. Correct.

8 16:23:48            MR. CONLOGUE:  Your Honor, plaintiff seeks leave of

9 16:23:50    court to read in the deposition transcript, page 178, line

10 16:23:56    17, to 179 line 11.

11 16:24:02           MS. GUSTAFSON:  No objection.

12 16:24:03           THE COURT:  All right.

13 16:24:05    Q. Question.  Okay.  Good afternoon, Ms. Fite, how are you

14 16:24:10    doing?

15 16:24:10           Answer.  I am well, how are you?

16 16:24:12           Question.  Good.  Thanks for asking.  So I'm going

17 16:24:15    to share my screen and let me know if you could see what I'm

18 16:24:18    projecting, okay?  Can you see my screen?

19 16:24:20           Answer.  Yes.

20 16:24:22           Question.  Okay.  And what do you see?

21 16:24:24           Answer.  I see Alessandro Road.

22 16:24:27           Question.  Okay.  All right.  So I'm going to screen

23 16:24:31    shot this after I ask you some questions.  Where in this

24 16:24:35    screen shot was your vehicle positioned?  Your patrol vehicle

25 16:24:40    positioned when you dropped off Mr. Breunig?

16:24:42    1       Answer.  If you see that, the yellow railroad sign,

16:24:48    2    it was -- it was in the dirt roadway past that railroad sign.

16:25:09    3       And then when you had pulled over to the side of the

16:25:12    4    road and told Mr. Breunig to get out, there was one car ahead

16:25:17    5    of you when you did that, correct?

16:25:19    6    A. I don't know how many cars, but yes, there was, I saw at

16:25:25    7    least one car.

16:25:25    8    Q. Okay.  And the one car ahead of you was on Alessandro

16:25:32    9    Road on the actual paved road, correct?

16:25:34    10    A. Correct.

16:25:35    11    Q. When you pulled over, were you on the dirt side of the

16:25:37    12    road?

16:25:37    13    A. Correct.

16:25:38    14    Q. And once you decided to leave, how did you move your

16:25:48    15    vehicle, if you can tell the jury, did you back up, did you

16:25:51    16    go forward, how did you leave once Mr. Breunig, you told him

16:25:56    17    to get out and you are back in your vehicle?

16:25:57    18    A. As I left Alessandro Road, I made a U-turn.

16:26:05    19    Q. Did you first back up?

16:26:06    20    A. I don't -- I believe I just pulled forward.  I don't

16:26:12    21    remember if I backed up or not.

16:26:13    22    Q. And then when you say you made a U-turn, you made a

16:26:16    23    U-turn from facing the railroad tracks to the complete

16:26:21    24    opposite direction from where you came from, correct?

16:26:23    25    A. Correct.

1  16:26:24    Q. And when you made your U-turn, that is when you stopped

2  16:26:30    observing Mr. Breunig at that point, correct?

3  16:26:32    A. I stopped observing him prior to that.

4  16:26:38    Q. And so when prior, were you in your vehicle, where were

5  16:26:45    you?

6  16:26:45    A. I was still outside of my vehicle.

7  16:26:47    Q. And where outside your vehicle were you when you stopped

8  16:26:54    observing Mr. Breunig?

9  16:26:56    A. Towards the, I was on the right-hand side, but towards

10 16:27:02    the front of my vehicle.

11 16:27:03    Q. Had you passed the bumper yet?

12 16:27:06    A. Did I pass the bumper?  No.

13 16:27:12    Q. And when Mr. Breunig got out of the car, what path did he

14 16:27:17    take?

15 16:27:19    A. He got out of the right rear passenger door, walked

16 16:27:25    forward past me, across my vehicle, towards the orange grove

17 16:27:33    on the other side of the road.

18 16:27:35    Q. Did he walk in front of your patrol vehicle?

19 16:27:37    A. Correct.

20 16:27:38    Q. And he then was walking towards the orange groves on the

21 16:27:43    other side of the road, and then is that the point when you

22 16:27:46    stopped watching him?

23 16:27:47    A. Correct.

24 16:27:49    Q. And just so I understand, you opened your door, you tell

25 16:27:54    him to get out, and he does, correct?

16:27:57    A. Correct.

16:27:58    Q. He walks in front of you to the front of your car,

16:28:02    correct?

16:28:02    A. Correct.

16:28:03    Q. And then he crosses the front of your car walking across

16:28:08    the road towards the orange groves, correct?

16:28:10    A. Correct.

16:28:11    Q. And so then at that time, you start walking in the same

16:28:14    direction, the same path as him, and then you just

16:28:20    stopwatching him once you get to the front bumper of your

16:28:24    vehicle, correct?

16:28:25    A. Correct.

16:28:25    Q. And then once you stopwatching him as he's heading

16:28:28    towards those orange groves, you then go ahead, walk around

16:28:32    your vehicle and get inside of it without taking another look

16:28:35    at Mr. Breunig, correct?

16:28:36    A. Correct.  He just walked away from me.

16:28:40    Q. And then you back up, pull out of there and go, do a

16:28:43    U-turn and go the same, from the same direction you came

16:28:46    from, correct?

16:28:47    A. Correct.

16:28:48    Q. Did you use GPS or anything to get back to where you were

16:28:52    going?

16:28:52    A. No.

16:28:54    Q. Where did you go back to?

16:28:56  1  A. I used that same route that I took.

16:29:00  2  Q. Did you go back to Loma Linda hospital?

16:29:02  3  A. I went back to Loma Linda city.

16:29:08  4  Q. Had your shift ended?

16:29:10  5  A. No.

16:29:10  6  Q. And then once you go back within a minute of Mr. Breunig

16:29:33  7  leaving your car, you typed in to the call log that you had

16:29:39  8  dropped him off at Redlands Community Hospital, correct?

16:29:43  9  A. There was a little bit of drive time to get back to Loma

16:29:48  10  Linda, yes, I dispoed that call out.

16:29:53  11  Q. Was it less than a minute after he left your car?

16:29:55  12  A. When I dispoed the call.

16:30:00  13  Q. Did you testify in your deposition that within a minute

16:30:03  14  of him leaving your car, you then went ahead and completed

16:30:07  15  and entered the -- well, actually, let me withdraw.

16:30:11  16       You hit complete that you had dropped him off at the

16:30:15  17  hospital's address, correct?

16:30:16  18  A. Correct.

16:30:17  19  Q. You had not typed in the disposition yet, correct?

16:30:20  20  A. Correct.

16:30:21  21  Q. And so within a minute of leaving the address that you

16:30:28  22  indicated that you left him at was 350 Tara Sina Boulevard,

16:30:43  23  correct?

16:30:43  24  A. Correct.

16:30:44  25  Q. With this Redlands Community Hospital, have you been

16:30:47  there before?

16:30:47   A. One other time.

16:30:50   Q. And the one other time you were there, it was through the

16:30:55  ER, correct?

16:30:56   A. There is this -- at Redlands Community Hospital

16:30:59  specifically, there's a separate location for law

16:31:02  enforcement.  It's not open to the public.  It's not the

16:31:04  normal ER.

16:31:06   Q. Okay.  But it's an ER for law enforcement; is that

16:31:09  correct?

16:31:09   A. It -- it's -- it's a drop-off for law enforcement.  So if

16:31:19  you can -- if you needed someone to get jail checked, if

16:31:24  you -- for whatever medical reason.

16:31:27   Q. Do you recall testifying in your deposition you've been

16:31:29  there before, to the ER?

16:31:30   A. Yes.

16:31:31   Q. And you're being honest in your deposition, correct?

16:31:34   A. Yes.

16:31:35   Q. All the answers were read in today from your deposition,

16:31:37  you've been honest when you're testifying at your deposition,

16:31:41  true?

16:31:41   A. Yes.

16:31:41   Q. And then the -- the actual entry that you typed in on the

16:31:59  keyboard on the MDC, that was -- you pulled off somewhere

16:32:05  down the road, correct?

1 16:32:06    A. Correct.

2 16:32:06    Q. Where did you pull off?

3 16:32:08    A. I don't remember.

4 16:32:12    Q. Let me show you our Exhibit 14.

5 16:32:30          When you pulled off to the side of the road, had you

6 16:32:34    driven this entire -- well, I guess for reference, this road

7 16:32:39    right here, that's the San Timoteo Road that goes between the

8 16:32:44    Redlands hospital and point C, correct?

9 16:32:47    A. Correct.

10 16:32:48    Q. Were you still on San Timoteo Road when you pulled over

11 16:32:53    and typed in the final disposition of this call?

12 16:32:57    A. No.  I was on my way to Loma Linda.

13 16:33:01    Q. Did -- and so were you around the hospital right here of

14 16:33:08    point A when you typed in the final disposition?

15 16:33:10    A. No.

16 16:33:13    Q. Were you somewhere here on Barton Road?

17 16:33:16    A. No.

18 16:33:17    Q. Well, wherever you were, you pulled over to the side of

19 16:33:30    the road, and you typed in that Mr. Breunig -- you tried to

20 16:33:37    take him to a residence in Loma Linda where he claims he

21 16:33:40    rents a room, correct?

22 16:33:43    A. Correct.

23 16:33:43    Q. And then he didn't have a key, and he didn't know the

24 16:33:46    address, and nobody at the residence could verify that he

25 16:33:48    lived there, correct?

1 16:33:48  A. Correct.

2 16:33:49  Q. You then typed in:  Subject was later transported to

3 16:33:53  Redlands Community Hospital due to not feeling well.

4 16:33:56  Correct?

5 16:33:56  A. Correct.

6 16:33:57  Q. That is a false statement, correct?

7 16:33:59  A. No.  It's a summary.

8 16:34:03  Q. Well, did you drop him off at Redlands Community

9 16:34:08  Hospital?

10 16:34:08  A. No.  I believe the hospital was nearby.

11 16:34:12  Q. Okay.  So with him not being dropped off at the Redlands

12 16:34:16  Community Hospital, you entering "Subject was later

13 16:34:18  transported to Redlands Community Hospital due to not feeling

14 16:34:21  well," that's not a true statement, correct?

15 16:34:23  A. Correct.  I believed the hospital was nearby.

16 16:34:29  Q. And with him not feeling well, what was wrong with him?

17 16:34:35  A. His sickness?

18 16:34:39  Q. Was he on drugs?

19 16:34:40  A. He said he was sick.

20 16:34:41  Q. He said he was sick.

21 16:34:43       Did you think he was on drugs?

22 16:34:44  A. No.

23 16:34:58  Q. And then going back to when you dropped Mr. Breunig off

24 16:35:06  on Alessandro Road, when he -- when you got out, when you let

25 16:35:12  him out of your car, and you said, "Get out," there was a

1 16:35:15    train passing by at that moment, correct?

2 16:35:17    A. Correct.

3 16:35:17    Q. And then when you left, that train was still passing by,

4 16:35:20    correct?

5 16:35:20    A. Correct.

6 16:35:21    Q. And looking at Exhibit 14 here, those train tracks, do

7 16:35:26    they go parallel with San Timoteo Road at all?

8 16:35:30    A. I believe for a portion of it, yes.

9 16:35:34    Q. And when you were at point B, you had to drive over the

10 16:35:39    train tracks at one -- well, at two points, correct?  One on

11 16:35:46    Beaumont way, correct?

12 16:35:49    A. I don't remember if I drove over them.

13 16:35:56    Q. I mean, then you would have to drive over those train

14 16:35:59    tracks again on San Timoteo, correct?

15 16:36:02    A. Yes, at least on San Timoteo.

16 16:36:08    Q. Where you left Mr. Breunig on Alessandro Road, that was a

17 16:36:17    rural area, correct?

18 16:36:18    A. Yes, you could describe it that way.

19 16:36:23    Q. There were no stores nearby, correct?

20 16:36:25    A. No.

21 16:36:25    Q. No homes, correct?

22 16:36:27    A. There was just a few homes.

23 16:36:29    Q. Do you recall testifying in your deposition that there

24 16:36:33    were no homes nearby where you dropped him off?

25 16:36:35    A. On Alessandro Road, yes.

1 16:36:38    Q. Okay.  And then there were no gas stations on Alessandro

2 16:36:43    Road, correct?

3 16:36:43    A. Yes.

4 16:36:43    Q. There are no hotels on that road, correct?

5 16:36:46    A. Yes.

6 16:36:46    Q. No pay phones nearby in that area, correct?

7 16:36:49    A. Yes.

8 16:36:50    Q. And then there was also no bus stops in that area,

9 16:36:53    correct?

10 16:36:53    A. Yes.

11 16:36:54    Q. There was no sidewalks on Alessandro Road, correct?

12 16:36:57    A. Yes.

13 16:36:57    Q. And you did not observe anything that made you believe a

14 16:37:01    hospital was nearby, correct?

15 16:37:03    A. I believe the hospital was nearby because of my GPS.

16 16:37:11    Q. Since the date of this incident, have you always believed

17 16:37:16    that the hospital was nearby?

18 16:37:18    A. I'm sorry, since?

19 16:37:21    Q. Yeah, since this incident happened, have you consistently

20 16:37:25    indicated that you believe the hospital was nearby?

21 16:37:29         MS. GUSTAFSON:  Objection, vague as to time.

22 16:37:31         THE COURT:  Sustained.

23 16:37:38    Q. Well, let me go back, then.  When you dropped him off at

24 16:37:41    Alessandro Road and told him to get out of your car, could

25 16:37:45    you observe anything that made you believe a hospital was

1 16:37:48  nearby?

2 16:37:49  A. No.

3 16:37:50  Q. And then also on this road of Alessandro and also San

4 16:38:00  Timoteo when you are driving there, there was no hospital

5 16:38:03  signage, correct?

6 16:38:04  A. I didn't see one, no.

7 16:38:06  Q. There was no signs indicating to the public, this

8 16:38:09  direction for the ER, if you are having an emergency,

9 16:38:12  correct?

10 16:38:12  A. Correct.

11 16:38:15  Q. And then also from where you were when you asked

12 16:38:19  Mr. Breunig to get out, there was no hospital parking lot,

13 16:38:22  correct?

14 16:38:23  A. No.

15 16:38:24  Q. Is that a correct statement?  Let me withdraw it.

16 16:38:30         Was there a hospital parking lot when you told him

17 16:38:33  to get out?

18 16:38:33  A. No.

19 16:38:34  Q. Before you asked Mr. Breunig to get out of your vehicle,

20 16:38:46  did you smell poop?

21 16:38:50  A. No.

22 16:38:50  Q. And when you back there and opened the door, did you see

23 16:38:53  fees sees anywhere?

24 16:38:54  A. No.

25 16:38:54  Q. And then when you asked him to get out, isn't it true

16:39:00  1  that you knew you were not in the hospital parking lot?

16:39:03  2   A. I was not in the parking lot, correct.

16:39:05  3   Q. And then when Mr. Breunig first exited your car, your

16:39:13  4  intention was not to leave him there, isn't that true?

16:39:15  5   A. Correct.

16:39:17  6   Q. And only when he began walking away you decided to leave

16:39:23  7  him there, correct?

16:39:23  8   A. Correct.

16:39:25  9   Q. And did you give him any verbal indication that you were

16:39:30  10  going to leave him there?

16:39:31  11   A. No.

16:39:33  12   Q. Without having any money, no shoes, nothing on him, how

16:39:37  13  did you expect him to get out of that area?

16:39:39  14   A. It's my belief he got around on his own.  I don't know.

16:39:47  15   Q. When you are in that area where you pulled off and

16:39:51  16  dropped him off, there was nothing but orange groves around

16:39:54  17  you, correct?

16:39:54  18   A. On Alessandro Road, correct.

16:40:05  19            THE COURT:  Is this a good time to stop, counsel?

16:40:07  20            MR. CONLOGUE:  Yes, Your Honor.

16:40:08  21            THE COURT:  All right.  Ladies and gentlemen, don't

16:40:10  22  talk about the case or form or express any opinions about the

16:40:14  23  case until it's finally submitted to you.

16:40:16  24            You are ordered to return tomorrow by 8:00 a.m., and

16:40:21  25  you are ordered to have a good evening.

1  16:40:24          (Thereupon, the jury retired from the courtroom.)

2  16:40:58          THE COURT:  You can step down deputy.

3  16:41:04          You can have a seat.  How much more do you think you

4  16:41:07  have, Mr. Conlogue?

5  16:41:08          MR. CONLOGUE:  I don't think more than 15 minutes,

6  16:41:10  Your Honor.

7  16:41:11          THE COURT:  Okay.

8  16:41:13          MR. CONLOGUE:  Probably sooner.

9  16:41:14          THE COURT:  All right.  I was trying to move things

10 16:41:16  along, because the jurors are getting sleepy, so I would

11 16:41:22  suggest as I do to all counsel in all trials, keep an eye on

12 16:41:28  the jury, so you can tell when you need to do something more

13 16:41:32  exciting to keep them awake.

14 16:41:34          Anything we need to discuss before tomorrow?

15 16:41:40          MS. GUSTAFSON:  If we could just get an estimate of

16 16:41:42  which witnesses are for tomorrow for timing and scheduling

17 16:41:45  purposes.

18 16:41:46          THE COURT:  Okay.  Well, I guess they might need to

19 16:41:48  know what you plan to do with the deputy before they can tell

20 16:41:52  you.

21 16:41:54          MS. GUSTAFSON:  I plan to have her about an hour,

22 16:41:56  hour and a half.

23 16:41:58          THE COURT:  Okay.

24 16:42:00          MR. CONLOGUE:  The two witnesses are going to be

25 16:42:04  testifying tomorrow are Thomas Lamar, and Juan Lievanos and

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  16:42:14  Scott DeFoe as well, if we run out of time, which don't think

2  16:42:17  we will, Your Honor, just in case if we do, plaintiff will

3  16:42:20  take the stand.

4  16:42:21      THE COURT:  Okay.  If the -- if you are submitting

5  16:42:28  an exhibit that has already been agreed to, and I think we

6  16:42:32  had most of the exhibits where they were stipulated to or I

7  16:42:36  made rulings on, then just say we have stipulated and don't

8  16:42:40  go through the extra back and forth that will save us a

9  16:42:43  little time.

10 16:42:45      Anything else we need to talk about?

11 16:42:47      MR. CONLOGUE:  Nothing from plaintiff, Your Honor.

12 16:42:49      MS. GUSTAFSON:  Nothing from defendants, Your Honor.

13 16:42:50      THE COURT:  All right.  We'll see you at 7:45

14 16:42:52  tomorrow morning.

15 16:42:53      (Thereupon, the Court was in recess.)

16           *****     *****     *****

17

18  I certify that the foregoing is a correct transcript from the

19  record of proceedings in the above-titled matter.

20

21

22

23  --------------------------

24

25  Amy C. Diaz, RPR, CRR              August 13, 2024

1        S/  Amy Diaz

2

3         BREANA FITE                                          122

4         CONLOGUE DIRECT EXAMINATION                          123

5        BY MR. CONLOGUE

6        Exhibit No. 14                                        179

7        Exhibit No. 10                                        206

8        Exhibit No. 11                                        207

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## #

**#4455** [1] - 1:23

## '

**'em** [1] - 178:24

## 1

**1** [14] - 3:1, 20:16, 20:17, 20:18, 20:21, 69:4, 75:23, 145:17, 145:18, 145:19, 166:18, 168:7, 188:10, 197:2
**1's** [1] - 21:13
**10** [17] - 20:1, 21:5, 25:20, 36:7, 43:21, 44:24, 67:2, 75:24, 101:6, 101:9, 176:21, 178:8, 206:2, 206:5, 206:6, 208:5, 222:7
**105** [1] - 177:24
**106** [1] - 177:24
**10:00** [1] - 71:3
**11** [16] - 21:6, 26:10, 45:21, 49:3, 68:1, 75:24, 130:21, 183:15, 207:1, 207:5, 207:17, 207:18, 207:22, 207:23, 208:10, 222:8
**1100** [1] - 2:10
**11209** [1] - 151:5
**117** [1] - 196:18
**11848** [2] - 180:7, 183:3
**11:54** [1] - 154:10
**12** [10] - 21:7, 26:15, 42:24, 46:17, 73:8, 73:10, 73:22, 74:2, 133:25, 134:3
**12-minute** [1] - 97:22
**122** [1] - 222:3
**123** [1] - 222:4
**12:04** [1] - 182:10
**12:15** [2] - 183:6, 184:4
**12th** [1] - 23:8
**13** [11] - 1:18, 21:8, 26:22, 48:9, 72:7, 75:24, 135:1, 183:14, 186:11, 186:23, 221:25
**14** [15] - 21:9, 27:7, 50:11, 75:24, 96:5, 163:22, 179:9,

179:10, 179:11, 179:16, 179:24, 183:3, 214:4, 216:6, 222:6
**14-year-old** [1] - 26:13
**1450** [1] - 2:10
**15** [14] - 21:10, 27:20, 30:15, 34:15, 36:9, 37:22, 39:25, 43:23, 48:13, 51:4, 75:24, 154:17, 156:7, 220:5
**15-minute** [2] - 10:3, 155:2
**16** [16] - 19:1, 20:16, 21:11, 28:8, 33:13, 40:10, 47:11, 51:10, 58:24, 59:7, 73:9, 73:10, 73:22, 74:3, 96:9, 158:10
**16-minute** [1] - 97:22
**164** [3] - 199:20, 199:25, 200:1
**17** [14] - 51:23, 137:20, 183:14, 183:15, 183:18, 184:3, 184:8, 194:10, 194:21, 199:21, 200:1, 207:1, 207:5, 208:10
**178** [3] - 207:1, 207:5, 208:9
**179** [4] - 207:1, 207:5, 208:10, 222:6
**18** [7] - 13:16, 101:12, 107:23, 123:11, 123:19, 130:14, 184:16
**18th** [3] - 100:18, 108:21, 109:12
**19** [3] - 185:1, 185:15, 198:1
**1:00** [1] - 95:23
**1:15** [1] - 94:14
**1st** [2] - 1:23, 101:1

## 2

**2** [11] - 20:22, 22:8, 31:5, 69:24, 75:24, 152:23, 153:5, 153:21, 166:4, 168:14, 184:16
**20** [4] - 154:17, 168:20, 169:9, 201:17
**2015** [2] - 124:12, 131:6
**2018** [1] - 125:15
**202** [4] - 163:5, 183:13, 184:4

**2020** [4] - 129:24, 130:4, 130:9, 131:8
**2021** [13] - 13:16, 100:18, 101:1, 101:9, 101:12, 107:24, 108:21, 109:12, 123:11, 123:20, 126:24, 127:11, 132:9
**2023** [8] - 130:14, 133:24, 135:2, 158:6, 177:24, 196:17, 199:20, 206:25
**2024** [2] - 1:18, 221:25
**206** [1] - 222:7
**207** [1] - 222:8
**21** [8] - 119:22, 130:15, 130:21, 177:24, 186:11, 186:23, 186:25, 187:8
**22** [2] - 188:10, 188:15
**22:57** [1] - 191:5
**23** [2] - 137:20, 190:22
**23:02** [1] - 191:8
**25** [3] - 191:22, 194:8, 194:10
**25th** [3] - 130:14, 133:24, 135:2
**26** [5] - 171:21, 194:21, 195:17, 196:6, 198:15
**26th** [2] - 10:18, 12:2
**27** [6] - 197:2, 198:1, 198:15, 198:24, 204:19, 205:17
**28** [1] - 201:9
**29** [2] - 7:18, 201:17
**2:30** [2] - 10:1, 11:20

## 3

**3** [19] - 20:23, 22:16, 29:18, 32:22, 38:14, 41:22, 50:13, 54:20, 59:13, 73:4, 73:10, 73:22, 74:2, 168:20, 169:9, 169:16, 169:25, 171:19, 204:17
**30** [4] - 201:9, 202:25, 203:14, 203:16
**31** [6] - 164:17, 203:24, 204:17, 204:19, 205:17, 205:19
**33** [2] - 119:23, 178:10
**350** [2] - 1:23, 212:22
**37** [2] - 172:24, 173:20

**38** [2] - 130:14, 130:21
**39** [4] - 166:18, 168:4, 202:25, 203:14
**39-minute** [1] - 97:23

## 4

**4** [22] - 20:24, 23:6, 31:9, 33:4, 34:11, 52:18, 73:8, 73:11, 73:15, 74:12, 74:13, 109:20, 144:20, 144:24, 163:22, 171:21, 172:24, 173:20, 173:22, 177:24, 194:8, 196:18
**41** [1] - 135:1
**42** [4] - 133:24, 137:20, 183:18, 184:4
**43** [3] - 176:2, 176:19, 195:18
**44** [1] - 205:19
**45** [1] - 169:16
**48** [1] - 168:14
**49** [2] - 185:1, 188:15
**4:30** [1] - 10:7

## 5

**5** [14] - 20:25, 23:16, 35:25, 42:7, 45:1, 56:11, 58:9, 58:11, 75:12, 75:13, 166:15, 174:11, 176:2, 176:19
**50** [4] - 53:25, 54:7, 56:14, 198:24
**51** [3] - 168:7, 186:25, 196:6
**5150** [1] - 113:5
**54** [2] - 173:22, 184:8
**55** [2] - 169:25, 171:19
**57** [2] - 185:15, 187:8
**58** [1] - 203:16
**5:00** [1] - 10:7
**5:22-CV-1306-DSF** [1] - 1:8

## 6

**6** [15] - 21:1, 24:8, 37:15, 64:9, 75:24, 135:1, 135:4, 158:7, 162:19, 176:21, 178:7, 178:10, 183:12, 204:15, 204:16
**6.9** [13] - 96:10, 96:12,

96:14, 96:17, 96:22, 97:2, 97:4, 97:7, 97:10, 97:16, 98:2, 98:5, 181:2

## 7

**7** [12] - 21:2, 24:15, 37:20, 38:7, 39:4, 40:22, 42:15, 60:15, 75:7, 75:8, 158:7, 158:10
**7:45** [1] - 221:13
**7D** [1] - 6:7

## 8

**8** [13] - 20:18, 21:3, 24:23, 40:16, 45:7, 46:2, 58:23, 73:6, 73:11, 74:17, 74:18, 74:22, 174:11
**8.6** [1] - 105:21
**822** [1] - 2:5
**8383** [1] - 2:5
**8:00** [2] - 10:1, 219:24

## 9

**9** [18] - 5:10, 20:19, 21:4, 25:5, 39:14, 41:13, 42:3, 45:15, 62:24, 75:17, 75:18, 133:24, 134:3, 135:5, 196:18, 199:21, 200:1, 206:25
**90012** [1] - 1:23
**90211** [1] - 2:6
**92** [1] - 158:7
**92868** [1] - 2:11
**9th** [5] - 158:6, 177:23, 196:17, 199:20, 207:2

## A

**a.m** [4] - 5:10, 10:1, 154:10, 219:24
**abandoned** [1] - 100:19
**ability** [4] - 36:14, 37:10, 38:19, 61:19
**able** [28] - 7:21, 11:17, 15:8, 17:7, 34:3, 35:17, 43:6, 44:19, 49:20, 62:12, 67:9, 68:8, 72:1, 85:20, 90:24, 101:21, 107:20, 113:11, 142:6, 142:18,

143:17, 159:11, 163:8, 188:20, 188:21, 188:23, 189:7
**abnormal** [3] - 135:25, 167:12, 167:14
**aboard** [1] - 122:4
**above-titled** [1] - 221:19
**abruptly** [1] - 104:20
**absent** [1] - 144:19
**absolute** [1] - 62:17
**absolutely** [3] - 62:10, 62:15, 84:20
**abuse** [7] - 65:8, 65:10, 65:19, 67:16, 70:8, 70:12
**abusers** [1] - 63:23
**academy** [8] - 124:13, 128:17, 128:21, 129:9, 129:12, 129:13, 129:21, 130:1
**accelerating** [2] - 198:18, 198:21
**accelerator** [1] - 198:16
**accept** [4] - 85:11, 87:1, 143:7, 181:4
**acceptable** [1] - 98:12
**accepts** [3] - 74:8, 75:3, 75:21
**access** [1] - 119:9
**Access** [2] - 21:18, 21:22
**accident** [13] - 48:10, 48:12, 48:15, 68:2, 68:8, 68:10, 68:19, 68:23, 69:2, 94:24, 95:13, 101:2, 125:20
**accidentally** [2] - 80:9, 81:12
**accidents** [2] - 48:23, 50:19
**accommodate** [1] - 99:16
**accountable** [16] - 60:19, 60:20, 63:4, 65:17, 139:17, 139:25, 140:4, 140:20, 140:22, 140:23, 141:8, 141:12, 141:19, 142:9, 142:11, 150:4
**accountant** [1] - 28:5
**accounts** [3] - 81:15, 83:13, 114:16
**accuracy** [1] - 81:22
**accurate** [9] - 20:7, 83:3, 83:9, 121:21,

148:19, 149:2, 149:4, 149:11, 150:2
**accurately** [1] - 181:8
**acknowledge** [2] - 91:25, 201:18
**acknowledges** [2] - 103:14, 107:9
**act** [5] - 43:17, 72:2, 92:18, 133:2, 135:25
**acted** [1] - 108:21
**actions** [7] - 139:17, 140:1, 140:5, 141:12, 141:20, 142:9, 142:11
**activated** [2] - 110:8, 110:9
**active** [1] - 46:7
**actual** [5] - 163:12, 163:13, 163:23, 209:9, 213:23
**addict** [6] - 39:5, 39:15, 40:11, 40:24, 61:16, 119:23
**addicted** [4] - 41:3, 61:18, 65:20, 119:23
**addiction** [14] - 38:8, 38:18, 39:10, 39:20, 40:7, 60:18, 60:21, 61:2, 63:3, 63:21, 65:11, 65:16, 69:20, 72:13
**addiction-related** [1] - 38:18
**addictions** [3] - 38:12, 60:19, 61:8
**addicts** [1] - 41:5
**addition** [3] - 83:10, 101:22, 145:3
**additional** [7] - 41:8, 116:6, 125:19, 131:7, 141:1, 147:3, 189:7
**address** [7] - 83:19, 84:13, 102:11, 145:20, 145:22, 146:4, 151:5, 169:21, 182:4, 182:6, 182:10, 182:15, 182:23, 182:24, 182:25, 183:2, 183:5, 183:6, 183:9, 183:23, 185:3, 188:22, 197:16, 212:17, 212:21, 214:24
**adequately** [1] - 132:10
**ADHD** [1] - 44:5
**adjust** [1] - 11:8
**admissibility** [3] -

155:15, 155:19, 155:20
**admission** [1] - 105:19
**admit** [1] - 179:18
**admitted** [5] - 89:18, 89:20, 179:15, 206:4, 207:21
**adult** [10] - 18:8, 18:13, 22:18, 23:3, 23:9, 23:19, 24:20, 25:23, 26:25, 27:3
**adults** [3] - 18:12, 25:12, 106:23
**advance** [1] - 6:8
**advantage** [2] - 58:6, 59:14
**advise** [1] - 84:15
**advised** [4] - 109:15, 109:19, 114:15, 116:4
**advocates** [1] - 92:18
**affect** [3] - 13:3, 77:25, 105:25
**afraid** [1] - 41:23
**afternoon** [7] - 10:5, 10:9, 96:2, 108:17, 123:9, 123:10, 208:13
**age** [1] - 44:8
**agent** [1] - 61:11
**agitated** [3] - 116:19, 198:8, 198:9
**agitation** [1] - 198:10
**ago** [7] - 20:1, 27:13, 47:19, 47:20, 49:8, 70:16, 149:16
**agree** [15] - 14:3, 36:9, 36:12, 51:13, 75:23, 77:13, 82:7, 85:10, 97:3, 140:10, 140:14, 167:16, 171:1, 190:5, 192:13
**agreed** [2] - 97:24, 103:1, 221:5
**agreeing** [2] - 154:3, 154:5
**ahead** [32] - 6:23, 106:14, 140:9, 150:19, 153:5, 153:13, 153:15, 161:24, 162:18, 168:12, 177:9, 178:7, 182:23, 183:16, 184:6, 186:9, 186:22, 188:8, 190:20, 191:20, 194:19, 195:15, 196:19, 196:25, 197:24,

198:22, 200:10, 200:24, 209:4, 209:8, 211:14, 212:14
**aid** [2] - 45:9, 61:14
**aided** [1] - 79:18
**ailment** [2] - 143:13, 143:14
**ain't** [2] - 190:24, 190:25
**air** [1] - 29:7
**al** [3] - 1:5, 1:9, 3:3
**alarm** [1] - 51:21
**alcohol** [10] - 38:8, 38:9, 38:12, 38:17, 38:23, 40:2, 40:8, 64:11, 65:8, 65:10
**alcoholic** [1] - 38:21
**alcoholics** [1] - 38:21
**alert** [2] - 110:14, 120:23
**Alessandro** [21] - 104:11, 104:17, 117:25, 180:10, 180:17, 203:7, 203:10, 205:25, 206:8, 208:3, 208:21, 209:8, 209:18, 215:24, 216:16, 216:25, 217:1, 217:11, 217:24, 218:3, 219:18
**allegations** [1] - 13:22
**alleges** [2] - 13:18, 13:22
**allow** [5] - 11:9, 77:19, 91:22, 93:14, 99:14
**allowed** [5] - 31:15, 88:24, 100:10, 108:5, 192:20
**allowing** [1] - 92:10
**allows** [1] - 148:3
**almost** [3] - 105:4, 117:17, 204:22
**altered** [1] - 132:6
**alternative** [1] - 11:24
**Amazon** [2] - 24:4, 24:6
**ambulance** [1] - 111:14
**amount** [1] - 103:19
**AMY** [1] - 1:22
**Amy** [6] - 2:10, 3:14, 7:4, 7:11, 221:25, 222:1
**analyst** [3] - 24:20, 25:23, 28:6
**analytics** [1] - 26:25
**ancestry** [2] - 77:17,

87:5
**Anderson** [1] - 151:6
**Angeles** [5] - 1:17, 1:23, 25:22, 54:24, 60:23
**anguish** [1] - 95:8
**ankle** [24] - 101:2, 101:8, 101:14, 101:16, 101:20, 101:22, 105:5, 106:6, 109:5, 110:22, 120:21, 157:9, 157:12, 157:14, 157:20, 157:23, 158:14, 159:1, 159:12, 164:20, 164:23, 165:6, 166:20, 168:22
**Anna** [1] - 20:24
**annoying** [2] - 8:24, 41:2
**Answer** [1] - 158:19
**answer** [56] - 5:13, 17:21, 18:20, 19:8, 19:15, 19:17, 19:18, 19:19, 19:20, 20:7, 20:14, 29:4, 29:9, 29:11, 29:16, 32:1, 32:21, 34:17, 50:14, 57:2, 61:3, 62:20, 82:10, 88:13, 88:21, 88:24, 91:17, 92:9, 92:12, 134:10, 135:9, 137:1, 137:4, 137:6, 137:12, 137:14, 138:1, 140:9, 140:19, 155:12, 158:15, 158:17, 167:7, 167:10, 171:10, 178:6, 196:22, 196:24, 199:14, 200:14, 200:18, 208:15, 208:19, 208:21, 209:1
**ANSWER** [3] - 131:1, 131:4, 131:7
**answered** [5] - 19:23, 36:2, 85:24, 92:15, 115:8
**answering** [1] - 130:8
**answers** [7] - 17:22, 19:4, 19:9, 19:10, 19:14, 131:9, 213:19
**ante** [1] - 118:4
**anticipate** [1] - 113:2
**anxiety** [3] - 16:9, 44:4, 44:14
**anybody..** [1] - 12:9

**apart** [3] - 128:23, 150:7, 154:17
**APC** [1] - 2:9
**apologies** [4] - 66:24, 76:2, 95:12, 95:16
**apologize** [14] - 11:23, 73:6, 74:21, 74:25, 130:20, 135:4, 153:12, 166:4, 166:15, 168:4, 169:9, 181:6, 183:13, 197:21
**appeals** [1] - 24:18
**appear** [1] - 113:1
**appearances** [1] - 3:4
**APPEARANCES** [1] - 2:1
**appeared** [2] - 115:2, 120:17
**apple** [1] - 37:24
**application** [1] - 80:23
**applies** [5] - 14:2, 51:11, 78:23, 81:2, 99:19
**apply** [9] - 15:11, 15:13, 15:16, 15:17, 15:22, 35:2, 77:8, 78:7, 85:1
**applying** [3] - 14:7, 15:3, 51:17
**appointments** [1] - 143:18
**appreciate** [2] - 55:8, 179:23
**approach** [4] - 14:8, 73:1, 102:4, 110:5
**approached** [1] - 110:18
**approve** [4] - 14:4, 15:3, 51:13, 51:18
**April** [3] - 130:14, 133:24, 135:2
**arbitration** [1] - 47:5
**area** [23] - 4:17, 18:4, 27:25, 37:16, 37:24, 64:17, 69:7, 104:13, 114:5, 114:8, 122:23, 126:22, 127:15, 156:23, 180:20, 192:19, 206:8, 206:11, 216:17, 217:6, 217:8, 219:13, 219:15
**areas** [3] - 95:10, 125:6, 206:19
**argue** [3] - 15:8, 100:2, 117:22
**argument** [4] - 99:20, 100:2, 106:12,

117:12
**argumentative** [4] - 106:13, 134:14, 189:17, 200:20
**arguments** [5] - 10:13, 16:21, 83:22, 88:9, 90:19
**arises** [1] - 7:13
**arms** [1] - 174:20
**arrest** [16] - 108:25, 111:21, 112:5, 112:11, 112:14, 112:21, 113:1, 113:22, 119:3, 121:1, 172:15, 193:11, 193:12, 193:17
**arrested** [1] - 124:22
**arresting** [3] - 113:3, 128:22, 128:23
**arrests** [3] - 189:16, 190:11, 190:15
**arrival** [1] - 114:10
**arrive** [4] - 77:10, 145:1, 165:23, 182:23
**arrived** [16] - 109:23, 110:6, 110:7, 151:11, 151:20, 151:23, 152:1, 152:2, 153:7, 154:6, 154:10, 154:13, 156:18, 159:21, 183:8
**arriving** [1] - 147:25
**articulate** [1] - 113:11
**artist** [1] - 27:1
**arts** [2] - 30:17, 30:20
**Ashley** [3] - 2:5, 3:5, 6:18
**aside** [4] - 32:4, 32:10, 33:19, 50:21
**aspects** [1] - 180:4
**assaulted** [2] - 41:14, 63:8
**assaultive** [1] - 41:17
**assembly** [1] - 78:9
**assigned** [11] - 125:24, 126:2, 126:11, 126:12, 126:16, 126:17, 126:21, 126:23, 127:4, 128:9, 146:23
**assignment** [10] - 109:14, 124:16, 125:1, 125:2, 125:18, 126:4, 126:6, 127:3, 128:5, 128:10
**assignments** [4] -

125:19, 125:21, 126:20
**assist** [6] - 20:6, 90:11, 100:5, 108:22, 163:15, 174:25
**assistance** [4] - 103:22, 166:25, 167:4, 167:11
**assistant** [3] - 23:18, 26:18, 58:14
**assistive** [1] - 8:10
**associate** [1] - 27:9
**assume** [4] - 7:22, 30:20, 36:18, 88:10
**assumes** [2] - 140:7, 141:15
**assuming** [1] - 36:21
**assure** [1] - 12:2
**AT&T** [2] - 24:10, 24:12
**attempt** [2] - 93:15, 109:2
**attempted** [1] - 119:11
**attention** [15] - 6:9, 19:3, 91:8, 92:20, 122:5, 133:16, 133:21, 134:9, 136:20, 143:12, 191:3, 193:18, 199:2, 200:13, 200:17
**attitude** [1] - 86:2
**attitudes** [1] - 77:22
**Attorney** [4] - 2:4, 2:5, 2:9, 2:10
**attorney** [12] - 9:11, 12:25, 88:15, 88:16, 88:17, 89:2, 89:4, 89:5, 90:1, 90:3
**attorney's** [3] - 89:1, 89:25, 189:13
**attorneys** [19] - 8:8, 8:12, 9:1, 9:5, 12:12, 15:8, 18:22, 19:20, 51:24, 79:18, 80:6, 80:11, 81:10, 84:5, 88:9, 89:23, 92:3, 92:18, 99:20
**audience** [1] - 76:11
**audio** [55] - 102:14, 102:16, 110:8, 163:5, 163:20, 164:14, 164:16, 164:17, 165:13, 166:6, 166:17, 168:6, 168:13, 168:19, 169:15, 169:24, 171:20, 172:23, 173:21,

174:10, 176:1, 176:20, 176:24, 178:9, 183:17, 184:7, 184:15, 184:25, 185:14, 186:10, 186:24, 187:7, 188:9, 188:14, 190:21, 191:7, 191:21, 194:9, 194:20, 195:16, 196:5, 197:1, 197:25, 198:14, 198:23, 200:25, 201:8, 201:16, 202:24, 203:15, 203:23, 204:13, 204:15, 204:18, 205:18
**audio-recorder** [1] - 102:16
**August** [15] - 1:18, 10:18, 12:2, 13:16, 100:18, 101:12, 107:23, 108:21, 109:12, 123:11, 123:19, 126:24, 127:11, 132:9, 221:25
**authority** [3] - 108:23, 119:6, 121:25
**automatically** [2] - 36:18, 67:11
**automotive** [1] - 27:16
**autopsy** [1] - 119:16
**available** [5] - 5:9, 9:22, 10:15, 12:1, 145:8
**Avenue** [1] - 97:18
**avenue** [1] - 97:19
**avoid** [2] - 41:18, 87:3
**awake** [2] - 110:14, 220:13
**awards** [1] - 50:12
**aware** [10] - 34:16, 63:12, 72:15, 72:16, 114:19, 189:14, 190:16, 190:18, 192:25, 202:15
**awareness** [1] - 77:24

# B

**bachelor's** [2] - 25:8, 25:22
**back-and-forth** [1] - 199:12
**backed** [1] - 209:21
**background** [3] - 17:16, 203:2, 206:15
**backpack** [1] - 102:2

**backseat** [9] - 113:22, 115:9, 117:11, 118:10, 186:4, 187:10, 195:20, 204:24, 204:25
**badge** [3] - 36:19, 39:9, 80:1, 80:8
**badly** [1] - 31:6
**bail** [1] - 124:24
**bailiff** [3] - 80:18, 93:19, 94:10
**baking** [1] - 106:24
**band** [1] - 110:2
**Bank** [1] - 28:6
**Bar** [1] - 179:6
**Barton** [1] - 214:16
**base** [3] - 50:16, 82:23, 85:6
**based** [28] - 10:25, 17:8, 17:19, 32:11, 35:12, 35:20, 43:18, 50:22, 59:10, 62:8, 67:10, 72:19, 78:21, 82:12, 86:10, 87:3, 91:6, 112:20, 113:14, 114:20, 120:9, 120:12, 155:18, 161:20, 165:9, 167:2, 167:12, 169:1
**basic** [1] - 45:9
**bathroom** [10] - 104:3, 115:16, 115:17, 115:21, 118:10, 186:16, 204:25, 205:2, 205:4, 205:9
**Baxter** [1] - 26:8
**Beach** [3] - 22:9, 28:9, 70:3
**bear** [1] - 86:8
**beat** [1] - 188:3
**beats** [1] - 157:2
**Beaumont** [6] - 97:18, 116:3, 116:5, 188:22, 192:1, 216:11
**beautiful** [1] - 107:20
**became** [8] - 69:13, 105:11, 116:19, 118:23, 124:14, 124:16, 128:17, 129:22
**become** [6] - 106:1, 110:14, 128:24, 129:10, 136:15, 202:15
**began** [5] - 111:5, 114:4, 115:1, 116:17, 219:6
**begin** [5] - 16:24,

93:8, 99:8, 122:22, 186:19
**beginning** [2] - 121:23, 126:25
**begins** [3] - 118:4, 118:5
**behalf** [3] - 3:6, 3:15, 36:18
**behavior** [1] - 85:22
**behind** [3] - 58:24, 102:23, 118:15
**belief** [4] - 55:12, 171:13, 175:8, 219:14
**beliefs** [3] - 35:20, 77:17, 87:4
**believability** [1] - 90:10
**believable** [1] - 87:9
**believes** [3] - 89:2, 97:1, 118:1
**belittle** [1] - 70:9
**belongings** [3] - 102:2, 103:3, 112:24
**below** [1] - 157:20
**belt** [9] - 110:8, 135:13, 161:24, 161:25, 162:4, 162:10, 162:16, 162:17, 165:19
**bench** [1] - 73:2
**BERNARDINO** [1] - 1:8
**Bernardino** [20] - 3:3, 6:14, 13:19, 30:2, 32:25, 33:1, 33:5, 37:16, 54:24, 54:25, 102:13, 114:12, 125:3, 125:7, 150:24, 169:12, 169:18, 181:17, 198:3
**best** [12] - 12:2, 15:24, 16:1, 37:9, 49:24, 61:25, 62:3, 62:5, 62:17, 71:18, 79:25, 196:11
**better** [3] - 40:3, 177:19, 178:5
**between** [12] - 10:17, 88:4, 96:11, 96:18, 102:18, 136:14, 157:19, 181:1, 181:7, 206:12, 206:18, 214:7
**Beverly** [1] - 2:6
**beyond** [1] - 7:20
**bias** [4] - 77:25, 85:25, 87:3
**biased** [1] - 17:11

**biases** [3] - 77:21, 77:22
**big** [2] - 105:22, 157:25
**bike** [1] - 97:23
**binder** [4] - 130:19, 152:20, 179:8, 179:10
**biotech** [1] - 26:7
**bipolar** [2] - 43:4, 45:3
**birth** [1] - 168:16
**bit** [17] - 13:14, 40:6, 46:21, 50:15, 53:24, 54:6, 56:14, 58:5, 61:22, 65:4, 68:4, 68:17, 117:12, 172:2, 197:20, 200:7, 212:9
**black** [2] - 98:7, 122:25
**blanket** [4] - 102:1, 109:25, 112:24, 138:20
**blinker** [1] - 203:4
**blocking** [1] - 118:14
**blog** [1] - 80:23
**blood** [5] - 26:8, 119:17, 119:20, 120:12
**blue** [2] - 36:19, 154:21
**board** [2] - 109:2, 119:25
**board-certified** [1] - 119:25
**body** [2] - 105:24, 162:15
**bond** [1] - 106:21
**booked** [1] - 124:22
**booking** [1] - 193:20
**boring** [1] - 18:25
**bothersome** [1] - 120:10
**Boulevard** [2] - 2:5, 212:22
**box** [2] - 12:18, 18:4
**brace** [2] - 101:10
**brain** [1] - 105:24
**break** [11] - 5:14, 7:17, 10:2, 10:8, 10:9, 49:5, 94:11, 95:25, 150:18, 154:23, 155:2
**breaks** [3] - 4:18, 10:3, 10:4
**BREANA** [3] - 122:15, 122:21, 222:3
**Breana** [4] - 4:5, 6:15, 7:5, 13:19, 36:2, 108:18,

108:21, 122:10, 122:21, 130:14, 133:24
**breathing** [1] - 120:20
**Bret** [12] - 13:16, 13:18, 36:3, 100:15, 100:17, 101:12, 101:18, 104:3, 138:25, 151:12, 154:15, 154:19
**Breunig** [180] - 13:17, 13:18, 13:20, 36:3, 49:19, 100:15, 100:17, 101:12, 101:15, 101:16, 101:18, 101:23, 102:5, 102:9, 102:10, 102:25, 103:2, 103:4, 103:6, 103:10, 103:12, 103:14, 104:3, 104:24, 105:2, 105:4, 105:8, 105:11, 105:17, 105:21, 107:6, 108:12, 108:22, 108:24, 109:4, 109:9, 109:24, 110:4, 110:10, 110:14, 110:18, 110:20, 110:21, 111:2, 111:5, 111:6, 111:11, 111:13, 111:19, 112:8, 112:11, 112:14, 112:19, 112:23, 113:3, 113:15, 113:18, 113:20, 113:24, 114:2, 114:11, 114:15, 114:19, 114:22, 114:24, 115:6, 115:9, 115:13, 115:15, 115:25, 116:4, 116:8, 116:18, 117:5, 117:8, 117:11, 117:19, 117:21, 117:22, 118:3, 118:9, 118:16, 118:20, 118:23, 119:10, 119:16, 119:18, 120:9, 120:13, 120:14, 120:23, 121:5, 121:9, 121:11, 121:18, 121:24, 123:11, 123:24, 124:2, 139:13, 151:13, 154:15, 154:19, 156:19,

157:6, 158:13, 158:18, 158:22, 159:6, 159:14, 159:22, 160:7, 161:18, 164:3, 164:6, 164:19, 165:15, 166:19, 167:1, 167:10, 168:1, 168:21, 169:11, 169:17, 170:2, 170:13, 170:24, 172:25, 173:13, 173:23, 175:1, 176:23, 177:19, 178:4, 178:11, 178:18, 179:1, 180:1, 181:9, 182:14, 184:9, 185:8, 185:16, 186:15, 187:1, 187:9, 188:10, 189:15, 189:20, 190:23, 191:25, 192:7, 192:11, 194:11, 195:19, 197:3, 198:2, 198:25, 200:16, 201:11, 201:18, 204:21, 206:9, 208:25, 209:4, 209:16, 210:2, 210:8, 210:13, 211:16, 212:6, 214:19, 215:23, 216:16, 218:12, 218:19, 219:3
**Breunig's** [8] - 13:21, 13:23, 109:1, 116:12, 121:25, 122:3, 138:25, 168:16
**Brian** [1] - 7:2
**Brie** [1] - 98:22
**brief** [7] - 5:15, 13:13, 96:4, 147:1, 156:8, 189:3, 189:4
**briefly** [3] - 69:24, 70:24, 179:13
**bring** [3] - 10:3, 34:3, 52:1
**bringing** [1] - 4:9
**brings** [2] - 101:11, 106:15
**broke** [1] - 101:2
**broken** [1] - 106:6
**brother** [8] - 19:25, 39:15, 42:17, 62:25, 63:9, 63:11, 63:12, 63:21
**brother-in-law** [1] -

42:17
**brother-in-law's** [1] - 19:25
**brought** [3] - 40:6, 60:16, 173:17
**bruised** [1] - 101:17
**Bryan** [1] - 20:21
**build** [1] - 120:3
**building** [2] - 170:15
**bump** [1] - 50:19
**bumper** [3] - 210:11, 210:12, 211:10
**bunch** [1] - 53:25
**burden** [7] - 53:21, 54:4, 54:14, 59:25, 85:2, 172:19
**bury** [1] - 108:2
**bus** [3] - 104:13, 170:2, 217:8
**business** [2] - 25:18, 27:5
**businesses** [1] - 104:14
**but..** [1] - 38:22
**button** [8] - 147:24, 148:3, 148:5, 152:2, 162:1, 162:3, 162:13, 184:21
**BY** [3] - 123:8, 156:17, 222:5

## C

**CA** [1] - 1:23
**CAD** [17] - 108:11, 146:19, 146:21, 146:22, 146:23, 148:17, 149:1, 149:10, 149:11, 149:12, 149:16, 149:21, 150:7, 152:4, 152:18, 184:20, 197:17
**calf** [1] - 157:20
**CALIFORNIA** [1] - 1:2
**California** [13] - 1:17, 2:6, 2:11, 13:16, 21:18, 22:17, 23:7, 23:17, 24:17, 24:25, 25:7, 27:9
**cannot** [13] - 7:24, 73:15, 89:9, 93:4, 104:7, 112:21, 113:1, 113:9, 143:5, 148:21, 164:20, 185:23, 201:20
**Canyon** [1] - 180:10
**capable** [1] - 110:15
**capacity** [2] - 23:1, 66:6

captured [1] - 121:23
car [72] - 31:18, 48:16,
48:19, 50:19, 71:3,
71:5, 71:6, 96:19,
103:8, 104:4,
113:21, 115:15,
115:19, 115:22,
115:23, 116:23,
117:11, 117:23,
118:6, 118:17,
118:20, 118:21,
119:1, 119:7, 121:2,
123:12, 146:3,
147:4, 154:7,
165:24, 172:3,
172:7, 172:20,
175:3, 178:12,
178:15, 178:18,
178:24, 179:2,
181:22, 183:21,
185:2, 185:7, 186:4,
186:15, 186:17,
190:1, 195:20,
195:22, 196:3,
196:15, 198:17,
201:10, 203:19,
203:25, 204:3,
205:1, 205:20,
206:12, 206:22,
209:4, 209:7, 209:8,
210:13, 211:2,
211:5, 212:7,
212:11, 212:14,
215:25, 217:24,
219:3
card [2] - 155:14,
156:1
Cardinal [7] - 114:9,
165:23, 180:7,
182:24, 183:3,
183:8, 183:24
cards [2] - 107:2,
156:4
care [21] - 25:9, 45:16,
58:16, 94:18, 102:9,
107:13, 111:6,
113:6, 142:13,
142:16, 142:17,
142:20, 142:21,
142:25, 143:1,
143:3, 143:5, 143:6,
143:10, 143:20,
175:15
career [1] - 103:25
careful [2] - 74:1,
106:9
carefully [2] - 90:9,
91:20
cars [3] - 118:14,
119:9, 209:6

case [132] - 4:13, 6:9,
6:13, 7:7, 7:12, 9:14,
10:10, 13:14, 14:2,
14:7, 15:3, 15:8,
15:11, 17:4, 17:7,
17:18, 17:19, 18:16,
26:1, 26:2, 26:3,
27:11, 28:12, 30:6,
31:1, 32:4, 32:11,
32:16, 33:19, 35:3,
37:8, 38:20, 46:11,
47:8, 47:22, 50:22,
51:11, 52:3, 52:25,
53:4, 53:20, 53:24,
54:3, 54:12, 56:2,
56:10, 56:13, 56:17,
57:9, 57:21, 59:8,
59:22, 60:3, 61:17,
61:19, 61:23, 64:22,
64:24, 67:8, 67:13,
67:17, 68:8, 68:17,
71:23, 71:24, 72:19,
73:21, 76:22, 77:7,
77:11, 78:20, 78:21,
78:22, 78:24, 79:1,
79:3, 79:9, 79:12,
80:2, 80:15, 80:20,
81:3, 81:8, 81:10,
81:13, 81:16, 81:18,
81:20, 82:5, 82:6,
82:12, 83:8, 83:16,
84:4, 84:11, 84:18,
85:12, 86:1, 86:2,
86:5, 86:6, 88:9,
88:15, 88:25, 89:15,
90:7, 92:14, 92:16,
93:9, 93:11, 95:24,
99:20, 100:2, 100:6,
100:13, 100:14,
105:15, 105:20,
106:16, 106:18,
108:8, 111:22,
117:6, 122:6,
154:24, 154:25,
219:22, 219:23,
221:2
Case [1] - 3:1
cases [5] - 10:10,
34:20, 35:2, 35:3,
53:23
cash [1] - 159:19
Casino [1] - 125:8
caught [1] - 63:15
caused [3] - 13:20,
48:10, 65:2
causing [1] - 171:6
cavity [1] - 135:17
Cecilia [1] - 21:2
cell [1] - 66:8
cellphone [3] - 102:3,

146:1, 159:17
cellphones [1] - 6:10
Centene [1] - 24:18
Center [18] - 23:19,
100:22, 101:4,
101:13, 109:13,
124:17, 126:18,
126:21, 127:5,
127:11, 128:1,
144:15, 150:23,
151:2, 156:23,
161:21, 180:2, 182:7
center [4] - 124:18,
136:8, 181:19,
202:13
CENTRAL [1] - 1:2
Central [8] - 125:3,
125:4, 125:11,
125:14, 125:16,
126:3, 126:7, 145:14
central [1] - 125:6
certain [6] - 34:21,
89:19, 89:23,
126:12, 192:25,
193:4
certainly [2] - 4:1,
35:7
certification [1] -
128:20, 131:3
certifications [2] -
45:9, 45:10
certified [5] - 119:25,
128:17, 128:24,
129:22, 131:6
certify [1] - 221:18
cetera [1] - 11:6
chair [1] - 20:19
chairs [1] - 18:4
challenges [1] - 73:3
chance [2] - 7:8, 10:11
change [4] - 70:20,
125:24, 126:5,
126:14
changed [1] - 106:10
Chapman [1] - 112:1
charge [3] - 18:17,
22:21, 23:22
charges [16] - 124:22,
161:9, 161:14,
189:10, 189:11,
189:12, 189:14,
189:21, 189:25,
190:2, 190:7, 190:8,
190:9, 190:11,
190:13
chat [1] - 80:23
Chatsworth [2] - 25:6,
25:7
chatting [1] - 164:3
check [2] - 98:11,

98:22
checked [1] - 213:12
chief [1] - 111:25
child [4] - 23:9, 26:25,
27:3, 108:2
children [12] - 18:13,
22:18, 23:3, 23:20,
24:2, 24:21, 25:10,
25:23, 27:10, 27:23,
48:25, 106:23
Children's [1] - 25:9
chime [3] - 184:17,
184:18
choice [5] - 60:25,
95:16, 117:3, 119:4,
119:5
choices [7] - 60:18,
60:20, 61:3, 63:4,
65:17, 108:25
choose [4] - 17:6,
86:22, 99:24, 143:7
chose [1] - 121:1
chosen [4] - 11:7,
11:15, 11:16, 77:4
circle [2] - 179:25,
180:22
circumstances [4] -
77:18, 86:10, 87:6,
165:5
circumstantial [5] -
87:12, 87:15, 87:24,
88:2, 88:5
cities [1] - 66:12
citizen [1] - 31:11
citizens [1] - 11:25
City [2] - 22:25, 25:1
city [9] - 29:24, 114:6,
119:8, 126:1, 126:7,
126:9, 179:7,
181:16, 212:3
civil [10] - 6:13, 18:16,
25:25, 26:1, 28:11,
28:22, 53:20, 56:10,
64:22
claim [4] - 18:17,
28:14, 85:2, 85:4
claiming [1] - 118:25
claims [1] - 214:20
Clarence [1] - 111:25
clarify [1] - 126:1
Clarita [1] - 27:8
Clark [1] - 119:25
classify [1] - 40:6
clean [1] - 107:15
clear [5] - 35:6, 97:17,
110:14, 118:23,
190:14
cleared [3] - 111:3,
193:13, 193:15
clearing [1] - 118:15

clearly [2] - 34:17,
121:24
clerk [1] - 7:10
CLERK [16] - 3:1, 5:8,
5:17, 5:19, 16:12,
16:14, 20:21, 94:17,
98:22, 98:24, 99:4,
122:12, 122:18,
130:19, 155:3,
156:11
clerks [1] - 93:25
clicking [1] - 183:19
client [2] - 6:19,
100:15
client's [1] - 67:24
clip [1] - 204:20
close [19] - 18:11,
19:3, 29:13, 30:17,
31:5, 32:22, 38:7,
40:17, 42:4, 45:21,
45:24, 46:17, 48:9,
48:11, 72:14, 91:8,
105:7, 166:10,
166:12
closed [1] - 121:10
closely [1] - 78:17
closeness [1] - 106:21
closer [3] - 114:2,
116:13, 188:7
closes [2] - 102:23,
147:2
closest [1] - 20:19
closing [2] - 83:21,
99:20
clothing [2] - 142:7,
156:19
CNAs [1] - 58:15
Coast [1] - 42:18
Code [5] - 109:20,
144:20, 144:24,
145:17, 145:18
coherent [1] - 120:23
colleague [2] - 7:3,
36:22
college [8] - 22:10,
22:13, 22:18, 23:9,
24:3, 24:17, 24:25,
25:24
color [4] - 77:16, 87:4,
148:6, 148:7
combat [1] - 144:19
combination [1] -
15:15
combining [2] - 141:6,
141:11
coming [2] - 10:12,
166:1
comment [1] - 72:10
commentary [1] -
81:15

6

**comments** [1] - 4:19
**commerce** [1] - 25:25
**commit** [1] - 113:16
**commitment** [1] - 113:5
**committed** [4] - 112:6, 119:4, 121:1, 172:17
**common** [6] - 82:25, 86:9, 87:25, 167:2, 175:18, 175:22
**communicate** [7] - 79:2, 79:17, 80:14, 80:16, 93:18, 145:6, 150:15
**communicating** [2] - 81:2, 150:9
**communication** [1] - 79:23
**communications** [1] - 82:1
**community** [3] - 10:22, 23:9, 70:1
**Community** [18] - 103:13, 108:12, 116:10, 116:14, 117:10, 117:13, 118:2, 180:21, 201:5, 201:12, 201:14, 212:8, 212:25, 213:5, 215:3, 215:8, 215:12, 215:13
**companionship** [1] - 106:19
**company** [3] - 21:23, 23:14, 26:8
**compelled** [1] - 5:4
**complained** [1] - 120:21
**complaints** [1] - 120:19
**complete** [12] - 17:22, 83:4, 83:9, 103:9, 148:18, 149:2, 183:6, 184:1, 184:19, 184:20, 209:23, 212:16
**completed** [6] - 10:14, 12:3, 24:17, 78:19, 184:22, 212:14
**completely** [1] - 52:2
**completing** [1] - 184:12
**computer** [8] - 80:21, 116:1, 143:16, 147:4, 147:9, 147:11, 190:23
**concern** [2] - 97:11, 97:15
**concerned** [2] - 80:10,

114:17
**concerns** [1] - 51:9
**conclude** [2] - 16:2, 87:17
**condition** [1] - 105:18
**conduct** [5] - 78:8, 80:19, 81:14, 89:25, 142:22
**confer** [1] - 155:10
**conference** [1] - 9:12
**conferences** [1] - 9:10
**conferred** [1] - 96:9
**confirm** [3] - 163:17, 188:20, 194:25
**confirmed** [1] - 110:23
**confirming** [2] - 187:4, 194:14
**conflicts** [1] - 45:18
**confront** [1] - 83:12
**confused** [2] - 106:2, 120:18
**confusing** [1] - 97:19
**conlogue** [1] - 162:18
**CONLOGUE** [117] - 2:4, 3:5, 3:8, 3:18, 3:22, 4:24, 6:18, 6:21, 52:7, 52:17, 52:21, 52:24, 53:3, 53:9, 53:14, 53:17, 54:20, 55:8, 55:14, 55:21, 55:25, 56:6, 58:1, 58:4, 58:8, 58:16, 58:21, 59:6, 59:13, 59:17, 60:10, 73:4, 73:6, 73:13, 74:8, 74:16, 74:21, 74:25, 75:3, 75:11, 75:16, 75:25, 95:18, 95:21, 96:4, 96:21, 96:25, 97:4, 97:24, 98:11, 98:15, 98:19, 99:2, 100:9, 106:15, 108:5, 122:9, 123:6, 123:8, 130:12, 130:17, 130:20, 130:23, 133:22, 134:3, 134:6, 134:25, 135:4, 137:16, 137:20, 137:22, 139:9, 141:2, 141:6, 141:10, 150:17, 150:20, 153:1, 153:12, 156:16, 156:17, 157:17, 158:5, 158:10, 162:21, 162:25, 163:3, 163:16, 163:19, 171:9, 175:24, 177:22,

178:1, 178:3, 179:17, 179:21, 180:25, 196:16, 197:21, 197:24, 199:19, 199:23, 200:1, 200:23, 206:24, 207:3, 207:5, 207:13, 207:16, 208:8, 219:20, 220:5, 220:8, 220:24, 221:11, 222:4, 222:5
**Conlogue** [12] - 2:4, 2:5, 3:5, 3:9, 6:19, 6:21, 60:9, 73:3, 123:5, 156:15, 197:22, 220:4
**connect** [1] - 106:23
**connected** [2] - 93:3, 93:17
**connections** [1] - 35:20
**connotations** [1] - 40:8
**conscious** [3] - 77:24, 77:25, 87:3
**consciously** [3] - 17:3, 67:22, 77:23
**consciousness** [1] - 120:19
**consider** [17] - 13:10, 81:6, 85:16, 86:4, 86:8, 86:17, 87:24, 88:2, 88:8, 88:24, 89:9, 89:15, 89:20, 91:19, 92:14, 92:15, 95:7
**considered** [1] - 88:12
**consistent** [1] - 86:12
**consistently** [1] - 217:19
**consists** [1] - 125:6
**constituted** [2] - 74:9, 75:4
**construction** [1] - 22:2
**consultant** [1] - 4:5
**contact** [12] - 7:13, 41:19, 107:5, 110:9, 112:7, 139:18, 140:1, 140:5, 161:3, 176:11, 179:25, 192:6
**contacts** [2] - 123:23, 124:2
**context** [1] - 130:21
**continue** [7] - 9:19, 67:11, 118:12, 156:15, 164:15, 172:2, 205:10

**continued** [4] - 116:22, 117:19, 117:22, 119:11
**continues** [1] - 117:24
**contract** [1] - 125:8
**control** [7] - 7:20, 66:20, 77:1, 77:24, 88:14, 103:9, 109:22
**conversation** [2] - 80:13, 102:18
**convicted** [1] - 124:19
**convictions** [1] - 190:18
**convince** [1] - 54:6
**cooking** [1] - 106:24
**cool** [1] - 65:25
**cooperative** [1] - 112:11
**cop** [1] - 72:2
**copies** [2] - 4:10, 163:2
**cops** [5] - 30:3, 31:13, 66:12, 70:17, 71:12
**copy** [3] - 98:8, 130:16, 130:17
**corner** [1] - 194:12
**corollary** [1] - 4:13
**correct** [355] - 38:3, 52:23, 57:8, 57:22, 59:3, 62:10, 96:21, 123:12, 123:14, 123:20, 123:21, 124:24, 126:19, 126:22, 127:6, 127:11, 127:15, 128:14, 128:17, 128:24, 129:2, 129:4, 129:6, 129:19, 129:24, 130:1, 131:11, 131:12, 131:14, 131:15, 131:23, 132:7, 132:15, 132:18, 132:25, 133:2, 133:5, 133:11, 133:17, 134:18, 134:23, 135:18, 135:20, 135:25, 136:20, 136:24, 136:25, 137:10, 138:5, 138:23, 138:24, 139:4, 139:11, 139:15, 139:22, 142:10, 142:11, 143:2, 143:16, 143:22, 144:1, 144:12, 144:24, 144:25, 145:4, 145:5, 145:7,

145:11, 146:19, 147:7, 147:9, 147:14, 147:21, 147:25, 148:11, 148:13, 148:19, 148:20, 148:21, 148:22, 148:24, 148:25, 149:7, 149:13, 149:18, 149:22, 149:25, 150:5, 150:11, 150:15, 151:3, 151:4, 151:6, 151:9, 151:13, 151:16, 151:18, 151:19, 151:24, 152:2, 152:5, 152:9, 153:9, 153:22, 154:1, 154:11, 156:20, 156:24, 158:3, 159:2, 160:8, 161:10, 161:11, 162:7, 162:10, 163:25, 164:1, 164:3, 164:4, 164:11, 164:12, 164:20, 164:23, 165:16, 167:18, 167:21, 167:24, 167:25, 168:16, 168:22, 169:12, 169:13, 169:18, 169:22, 170:3, 170:6, 170:18, 171:3, 171:9, 171:23, 172:4, 173:1, 173:24, 174:7, 175:3, 175:19, 176:12, 176:13, 180:2, 180:7, 180:11, 180:18, 180:22, 181:12, 181:20, 181:22, 182:1, 182:4, 182:8, 182:11, 182:15, 182:16, 182:18, 182:19, 182:21, 182:22, 182:25, 183:1, 183:3, 183:4, 183:6, 183:7, 183:10, 183:11, 184:1, 184:4, 185:3, 185:5, 185:9, 185:17, 185:18, 185:20, 185:21, 185:22, 185:24, 185:25, 186:4, 186:5, 186:8, 186:13, 186:14, 186:17, 186:18,

186:20, 186:21,
187:2, 187:3, 187:4,
187:5, 187:11,
187:14, 187:15,
187:16, 187:17,
188:11, 188:12,
188:16, 189:2,
189:16, 189:21,
190:3, 190:12,
190:16, 190:17,
192:1, 192:2, 192:4,
192:5, 192:14,
192:15, 192:22,
194:7, 194:12,
194:13, 194:15,
194:16, 194:18,
194:23, 194:24,
195:1, 195:2, 195:4,
195:5, 195:24,
196:8, 196:9,
196:10, 197:5,
197:6, 197:8, 197:9,
197:12, 197:14,
197:15, 198:4,
198:5, 198:19,
199:3, 199:17,
199:18, 201:13,
201:14, 201:21,
201:22, 201:24,
203:2, 203:3, 203:4,
203:5, 203:8, 203:9,
203:11, 203:17,
203:18, 203:20,
204:1, 204:3, 204:6,
204:7, 205:20,
206:9, 206:10,
206:13, 206:14,
206:16, 206:17,
206:19, 207:3,
207:16, 208:3,
208:4, 208:6, 208:7,
209:5, 209:9,
209:10, 209:13,
209:24, 209:25,
210:2, 210:19,
210:23, 210:25,
211:1, 211:3, 211:4,
211:6, 211:7,
211:11, 211:12,
211:16, 211:17,
211:20, 211:21,
212:8, 212:17,
212:18, 212:19,
212:20, 212:23,
212:24, 213:4,
213:10, 213:17,
213:25, 214:1,
214:8, 214:9,
214:21, 214:22,
214:25, 215:1,
215:4, 215:5, 215:6,

215:14, 215:15,
216:1, 216:2, 216:4,
216:5, 216:10,
216:11, 216:14,
216:17, 216:19,
216:21, 217:2,
217:4, 217:6, 217:9,
217:11, 217:14,
218:5, 218:9,
218:10, 218:13,
218:15, 219:2,
219:5, 219:7, 219:8,
219:17, 219:18,
221:18
**correctly** [5] - 52:19,
58:23, 67:5, 139:10,
151:21
**cost** [3] - 48:1, 48:7
**counsel** [23] - 3:4,
3:23, 5:13, 5:22,
6:16, 16:22, 17:15,
73:1, 75:23, 76:1,
90:19, 100:2, 155:8,
155:11, 155:16,
156:1, 158:8,
162:20, 207:12,
207:16, 219:19,
220:11
**Counsel** [3] - 100:4,
134:1, 175:23
**COUNSEL** [1] - 2:1
**counsel's** [1] - 68:3
**Counsel's** [1] - 200:2
**count** [1] - 76:3
**counterfeit** [1] - 26:3
**counting** [1] - 58:23
**Country** [1] - 2:10
**country** [2] - 34:1,
84:15
**county** [2] - 29:24,
189:6
**COUNTY** [1] - 1:8
**County** [10] - 3:2,
6:14, 13:19, 32:25,
33:1, 54:24, 102:13,
124:4, 146:4, 150:25
**couple** [7] - 18:23,
29:5, 29:10, 44:25,
46:5, 165:15, 166:8
**course** [10] - 4:17, 8:8,
8:12, 17:9, 17:25,
78:25, 79:24, 93:7,
103:23, 144:5
**Court** [31] - 6:8, 7:10,
12:13, 13:24, 13:25,
14:1, 17:15, 51:10,
52:10, 55:15, 55:16,
55:22, 74:16, 75:11,
75:16, 79:11, 79:15,
83:10, 84:5, 89:10,

114:9, 130:13,
162:22, 165:23,
180:7, 182:24,
183:3, 183:8,
183:24, 221:15
**COURT** [306] - 1:1,
3:7, 3:10, 3:13, 3:16,
3:20, 3:25, 4:6, 4:11,
4:15, 4:22, 5:1, 5:12,
5:16, 5:18, 5:22, 6:2,
6:25, 7:6, 8:6, 14:12,
14:15, 14:20, 14:23,
15:1, 15:22, 15:25,
16:6, 16:10, 16:16,
21:12, 21:20, 21:24,
22:4, 22:6, 22:8,
22:13, 22:15, 22:21,
22:23, 23:1, 23:3,
23:6, 23:11, 23:15,
23:22, 23:24, 24:2,
24:5, 24:7, 24:12,
24:14, 24:22, 25:4,
25:15, 25:19, 26:5,
26:9, 26:15, 26:19,
26:21, 27:3, 27:6,
27:12, 27:14, 27:17,
27:20, 27:25, 28:2,
28:7, 28:12, 28:15,
28:19, 28:21, 28:25,
29:21, 29:23, 30:1,
30:4, 30:9, 30:12,
30:22, 30:24, 31:3,
31:17, 31:20, 31:22,
31:24, 32:3, 32:9,
32:15, 32:20, 33:8,
33:11, 33:17, 33:22,
33:25, 34:8, 34:18,
35:2, 35:6, 35:13,
35:22, 36:14, 36:20,
36:25, 37:5, 37:11,
38:2, 38:4, 38:17,
38:23, 39:1, 39:3,
39:11, 39:23, 40:9,
40:13, 41:10, 41:20,
42:1, 42:12, 42:21,
43:6, 43:10, 43:15,
43:19, 43:25, 44:11,
44:15, 44:21, 45:5,
45:13, 45:19, 46:10,
46:15, 46:21, 46:25,
47:3, 47:6, 47:10,
47:14, 47:17, 47:19,
47:21, 48:3, 48:8,
48:24, 49:1, 49:7,
49:9, 49:12, 49:18,
49:25, 50:4, 50:9,
50:15, 50:21, 50:24,
51:2, 52:16, 53:18,
54:19, 56:9, 56:20,
56:23, 57:3, 57:9,
57:18, 57:23, 57:25,

59:18, 60:4, 60:8,
60:12, 68:22, 69:1,
72:6, 72:25, 73:3,
73:5, 73:8, 73:10,
73:18, 73:22, 73:25,
74:10, 74:13, 74:18,
74:23, 75:5, 75:8,
75:13, 75:18, 75:22,
76:1, 76:5, 76:7,
76:10, 94:18, 94:22,
95:15, 95:17, 95:19,
95:23, 96:2, 96:18,
96:23, 97:3, 97:20,
97:25, 98:6, 98:13,
98:18, 98:20, 98:23,
98:25, 99:3, 99:6,
106:13, 108:4,
108:14, 122:7,
122:11, 122:22,
130:16, 130:22,
134:1, 134:5,
134:15, 135:3,
136:4, 137:3,
137:18, 137:21,
139:8, 140:8,
140:15, 140:19,
140:25, 141:4,
141:9, 141:16,
142:3, 150:19,
152:25, 153:4,
153:10, 153:15,
153:18, 154:23,
155:5, 155:17,
156:6, 156:9,
156:13, 157:15,
158:8, 158:12,
162:20, 162:24,
163:1, 163:7,
163:18, 167:6,
171:8, 171:10,
175:23, 177:25,
178:2, 179:11,
179:15, 179:18,
179:23, 181:3,
189:19, 196:19,
197:19, 197:22,
199:12, 199:22,
199:24, 200:3,
200:6, 200:10,
200:21, 200:22,
202:22, 205:16,
206:4, 207:8,
207:11, 207:15,
207:19, 207:21,
208:12, 217:22,
219:19, 219:21,
220:2, 220:7, 220:9,
220:18, 220:23,
221:4, 221:13
**court** [15] - 1:25, 7:11,
8:14, 19:20, 20:5,

32:17, 47:3, 73:24,
81:21, 82:13, 84:15,
123:2, 133:23, 208:9
**Court's** [2] - 77:2,
150:17
**court-related** [1] -
8:14
**courtesy** [11] - 123:17,
123:18, 123:19,
140:2, 140:6, 141:8,
141:21, 141:24,
142:15, 174:14,
174:16
**courthouse** [1] - 78:8
**courtroom** [31] - 5:21,
6:20, 7:8, 7:10, 8:12,
8:19, 8:25, 13:12,
17:20, 20:6, 32:10,
32:11, 34:3, 48:4,
76:18, 78:8, 79:13,
79:15, 81:25, 82:24,
83:17, 84:11, 94:3,
94:5, 94:9, 94:21,
99:5, 100:16, 155:4,
156:12, 220:1
**Courtroom** [1] - 6:7
**courtrooms** [2] -
93:22
**courts** [1] - 31:7
**cousin** [6] - 39:5,
40:23, 42:17, 60:17,
61:16, 61:20
**cousins** [2] - 29:19,
54:23
**coverage** [4] - 83:3,
83:5, 83:7, 84:10
**covering** [1] - 159:11
**COVID** [2] - 41:16,
43:1
**coworkers** [1] - 49:4
**CPA** [1] - 28:10
**CPR** [1] - 45:9
**crazy** [2] - 191:2,
191:10
**creates** [1] - 146:23
**creating** [1] - 148:17
**credential** [1] - 26:12
**credibility** [6] - 13:3,
34:13, 36:11, 54:16,
86:8, 87:6
**credible** [1] - 37:1
**credit** [1] - 74:5
**Cricket** [1] - 66:8
**crime** [4] - 112:6,
112:11, 144:19,
172:17
**crimes** [2] - 144:9,
144:23
**criminal** [18] - 18:16,
22:19, 23:20, 25:13,

26:1, 26:2, 47:15, 53:23, 64:3, 114:20, 116:6, 188:25, 189:1, 189:6, 189:8, 190:14, 190:19, 191:4
**crisis** [3] - 39:8, 41:1, 131:17
**criticism** [1] - 89:24
**cross** [4] - 10:22, 83:20, 99:10, 99:12
**cross-examination** [1] - 83:20
**cross-examine** [2] - 99:10, 99:12
**cross-section** [1] - 10:22
**crosses** [3] - 180:18, 203:10, 211:5
**crossing** [2] - 104:16, 104:18
**crow** [1] - 96:19
**CRR** [2] - 1:22, 221:25
**crutches** [5] - 101:10, 177:11, 177:17, 177:20, 178:5
**cryptocurrency** [1] - 25:11
**cul** [1] - 114:8
**cul-de-sac** [1] - 114:8
**curiosity** [1] - 84:17
**cursing** [1] - 170:12
**custody** [10] - 138:3, 142:20, 185:24, 186:7, 187:4, 187:16, 189:15, 189:21, 192:13, 194:14
**cut** [1] - 204:14

# D

**dad** [1] - 40:4
**DALE** [1] - 1:3
**damages** [1] - 51:5
**dance** [2] - 22:10, 22:14
**Dance** [1] - 22:11
**danger** [13] - 63:7, 63:8, 63:9, 66:2, 100:11, 103:20, 108:6, 110:4, 113:12, 134:18, 134:22, 135:7
**dangerous** [2] - 137:10, 137:25
**Daniela** [1] - 21:7
**data** [2] - 24:20, 28:5
**date** [16] - 10:18, 101:11, 126:15,

129:13, 136:14, 146:8, 150:21, 168:16, 173:3, 175:7, 175:16, 177:1, 178:14, 181:9, 189:24, 217:16
**dates** [1] - 190:7
**daughter** [4] - 26:13, 31:11, 31:12, 67:16
**days** [7] - 9:16, 101:6, 102:6, 165:16, 166:9, 189:23, 190:6
**de** [1] - 114:8
**dead** [1] - 105:2
**deal** [5] - 42:25, 45:3, 144:9, 170:17, 188:5
**dealing** [5] - 61:7, 63:21, 64:3, 65:11, 65:16
**dealt** [3] - 42:4, 45:3, 70:16
**death** [10] - 13:21, 13:23, 40:5, 48:10, 100:14, 101:15, 105:13, 105:15, 109:3, 122:3
**Debby** [1] - 6:22
**DEBORAH** [1] - 1:5
**Deborah** [8] - 3:2, 3:19, 6:14, 6:19, 13:17, 36:3, 100:15, 106:17
**debt** [1] - 107:17
**decades** [1] - 27:13
**decedent** [4] - 100:21, 100:25, 101:1, 107:2
**decedent's** [1] - 106:17
**decide** [25] - 7:24, 9:8, 13:10, 15:13, 15:14, 17:8, 17:19, 43:17, 49:21, 52:18, 61:19, 77:8, 77:11, 78:18, 78:21, 82:12, 85:13, 86:18, 86:20, 87:23, 88:5, 90:7, 93:10, 121:20, 161:1
**decided** [11] - 11:13, 53:11, 53:15, 81:20, 86:1, 116:9, 118:17, 201:11, 203:6, 209:14, 219:6
**decides** [6] - 15:16, 102:8, 102:9, 103:4, 103:11, 118:3
**deciding** [6] - 56:9, 64:19, 85:12, 88:8, 89:15, 105:14
**decision** [14] - 11:16,

53:4, 82:23, 85:6, 91:6, 91:21, 106:1, 109:1, 122:3, 131:23, 132:4, 192:12, 201:2, 201:20
**decision-making** [3] - 106:1, 131:23, 132:4
**decisions** [5] - 61:2, 78:1, 110:15, 113:13, 122:2
**declare** [1] - 94:25
**decorator** [1] - 23:8
**deep** [3] - 108:2, 114:4, 114:7
**deescalate** [1] - 61:13
**Defendant** [3] - 3:12, 13:18, 122:10
**defendant** [9] - 3:15, 10:21, 30:4, 51:8, 54:15, 59:25, 60:1, 67:13, 100:13
**defendants** [1] - 221:12
**Defendants** [2] - 1:10, 2:8
**defense** [21] - 54:4, 59:21, 60:13, 74:10, 74:11, 75:5, 75:6, 75:20, 75:21, 85:2, 85:4, 96:13, 96:25, 97:2, 97:8, 98:3, 99:9, 99:11, 108:14, 112:1, 119:25
**defense's** [2] - 75:1, 96:16
**defer** [1] - 143:21
**definitely** [1] - 40:5
**DeFoe** [4] - 103:24, 111:23, 113:2, 221:1
**degree** [3] - 25:22, 26:24, 27:9
**deliberate** [3] - 77:6, 90:25, 99:21
**deliberately** [1] - 86:21
**deliberating** [1] - 10:14
**deliberation** [1] - 81:4
**deliberations** [3] - 77:1, 78:20, 93:8
**delivery** [1] - 23:13
**delusions** [1] - 132:15
**dementia** [1] - 45:4
**denied** [1] - 82:13
**denies** [1] - 13:22
**dental** [2] - 26:17
**deny** [2] - 9:12, 121:7
**Department** [2] - 33:1, 150:14

**department** [6] - 67:17, 115:11, 116:15, 124:2, 124:7, 150:10
**dependency** [1] - 38:8
**depicted** [2] - 96:22, 97:10
**depo** [3] - 4:9, 207:7, 207:9
**deposition** [21] - 130:7, 130:13, 131:10, 133:23, 135:1, 137:18, 158:6, 177:23, 196:17, 199:20, 201:4, 206:25, 207:2, 207:17, 208:9, 212:13, 213:14, 213:17, 213:19, 213:20, 216:23
**depression** [5] - 42:9, 44:4, 44:8, 44:13, 45:4
**deprived** [2] - 83:12, 107:24
**deputies** [10] - 102:4, 102:13, 102:20, 103:18, 104:1, 111:15, 112:3, 124:1, 149:21, 150:3
**Deputy** [92] - 4:4, 6:15, 7:5, 51:25, 58:4, 59:14, 100:12, 100:20, 100:21, 101:18, 102:6, 102:8, 102:12, 102:16, 102:25, 103:1, 103:3, 103:7, 103:8, 103:11, 103:16, 104:4, 104:5, 104:10, 104:18, 104:20, 104:23, 105:8, 105:16, 106:4, 106:5, 106:6, 108:11, 108:18, 108:21, 109:5, 109:12, 109:19, 109:20, 109:23, 110:6, 110:7, 110:8, 110:18, 110:25, 111:4, 111:5, 112:8, 112:9, 112:13, 112:20, 113:4, 113:17, 113:21, 113:24, 114:7, 114:11, 114:17, 114:19, 114:25, 115:12, 115:20,

117:6, 117:13, 117:24, 118:8, 118:21, 118:23, 119:18, 120:14, 120:24, 121:4, 121:10, 121:22, 121:25, 122:2, 151:21, 151:23, 152:9, 153:6, 153:24, 154:6, 155:5, 156:9, 156:14, 166:22, 166:24, 172:10, 173:8, 174:23, 179:2, 207:23
**deputy** [23] - 7:10, 13:19, 13:22, 30:21, 54:25, 100:10, 102:24, 106:4, 108:5, 116:15, 124:9, 124:14, 124:16, 126:21, 126:23, 128:16, 136:24, 144:7, 150:9, 153:24, 202:10, 220:2, 220:19
**Derrick** [1] - 14:19
**describe** [5] - 53:25, 85:21, 101:16, 150:4, 216:18
**described** [3] - 64:22, 78:9, 81:8
**deserves** [1] - 87:10
**desk** [2] - 8:21, 122:24
**desolate** [2] - 100:19, 105:17
**despite** [2] - 106:5, 142:6
**detailed** [1] - 77:1
**details** [5] - 68:22, 68:25, 94:24, 95:13, 95:14
**detain** [2] - 142:19, 142:22
**detained** [2] - 185:19, 194:14
**Detention** [1] - 124:17
**detention** [2] - 124:18, 136:8
**determination** [2] - 87:6, 145:10
**determine** [6] - 16:25, 17:17, 36:15, 77:9, 129:1, 130:5
**determining** [1] - 95:6
**detox** [4] - 192:25, 193:6, 193:8, 193:9
**Devaansh** [1] - 21:11
**device** [2] - 8:10,

135:17
**devices** [3] - 6:11, 102:14, 181:20
**devoted** [2] - 106:21, 107:13
**diabetes** [1] - 31:14
**Diagnostics** [1] - 24:20
**diarrhea** [1] - 138:9
**DIAZ** [1] - 1:22
**Diaz** [6] - 7:11, 8:21, 20:11, 91:11, 221:25, 222:1
**Diaz's** [1] - 89:7
**dictionary** [1] - 82:7
**died** [6] - 48:11, 49:19, 100:17, 119:16, 119:24, 121:12
**differences** [1] - 86:17
**different** [25] - 13:2, 34:23, 35:19, 42:19, 43:14, 43:15, 52:16, 53:25, 63:5, 66:12, 76:18, 86:13, 91:2, 106:11, 115:15, 144:8, 144:9, 149:8, 155:19, 163:11, 197:11, 197:14, 200:22
**differently** [2] - 35:9, 86:17
**differs** [1] - 86:18
**difficult** [2] - 20:10, 57:4
**difficulty** [8] - 13:6, 14:6, 15:2, 16:20, 34:11, 51:6, 51:16, 78:16
**dilated** [1] - 138:23
**diligently** [1] - 17:3
**dinners** [1] - 107:25
**dire** [3] - 5:2, 52:9, 52:12
**DIRECT** [2] - 123:7, 222:4
**direct** [7] - 87:11, 87:12, 88:2, 88:5, 89:22, 129:11
**direction** [5] - 97:12, 209:24, 211:9, 211:19, 218:8
**directions** [4] - 79:22, 114:4, 114:7, 116:12
**directly** [1] - 85:24
**director** [3] - 23:18, 26:25, 58:14
**dirt** [3] - 206:23, 209:2, 209:11
**disabilities** [1] - 44:5
**disapprove** [5] - 14:4,

14:8, 15:4, 51:14, 51:18
**disbelieve** [1] - 164:25
**discharged** [19] - 79:5, 79:11, 101:9, 110:21, 110:23, 110:25, 111:4, 160:7, 160:11, 160:13, 160:21, 160:25, 161:4, 161:6, 161:7, 163:25, 172:25, 173:6, 177:14
**disclose** [1] - 17:12
**disclosure** [1] - 17:14
**discomfort** [1] - 138:13
**discrepancies** [1] - 160:24
**discuss** [8] - 4:22, 9:6, 81:6, 93:2, 93:4, 94:6, 96:3, 220:14
**discussed** [2] - 68:5, 72:12, 138:2
**discussing** [1] - 80:20
**discussion** [1] - 8:13
**disease** [2] - 60:22, 60:24
**dislikes** [1] - 77:20
**disorder** [1] - 43:4
**disoriented** [2] - 106:2, 120:18
**dispatch** [10] - 112:9, 145:4, 148:2, 148:13, 148:15, 150:25, 151:9, 168:11, 168:15, 189:5
**dispatcher** [3] - 109:15, 109:19, 114:21
**display** [1] - 96:6
**displayed** [1] - 163:16
**dispo** [1] - 148:16
**dispoed** [2] - 212:10, 212:12
**disposition** [6] - 147:20, 148:11, 149:8, 212:19, 214:11, 214:14
**disprove** [1] - 86:6
**dispute** [3] - 152:25, 153:3, 155:6
**disputing** [3] - 155:23, 155:25, 156:2
**disregard** [1] - 89:14
**dissuaded** [1] - 36:25
**distance** [9] - 96:11, 96:18, 97:9, 165:20, 165:23, 165:25,

172:8, 172:10, 181:1
**distinction** [1] - 88:4
**distract** [2] - 90:8, 93:24
**distracted** [2] - 117:19, 121:18
**distress** [1] - 68:13
**distressed** [1] - 68:14
**DISTRICT** [3] - 1:1, 1:2, 1:3
**District** [1] - 6:8
**DIVISION** [1] - 1:2
**divorced** [6] - 18:7, 22:18, 23:9, 23:19, 25:10, 25:23
**doctor** [1] - 160:22
**doctors** [1] - 101:7
**document** [1] - 96:9
**documentation** [1] - 121:20
**dollars** [1] - 84:7
**domestic** [1] - 65:8
**done** [13] - 10:11, 21:14, 22:18, 23:10, 52:13, 70:1, 71:11, 84:10, 89:11, 146:25, 150:5, 205:8
**door** [21] - 71:7, 102:23, 103:8, 115:8, 115:10, 118:19, 185:3, 186:3, 186:12, 204:5, 204:9, 204:10, 204:11, 204:21, 205:1, 205:3, 210:15, 210:24, 218:22
**dose** [2] - 105:22, 105:24
**double** [1] - 40:24
**double-edged** [1] - 40:24
**doubt** [1] - 66:18
**down** [26] - 7:18, 8:22, 16:17, 20:6, 20:12, 20:17, 21:15, 58:10, 90:14, 90:16, 91:3, 91:4, 91:12, 91:23, 111:16, 112:23, 118:5, 118:12, 138:20, 138:21, 155:5, 156:19, 171:23, 208:2, 213:25, 220:2
**Downey** [1] - 22:17
**downtown** [1] - 25:21
**Dr** [1] - 119:25
**drawn** [1] - 10:22
**drew** [3] - 179:25, 180:17, 180:22

**drink** [1] - 10:4
**drinker** [1] - 40:4
**drive** [9] - 37:17, 97:22, 103:14, 114:1, 117:19, 145:14, 212:9, 216:9, 216:13
**driven** [1] - 214:6
**driver** [1] - 23:13
**driver's** [5] - 116:2, 188:21, 203:19, 204:9
**drives** [1] - 96:19
**driving** [8] - 38:2, 48:15, 116:17, 116:18, 118:12, 172:4, 201:10, 218:4
**drop** [12] - 66:12, 66:15, 121:14, 170:2, 172:14, 180:13, 187:1, 201:20, 213:11, 215:8
**drop-off** [1] - 213:11
**dropped** [14] - 105:11, 105:17, 108:12, 121:13, 188:11, 199:8, 208:25, 212:8, 212:16, 215:11, 215:23, 216:24, 217:23, 219:16
**drove** [5] - 117:10, 119:8, 205:23, 216:12
**drug** [27] - 34:20, 35:2, 35:3, 38:7, 38:11, 39:15, 41:4, 61:2, 64:1, 65:8, 65:10, 65:19, 72:13, 112:17, 120:6, 120:17, 129:10, 167:17, 189:10, 189:11, 189:12, 189:14, 189:16, 189:21, 190:6, 202:17
**drugging** [1] - 64:4
**drugs** [37] - 25:13, 38:9, 39:10, 41:3, 63:15, 64:11, 65:25, 103:15, 103:16, 103:21, 104:7, 106:7, 107:11, 112:15, 112:16, 112:17, 117:5, 117:9, 118:24, 119:22, 120:2, 129:2, 130:10, 130:25, 133:20,

134:8, 135:7, 137:9, 137:25, 170:24, 171:15, 191:13, 191:18, 196:21, 200:12, 215:18, 215:21
**due** [3] - 46:23, 215:3, 215:13
**DUI** [1] - 19:25
**duly** [1] - 122:16
**during** [37] - 4:18, 8:8, 8:16, 11:18, 17:9, 17:15, 43:1, 46:8, 77:3, 78:3, 78:24, 87:20, 91:1, 91:23, 93:2, 93:7, 94:5, 95:25, 101:19, 103:14, 103:23, 105:20, 107:11, 112:7, 120:13, 121:5, 127:4, 144:10, 145:13, 148:9, 148:10, 149:17, 176:22, 179:1, 182:20, 185:1
**duties** [3] - 76:23, 77:15, 125:17
**duty** [12] - 13:24, 14:1, 14:2, 17:3, 17:13, 22:19, 51:10, 51:12, 77:6, 89:1, 145:15, 167:23

# E

**E-commerce** [1] - 25:25
**e-mail** [1] - 80:22
**Eagle** [1] - 26:16
**earliest** [1] - 5:9
**early** [2] - 99:1, 204:14
**earth** [1] - 108:1
**ease** [1] - 163:6
**East** [2] - 70:4, 71:16
**eat** [1] - 10:4
**eaten** [4] - 102:6, 165:15, 166:8, 166:11
**economic** [2] - 77:18, 87:6
**EDCV-22-1306-DSF** [1] - 3:2
**edged** [1] - 40:24
**education** [1] - 18:5
**effect** [1] - 78:14
**effort** [1] - 7:14
**eight** [2] - 9:15, 47:20
**either** [13] - 8:16, 30:20, 63:25, 88:3, 88:4, 98:7, 104:12,

135:12, 143:17, 145:25, 148:11, 163:1, 166:1
**elastic** [1] - 110:2
**elementary** [1] - 27:19
**elevator** [1] - 80:4
**embarrass** [1] - 19:22
**embarrassed** [1] - 20:3
**embarrassing** [1] - 19:18
**emergencies** [1] - 144:9
**emergency** [6] - 7:13, 100:23, 109:22, 120:1, 120:17, 218:8
**emotional** [5] - 43:5, 43:13, 62:1, 68:4, 68:20
**emotions** [1] - 62:2
**emphasize** [1] - 84:14
**employed** [3] - 23:8, 25:1, 32:23
**employer** [8] - 11:2, 11:5, 18:6, 21:18, 21:21, 28:10, 46:24, 79:7
**employment** [2] - 26:1, 46:23
**EMS** [1] - 194:6
**encounter** [3] - 110:11, 111:10, 121:23
**encountered** [1] - 100:21
**encouraged** [1] - 107:14
**end** [13] - 4:4, 70:6, 72:2, 76:25, 78:20, 79:1, 91:5, 98:16, 105:15, 107:23, 108:8, 121:23, 126:25
**ended** [3] - 79:4, 180:6, 212:4
**enforcement** [50] - 29:14, 29:15, 30:18, 31:7, 32:13, 33:3, 33:16, 34:12, 35:8, 35:10, 35:13, 45:23, 45:25, 46:4, 46:12, 47:25, 52:22, 54:9, 54:10, 54:23, 59:4, 59:11, 61:11, 63:11, 63:19, 67:4, 67:5, 67:8, 67:13, 67:18, 67:24, 70:8, 70:12, 70:20, 71:1, 71:10, 71:23, 73:16, 73:21, 103:25, 108:23,

109:21, 112:3, 113:10, 150:13, 195:7, 195:9, 213:7, 213:9, 213:11
**enforcement's** [2] - 61:6, 63:20
**engage** [1] - 83:20
**England** [2] - 122:25, 123:1
**English** [1] - 48:21
**ensure** [3] - 11:24, 12:3, 82:21
**enter** [3] - 146:19, 183:5, 184:21
**entered** [8] - 5:20, 153:6, 154:1, 182:6, 182:10, 184:20, 197:16, 212:15
**entering** [1] - 215:12
**entire** [7] - 110:11, 124:6, 125:16, 126:4, 140:14, 162:9, 214:6
**entirely** [2] - 78:5, 93:6
**entitled** [5] - 17:4, 19:20, 32:16, 33:18, 82:11
**entries** [1] - 149:21
**entry** [1] - 213:23
**episode** [1] - 43:1
**ER** [8] - 195:8, 195:11, 195:13, 213:4, 213:8, 213:9, 213:15, 218:8
**err** [1] - 17:22
**escort** [1] - 177:16
**especially** [1] - 105:23
**essentially** [2] - 56:1, 124:21
**establish** [1] - 56:12
**estimate** [3] - 9:15, 9:16, 220:15
**et** [4] - 1:5, 1:8, 3:3, 11:6
**evaluate** [6] - 13:9, 35:15, 49:20, 77:7, 78:1, 86:9
**evaluating** [2] - 13:6, 85:16
**Evelyn** [1] - 21:6
**evening** [1] - 219:25
**event** [2] - 86:16, 104:23
**eventually** [2] - 12:22, 114:7
**eviction** [3] - 28:17, 28:20, 28:21
**evidence** [97] - 9:8, 10:11, 15:7, 15:9,

16:21, 17:9, 17:20, 43:8, 53:22, 54:12, 56:13, 56:18, 58:2, 58:5, 59:14, 61:17, 62:3, 62:12, 62:17, 68:18, 77:7, 77:11, 78:4, 78:22, 79:14, 81:7, 81:20, 82:24, 83:18, 83:19, 83:21, 85:3, 85:4, 85:6, 85:8, 85:9, 86:5, 86:6, 87:7, 87:11, 87:12, 87:15, 87:20, 87:24, 87:25, 88:3, 88:5, 88:6, 88:7, 88:8, 88:9, 88:10, 88:14, 88:16, 88:25, 89:9, 89:13, 89:14, 89:16, 89:18, 89:19, 90:5, 90:18, 90:21, 91:6, 92:5, 92:16, 99:9, 99:11, 99:18, 100:1, 100:5, 108:20, 108:24, 109:3, 111:11, 111:16, 111:18, 112:7, 112:14, 113:14, 117:16, 120:15, 120:22, 120:25, 121:3, 122:2, 163:9, 163:12, 163:13, 163:14, 179:16, 206:5, 207:22
**exhibits** [3] - 4:9, 85:9, 221:6
**exist** [1] - 87:17
**exited** [4] - 110:8, 154:8, 154:9, 219:3
**exiting** [1] - 203:25
**expect** [3] - 112:16, 120:11, 219:13
**expecting** [1] - 12:22
**expects** [1] - 100:4
**expenses** [1] - 95:1
**experience** [24] - 17:16, 29:14, 33:15, 38:9, 44:25, 45:10, 46:12, 47:7, 47:21, 48:12, 60:16, 61:15, 63:10, 65:3, 65:5, 66:14, 68:9, 68:21, 71:21, 87:25, 112:21, 112:25, 120:6, 202:13
**experienced** [1] - 40:17
**experiences** [7] - 32:25, 61:20, 62:9, 62:24, 64:11, 69:10, 72:17
**experiencing** [4] - 69:19, 120:10, 120:16, 175:21
**experiments** [1] -

10:25, 11:7, 11:17, 44:18, 73:10, 74:12, 74:16, 74:23, 75:7, 75:11, 75:16, 84:20, 125:11
**excused** [11] - 9:18, 10:23, 19:7, 74:3, 74:14, 74:19, 74:22, 75:9, 75:14, 75:19, 76:14
**excusing** [1] - 10:20
**executive** [1] - 105:25
**exercised** [1] - 11:11
**exhibit** [6] - 88:16, 97:5, 97:10, 97:15, 206:11, 221:5
**Exhibit** [29] - 96:5, 152:23, 153:5, 162:19, 163:5, 179:9, 179:10, 179:16, 179:24, 183:3, 183:12, 183:13, 184:4, 204:15, 204:16, 206:2, 206:5, 206:6, 207:17, 207:18, 207:22, 207:23, 208:5, 214:4, 216:6, 222:6, 222:7, 222:8

81:14
**expert** [3] - 103:24, 113:2, 202:17
**experts** [2] - 112:2, 113:8
**explain** [12] - 17:25, 83:12, 109:20, 110:25, 112:10, 112:20, 112:25, 120:3, 120:8, 120:14, 122:22, 207:14
**explanation** [1] - 87:22
**exposed** [1] - 78:23
**express** [3] - 93:10, 154:25, 219:22
**expressed** [4] - 62:24, 73:20, 77:24
**expressions** [1] - 4:19
**extra** [3] - 73:25, 92:18, 221:8
**extremely** [2] - 17:2, 20:2
**eye** [2] - 139:7, 220:11
**eye-tracking** [1] - 139:7
**eyes** [3] - 7:18, 139:1, 139:15

---

## F

**F-i-t-e** [1] - 122:21
**face** [2] - 41:15, 177:8
**Facebook** [1] - 80:24
**faces** [2] - 118:5, 177:7
**facial** [1] - 4:18
**facilities** [4] - 58:19, 193:1, 193:4, 193:6
**facility** [2] - 151:3, 193:10
**facing** [2] - 205:24, 209:23
**fact** [16] - 11:1, 12:25, 17:11, 86:7, 87:7, 87:12, 87:19, 87:23, 88:3, 90:22, 92:19, 115:6, 119:18, 141:16, 155:18, 181:4
**factors** [2] - 86:8, 136:23
**facts** [36] - 15:13, 15:14, 15:16, 16:25, 17:2, 17:12, 33:19, 43:7, 49:21, 53:6, 53:10, 53:15, 56:12, 56:25, 57:7, 57:11, 57:15, 57:18, 77:8,

77:9, 81:5, 81:6, 85:9, 85:10, 85:12, 87:16, 87:17, 88:8, 100:14, 140:7, 141:15, 145:3, 148:24, 149:1
**faint** [2] - 165:22, 180:17
**fair** [46] - 10:19, 10:22, 17:5, 17:6, 17:18, 19:12, 30:5, 30:6, 30:25, 32:4, 34:2, 38:19, 46:10, 47:7, 47:22, 52:2, 54:16, 54:18, 55:15, 55:22, 55:23, 55:25, 56:2, 56:3, 56:19, 56:20, 57:19, 57:23, 58:25, 59:1, 59:8, 60:2, 61:19, 62:13, 62:16, 68:9, 71:22, 72:18, 73:16, 73:21, 82:11, 82:13, 82:22, 83:9, 131:18
**fairly** [8] - 30:17, 32:12, 32:17, 49:21, 52:19, 77:15, 83:6, 129:10
**fairness** [2] - 11:24, 84:1
**false** [1] - 215:6
**familiar** [11] - 36:6, 37:15, 37:19, 127:10, 136:11, 136:15, 139:3, 139:11, 154:22, 156:23, 181:11
**family** [12] - 39:17, 44:2, 48:14, 64:16, 65:3, 65:12, 65:13, 72:14, 79:7, 100:16, 106:24, 107:25
**far** [3] - 53:15, 80:12, 84:3
**fast** [1] - 198:20
**father** [1] - 28:5
**father's** [2] - 40:5, 44:2
**favor** [4] - 51:7, 51:8, 54:2, 54:13
**FCRR** [1] - 1:22
**fear** [1] - 77:20
**feather** [2] - 54:1, 59:22
**feature** [1] - 146:1
**Federal** [2] - 1:22, 28:6
**feed** [1] - 69:12
**feelings** [4] - 39:6, 39:20, 41:18, 73:19

**fees** [2] - 95:1, 218:23
**feet** [2] - 154:17, 159:8
**fellow** [7] - 11:25, 35:21, 78:19, 81:3, 83:15, 83:24, 90:7
**felt** [2] - 61:23, 169:3
**fentanyl** [21] - 105:21, 105:23, 119:18, 120:2, 120:11, 129:6, 129:8, 129:10, 129:11, 129:14, 129:15, 129:18, 135:20, 135:22, 135:24, 136:5, 136:6, 136:12, 136:16, 138:3, 143:9
**few** [11] - 5:3, 9:11, 45:8, 52:9, 76:22, 89:6, 99:1, 104:9, 151:23, 172:3, 189:23, 197:23, 216:22
**fiberoptic** [1] - 21:23
**field** [16] - 132:9, 135:13, 139:3, 143:24, 143:25, 144:6, 144:11, 144:14, 145:2, 145:13, 146:18, 148:9, 149:20, 150:8, 168:1, 202:7
**figure** [4] - 57:5, 115:24, 164:7, 202:4
**figured** [1] - 11:15
**file** [1] - 163:23
**fill** [1] - 20:18
**filling** [2] - 20:15, 128:14
**final** [4] - 108:10, 148:11, 214:11, 214:14
**finally** [3] - 93:11, 155:1, 219:23
**financial** [3] - 9:24, 10:25, 12:6
**fine** [6] - 30:11, 38:25, 102:12, 135:3, 137:19, 139:24
**finish** [2] - 20:13, 22:18
**finished** [2] - 24:3, 25:7
**firm** [2] - 10:19, 28:10
**firms** [1] - 81:10
**First** [1] - 16:14
**first** [49] - 12:7, 14:17, 14:19, 16:12, 18:2, 24:11, 29:2, 29:13, 30:13, 33:12, 37:21,

38:14, 39:3, 39:12, 40:21, 41:11, 42:14, 42:22, 45:6, 45:9, 46:1, 61:9, 66:18, 73:14, 83:25, 94:10, 94:16, 100:21, 117:25, 119:13, 120:7, 122:16, 124:11, 124:16, 151:11, 152:21, 154:13, 154:19, 159:21, 166:9, 178:24, 183:8, 189:18, 192:21, 197:13, 204:2, 209:19, 219:3
**FISCHER** [1] - 1:3
**Fischer** [1] - 7:10
**FITE** [2] - 122:15, 222:3
**Fite** [91] - 4:5, 6:15, 7:5, 13:19, 13:22, 36:2, 51:25, 54:4, 54:6, 56:15, 58:4, 59:14, 100:12, 100:20, 100:21, 101:18, 102:6, 102:8, 102:12, 102:25, 103:1, 103:3, 103:7, 103:9, 103:11, 103:16, 104:5, 104:10, 104:18, 104:20, 104:23, 105:8, 105:16, 106:4, 106:5, 108:6, 108:11, 108:19, 108:21, 109:5, 109:12, 109:19, 109:20, 109:23, 110:6, 110:8, 110:18, 110:25, 111:5, 112:8, 112:10, 112:13, 112:20, 113:4, 113:17, 113:24, 114:7, 114:11, 114:17, 114:19, 114:25, 115:12, 115:20, 117:6, 117:13, 117:24, 118:8, 118:21, 118:23, 119:19, 120:14, 120:25, 121:4, 121:10, 121:22, 121:25, 122:10, 122:21, 122:23, 130:14, 133:24, 155:5, 156:9, 156:14, 158:7, 177:23,

196:17, 199:20, 207:23, 208:13
**Fite's** [5] - 102:16, 113:21, 122:2, 135:1, 206:25
**five** [2] - 5:3, 203:24
**fix** [1] - 83:23
**fixated** [1] - 105:11
**flexible** [1] - 10:12
**flies** [1] - 96:19
**flip** [1] - 56:11
**floor** [3] - 31:12, 31:16, 31:20
**fluid** [1] - 204:22
**focus** [1] - 146:13
**focusing** [6] - 19:1, 128:16, 131:20, 131:25, 136:18, 150:21
**follow** [20] - 5:4, 14:2, 16:3, 51:12, 52:9, 53:18, 56:16, 57:20, 58:1, 59:18, 67:15, 67:20, 70:18, 82:15, 82:16, 100:13, 160:10, 164:10, 168:9, 173:5
**follow-up** [2] - 52:9, 164:10
**followed** [2] - 55:16, 92:6
**following** [9] - 14:7, 15:2, 51:6, 51:16, 56:20, 56:22, 85:17, 88:7, 92:25
**follows** [1] - 122:17
**followup** [1] - 18:22
**foot** [4] - 157:18, 157:20, 157:24, 198:16
**forced** [1] - 113:7
**foregoing** [1] - 221:18
**forget** [5] - 40:2, 86:14, 92:8, 97:14, 134:11
**forgive** [1] - 151:20
**forgot** [1] - 181:6
**form** [3] - 93:10, 154:25, 219:22
**formal** [1] - 139:15
**formed** [1] - 33:2
**former** [7] - 18:10, 30:16, 30:20, 46:23, 111:22, 111:25, 112:3
**forms** [1] - 80:25
**forth** [2] - 199:12, 221:8
**forward** [6] - 106:15, 107:16, 122:6,

209:16, 209:20, 210:16
**Four** [2] - 23:18, 58:12
**four** [2] - 5:3, 191:22
**free** [2] - 147:2, 185:22
**friend** [6] - 19:25, 37:17, 94:8, 114:13, 169:20, 169:21
**friend's** [4] - 102:10, 111:17, 171:22, 172:4
**friends** [8] - 30:3, 44:2, 56:8, 69:13, 69:18, 70:14, 79:8, 94:2
**frightened** [1] - 12:19
**front** [18] - 50:7, 50:8, 95:3, 114:9, 118:14, 118:21, 122:23, 131:13, 157:19, 157:21, 178:12, 179:9, 210:10, 210:18, 211:2, 211:5, 211:10
**frustrated** [3] - 170:13, 198:6, 198:7
**frustrations** [2] - 121:8, 170:15
**fucking** [3] - 170:5, 170:10, 198:4
**fully** [4] - 17:24, 19:15, 34:16, 110:15
**function** [1] - 136:24
**functioning** [1] - 105:25
**funny** [1] - 107:6
**future** [2] - 64:3, 155:22

## G

**gain** [2] - 81:25, 145:3
**gallery** [1] - 3:23
**games** [1] - 198:4
**garden** [1] - 87:21
**gas** [2] - 104:14, 217:1
**gather** [1] - 145:9
**gathered** [1] - 106:23
**GED** [1] - 24:10
**gender** [4] - 77:18, 87:5
**general** [5] - 18:4, 33:3, 84:25, 135:11, 180:20
**generally** [4] - 10:1, 33:15, 38:2, 102:14
**gentlemen** [8] - 75:22, 76:11, 76:21, 76:21, 108:17, 154:24, 163:7, 181:4, 219:21

geographical [1] - 125:4
geographically [1] - 126:5
gestures [1] - 4:19
get-togethers [1] - 55:2
Gianna [1] - 20:22
given [19] - 5:1, 6:3, 7:12, 16:22, 52:13, 61:15, 61:19, 62:11, 62:13, 63:10, 68:9, 68:21, 73:19, 77:2, 77:13, 88:4, 90:4, 91:8
glasses [1] - 41:17
goal [1] - 17:5
God [1] - 40:12
Goleta [2] - 28:1, 30:23
goofy [1] - 107:21
Google [1] - 96:7
government [1] - 31:6
Government [2] - 69:8, 70:7
gown [2] - 102:1, 157:3
gowns [1] - 156:24
GPS [8] - 116:17, 146:14, 146:17, 147:15, 147:18, 181:20, 211:22, 217:15
grab [4] - 119:12, 119:14, 152:21, 179:10
grade [1] - 23:8
graduated [2] - 25:24, 26:17
Grand [1] - 125:7
grandmother [1] - 37:21
graphics [1] - 23:14
great [6] - 8:6, 12:10, 14:10, 16:23, 27:6, 45:13
greet [1] - 79:21
grew [1] - 70:3
grief [1] - 95:7
grievance [1] - 24:18
Grill [1] - 179:6
grimace [1] - 177:7
groan [1] - 118:4
ground [12] - 31:22, 31:23, 101:25, 138:21, 154:16, 154:19, 156:19, 169:5, 173:14, 173:17, 174:7, 174:17

grounds [6] - 113:10, 113:11, 113:16, 119:3, 121:1
group [3] - 13:2, 18:2, 58:17
grove [2] - 106:7, 210:16
groves [9] - 100:19, 104:12, 104:15, 117:17, 142:5, 210:20, 211:6, 211:14, 219:16
grow [2] - 48:20, 107:24
guard [8] - 154:14, 159:22, 159:23, 160:6, 160:14, 163:24, 164:11, 174:24
Guard [1] - 42:18
guard's [1] - 160:20
guess [7] - 48:2, 76:4, 88:21, 97:1, 157:12, 214:6, 220:18
guilt [2] - 56:10, 64:23
guilt-or-innocence [1] - 64:23
guilty [1] - 64:20
gun [1] - 71:7
Gustafson [5] - 2:9, 3:12, 7:2, 108:18, 199:24
GUSTAFSON [91] - 3:11, 4:4, 4:8, 4:21, 4:25, 7:1, 7:5, 60:14, 61:5, 61:15, 62:4, 62:11, 62:19, 62:23, 63:2, 63:10, 63:18, 64:8, 64:21, 65:2, 65:10, 65:15, 66:5, 66:14, 66:22, 67:2, 67:7, 67:23, 68:7, 68:12, 68:16, 69:4, 69:18, 69:23, 70:11, 70:24, 71:8, 71:21, 72:3, 72:7, 72:17, 72:21, 72:23, 73:14, 73:19, 74:11, 75:6, 75:21, 76:2, 76:6, 95:12, 95:16, 97:8, 97:21, 98:1, 106:12, 108:3, 108:16, 134:2, 134:4, 134:14, 136:2, 137:2, 140:7, 141:15, 153:2, 155:8, 155:25, 158:9, 158:11, 167:5, 179:12, 189:17, 199:25,

200:2, 200:4, 200:9, 200:20, 202:21, 205:15, 206:3, 207:2, 207:4, 207:6, 207:9, 207:20, 208:11, 217:21, 220:15, 220:21, 221:12
guy [2] - 49:5, 107:21

# H

half [2] - 31:16, 220:22
hall [4] - 7:18, 79:20, 80:1, 93:5
hallucinations [1] - 132:15
hand [20] - 5:24, 8:3, 12:6, 14:12, 16:7, 29:7, 29:9, 34:15, 49:2, 64:10, 65:3, 65:7, 66:23, 75:23, 86:24, 91:24, 122:13, 152:24, 203:7, 210:9
handcuffed [1] - 113:22
handle [3] - 9:8, 10:10, 161:2
handles [2] - 102:21, 102:22
hands [8] - 8:3, 12:15, 29:5, 29:8, 35:23, 37:12, 51:3, 51:20
hang [1] - 56:8
hanging [1] - 29:7
happy [1] - 116:19
hard [7] - 61:21, 62:1, 62:16, 64:2, 107:21, 138:12, 166:1
hard-working [1] - 107:21
hardship [7] - 9:25, 10:16, 11:1, 11:4, 11:5, 12:6
hardships [1] - 10:20
harshly [1] - 35:10
head [5] - 20:8, 20:19, 52:11, 171:4, 192:21
heading [1] - 211:13
healed [2] - 101:9, 158:20
healing [1] - 101:14
health [9] - 42:4, 42:6, 42:17, 42:19, 42:25, 44:3, 61:1, 72:12, 131:17
healthcare [1] - 111:1
Healthcare [2] - 23:19, 24:18

healthier [1] - 107:16
hear [78] - 8:5, 8:11, 8:22, 9:1, 9:6, 15:7, 19:18, 19:20, 24:5, 32:11, 33:4, 33:15, 34:6, 35:7, 35:8, 42:12, 50:22, 51:21, 52:19, 52:22, 53:23, 56:25, 57:14, 57:15, 57:18, 59:19, 59:20, 62:12, 67:5, 67:10, 67:21, 69:1, 79:12, 80:2, 81:8, 83:18, 84:9, 84:16, 85:18, 89:10, 89:11, 94:4, 102:18, 103:24, 104:22, 106:20, 106:22, 106:25, 110:12, 110:16, 110:20, 111:11, 121:4, 121:8, 121:19, 163:8, 163:10, 163:14, 163:24, 165:1, 165:17, 166:2, 166:10, 166:12, 166:21, 167:1, 167:11, 167:15, 168:10, 171:14, 173:3, 176:22, 176:25, 177:2, 183:19, 188:15, 196:24
heard [21] - 7:7, 16:21, 20:1, 36:1, 36:3, 53:6, 58:2, 59:15, 67:3, 68:17, 69:14, 70:13, 72:8, 73:12, 87:14, 89:17, 90:18, 99:18, 145:4, 167:10, 184:17
hearing [15] - 8:2, 8:7, 53:14, 58:5, 61:22, 70:23, 94:13, 95:19, 102:5, 111:7, 111:12, 112:19, 112:22, 167:17, 171:4
hearsay [2] - 155:9
heart [1] - 35:18
heavily [1] - 69:10
heavy [4] - 40:4, 44:7, 105:5, 198:16
height [1] - 41:16
held [5] - 124:23, 140:20, 140:21, 141:19, 150:4
hello [2] - 43:24, 100:10
help [22] - 13:9, 13:14,

17:16, 36:22, 39:21, 42:10, 65:22, 69:11, 69:15, 82:10, 90:5, 102:7, 106:8, 127:14, 146:4, 149:17, 172:21, 174:19, 174:21, 176:4, 177:12, 179:2
helped [2] - 46:8, 67:17
helping [5] - 4:9, 61:7, 176:6, 176:8, 176:16
helps [1] - 88:12
Hermosa [1] - 28:9
heroin [7] - 39:5, 40:24, 41:5, 61:16, 61:18, 119:23, 120:2
herself [1] - 7:3
hi [2] - 6:23, 52:8
hide [1] - 92:4
high [5] - 24:17, 26:13, 26:17, 46:6, 50:12
higher [1] - 70:22
highest [1] - 18:5
highly [4] - 32:14, 52:22, 72:1, 73:17
highway [1] - 48:16
Hills [2] - 2:6, 24:16
himself [5] - 63:9, 103:25, 110:21, 111:9, 118:10
hired [2] - 111:24, 112:1
history [12] - 109:6, 114:20, 116:6, 149:13, 182:3, 188:25, 189:2, 189:6, 189:8, 190:14, 190:19, 191:4
hit [6] - 48:16, 49:5, 49:12, 49:19, 52:10, 212:16
hold [13] - 32:13, 34:23, 34:24, 35:19, 52:21, 53:7, 55:4, 67:3, 70:22, 73:16, 113:5, 184:10, 184:11
holidays [1] - 107:3
home [4] - 58:20, 71:2, 79:7, 182:25
homeless [22] - 40:20, 40:24, 40:25, 41:14, 41:23, 60:18, 63:25, 64:5, 65:23, 66:5, 66:11, 66:12, 66:15, 69:12, 69:13, 70:3, 70:5, 70:10, 113:1,

114:15, 127:17, 182:21
**homelessness** [6] - 40:17, 40:19, 69:7, 69:19, 69:25, 72:16
**homes** [4] - 104:15, 216:21, 216:22, 216:24
**honest** [8] - 19:14, 49:22, 53:7, 55:12, 55:23, 73:17, 213:17, 213:20
**honesty** [2] - 53:17, 55:9
**Honor** [82] - 3:8, 3:11, 3:14, 3:18, 4:12, 4:21, 4:24, 4:25, 5:17, 52:7, 52:17, 60:11, 60:14, 64:22, 72:24, 73:4, 73:7, 73:13, 74:9, 74:17, 74:21, 75:1, 75:4, 75:12, 75:25, 76:6, 95:12, 95:18, 95:22, 96:4, 96:8, 97:6, 97:8, 98:15, 98:17, 98:19, 99:2, 100:9, 108:16, 122:9, 123:6, 130:12, 130:18, 130:20, 133:22, 134:4, 134:6, 134:25, 137:16, 137:22, 139:9, 141:2, 155:9, 155:25, 156:16, 158:5, 162:19, 163:3, 163:4, 163:17, 175:24, 177:22, 178:3, 179:12, 179:17, 179:21, 181:1, 196:16, 199:19, 199:23, 200:23, 204:14, 206:24, 207:6, 207:13, 207:18, 208:8, 219:20, 220:6, 221:2, 221:11, 221:12
**honored** [1] - 119:5
**hopefully** [1] - 48:20
**horn** [1] - 203:1
**hose** [1] - 87:21
**Hospital** [19] - 25:9, 103:14, 108:12, 116:10, 116:14, 117:10, 117:14, 118:2, 180:22, 201:5, 201:12, 201:14, 212:8,

212:25, 213:5, 215:3, 215:9, 215:12, 215:13
**hospital** [86] - 43:2, 101:20, 101:25, 102:1, 103:12, 103:17, 105:19, 109:17, 109:25, 110:1, 110:21, 110:22, 111:2, 111:13, 112:8, 116:16, 116:18, 116:20, 116:21, 117:4, 117:7, 117:20, 118:8, 118:13, 121:6, 121:13, 121:15, 121:20, 126:23, 144:16, 154:21, 156:19, 156:24, 157:1, 157:3, 157:4, 160:25, 161:3, 161:6, 172:12, 177:11, 177:14, 187:11, 187:13, 187:18, 187:20, 187:21, 187:24, 188:7, 192:12, 192:17, 192:23, 193:7, 193:9, 193:20, 193:23, 194:1, 194:4, 195:1, 195:6, 196:8, 196:12, 197:4, 197:11, 197:14, 197:16, 199:9, 199:11, 201:3, 201:24, 205:10, 212:2, 214:8, 214:13, 215:10, 215:15, 217:14, 215:17, 217:17, 217:20, 217:25, 218:4, 218:12, 218:16, 219:11
**hospital's** [1] - 212:17
**hospitalized** [1] - 101:5
**hotels** [1] - 217:4
**hour** [4] - 31:16, 97:22, 220:21, 220:22
**house** [10] - 102:10, 102:25, 111:17, 114:9, 115:4, 115:5, 171:23, 172:4, 182:13, 186:12
**household** [1] - 39:18
**hum** [1] - 48:24
**Huntington** [1] - 24:9

**hurt** [2] - 48:18, 111:9
**husband** [4] - 24:19, 38:15, 38:16
**husband's** [1] - 37:21

**I**

**idea** [3] - 5:6, 14:5, 51:15, 135:11, 192:21, 195:3, 202:10
**identify** [4] - 63:6, 63:23, 64:6, 202:11
**identity** [2] - 77:18, 87:5
**ignore** [3] - 80:6, 87:2, 89:14
**ignoring** [1] - 84:16
**ill** [2] - 39:21, 113:12
**illicit** [2] - 137:9, 137:25
**illness** [2] - 167:21, 191:15
**illnesses** [1] - 44:13
**immediately** [6] - 8:9, 12:24, 61:23, 80:17, 84:12, 91:10
**immersed** [1] - 57:4
**impact** [6] - 39:17, 46:6, 46:9, 48:22, 61:18, 106:2
**impaired** [2] - 131:22, 132:4
**impartial** [24] - 17:6, 17:19, 19:12, 37:4, 37:6, 37:8, 44:20, 46:14, 48:4, 48:5, 52:3, 59:12, 61:25, 62:13, 62:16, 62:18, 67:21, 68:9, 70:23, 71:22, 72:19, 82:11, 92:19
**impartiality** [1] - 36:11
**impartially** [2] - 61:19, 77:15
**impeachment** [1] - 155:12
**important** [21] - 7:25, 11:5, 11:14, 17:2, 19:2, 19:13, 77:5, 78:7, 78:10, 82:16, 82:19, 86:22, 87:9, 90:17, 94:4, 102:19, 103:18, 104:6, 108:7, 110:24, 181:6
**impression** [1] - 68:3
**improper** [1] - 81:25
**impulsively** [1] - 133:2
**inability** [1] - 142:2
**inaccurate** [3] - 82:2,

83:4, 83:14
**inactions** [1] - 139:21
**Inaudible** [1] - 16:15
**incarcerated** [2] - 63:13, 107:11
**incident** [40] - 53:10, 101:11, 108:11, 123:22, 123:23, 125:20, 125:23, 126:15, 127:4, 127:25, 128:3, 128:6, 128:9, 128:12, 128:14, 129:14, 136:15, 146:8, 146:23, 146:24, 149:15, 149:18, 150:10, 150:21, 152:4, 153:25, 155:23, 160:2, 161:25, 162:10, 170:16, 173:3, 175:7, 177:1, 177:2, 178:14, 181:9, 189:23, 217:16, 217:19
**inclined** [1] - 73:10
**include** [3] - 72:12, 125:9, 138:10
**includes** [4] - 79:6, 79:12, 80:20, 139:21
**including** [9] - 10:14, 32:25, 51:5, 57:6, 57:20, 77:3, 77:21, 80:23, 181:22
**incomplete** [3] - 17:22, 82:2, 83:4
**inconsistent** [1] - 171:2
**independently** [1] - 81:5
**indicate** [4] - 110:4, 149:4, 191:24, 196:7
**indicated** [17] - 48:5, 52:18, 58:12, 58:24, 59:2, 59:13, 62:6, 96:13, 117:8, 141:3, 141:4, 147:7, 169:17, 170:1, 200:16, 212:22, 217:20
**indicates** [4] - 147:2, 150:6, 184:18, 191:25
**indicating** [3] - 78:4, 185:8, 218:7
**indication** [2] - 9:13, 219:9
**indirect** [1] - 87:15
**individual** [8] - 21:15, 109:16, 110:16,

130:25, 142:12, 142:16, 142:21, 161:14
**individuals** [5] - 120:2, 135:22, 135:24, 136:5, 177:16
**influence** [37] - 9:12, 103:15, 103:21, 112:14, 117:9, 123:12, 127:21, 129:2, 129:23, 130:5, 130:10, 130:25, 131:21, 131:22, 132:3, 132:14, 132:17, 133:9, 133:15, 134:8, 134:17, 134:22, 135:7, 138:3, 139:19, 140:2, 140:6, 140:22, 140:24, 141:7, 141:14, 141:22, 141:25, 191:18, 192:25, 193:4, 193:13
**influenced** [5] - 77:16, 77:19, 82:1, 90:13, 90:21
**inform** [3] - 5:8, 80:18, 84:12
**information** [34] - 17:23, 18:3, 19:17, 20:2, 44:22, 52:14, 72:21, 78:1, 78:24, 81:9, 81:13, 81:17, 81:25, 82:2, 82:4, 82:12, 83:14, 83:16, 83:24, 84:10, 94:20, 109:10, 115:25, 116:8, 145:9, 151:12, 151:14, 160:15, 173:13, 184:13, 188:20, 189:7, 191:24
**informed** [2] - 111:7, 114:21
**initial** [6] - 12:7, 14:17, 14:19, 18:20, 76:19, 179:25
**injection** [1] - 45:10
**injured** [2] - 101:20, 101:22
**injury** [4] - 48:10, 48:17, 109:4, 120:21
**inmate** [3] - 143:9, 143:10, 143:20
**inmates** [1] - 143:16
**innocence** [2] - 56:10, 64:23

**innocent** [1] - 56:4
**inputting** [1] - 184:12
**inside** [6] - 65:13, 71:6, 102:21, 154:7, 181:22, 211:15
**insinuation** [1] - 88:11
**instability** [1] - 43:5
**Instagram** [1] - 80:24
**instances** [2] - 32:6, 35:4
**instantly** [1] - 105:4
**instead** [6] - 113:3, 115:1, 116:11, 118:2, 120:22, 123:4
**instruct** [7] - 14:1, 51:4, 51:11, 81:4, 85:10, 93:1, 99:19
**instruction** [6] - 56:16, 56:21, 56:22, 95:4, 103:19, 137:23
**instructions** [26] - 6:6, 13:8, 14:3, 14:7, 14:9, 15:2, 15:5, 15:7, 15:10, 16:3, 16:22, 49:21, 51:13, 51:17, 57:20, 67:15, 67:20, 76:19, 76:24, 77:1, 77:2, 77:4, 78:2, 78:22, 89:6, 90:19
**instructor** [1] - 22:11
**intended** [2] - 121:14, 155:11
**intensive** [2] - 25:9, 45:16
**intent** [3] - 121:14, 183:9, 195:13
**intention** [5] - 77:24, 174:14, 174:16, 187:13, 219:4
**interact** [3] - 132:10, 170:8, 170:11
**interacting** [1] - 102:15
**interaction** [1] - 121:6
**interactions** [1] - 64:15
**interest** [3] - 34:21, 35:1, 86:1
**interfere** [1] - 38:19
**interior** [1] - 23:8
**Internet** [5] - 21:18, 21:22, 80:22, 83:7, 93:16
**interpretation** [1] - 34:17
**interrupt** [1] - 20:14
**intersects** [1] - 180:10
**intoxicated** [2] - 112:16, 193:17

**intoxication** [4] - 120:17, 167:18, 193:19, 193:22
**introduce** [3] - 6:16, 7:3, 7:9
**investigate** [6] - 81:5, 137:1, 137:6, 145:2, 167:24, 191:17
**investigating** [1] - 164:8
**investigation** [2] - 81:24, 142:22
**investigations** [1] - 144:8
**investigatory** [1] - 136:24
**involuntary** [1] - 113:5
**involve** [3] - 44:9, 44:11, 100:14
**involved** [5] - 34:22, 63:11, 68:8, 68:23, 70:25
**involvement** [1] - 29:15
**involves** [2] - 49:19, 78:24
**involving** [6] - 38:9, 44:13, 48:25, 61:17, 68:2, 114:20
**Iraq** [1] - 42:19
**issue** [15] - 38:17, 38:24, 41:1, 54:3, 54:5, 55:17, 63:25, 64:13, 64:19, 65:1, 96:23, 96:25, 155:21, 171:17, 172:13
**issued** [4] - 135:12, 154:21, 156:22, 156:25
**issues** [18] - 9:8, 26:1, 38:18, 42:4, 42:6, 42:17, 42:19, 43:1, 44:3, 61:1, 65:11, 66:21, 68:21, 69:20, 78:24, 93:9, 95:22, 146:5
**it'll** [2] - 135:4, 179:10
**Item** [1] - 3:1
**item** [1] - 153:21
**itself** [4] - 69:2, 123:22, 137:9, 190:8

**J**

**jail** [12] - 39:19, 63:15, 124:18, 124:20, 124:21, 143:8, 143:11, 143:21, 193:16, 193:20,

202:13, 213:12
**jails** [2] - 136:11, 143:24
**Janzen** [1] - 27:21
**Jazmyn** [1] - 21:5
**jeans** [1] - 26:3
**jeopardizes** [1] - 84:1
**job** [6] - 9:2, 52:13, 91:11, 125:24, 137:1, 137:6
**Jobe** [2] - 21:10, 27:21
**jobs** [1] - 84:19
**joke** [2] - 107:7, 107:21
**Joshua** [1] - 21:3
**joy** [1] - 107:24
**Juan** [1] - 220:25
**Judge** [1] - 7:10
**judge** [10] - 32:10, 33:19, 34:13, 35:9, 35:10, 50:21, 54:16, 60:4, 60:6, 67:10
**JUDGE** [1] - 1:3
**judges** [5] - 9:20, 13:24, 17:1, 84:14, 90:10
**judgment** [3] - 13:3, 86:9, 106:3
**Juliana** [1] - 21:1
**July** [3] - 101:1, 101:3, 101:9
**jump** [3] - 50:7, 119:12, 122:4
**jumped** [1] - 119:13
**juries** [2] - 53:19, 84:15
**jurisdiction** [2] - 116:15, 126:12
**JUROR** [205] - 8:5, 14:11, 14:13, 14:19, 14:21, 14:25, 15:21, 15:24, 16:5, 16:8, 16:13, 16:15, 21:17, 21:22, 22:1, 22:5, 22:7, 22:9, 22:14, 22:17, 22:22, 22:25, 23:2, 23:5, 23:7, 23:13, 23:17, 23:23, 24:1, 24:3, 24:6, 24:9, 24:13, 24:16, 24:24, 25:6, 25:17, 25:21, 26:7, 26:11, 26:16, 26:20, 26:23, 27:4, 27:8, 27:13, 27:16, 27:19, 27:21, 28:1, 28:4, 28:9, 28:13, 28:17, 28:20, 28:24, 29:19, 29:22, 29:25, 30:2, 30:8, 30:11, 30:16, 30:23,

31:2, 31:10, 31:19, 31:21, 31:23, 31:25, 32:5, 32:13, 32:19, 33:7, 33:10, 33:14, 33:20, 33:23, 34:7, 34:16, 34:19, 35:5, 35:12, 35:17, 36:8, 36:17, 36:23, 37:3, 37:9, 37:21, 38:3, 38:15, 38:21, 38:25, 39:2, 39:5, 39:15, 40:1, 40:11, 40:23, 41:14, 41:23, 42:8, 42:16, 42:25, 43:9, 43:12, 43:16, 43:24, 44:1, 44:12, 44:17, 45:2, 45:8, 45:16, 46:3, 46:13, 46:20, 46:22, 47:1, 47:4, 47:9, 47:12, 47:15, 47:18, 47:20, 47:23, 48:6, 48:14, 48:25, 49:4, 49:8, 49:11, 49:15, 49:22, 50:2, 50:5, 50:14, 50:18, 50:23, 51:1, 52:20, 52:23, 53:2, 53:5, 53:12, 53:16, 54:18, 55:1, 55:13, 55:19, 55:24, 56:3, 56:7, 56:19, 56:22, 56:25, 57:8, 57:17, 57:22, 57:24, 58:3, 58:7, 58:14, 58:18, 59:5, 59:9, 59:16, 60:2, 60:7, 60:21, 61:9, 61:21, 62:10, 62:15, 62:22, 63:1, 63:5, 63:13, 63:22, 64:14, 64:25, 65:6, 65:13, 65:18, 66:7, 66:17, 66:25, 67:6, 67:14, 68:6, 68:11, 68:14, 68:24, 69:3, 69:9, 69:21, 70:2, 70:14, 71:2, 71:12, 71:24, 72:11, 72:20, 72:22
**Juror** [95] - 20:21, 20:22, 20:23, 20:24, 20:25, 21:1, 21:2, 21:3, 21:4, 21:5, 21:6, 21:7, 21:8, 21:9, 21:10, 21:11, 21:13, 22:8, 22:16, 23:6, 23:16, 24:8, 24:15, 24:23, 25:5, 25:20, 26:10, 26:15, 26:22, 27:7, 27:20, 28:8, 29:17, 30:15, 31:9, 33:4, 33:13, 34:15, 36:7, 36:9,

37:20, 38:14, 39:4, 39:14, 39:25, 40:10, 40:22, 41:13, 41:22, 42:7, 42:24, 43:23, 45:1, 45:7, 45:15, 46:2, 47:11, 48:13, 49:3, 50:13, 52:18, 54:20, 56:11, 58:9, 58:11, 58:23, 58:24, 59:7, 59:13, 60:15, 62:24, 64:9, 67:2, 68:1, 69:4, 69:23, 72:7, 73:4, 73:6, 73:8, 73:15, 74:2, 74:12, 74:13, 74:17, 74:18, 74:22, 75:7, 75:8, 75:12, 75:13, 75:17, 75:18
**juror** [14] - 17:17, 17:19, 40:16, 43:21, 52:3, 71:25, 79:5, 79:9, 80:5, 83:25, 84:9, 90:14, 90:20
**juror's** [2] - 80:1, 80:8
**Jurors** [1] - 75:23
**jurors** [39] - 4:16, 4:18, 5:20, 5:25, 7:15, 10:20, 11:25, 14:2, 15:11, 17:6, 17:7, 18:2, 19:6, 30:5, 48:4, 51:12, 76:13, 76:21, 76:23, 77:4, 78:16, 78:19, 81:3, 83:15, 83:18, 83:24, 84:4, 84:16, 84:18, 84:20, 90:7, 90:13, 90:22, 91:9, 91:22, 94:16, 98:21, 99:1, 220:10
**JURY** [1] - 1:15
**jury** [94] - 4:23, 5:7, 6:1, 6:13, 7:23, 8:25, 9:18, 9:21, 9:23, 10:21, 11:8, 11:12, 11:17, 12:5, 12:18, 14:1, 15:12, 15:15, 16:11, 16:24, 16:25, 17:5, 17:10, 17:15, 18:4, 18:15, 19:13, 22:6, 22:12, 22:19, 23:10, 23:20, 24:11, 24:21, 25:3, 25:12, 25:25, 26:14, 26:19, 27:2, 27:11, 50:12, 51:11, 59:23, 74:4, 74:5, 74:8, 74:14, 74:19, 75:3, 75:9, 75:14, 75:19, 75:24, 76:8, 76:9, 76:15, 76:19, 78:9, 78:25,

79:3, 82:6, 82:12, 82:22, 82:23, 90:7, 90:19, 90:25, 93:5, 94:5, 94:19, 94:21, 95:4, 95:7, 97:14, 98:14, 99:5, 99:21, 105:14, 108:8, 131:14, 146:21, 155:4, 156:12, 162:24, 163:1, 163:2, 163:6, 179:20, 209:15, 220:1, 220:12
**justice** [1] - 17:1
**justification** [1] - 84:20

## K

**Kaiser** [1] - 26:24
**Kansas** [2] - 30:19, 48:15
**keep** [19] - 8:18, 8:22, 9:7, 9:10, 11:4, 29:8, 78:17, 90:6, 93:8, 99:17, 106:9, 136:22, 149:11, 150:18, 150:19, 168:8, 194:23, 220:11, 220:13
**keeping** [1] - 16:20
**Kevin** [3] - 2:4, 3:8, 6:21
**key** [7] - 103:2, 114:24, 114:25, 115:1, 115:3, 185:8, 214:23
**keyboard** [1] - 213:24
**kicked** [11] - 69:22, 100:24, 123:11, 160:8, 160:11, 160:14, 160:23, 163:25, 173:16, 197:7
**kids** [2] - 24:10, 28:11
**killed** [2] - 13:17, 119:15
**Kim** [17] - 5:6, 5:25, 6:3, 7:11, 11:19, 18:21, 20:15, 76:7, 80:18, 84:12, 91:24, 91:25, 93:20, 94:10, 94:16, 94:18, 98:21
**Kim's** [1] - 122:24
**Kimberly's** [1] - 22:11
**kind** [20] - 15:15, 29:23, 40:24, 47:14, 48:12, 56:11, 58:16, 61:22, 64:5, 66:3, 66:17, 68:12, 68:20,

79:23, 93:16, 157:13, 174:19, 182:17, 186:6, 191:9
**kindergarten** [1] - 98:9
**kinds** [1] - 87:11
**knock** [1] - 115:10
**knocked** [3] - 115:8, 185:3, 186:12
**knowing** [6] - 54:9, 68:7, 83:8, 83:11, 123:12, 151:11
**knowledge** [3] - 94:3, 106:5, 109:7
**known** [1] - 66:10
**knows** [5] - 92:12, 102:11, 106:4, 150:3, 173:1

## L

**LA** [7] - 25:9, 27:2, 30:2, 41:1, 64:17, 70:4, 71:16
**ladies** [8] - 75:22, 76:11, 76:21, 108:17, 154:24, 163:7, 181:4, 219:21
**LADWP** [1] - 25:22
**Lake** [2] - 66:9, 66:10
**Lamar** [1] - 220:25
**lane** [1] - 104:11
**LAPD** [1] - 111:23
**large** [3] - 103:19, 114:9, 151:3
**last** [12] - 9:15, 12:8, 14:18, 16:14, 22:10, 43:3, 49:23, 66:19, 79:10, 79:23, 144:3, 153:20
**lasting** [1] - 48:22
**laugh** [1] - 107:7
**laughed** [1] - 66:17
**LAUSD** [1] - 26:12
**LAW** [1] - 2:4
**law** [88] - 14:1, 14:5, 14:7, 14:8, 15:3, 15:4, 15:11, 15:14, 15:16, 15:17, 15:18, 15:22, 28:10, 29:14, 29:15, 30:18, 31:6, 32:13, 33:3, 33:16, 34:12, 35:8, 35:13, 42:17, 45:23, 45:24, 46:4, 46:12, 47:24, 51:5, 51:6, 51:11, 51:15, 51:17, 51:18, 52:21, 54:8, 54:10, 54:23, 56:12, 57:4, 57:10, 57:12, 59:3,

59:11, 61:6, 61:11, 63:11, 63:18, 63:20, 67:4, 67:8, 67:13, 67:18, 67:24, 70:8, 70:11, 70:20, 71:1, 71:10, 71:22, 73:16, 73:21, 77:8, 77:13, 77:14, 78:15, 78:23, 81:6, 81:10, 82:20, 82:21, 88:3, 93:25, 99:19, 103:25, 108:23, 109:21, 112:3, 113:10, 150:13, 195:7, 195:9, 213:6, 213:9, 213:11
**Law** [4] - 2:4, 2:5, 2:9, 2:10
**law's** [1] - 19:25
**lawn** [3] - 100:22, 109:17, 113:21
**laws** [1] - 78:14
**lawsuit** [5] - 46:18, 46:20, 47:13, 47:14, 47:16
**lawsuits** [5] - 50:12, 50:19, 83:1, 83:2
**Lawton** [1] - 97:18
**lawyer's** [1] - 179:20
**lawyers** [5] - 20:1, 79:14, 83:2, 84:19, 99:23
**lay** [1] - 31:12
**laying** [3] - 109:24, 112:23, 113:20
**leading** [1] - 95:13
**leads** [1] - 97:12
**learn** [6] - 105:20, 105:23, 129:8, 129:14, 150:22, 189:8
**learned** [9] - 84:10, 98:9, 116:2, 121:12, 129:22, 133:10, 134:17, 146:19, 182:20
**learning** [2] - 44:5, 111:4
**least** [6] - 34:24, 35:8, 53:19, 81:10, 209:7, 216:15
**leave** [36] - 8:17, 29:6, 80:3, 90:23, 103:10, 104:7, 109:18, 111:19, 112:12, 116:8, 116:24, 117:1, 130:12, 133:22, 141:22, 142:9, 151:1, 161:1, 161:16, 172:12,

172:16, 172:18, 176:18, 183:9, 185:22, 185:23, 186:1, 192:19, 205:22, 208:8, 209:14, 209:16, 219:4, 219:6, 219:10
**leaves** [2] - 92:21, 92:22
**leaving** [5] - 11:20, 160:23, 212:7, 212:14, 212:21
**led** [1] - 118:13
**left** [26] - 32:2, 48:22, 49:16, 71:10, 87:21, 97:5, 97:17, 97:25, 98:2, 106:5, 115:7, 117:16, 117:24, 117:25, 118:1, 120:20, 121:11, 121:17, 152:20, 197:23, 203:7, 209:18, 212:11, 212:22, 216:3, 216:16
**left-hand** [1] - 203:7
**leg** [8] - 48:18, 101:10, 157:15, 157:21, 159:1, 159:4
**legally** [1] - 92:13
**length** [1] - 9:24
**less** [1] - 212:11
**lethargic** [2] - 138:16, 138:18
**letter** [1] - 16:14
**letters** [2] - 107:1, 107:2
**letting** [1] - 149:6
**level** [6] - 18:5, 34:23, 34:24, 35:19, 64:6, 105:22
**levels** [1] - 63:5
**liability** [1] - 64:3
**license** [2] - 116:3, 188:21
**lie** [4] - 36:19, 36:21, 67:4, 85:25
**Lievanos** [1] - 220:25
**life** [8] - 46:5, 62:8, 62:19, 64:16, 106:21, 107:10, 107:15, 107:23
**lifeguard** [1] - 25:1
**lifeguarding** [1] - 45:11
**lifestyle** [1] - 13:2
**lift** [1] - 157:15
**light** [1] - 87:25
**lightly** [1] - 113:10
**lights** [1] - 144:24

**likely** [1] - 144:10
**likewise** [1] - 121:10
**limine** [1] - 108:3
**limited** [7] - 72:19, 80:24, 83:17, 89:18, 89:20, 108:22, 112:4
**limp** [2] - 101:16, 105:5
**Linda** [51] - 4:13, 37:16, 100:22, 101:3, 101:13, 109:13, 109:15, 110:19, 114:5, 114:13, 116:11, 116:13, 119:8, 120:21, 125:7, 126:17, 126:18, 126:20, 127:5, 127:11, 128:1, 144:14, 150:22, 150:25, 151:2, 154:14, 156:22, 156:25, 159:23, 161:18, 161:21, 168:2, 169:18, 173:16, 177:17, 179:7, 180:1, 181:16, 181:18, 182:7, 187:19, 188:2, 194:2, 205:23, 205:24, 212:2, 212:3, 212:10, 214:12, 214:20
**line** [21] - 118:15, 130:21, 133:24, 133:25, 134:3, 135:5, 137:20, 158:9, 158:10, 177:24, 180:17, 180:19, 200:1, 207:5, 208:9, 208:10
**lines** [7] - 130:14, 134:2, 135:1, 135:4, 158:7, 196:18, 199:21
**LinkedIn** [1] - 80:25
**list** [6] - 6:4, 12:16, 12:20, 18:21, 29:2, 36:1
**listed** [1] - 18:3
**listen** [10] - 35:14, 35:18, 43:7, 49:21, 67:9, 67:14, 78:17, 81:14, 91:20, 110:13
**listened** [1] - 162:9
**listening** [4] - 8:10, 8:21, 90:9, 163:15
**lists** [1] - 98:14
**live** [23] - 23:7, 24:16,

16

24:24, 25:6, 25:21,
26:11, 26:16, 26:23,
27:1, 27:8, 27:22,
27:25, 28:9, 30:23,
39:18, 69:7, 70:2,
72:15, 114:3,
114:18, 115:6,
115:13, 115:22
**lived** [9] - 37:22,
113:25, 114:11,
114:16, 114:23,
116:3, 169:11,
171:11, 214:25
**lives** [5] - 169:17,
169:21, 171:13,
191:25, 192:4
**living** [5] - 18:8, 18:12,
39:16, 58:19, 62:19
**LLP** [1] - 2:4
**local** [1] - 172:13
**locally** [3] - 29:21,
46:25, 47:17
**located** [2] - 149:7,
181:12
**location** [10] - 97:1,
109:23, 115:13,
125:5, 126:15,
149:9, 149:14,
164:6, 184:1, 213:6
**locations** [2] - 171:12,
171:14
**lock** [1] - 71:6
**locked** [1] - 103:8
**lodge** [1] - 162:23
**lodged** [1] - 162:22
**log** [28] - 108:11,
146:19, 146:21,
146:22, 146:24,
149:1, 149:10,
149:11, 149:13,
149:16, 149:21,
150:7, 152:4,
152:13, 152:15,
152:18, 153:6,
153:9, 154:1, 155:6,
155:9, 155:12,
182:3, 182:6,
184:20, 197:17,
212:7
**logical** [1] - 99:16
**logs** [1] - 148:17
**Loma** [51] - 4:13,
37:16, 100:22,
101:3, 101:12,
109:13, 109:15,
110:19, 114:5,
114:13, 116:11,
116:13, 119:8,
120:20, 125:7,
126:17, 126:18,

126:20, 127:5,
127:10, 127:25,
144:14, 150:22,
150:25, 151:2,
154:14, 156:22,
156:25, 159:23,
161:18, 161:20,
168:2, 169:18,
173:16, 177:16,
179:7, 180:1,
181:16, 181:18,
182:7, 187:19,
188:2, 194:1,
205:23, 205:24,
212:2, 212:3, 212:9,
214:12, 214:20
**look** [24] - 6:4, 6:5,
35:25, 36:6, 44:9,
51:23, 62:3, 62:17,
70:5, 71:25, 72:1,
81:12, 82:6, 83:7,
97:16, 115:25,
122:5, 138:25,
152:18, 155:20,
175:19, 179:12,
200:2, 211:15
**Look** [1] - 104:6
**looked** [5] - 153:20,
157:3, 158:19,
185:12, 190:8
**looking** [15] - 7:18,
101:17, 149:12,
153:21, 158:2,
179:24, 180:16,
180:21, 181:7,
188:24, 191:4,
206:11, 207:9,
208:5, 216:6
**looks** [3] - 163:21,
181:10, 191:23
**Los** [5] - 1:17, 1:23,
25:21, 54:23, 60:23
**loss** [2] - 95:6, 106:18
**lost** [1] - 108:7
**loud** [1] - 20:7
**louder** [1] - 8:10
**love** [4] - 106:18,
106:25, 107:18,
107:19
**loved** [1] - 107:21
**lower** [1] - 53:22
**loyalty** [1] - 35:21
**luckily** [1] - 71:5
**lunch** [9] - 10:2, 10:8,
49:5, 76:20, 94:11,
94:15, 94:20, 96:1,
107:8
**lunches** [1] - 37:25
**LVNs** [1] - 58:15
**Lydia** [1] - 21:4

**lying** [8] - 67:12,
101:24, 138:20,
138:21, 154:16,
154:19, 156:19,
173:14
**LYNBERG** [1] - 2:9

**M**

**machinery** [2] - 22:1,
22:2
**magistrate** [1] - 9:20
**mail** [1] - 80:22
**major** [2] - 22:14,
24:25
**male** [1] - 166:22
**malfunction** [1] -
148:15
**man** [1] - 106:5
**manage** [1] - 34:1
**manager** [1] - 24:19
**managing** [1] - 58:15
**manipulative** [1] -
120:23
**manually** [4] - 148:2,
162:4, 162:5, 162:6
**map** [12] - 96:7, 96:15,
97:11, 117:15,
145:23, 145:24,
146:1, 146:6,
146:13, 180:21,
180:23, 181:7
**maps** [1] - 121:17
**Margolies** [3] - 2:10,
3:15, 7:4
**MARGOLIES** [3] -
3:14, 7:4, 98:16
**Maria** [1] - 20:23
**marine** [1] - 42:18
**marital** [1] - 18:6
**mark** [1] - 153:9
**marked** [1] - 162:25
**married** [4] - 18:7,
24:19, 26:25, 27:10
**martial** [2] - 30:16,
30:20
**mask** [1] - 41:17
**master's** [1] - 26:24
**Matteo** [1] - 203:7
**matter** [9] - 34:5,
52:19, 55:10, 59:2,
78:5, 84:3, 92:13,
93:11, 221:19
**matters** [3] - 10:10,
93:6, 121:21
**MDA** [1] - 181:23
**MDC** [16] - 147:12,
147:13, 147:15,
147:18, 181:24,
181:25, 182:1,

182:25, 183:21,
188:16, 188:18,
188:20, 190:2,
190:23, 191:24,
213:24
**mean** [35] - 6:11,
20:10, 31:20, 37:17,
43:15, 47:25, 52:14,
53:5, 66:18, 69:9,
69:10, 69:16, 69:22,
70:17, 70:22, 72:11,
72:13, 78:11, 91:3,
120:5, 138:18,
140:25, 145:24,
147:19, 153:1,
155:14, 157:2,
162:24, 162:25,
167:20, 176:25,
184:17, 187:21,
207:12, 216:13
**meaning** [3] - 82:8,
160:22, 160:23
**meaningless** [1] -
10:23
**means** [19] - 8:20,
17:18, 51:7, 52:12,
52:15, 53:23, 56:20,
79:17, 80:22, 81:7,
84:3, 84:4, 85:3,
88:20, 89:14, 106:8,
109:21, 144:24,
168:9
**meant** [2] - 95:13,
111:1
**measuring** [1] - 34:12
**mechanic** [1] - 27:16
**media** [7] - 79:8, 81:1,
81:15, 82:25, 83:3,
83:7, 163:23
**Medical** [16] - 100:22,
101:4, 101:13,
109:13, 126:18,
126:21, 127:5,
127:11, 128:1,
144:15, 150:23,
151:2, 156:23,
161:21, 180:1, 182:7
**medical** [45] - 25:2,
44:24, 45:9, 58:16,
103:22, 109:6,
111:1, 111:6, 113:6,
120:17, 133:16,
133:21, 134:8,
136:20, 142:13,
142:16, 142:17,
142:20, 142:21,
142:25, 143:1,
143:3, 143:4, 143:5,
143:10, 143:11,
143:12, 143:13,

143:18, 143:20,
143:21, 160:22,
166:25, 167:3,
167:11, 175:15,
181:19, 193:18,
194:5, 199:2,
200:12, 200:17,
202:6, 202:7, 213:13
**medically** [4] - 137:9,
137:25, 193:13,
193:15
**medication** [2] -
42:10, 43:3
**meet** [3] - 59:24,
124:23, 155:10
**meetings** [1] - 11:5
**member** [1] - 140:5
**members** [2] - 102:15
**memory** [5] - 90:11,
90:12, 152:18,
153:6, 153:16
**mental** [19] - 19:3,
42:4, 42:6, 42:17,
42:19, 42:25, 43:2,
43:12, 44:3, 44:13,
61:1, 63:25, 72:12,
95:8, 111:1, 131:17,
167:21, 171:17,
191:15
**mentally** [1] - 113:12
**mention** [3] - 55:14,
179:5, 189:14
**mentioned** [5] - 12:13,
61:5, 94:24, 96:15,
192:13
**Meranda** [1] - 20:25
**messages** [1] - 107:1
**messaging** [1] - 80:22
**met** [4] - 54:14, 94:1,
96:8, 100:25
**meth** [1] - 41:5
**Metropolitan** [1] -
27:22
**Michael** [1] - 4:12
**microphone** [6] -
8:21, 14:16, 54:21,
58:10, 95:20, 122:19
**middle** [7] - 31:21,
106:7, 141:23,
142:2, 142:3, 142:5,
180:23
**might** [18] - 12:17,
12:21, 17:11, 34:24,
35:21, 83:4, 88:21,
89:18, 89:22, 90:15,
90:17, 92:9, 99:15,
132:17, 132:24,
193:22, 200:17,
220:18
**miles** [12] - 96:10,

96:12, 96:14, 96:17, 96:22, 97:2, 97:4, 97:7, 97:10, 98:2, 98:5, 181:2
**military** [1] - 42:9
**Miller** [1] - 110:19
**millions** [1] - 33:25
**mind** [14] - 11:4, 16:20, 31:8, 34:5, 38:13, 53:4, 59:6, 66:4, 78:17, 93:8, 99:17, 101:24, 105:9, 164:5
**mine** [1] - 200:4
**mingling** [1] - 4:17
**minute** [12] - 14:15, 72:6, 163:22, 166:4, 166:15, 166:18, 168:4, 168:7, 212:6, 212:11, 212:13, 212:21
**minutes** [63] - 5:3, 18:23, 76:22, 96:9, 99:1, 104:9, 105:2, 151:24, 156:7, 168:14, 168:20, 169:9, 169:16, 169:25, 171:19, 171:21, 172:24, 173:20, 173:22, 174:11, 176:2, 176:19, 176:21, 178:7, 178:10, 183:14, 183:15, 183:18, 184:3, 184:8, 184:16, 185:1, 185:15, 186:11, 186:23, 186:25, 187:8, 188:10, 188:15, 190:22, 191:22, 194:8, 194:10, 194:21, 195:17, 196:6, 197:2, 197:23, 198:1, 198:15, 198:24, 201:9, 201:17, 202:25, 203:14, 203:16, 203:24, 204:17, 204:19, 205:17, 205:19, 220:5
**misleading** [3] - 82:2, 96:17, 97:2
**mispronounciate** [1] - 139:6
**miss** [4] - 35:23, 37:12, 40:14, 43:22
**missed** [7] - 39:12, 44:23, 47:10, 48:8,

64:11, 117:13, 121:18
**missing** [1] - 200:4
**mistaken** [1] - 162:22
**mistakes** [1] - 86:14
**mistrial** [3] - 84:1, 84:3, 94:25
**misunderstand** [1] - 155:21
**mobile** [1] - 6:11
**Moller** [18] - 3:2, 3:19, 6:14, 6:19, 6:22, 13:18, 36:3, 51:24, 62:8, 62:14, 95:5, 100:15, 106:17, 107:9, 107:12, 107:18, 108:7, 119:21
**MOLLER** [1] - 1:5
**Moller's** [2] - 95:6, 95:7
**Molly** [2] - 4:5, 7:2
**mom** [6] - 28:5, 31:11, 31:13, 107:12, 116:4, 192:4
**moment** [7] - 9:23, 12:3, 172:11, 195:4, 195:22, 203:6, 216:1
**moments** [2] - 101:15, 172:3
**Monday** [3] - 10:9, 10:12, 10:18
**Mondays** [2] - 10:11, 10:15
**money** [4] - 102:3, 106:6, 159:19, 219:12
**month** [7] - 37:22, 126:24, 127:1, 127:5, 128:9, 128:10, 128:21
**months** [5] - 101:8, 125:24, 126:11, 126:13, 127:3
**mood** [2] - 43:16, 43:18
**morning** [18] - 3:5, 3:7, 3:8, 3:10, 3:11, 3:13, 3:14, 3:16, 4:12, 4:15, 5:23, 6:18, 6:20, 7:1, 7:4, 52:8, 87:18, 221:14
**most** [9] - 9:2, 9:21, 44:1, 44:3, 53:21, 108:1, 181:6, 190:5, 221:6
**mostly** [3] - 44:3, 63:25, 66:10
**mother** [9] - 3:19, 3:22, 4:2, 6:19,

13:18, 61:22, 95:5, 106:17, 106:22
**Mother** [1] - 4:2
**Mother's** [1] - 107:2
**mother's** [1] - 107:18
**motion** [2] - 108:3, 118:5
**move** [11] - 4:16, 29:1, 30:14, 106:14, 107:16, 108:4, 175:24, 189:17, 200:7, 209:14, 220:9
**movement** [1] - 204:22
**movies** [1] - 8:15
**moving** [7] - 13:17, 109:2, 122:4, 142:5, 143:24, 175:6, 194:17
**MR** [105] - 3:8, 4:12, 6:21, 52:7, 52:17, 52:21, 52:24, 53:3, 53:9, 53:14, 53:17, 54:20, 55:8, 55:14, 55:21, 55:25, 56:6, 58:1, 58:4, 58:8, 58:16, 58:21, 59:6, 59:13, 59:17, 60:10, 73:4, 73:6, 73:13, 74:8, 74:16, 74:21, 74:25, 75:3, 75:11, 75:16, 75:25, 96:4, 96:21, 96:25, 97:4, 97:24, 98:11, 98:19, 99:2, 122:9, 123:6, 123:8, 130:12, 130:17, 130:20, 130:23, 133:22, 134:3, 134:6, 134:25, 135:4, 137:16, 137:20, 137:22, 139:9, 141:2, 141:6, 141:10, 150:17, 150:20, 153:1, 153:12, 156:16, 156:17, 157:17, 158:5, 158:10, 162:21, 162:25, 163:3, 163:16, 163:19, 171:9, 175:24, 177:22, 178:1, 178:3, 179:17, 179:21, 180:25, 196:16, 197:21, 197:24, 199:19, 199:23, 200:1, 200:23, 206:24, 207:3, 207:5, 207:13,

207:16, 208:8, 219:20, 220:5, 220:8, 220:24, 221:11, 222:5
**MS** [105] - 3:5, 3:11, 3:14, 3:18, 3:22, 4:4, 4:8, 4:21, 4:24, 4:25, 6:18, 7:1, 7:4, 7:5, 60:14, 61:5, 61:15, 62:4, 62:11, 62:19, 62:23, 63:2, 63:10, 63:18, 64:8, 64:21, 65:2, 65:10, 65:15, 66:5, 66:14, 66:22, 67:2, 67:7, 67:23, 68:7, 68:12, 68:16, 69:4, 69:18, 69:23, 70:11, 70:24, 71:8, 71:21, 72:3, 72:7, 72:17, 72:21, 72:23, 73:14, 73:19, 74:11, 75:6, 75:21, 76:2, 76:6, 95:12, 95:16, 95:18, 95:21, 97:8, 97:21, 98:1, 98:15, 98:16, 100:9, 106:12, 106:15, 108:3, 108:5, 108:16, 134:2, 134:4, 134:14, 136:2, 137:2, 140:7, 141:15, 153:2, 155:8, 155:25, 158:9, 158:11, 167:5, 179:12, 189:17, 199:25, 200:2, 200:4, 200:9, 200:20, 202:21, 205:15, 206:3, 207:2, 207:4, 207:6, 207:9, 207:20, 208:11, 217:21, 220:15, 220:21, 221:12
**multiple** [5] - 128:11, 152:7, 171:12, 171:13, 189:12
**Murphy** [2] - 4:5, 7:2
**must** [30] - 10:19, 15:11, 17:12, 59:23, 77:8, 77:11, 78:21, 78:23, 81:5, 83:16, 84:12, 85:3, 87:3, 87:24, 88:7, 88:20, 89:15, 89:25, 92:5, 92:25, 93:2, 93:6, 93:8, 93:10, 112:5, 113:10, 113:11, 163:11, 181:4

**N**

**name** [22] - 6:18, 6:21, 7:1, 12:7, 12:8, 14:17, 14:18, 14:19, 16:12, 16:14, 91:25, 108:18, 111:23, 122:20, 151:21, 159:24, 166:9, 168:16, 169:20, 188:19, 189:5, 189:8
**names** [5] - 6:4, 12:16, 12:19, 36:6, 37:13
**nanograms** [1] - 105:21
**NARCAN** [4] - 135:10, 135:12, 135:15, 135:16
**narcotic** [1] - 129:18
**narcotics** [12] - 129:4, 129:16, 131:21, 131:25, 132:2, 132:4, 132:14, 133:9, 133:15, 134:17, 134:22, 136:19
**nasal** [1] - 135:17
**national** [3] - 13:1, 77:17, 87:4
**nausea** [1] - 138:14
**Navy** [1] - 24:1
**near** [6] - 113:25, 114:3, 114:13, 116:5, 121:19, 206:23
**nearby** [13] - 102:10, 113:25, 195:9, 215:10, 215:15, 216:19, 216:24, 217:6, 217:14, 217:15, 217:17, 217:20, 218:1
**nearly** [1] - 107:5
**necessarily** [9] - 11:3, 87:8, 91:3, 99:13, 133:21, 134:24, 136:1, 170:21, 170:23
**necessary** [7] - 9:5, 9:7, 12:21, 89:22, 89:24, 90:2, 91:21
**need** [63] - 4:22, 6:6, 7:13, 8:11, 10:5, 10:15, 12:1, 19:22, 29:6, 30:5, 34:4, 37:5, 37:6, 37:7, 39:21, 44:21, 48:4, 63:6, 64:6, 76:13, 76:17, 78:7, 78:10, 84:18, 91:19, 92:18,

92:19, 92:20, 93:18,
95:11, 98:9, 98:18,
99:1, 103:17,
103:22, 118:24,
133:21, 136:20,
142:13, 142:16,
142:17, 143:3,
143:7, 143:20,
145:6, 148:18,
150:2, 163:2,
166:24, 167:3,
167:11, 167:24,
177:17, 179:18,
193:18, 197:19,
197:23, 199:16,
200:17, 220:12,
220:14, 220:18,
221:10
**needed** [12] - 111:6,
150:22, 177:12,
193:8, 199:1, 199:5,
199:7, 199:10,
199:13, 201:12,
201:24, 213:12
**needing** [1] - 175:14
**needs** [6] - 126:13,
142:20, 142:25,
162:24, 163:1, 204:5
**negative** [15] - 32:24,
33:3, 33:16, 38:8,
38:11, 39:6, 39:17,
40:7, 40:19, 41:6,
41:19, 42:6, 42:20,
47:24, 69:17
**negatively** [1] - 70:5
**negligence** [2] -
13:20, 13:23
**negligent** [2] - 13:20,
105:16
**neighborhood** [4] -
41:1, 41:4, 116:8,
116:25
**neighboring** [1] -
114:6
**neighbors** [1] - 79:8
**neonatal** [1] - 25:9
**neonates** [1] - 45:17
**nervous** [1] - 56:24
**neutral** [1] - 30:5
**never** [19] - 23:10,
27:2, 71:19, 89:16,
105:7, 108:25,
111:13, 117:8,
120:16, 120:17,
120:18, 120:19,
120:21, 129:15,
139:10, 139:15,
145:21, 182:14
**nevertheless** [1] -
59:25

**new** [7] - 129:10,
158:2, 158:4,
158:21, 158:22,
165:6
**New** [1] - 19:25
**news** [6] - 33:15,
50:17, 50:18, 81:15,
81:17, 84:10
**newspaper** [3] -
25:17, 190:24,
190:25
**newspapers** [1] - 83:1
**next** [7] - 11:22, 71:4,
75:1, 94:12, 117:24,
125:1, 142:5
**night** [2] - 71:3, 87:20
**nine** [2] - 49:8, 124:5
**nobody** [5] - 3:25,
29:9, 57:6, 115:8,
214:24
**noises** [1] - 176:23
**none** [2] - 85:15, 94:2
**nonlaw** [1] - 35:10
**noon** [1] - 109:12
**normal** [3] - 112:15,
167:3, 213:8
**normally** [1] - 127:17
**notate** [1] - 190:7
**notation** [2] - 96:9,
96:10
**note** [6] - 19:4, 90:8,
93:19, 94:9, 102:19,
103:18
**notebooks** [2] - 90:4,
90:23
**notes** [8] - 90:5, 90:6,
90:11, 90:20, 90:22,
91:1, 91:2, 91:3
**nothing** [17] - 17:20,
32:1, 39:9, 70:16,
70:18, 73:13, 79:10,
95:18, 102:3,
104:12, 104:15,
110:2, 144:23,
219:12, 219:16,
221:11, 221:12
**notice** [1] - 28:20
**noticed** [1] - 97:21
**notified** [1] - 100:23
**notion** [1] - 58:25
**nowhere** [3] - 141:23,
142:2, 142:3
**number** [7] - 7:12,
12:19, 20:16, 20:17,
20:19, 87:8, 146:23,
153:21, 200:4
**Number** [107] - 3:1,
20:21, 20:22, 20:23,
20:24, 20:25, 21:1,
21:2, 21:3, 21:4,

21:5, 21:6, 21:7,
21:8, 21:9, 21:10,
21:11, 21:13, 22:8,
22:16, 23:6, 23:16,
24:8, 24:15, 24:23,
25:5, 25:20, 26:10,
26:15, 26:22, 27:7,
27:20, 28:8, 29:18,
30:15, 31:5, 31:9,
33:4, 33:13, 34:11,
34:15, 35:25, 36:7,
37:20, 38:14, 39:4,
39:14, 39:25, 40:10,
40:16, 40:22, 41:13,
41:22, 42:3, 42:7,
42:24, 43:21, 43:23,
45:1, 45:7, 45:15,
46:2, 47:11, 48:13,
49:3, 50:13, 52:18,
54:20, 56:11, 58:9,
58:11, 58:23, 58:24,
59:7, 59:13, 60:15,
62:24, 64:9, 67:2,
68:1, 69:4, 69:24,
73:4, 73:6, 73:8,
73:9, 73:15, 74:2,
74:3, 74:12, 74:13,
74:17, 74:18, 74:22,
75:7, 75:8, 75:12,
75:13, 75:17, 75:18,
75:23, 179:9, 179:10
**nurse** [3] - 16:16,
23:18, 45:2
**nursing** [5] - 23:10,
23:18, 24:25, 25:8,
58:15
**Nuys** [1] - 47:2
**nystagmus** [3] -
139:7, 139:8, 139:11

## O

**oath** [5] - 19:14,
81:21, 82:15, 130:8,
156:14
**object** [3] - 88:18,
89:2, 156:4
**objected** [3] - 88:19,
92:8, 155:8
**objection** [29] - 88:19,
88:22, 88:23, 89:5,
92:3, 106:12, 108:3,
134:14, 136:2,
136:3, 137:2, 140:7,
141:15, 155:15,
155:20, 167:5,
179:11, 179:14,
189:17, 200:9,
200:20, 202:21,
205:15, 206:3,
207:6, 207:19,

207:20, 208:11,
217:21
**objections** [1] - 88:10
**observations** [1] -
161:20
**observe** [5] - 4:14,
112:15, 159:12,
217:13, 217:25
**observed** [3] - 109:24,
110:3, 173:15
**observes** [1] - 109:8
**observing** [4] - 177:5,
210:2, 210:3, 210:8
**obtaining** [4] - 106:8,
142:21, 143:1, 143:5
**obvious** [3] - 120:8,
120:10, 186:6
**obviously** [12] - 30:4,
40:25, 54:8, 57:6,
59:9, 60:25, 67:21,
67:24, 68:18,
101:22, 105:6,
155:24
**occasion** [1] - 121:4
**occasionally** [3] - 9:7,
136:9, 138:6
**occasions** [2] - 160:1,
160:4
**occupation** [4] - 18:6,
18:10, 18:12, 27:1
**occupations** [1] -
18:14
**occurred** [4] - 70:16,
146:25, 149:5, 149:6
**OF** [4] - 1:2, 1:8, 1:15,
2:1
**offended** [1] - 80:6
**offending** [1] - 94:25
**offers** [1] - 88:16
**office** [3] - 4:8, 26:17,
107:8
**office's** [1] - 56:4
**officer** [18] - 30:5,
35:8, 36:18, 36:19,
36:21, 37:1, 54:15,
56:15, 60:1, 66:15,
67:8, 67:13, 67:24,
71:23, 108:23,
113:4, 113:10, 161:9
**Officer** [5] - 54:4,
54:5, 56:15, 110:19,
122:23
**officers** [20] - 29:20,
30:7, 32:6, 34:12,
35:14, 35:21, 36:11,
36:12, 54:9, 54:10,
54:14, 55:3, 55:5,
55:7, 60:5, 67:4,
67:5, 67:18, 112:3,
113:9

**official** [1] - 108:10
**Official** [1] - 1:22
**often** [4] - 37:25,
86:14, 126:9, 167:14
**oftentimes** [2] -
160:25, 195:12
**old** [6] - 48:19, 107:25,
119:22, 158:4,
158:20
**older** [1] - 31:14
**on-scene** [24] - 145:1,
145:7, 147:24,
147:25, 148:4,
148:5, 148:8,
151:11, 151:23,
152:1, 152:2, 152:9,
152:11, 152:16,
153:7, 154:6,
154:10, 154:13,
156:18, 159:21,
174:23, 183:8
**onboard** [1] - 146:15
**once** [22] - 10:13,
92:21, 102:22,
103:1, 120:20,
124:16, 124:21,
138:25, 142:24,
145:1, 145:9, 148:8,
179:18, 182:13,
190:9, 199:8, 201:2,
209:14, 209:16,
211:10, 211:13,
212:6
**one** [71] - 7:17, 9:2,
9:20, 18:19, 20:12,
21:13, 23:9, 24:3,
25:10, 25:11, 25:24,
26:25, 35:1, 35:7,
35:8, 48:15, 53:11,
67:12, 72:6, 75:1,
80:9, 80:18, 83:6,
84:22, 87:16, 89:11,
89:22, 91:10, 92:12,
93:19, 108:10,
117:17, 123:1,
126:21, 126:23,
127:8, 127:9,
127:23, 129:1,
132:23, 136:22,
136:23, 144:10,
149:16, 152:21,
160:5, 160:10,
162:22, 162:23,
162:25, 163:3,
166:1, 167:19,
167:23, 175:8,
175:14, 189:23,
190:5, 202:1,
204:22, 209:4,
209:7, 209:8, 213:2,

213:3, 216:10, 218:6
**one-sided** [1] - 83:6
**ones** [2] - 34:20, 45:17
**online** [3] - 25:11, 83:1
**open** [8] - 16:20, 73:24, 78:17, 93:8, 99:17, 204:5, 204:21, 213:7
**opened** [5] - 118:19, 205:1, 205:3, 210:24, 218:22
**opening** [9] - 83:21, 94:13, 99:8, 99:23, 100:1, 100:3, 100:7, 108:15, 189:13
**opens** [1] - 186:3
**Opera** [1] - 27:2
**operate** [1] - 22:1
**operator** [2] - 21:19, 21:25
**opinion** [9] - 9:13, 32:16, 33:2, 33:18, 50:16, 50:20, 67:7, 77:20, 93:11
**opinions** [5] - 59:10, 67:1, 69:6, 154:25, 219:22
**opioid** [1] - 135:18
**opportunity** [6] - 9:18, 83:12, 83:19, 94:10, 102:17, 105:7
**opposite** [2] - 55:6, 209:24
**option** [10] - 11:11, 113:4, 148:1, 161:19, 196:11, 199:4, 199:5, 199:6, 199:8, 199:11
**options** [1] - 116:9
**or..** [1] - 69:20
**Orange** [1] - 2:11
**orange** [11] - 100:19, 104:12, 104:15, 106:7, 117:17, 142:5, 210:16, 210:20, 211:6, 211:14, 219:16
**orchard** [1] - 37:24
**order** [11] - 1:25, 11:24, 84:19, 89:13, 94:14, 94:15, 99:14, 99:16, 186:1, 205:12, 205:13
**ordered** [11] - 74:3, 74:14, 74:19, 75:9, 75:14, 75:19, 76:14, 79:17, 101:7, 219:24, 219:25
**ordering** [1] - 78:13

**orders** [5] - 78:13, 78:14, 80:7, 82:18, 93:13
**organization** [2] - 45:22, 46:4
**orientation** [2] - 77:17, 87:5
**oriented** [1] - 110:15
**originally** [2] - 111:20, 155:14
**otherwise** [8] - 5:14, 79:2, 81:4, 85:18, 93:16, 123:2, 132:18, 132:25
**ourself** [1] - 148:16
**ourselves** [2] - 13:25
**out-of-town** [1] - 11:6
**outline** [1] - 100:4
**outside** [16] - 13:11, 32:10, 48:3, 64:16, 65:14, 78:8, 79:2, 81:24, 84:11, 99:15, 102:22, 112:23, 155:12, 186:3, 210:6, 210:7
**outskirts** [2] - 114:5, 116:13
**overall** [1] - 46:9
**overdose** [2] - 135:16, 135:18
**overhear** [1] - 80:13
**overly** [1] - 90:13
**overruled** [4] - 88:23, 137:3, 167:6, 200:21
**own** [16] - 13:3, 13:23, 14:5, 32:16, 51:15, 62:8, 65:17, 83:6, 105:19, 108:2, 108:25, 121:22, 143:17, 175:2, 186:7, 219:14
**Oxnard** [1] - 23:17

**P**

**p.m** [3] - 182:10, 183:6, 184:4
**pace** [1] - 197:19
**packages** [1] - 107:14
**page** [12] - 130:14, 130:21, 133:24, 135:1, 137:20, 158:7, 177:24, 196:18, 199:20, 200:4, 208:9
**pages** [2] - 207:1, 207:4
**paid** [1] - 107:16
**pain** [10] - 95:8, 108:2, 175:5, 175:8,

175:10, 175:14, 175:18, 175:19, 175:20, 175:22
**pair** [1] - 154:21
**paired** [1] - 144:7
**pairs** [1] - 7:18
**Palmdale** [2] - 24:24, 25:1
**panel** [7] - 6:1, 7:15, 75:21, 76:9, 97:25, 98:1, 98:6
**pants** [3] - 110:2, 118:6, 154:21
**paper** [5] - 18:3, 21:13, 91:24, 98:8, 115:3
**papers** [1] - 52:25
**parallel** [1] - 216:7
**paraphernalia** [3] - 112:18, 189:12, 190:6
**pardon** [2] - 28:19, 33:22
**parents** [6] - 27:23, 28:2, 28:4, 39:17, 45:17, 69:22
**Park** [1] - 24:9
**parked** [3] - 206:12, 206:18, 206:21
**parking** [4] - 218:12, 218:16, 219:1, 219:2
**part** [7] - 27:5, 27:22, 64:15, 69:15, 69:17, 85:14, 87:1, 91:9, 131:16, 132:13, 134:16, 137:8, 192:24, 204:16
**part-time** [2] - 27:5, 27:22
**partiality** [1] - 48:1
**participate** [2] - 11:9, 43:6
**participated** [1] - 45:22
**particular** [5] - 13:1, 54:5, 91:17, 140:16, 141:17
**particularly** [11] - 32:24, 37:15, 37:18, 38:10, 38:11, 40:18, 40:19, 42:5, 94:4
**parties** [20] - 11:24, 12:13, 51:24, 79:18, 80:5, 81:9, 82:11, 82:13, 82:22, 83:2, 83:10, 83:19, 84:5, 85:10, 89:11, 94:13, 96:8, 145:6, 145:8, 181:1
**partner** [3] - 79:6,

110:7, 178:15
**partners** [2] - 149:5, 149:7
**parts** [1] - 107:20
**party** [7] - 12:25, 46:18, 85:1, 85:7, 95:1, 101:14, 161:13
**party's** [1] - 81:19
**Pasadena** [1] - 26:23
**pass** [3] - 54:20, 58:10, 210:12
**passed** [5] - 39:6, 76:3, 114:14, 206:21, 210:11
**passenger** [2] - 204:11, 210:15
**passenger's** [1] - 204:10
**passing** [3] - 105:11, 216:1, 216:3
**past** [5] - 59:10, 109:6, 118:21, 209:2, 210:16
**path** [3] - 118:14, 210:13, 211:9
**patience** [1] - 89:7
**patient** [1] - 20:12
**patients** [2] - 157:4, 160:25
**Patricia** [1] - 7:11
**patrol** [47] - 71:17, 102:21, 103:8, 113:21, 115:23, 118:21, 121:2, 125:3, 125:14, 125:17, 125:21, 125:22, 126:17, 126:21, 130:2, 135:12, 136:7, 136:10, 136:14, 136:16, 143:25, 146:3, 146:6, 147:4, 147:9, 154:7, 162:14, 165:24, 172:3, 172:7, 172:20, 175:2, 178:12, 178:15, 178:18, 178:24, 183:21, 185:2, 185:7, 186:4, 186:15, 194:17, 195:20, 203:19, 203:25, 208:24, 210:18
**patrolling** [1] - 109:13
**Paula** [1] - 16:13
**paula** [1] - 16:14
**Pause** [1] - 75:2
**pause** [46] - 55:18, 56:2, 163:21,

164:17, 165:14, 166:7, 166:18, 168:14, 168:20, 169:16, 169:25, 171:21, 172:24, 173:22, 174:11, 176:2, 176:21, 178:10, 183:18, 184:16, 185:1, 185:15, 186:11, 186:25, 187:8, 188:10, 188:15, 190:22, 191:22, 194:10, 194:21, 195:17, 196:6, 197:2, 198:1, 198:15, 198:24, 201:1, 201:9, 201:17, 202:25, 203:16, 203:24, 204:19, 205:19
**paused** [4] - 166:4, 168:7, 169:9, 184:8
**pausing** [1] - 191:8
**paved** [1] - 209:9
**pay** [5] - 11:2, 19:3, 91:8, 95:1, 217:6
**penalty** [1] - 131:10
**pens** [1] - 90:4
**people** [56] - 4:3, 4:6, 6:17, 12:19, 12:20, 19:1, 29:7, 34:1, 34:22, 36:5, 36:15, 37:6, 38:11, 40:20, 41:3, 41:24, 42:6, 44:12, 45:3, 53:25, 54:1, 55:5, 56:8, 60:19, 61:7, 63:25, 65:11, 65:16, 65:19, 65:23, 66:2, 66:3, 66:6, 66:11, 66:12, 69:14, 72:13, 77:23, 79:20, 81:12, 86:14, 86:16, 93:22, 93:24, 100:11, 107:10, 108:6, 124:19, 127:14, 136:11, 136:15, 138:2, 141:24, 167:14, 174:20, 186:6
**percent** [3] - 53:25, 54:7, 56:14
**perception** [1] - 132:7
**peremptories** [1] - 73:23
**peremptory** [9] - 74:7, 74:10, 74:15, 74:20, 75:5, 75:10, 75:15, 75:20, 76:3
**perfect** [1] - 107:20

perfectly [1] - 93:23
perform [2] - 17:2, 77:15
period [3] - 101:5, 101:8, 128:21
periods [1] - 43:2
perjury [1] - 131:11
Permanente [1] - 26:24
permissible [2] - 80:12, 92:13
permission [4] - 123:2, 179:17, 179:19, 207:18
permit [1] - 90:8
permitted [4] - 88:17, 92:24, 99:23, 100:2
perpetual [1] - 63:23
person [35] - 12:23, 18:11, 20:12, 36:25, 41:15, 44:16, 61:10, 61:14, 62:1, 63:8, 64:6, 64:7, 66:15, 67:12, 80:21, 107:6, 113:6, 113:11, 132:17, 133:2, 133:9, 133:10, 134:7, 135:7, 136:19, 140:6, 142:10, 142:25, 143:1, 150:11, 150:15, 161:15, 167:17, 193:7, 200:12
person's [3] - 13:4, 77:16, 189:5
personal [9] - 9:24, 12:5, 19:16, 20:2, 33:14, 69:9, 77:19, 86:1, 112:24
personally [5] - 48:17, 69:11, 70:13, 87:13, 180:19
persuaded [1] - 85:3
pertinent [1] - 148:24
phase [1] - 94:12
phone [5] - 7:12, 80:21, 107:5, 116:17, 145:25
phones [1] - 217:6
photograph [1] - 206:8
physical [3] - 45:11, 79:14, 176:11
physically [2] - 152:2, 176:8
physician [1] - 120:1
pick [4] - 165:20, 174:17, 176:16, 197:19

picked [1] - 11:12
picture [2] - 107:7, 188:23
piece [3] - 18:3, 91:24, 115:3
place [10] - 66:10, 81:8, 83:25, 90:12, 103:11, 105:17, 114:18, 115:22, 117:1, 192:22
placed [2] - 97:16, 178:18
placement [2] - 97:11, 98:3
places [2] - 9:3, 39:22
placing [1] - 113:4
plaintiff [43] - 3:6, 3:18, 4:1, 10:21, 13:17, 51:8, 52:5, 53:21, 53:24, 54:2, 54:11, 54:13, 56:12, 56:16, 56:17, 57:20, 57:21, 59:20, 59:22, 59:23, 59:24, 74:7, 74:8, 74:15, 74:20, 75:3, 75:10, 75:15, 95:18, 96:13, 99:9, 99:10, 99:11, 100:7, 106:16, 111:24, 122:8, 122:9, 130:12, 206:24, 208:8, 221:2, 221:11
Plaintiff [14] - 3:9, 6:22, 58:6, 73:13, 74:21, 95:21, 133:22, 134:25, 137:16, 158:5, 163:4, 177:22, 196:16, 199:19
plaintiff's [7] - 62:2, 103:24, 113:2, 155:8, 155:11, 155:15, 156:1
Plaintiffs [2] - 1:6, 2:2
plan [4] - 150:17, 192:18, 220:19, 220:21
plans [1] - 118:20
plasma [1] - 26:8
play [55] - 161:24, 162:18, 163:4, 163:19, 164:13, 165:12, 166:3, 166:5, 166:14, 166:16, 168:12, 168:18, 169:10, 169:14, 169:23, 171:19, 172:22, 173:20, 174:9, 175:25,

176:19, 177:9, 178:7, 183:16, 184:6, 184:14, 184:24, 185:13, 186:9, 186:22, 187:6, 188:8, 188:13, 190:20, 191:6, 191:20, 192:16, 194:8, 194:19, 195:15, 196:4, 196:25, 197:24, 198:13, 198:22, 200:24, 201:7, 201:15, 202:23, 203:14, 203:22, 204:12, 204:15, 205:17
played [49] - 163:20, 164:14, 164:16, 165:13, 166:6, 166:17, 168:6, 168:13, 168:19, 169:15, 169:24, 171:20, 172:23, 173:21, 174:10, 176:1, 176:20, 178:9, 183:17, 184:7, 184:15, 184:25, 185:14, 186:10, 186:24, 187:7, 188:9, 188:14, 190:21, 191:7, 191:21, 194:9, 194:20, 195:16, 196:5, 197:1, 197:25, 198:14, 198:23, 200:25, 201:8, 201:16, 202:24, 203:15, 203:23, 204:13, 204:18, 204:20, 205:18
playing [1] - 198:3
pleads [1] - 102:6
plenty [1] - 6:5
plugged [1] - 116:16
pocket [1] - 115:2
point [60] - 16:2, 48:15, 65:20, 65:21, 95:2, 95:6, 96:7, 96:8, 96:11, 96:15, 96:18, 96:19, 97:9, 97:10, 97:16, 98:4, 100:3, 103:11, 117:12, 118:7, 118:23, 119:2, 161:16, 168:15, 168:24, 169:7, 170:1, 170:14, 170:24, 174:13,

179:4, 179:24, 180:4, 180:5, 180:6, 180:9, 180:16, 181:1, 181:7, 181:8, 187:1, 188:18, 189:22, 194:22, 196:1, 196:11, 204:20, 204:24, 210:2, 210:21, 214:8, 214:14, 216:9
points [1] - 216:10
police [20] - 29:19, 30:5, 30:7, 31:11, 32:6, 33:6, 34:20, 36:11, 36:12, 46:7, 53:8, 56:15, 59:1, 60:1, 60:5, 64:16, 65:4, 66:15, 102:23, 111:25
Police [1] - 150:14
Pomona [2] - 21:17, 69:10
poop [2] - 116:22, 218:20
poor [1] - 95:16
poorly [5] - 39:7, 39:9, 41:7, 44:6, 61:21
popular [1] - 129:10
portion [4] - 102:22, 164:18, 189:18, 216:8
portions [2] - 94:1, 102:18
portray [1] - 83:5
position [3] - 45:23, 45:24, 96:16
positioned [2] - 208:24, 208:25
positive [11] - 32:24, 33:2, 38:10, 40:7, 40:18, 41:6, 42:5, 42:20, 46:6, 46:9, 46:12
positives [1] - 69:17
positivity [1] - 41:7
possession [1] - 63:15
possible [10] - 8:18, 9:10, 9:11, 11:19, 19:6, 67:21, 132:6, 136:21, 136:22, 157:13
possibly [7] - 70:8, 83:14, 132:5, 132:8, 132:16, 133:3, 192:19
POST [7] - 128:17, 128:20, 128:24, 129:22, 131:2, 131:6, 150:8

post [1] - 129:13
postpone [1] - 11:13
postponing [1] - 11:12
potential [1] - 167:17
poverty [1] - 95:8
power [5] - 32:7, 70:9, 70:12, 70:22, 112:4
powers [2] - 128:22, 128:23
preconceived [1] - 58:25
prefer [3] - 3:24, 10:24
preferences [2] - 77:23, 82:19
pregnancy [1] - 46:23
prejudice [4] - 77:20, 86:1, 89:3, 89:25
prejudiced [1] - 17:12
preliminary [2] - 12:10, 76:23
preponderance [5] - 53:22, 54:12, 56:13, 56:18, 85:3
presence [1] - 80:3
present [7] - 9:19, 94:3, 94:7, 99:9, 99:11, 153:25, 154:7
presented [15] - 9:9, 17:8, 17:9, 17:20, 59:20, 59:21, 81:20, 82:13, 82:24, 83:17, 85:7, 88:15, 90:16, 99:19, 100:6
presenting [2] - 109:9, 122:6
press [60] - 79:8, 161:9, 161:14, 162:1, 162:4, 162:18, 163:19, 164:13, 165:12, 166:3, 166:5, 166:14, 166:16, 168:5, 168:12, 168:18, 169:10, 169:14, 169:23, 171:19, 172:22, 173:20, 174:9, 175:25, 176:19, 177:9, 177:8, 183:16, 184:6, 184:14, 184:21, 184:24, 185:13, 186:9, 186:22, 187:6, 188:8, 188:13, 190:20, 191:5, 191:20, 192:16, 194:8, 194:10, 194:19, 195:15, 196:4,

196:25, 197:24, 198:13, 198:22, 200:24, 201:7, 201:15, 202:23, 203:14, 203:22, 204:12, 205:17
**pretty** [5] - 13:10, 41:8, 65:25, 145:18, 198:16
**prevalent** [1] - 44:4
**prevent** [1] - 90:9
**preventing** [1] - 43:10
**previous** [2] - 189:25, 190:2
**previously** [2] - 28:11, 47:24
**principles** [1] - 85:1
**priority** [1] - 145:19
**priors** [1] - 151:16
**prison** [1] - 124:18
**privately** [1] - 19:18
**probable** [2] - 112:6, 112:10
**problem** [5] - 10:17, 38:8, 72:16, 83:23, 95:19
**problems** [2] - 64:1, 66:1
**proceed** [4] - 123:5, 130:22, 137:21, 178:1
**proceeding** [1] - 79:19
**proceedings** [6] - 75:2, 84:1, 93:14, 100:3, 122:16, 221:19
**process** [10] - 15:15, 17:10, 43:13, 77:8, 81:23, 82:3, 137:9, 137:24, 138:4, 179:1
**profanity** [1] - 121:5
**professionals** [1] - 143:21
**program** [8] - 144:1, 144:6, 144:11, 145:2, 145:13, 146:18, 148:10, 150:9
**programs** [1] - 8:15
**projecting** [1] - 208:18
**promise** [1] - 9:16
**pronouncing** [1] - 151:21
**proof** [5] - 53:21, 54:14, 85:2, 87:12, 87:16
**propensity** [1] - 67:18
**proper** [2] - 89:3, 92:13
**properly** [1] - 146:7

**properties** [1] - 151:4
**property** [2] - 151:1, 172:12
**PROSPECTIVE** [205] - 8:5, 14:11, 14:13, 14:19, 14:21, 14:25, 15:21, 15:24, 16:5, 16:8, 16:13, 16:15, 21:17, 21:22, 22:1, 22:5, 22:7, 22:9, 22:14, 22:17, 22:22, 22:25, 23:2, 23:5, 23:7, 23:13, 23:17, 23:23, 24:1, 24:3, 24:6, 24:9, 24:13, 24:16, 24:24, 25:6, 25:17, 25:21, 26:7, 26:11, 26:16, 26:20, 26:23, 27:4, 27:8, 27:13, 27:16, 27:19, 27:21, 28:1, 28:4, 28:9, 28:13, 28:17, 28:20, 28:24, 29:19, 29:22, 29:25, 30:2, 30:8, 30:11, 30:16, 30:23, 31:2, 31:10, 31:19, 31:21, 31:23, 31:25, 32:5, 32:13, 32:19, 33:7, 33:10, 33:14, 33:20, 33:23, 34:7, 34:16, 34:19, 35:5, 35:12, 35:17, 36:8, 36:17, 36:23, 37:3, 37:9, 37:21, 38:3, 38:15, 38:21, 38:25, 39:2, 39:5, 39:15, 40:1, 40:11, 40:23, 41:14, 41:23, 42:8, 42:16, 42:25, 43:9, 43:12, 43:16, 43:24, 44:1, 44:12, 44:17, 45:2, 45:8, 45:16, 46:3, 46:13, 46:20, 46:22, 47:1, 47:4, 47:9, 47:12, 47:15, 47:18, 47:20, 47:23, 48:6, 48:14, 48:25, 49:4, 49:8, 49:11, 49:15, 49:22, 50:2, 50:5, 50:14, 50:18, 50:23, 51:1, 52:20, 52:23, 53:2, 53:5, 53:12, 53:16, 54:18, 55:1, 55:13, 55:19, 55:24, 56:3, 56:7, 56:19, 56:22, 56:25, 57:8, 57:17, 57:22, 57:24, 58:3, 58:7, 58:14, 58:18, 59:5, 59:9, 59:16, 60:2, 60:7, 60:21,

61:9, 61:21, 62:10, 62:15, 62:22, 63:1, 63:5, 63:13, 63:22, 64:14, 64:25, 65:6, 65:13, 65:18, 66:7, 66:17, 66:25, 67:6, 67:14, 68:6, 68:11, 68:14, 68:24, 69:3, 69:9, 69:21, 70:2, 70:14, 71:2, 71:12, 71:24, 72:11, 72:20, 72:22
**prospective** [2] - 5:20, 7:15
**protect** [1] - 81:19
**protests** [1] - 45:25
**proud** [1] - 107:16
**prove** [4] - 53:24, 54:12, 86:6, 88:3
**proved** [4] - 56:13, 56:17, 57:21, 85:11
**proven** [1] - 87:24
**proves** [1] - 59:22
**provide** [6] - 18:3, 58:17, 84:7, 87:21, 143:12, 143:18
**provided** [1] - 91:14
**pry** [1] - 19:13
**psychosis** [1] - 43:1
**PTSD** [1] - 42:9
**public** [13] - 59:3, 77:20, 93:22, 102:15, 132:11, 139:18, 140:1, 140:5, 170:8, 170:11, 193:22, 213:7, 218:7
**publically** [3] - 45:24, 46:4, 193:17
**publish** [4] - 179:17, 179:19, 207:18
**pull** [6] - 118:18, 188:21, 190:2, 195:22, 211:18, 214:2
**pulled** [17] - 31:10, 31:17, 71:4, 71:7, 105:13, 116:6, 118:19, 205:25, 206:9, 209:3, 209:11, 209:20, 213:24, 214:5, 214:10, 214:18, 219:15
**pulling** [3] - 62:2, 115:1, 118:5
**pullover** [1] - 110:1
**pullover-type** [1] - 110:1
**pulls** [1] - 104:20

**pupils** [2] - 138:23, 138:25
**purpose** [7] - 16:25, 89:16, 89:19, 89:20, 89:21, 100:5
**purposes** [2] - 149:16, 220:17
**pursuant** [7] - 132:7, 132:23, 133:9, 133:16, 134:21, 145:1, 148:17
**push** [1] - 147:24
**pushed** [2] - 152:1, 162:12
**put** [20] - 6:11, 19:5, 32:10, 33:18, 34:6, 50:21, 66:23, 100:10, 108:6, 135:17, 148:15, 149:4, 152:9, 152:11, 152:15, 172:6, 173:17, 178:23, 183:5, 203:4
**putting** [2] - 140:23, 172:19

## Q

**qualified** [2] - 17:17, 17:18
**Quest** [1] - 24:20
**QUESTION** [3] - 130:24, 131:2, 131:5
**questioning** [2] - 158:25, 191:10
**questions** [41] - 5:2, 5:5, 6:4, 12:10, 13:15, 17:8, 18:20, 18:21, 18:22, 18:23, 19:3, 19:4, 19:8, 19:10, 19:11, 19:16, 19:22, 20:5, 21:15, 29:2, 29:3, 29:5, 36:1, 52:6, 52:10, 58:21, 60:10, 70:18, 82:9, 84:23, 85:17, 85:23, 88:10, 89:2, 91:22, 92:17, 95:9, 130:8, 164:10, 208:23
**quick** [2] - 71:6, 72:2
**quickly** [2] - 7:22, 198:19
**quite** [4] - 41:19, 127:10, 151:2, 198:19

## R

**race** [2] - 77:16, 87:4

**racial** [1] - 13:1
**radio** [4] - 83:1, 148:1, 188:19, 189:5
**railroad** [9] - 180:18, 180:20, 206:12, 206:21, 206:23, 207:25, 209:1, 209:2, 209:23
**rained** [1] - 87:20
**raise** [8] - 5:24, 12:6, 64:10, 65:3, 65:6, 75:23, 91:24, 122:13
**raised** [1] - 72:9
**ran** [3] - 112:9, 188:19, 189:8
**randomly** [1] - 71:3
**rank** [1] - 124:9
**rape** [1] - 65:9
**rather** [6] - 9:4, 17:23, 18:25, 19:16, 20:9
**Raul** [1] - 21:8
**reach** [6] - 5:10, 8:1, 22:19, 23:21, 25:13, 25:14
**reached** [3] - 18:17, 18:19, 26:3
**read** [28] - 29:2, 29:3, 29:10, 50:17, 52:25, 78:2, 81:14, 83:11, 91:11, 91:15, 91:16, 97:9, 97:13, 98:4, 130:13, 133:23, 134:25, 137:17, 137:18, 158:5, 177:22, 190:24, 196:16, 199:19, 206:24, 208:9, 213:19
**reading** [1] - 83:9
**Ready** [4] - 176:5, 176:10, 176:11, 176:14
**ready** [8] - 4:20, 5:16, 5:17, 5:18, 95:24, 98:20, 98:25, 176:18
**realize** [1] - 155:13
**realized** [1] - 104:18
**really** [28] - 8:11, 20:2, 33:20, 33:23, 35:3, 39:20, 39:21, 40:7, 46:8, 47:25, 53:5, 53:6, 53:16, 61:3, 64:14, 64:25, 65:6, 70:24, 72:11, 72:14, 91:19, 104:6, 107:15, 146:16, 155:23, 173:23, 192:18
**rear** [3] - 204:9, 204:10, 210:15

**reason** [20] - 9:18, 11:7, 17:11, 30:9, 40:12, 49:25, 50:24, 52:2, 78:16, 85:25, 87:25, 88:21, 92:9, 111:20, 148:14, 148:23, 150:2, 161:1, 200:5, 213:13
**reasonable** [5] - 86:4, 116:24, 118:9, 172:8, 172:10
**reasonably** [3] - 108:21, 114:25, 116:7
**reasons** [4] - 17:12, 91:2, 121:19, 186:6
**reassigned** [1] - 127:25
**receive** [5] - 103:18, 128:23, 130:4, 140:12, 192:24
**received** [24] - 77:12, 78:22, 85:9, 111:3, 129:21, 130:9, 130:24, 131:5, 131:7, 131:16, 131:20, 134:7, 134:12, 135:6, 137:23, 143:25, 144:17, 150:8, 150:24, 167:16, 179:16, 200:11, 206:5, 207:22
**receiving** [1] - 141:8
**recent** [1] - 190:5
**recess** [5] - 5:15, 90:24, 96:1, 156:8, 221:15
**recesses** [3] - 92:24, 92:25, 93:2
**recognition** [3] - 37:12, 202:17
**recognize** [4] - 12:12, 80:5, 129:22, 130:10
**recognizing** [1] - 130:24
**recollection** [3] - 90:21, 153:3, 153:11
**record** [9] - 19:21, 91:12, 108:10, 122:20, 130:13, 133:23, 148:10, 158:6, 221:19
**recorded** [2] - 110:11, 121:6
**recorder** [6] - 102:16, 161:24, 161:25, 162:3, 162:16, 165:19
**recording** [19] -

102:14, 110:9, 110:12, 110:13, 111:11, 113:15, 120:10, 120:15, 121:4, 121:7, 121:22, 121:24, 162:2, 162:10, 163:8, 163:9, 163:13, 197:23
**records** [1] - 149:11
**rectify** [1] - 160:24
**red** [2] - 101:17, 148:3
**redacted** [4] - 96:10, 97:5, 97:23, 98:2
**Redlands** [28] - 13:16, 37:16, 38:1, 103:13, 108:12, 114:6, 116:10, 116:11, 116:14, 117:10, 117:13, 118:2, 125:9, 125:13, 150:14, 180:21, 201:5, 201:12, 201:14, 212:8, 212:25, 213:5, 214:8, 215:3, 215:8, 215:11, 215:13
**refer** [2] - 6:14, 13:25
**reference** [1] - 214:6
**referred** [1] - 122:24
**referring** [11] - 96:24, 97:18, 129:25, 130:6, 130:11, 139:23, 149:14, 170:9, 187:20, 207:7, 207:17
**reflect** [1] - 181:8
**refresh** [3] - 152:18, 153:11, 153:16
**refreshes** [1] - 153:6
**refreshing** [1] - 153:2
**refuse** [4] - 116:21, 117:2, 197:3, 197:5
**refusing** [1] - 109:17, 151:1
**regarding** [10] - 38:11, 40:19, 42:6, 42:20, 65:3, 69:25, 130:9, 131:25, 150:25, 192:6
**regardless** [4] - 13:7, 51:7, 85:7, 122:1
**registered** [2] - 23:18, 45:2
**regularly** [3] - 120:1, 120:3, 123:3
**rehab** [3] - 58:18, 58:19, 58:20
**rehabilitated** [1] - 73:18

**REID** [1] - 4:12
**Reid** [1] - 4:12
**reject** [1] - 77:23
**related** [7] - 8:14, 33:2, 38:9, 38:18, 40:18, 64:1, 116:7
**relates** [1] - 51:5
**relating** [2] - 82:4, 83:8
**relation** [1] - 35:3
**relationship** [2] - 18:8, 18:11
**relative** [1] - 94:8
**relatively** [1] - 158:2
**relatives** [2] - 30:7, 94:2
**relax** [1] - 51:23
**release** [3] - 142:21, 143:1, 143:5
**relevance** [1] - 202:21
**relevant** [2] - 30:19, 40:3
**religious** [3] - 13:2, 77:17, 87:4
**rely** [3] - 90:20, 163:11, 163:12
**remarkable** [1] - 110:2
**remember** [22] - 22:21, 22:22, 23:2, 23:22, 27:11, 28:12, 82:15, 85:20, 86:15, 86:16, 89:1, 90:5, 90:10, 92:17, 93:13, 141:18, 153:19, 159:9, 159:24, 209:21, 214:3, 216:12
**reminder** [2] - 94:23, 95:3
**remove** [1] - 161:15
**render** [1] - 61:14
**rents** [1] - 214:21
**repair** [1] - 101:4
**repeat** [8] - 14:24, 14:25, 78:10, 131:24, 134:19, 137:5, 142:14, 167:8
**repeatedly** [1] - 194:22
**rephrase** [1] - 133:8
**replaced** [1] - 19:7
**report** [1] - 83:1
**reported** [1] - 108:11
**reporter** [3] - 7:11, 19:21, 20:5
**Reporter** [1] - 1:22
**REPORTER'S** [1] - 1:15
**reports** [1] - 81:17
**represent** [3] - 4:13,

6:22, 108:18
**representative** [1] - 24:13
**represents** [2] - 89:4, 90:1
**request** [4] - 9:12, 9:19, 91:20, 143:13
**requested** [1] - 111:13
**requesting** [1] - 10:25
**requests** [1] - 82:19
**require** [3] - 133:16, 134:8, 200:12
**required** [3] - 19:21, 99:25, 121:11
**requires** [1] - 82:21
**research** [4] - 81:24, 83:7, 84:10, 93:15
**Reseda** [1] - 23:7
**Reserve** [1] - 28:6
**reside** [1] - 22:9
**residence** [6] - 18:5, 18:13, 21:17, 114:10, 214:20, 214:24
**residential** [3] - 114:5, 114:8, 116:25
**resource** [1] - 39:22
**resources** [3] - 41:8, 61:6, 61:12
**respect** [4] - 55:4, 63:20, 136:18, 179:22
**respiratory** [1] - 25:10
**respond** [15] - 20:13, 88:20, 104:1, 104:2, 127:14, 131:17, 145:20, 147:18, 147:20, 147:24, 150:22, 151:5, 161:12, 161:15, 190:25
**responded** [1] - 187:10
**responding** [8] - 144:11, 144:18, 144:24, 145:17, 147:23, 148:8, 151:8
**responds** [2] - 167:1, 181:18
**response** [9] - 144:20, 148:10, 158:16, 167:3, 167:10, 167:12, 185:5, 186:13, 197:10
**responsible** [2] - 63:3, 105:15, 140:3
**rest** [3] - 19:1, 58:19, 87:2
**restaurant** [4] - 27:4, 113:25, 179:7,

181:12
**restriction** [2] - 80:20, 81:2
**restrictions** [2] - 82:21, 83:25
**restroom** [4] - 80:1, 118:3, 118:18, 118:25
**result** [2] - 48:11, 84:2
**retired** [11] - 25:8, 27:9, 27:10, 27:15, 27:18, 28:3, 28:5, 42:18, 94:21, 155:4, 220:1
**return** [12] - 11:21, 74:3, 74:14, 74:19, 75:9, 75:14, 75:19, 76:14, 92:25, 94:14, 98:18, 219:24
**returned** [3] - 99:5, 101:12, 156:12
**review** [3] - 18:21, 120:9, 153:5
**reviewed** [3] - 152:4, 152:13, 152:15
**ride** [26] - 97:23, 102:9, 111:16, 113:18, 113:19, 113:23, 114:17, 118:7, 119:12, 119:14, 123:16, 123:17, 123:18, 123:19, 140:2, 140:6, 140:21, 140:24, 141:8, 141:13, 141:21, 142:16, 172:12, 174:14, 174:16
**rides** [1] - 141:24
**right-hand** [2] - 152:24, 210:9
**rights** [2] - 113:6, 122:1
**rise** [4] - 5:19, 99:4, 155:3, 156:11
**Riverside** [2] - 30:2, 54:24
**RN** [1] - 58:12
**RNs** [1] - 58:15
**road** [23] - 100:19, 104:8, 104:11, 104:16, 104:21, 118:13, 118:16, 121:15, 180:18, 201:21, 203:12, 209:4, 209:9, 209:12, 210:17, 210:21, 211:6, 213:25, 214:5, 214:6, 214:19,

23

217:4, 218:3
**Road** [26] - 2:10,
104:11, 104:17,
117:25, 180:10,
180:17, 203:7,
203:10, 205:25,
206:8, 208:3,
208:21, 209:9,
209:18, 214:7,
214:10, 214:16,
215:24, 216:7,
216:16, 216:25,
217:2, 217:11,
217:24, 219:18
**roadway** [1] - 209:2
**rob** [1] - 71:5
**robes** [1] - 122:25
**Rock** [1] - 26:16
**role** [2] - 61:7, 63:20
**roles** [1] - 55:1
**room** [24] - 5:7, 8:25,
9:21, 15:12, 16:11,
74:4, 74:5, 74:14,
74:19, 75:9, 75:14,
75:19, 76:15, 78:10,
80:23, 90:7, 90:25,
93:5, 94:19, 99:21,
100:23, 118:16,
120:1, 214:21
**rotation** [3] - 126:24,
126:25, 127:1
**rotations** [1] - 126:11
**route** [3] - 96:21,
181:8, 212:1
**row** [23] - 20:17,
20:18, 20:20, 21:4,
30:13, 33:12, 38:14,
39:3, 39:12, 39:13,
39:24, 40:21, 41:11,
41:12, 42:14, 42:22,
42:23, 43:20, 45:6,
45:14, 45:20, 46:1,
51:3
**RPR** [2] - 1:22, 221:25
**rude** [1] - 32:8
**Ruiz** [1] - 4:8
**rule** [3] - 100:11,
100:13, 108:7
**rules** [11] - 60:5, 78:7,
81:19, 82:16, 82:17,
84:14, 84:16, 84:21,
88:14, 88:17, 92:5
**rulings** [1] - 221:7
**run** [5] - 163:1,
168:16, 189:5,
189:7, 221:1
**rural** [2] - 104:13,
216:17
**ruse** [1] - 115:21

# S

**sac** [1] - 114:8
**sad** [3] - 39:20, 61:23,
69:14
**safe** [8] - 10:18, 40:3,
61:10, 61:11,
109:22, 127:10,
192:22, 192:23
**safest** [2] - 70:4, 71:17
**safety** [1] - 186:6
**sake** [1] - 36:19
**sales** [1] - 24:13
**san** [1] - 203:7
**SAN** [1] - 1:8
**San** [27] - 3:2, 6:14,
13:19, 30:2, 32:25,
33:1, 33:5, 37:16,
54:24, 54:25,
102:13, 114:11,
114:12, 125:3,
125:7, 150:24,
169:11, 169:18,
180:9, 181:17,
198:3, 214:7,
214:10, 216:7,
216:14, 216:15,
218:3
**Santa** [1] - 27:8
**save** [2] - 39:8, 221:8
**saved** [1] - 121:7
**saves** [1] - 19:8
**saw** [19] - 30:13, 49:2,
50:3, 64:10, 66:16,
66:23, 87:13,
101:15, 138:2,
138:4, 153:19,
154:19, 156:18,
157:6, 159:1,
159:15, 175:1,
189:24, 209:6
**scales** [1] - 54:1
**scar** [12] - 157:9,
157:11, 157:25,
158:3, 158:15,
158:20, 158:22,
159:2, 159:4,
159:11, 164:22,
165:6
**scare** [1] - 41:25
**scenario** [1] - 56:17
**scene** [25] - 145:1,
145:7, 147:24,
147:25, 148:4,
148:5, 148:8,
151:11, 151:23,
152:1, 152:2, 152:9,
152:11, 152:16,
153:7, 154:6,
154:10, 154:13,

156:18, 159:21,
174:23, 183:8,
205:22
**schedule** [1] - 11:8
**scheduled** [1] - 11:14
**schedules** [1] - 99:16
**scheduling** [1] -
220:16
**schizophrenia** [1] -
45:4
**school** [8] - 23:5,
24:17, 26:13, 26:17,
27:19, 46:6, 46:7,
64:17
**science** [1] - 27:9
**Scott** [3] - 103:24,
111:23, 221:1
**screen** [7] - 163:2,
207:7, 207:8,
208:17, 208:18,
208:22, 208:24
**scrutiny** [3] - 34:23,
34:24, 35:20
**search** [5] - 81:9,
178:19, 178:21,
178:24, 178:25
**searching** [1] - 31:15
**Seasons** [2] - 23:19,
58:12
**seat** [14] - 5:23, 6:2,
20:4, 20:16, 20:17,
76:13, 90:23,
122:18, 189:15,
189:20, 191:2,
203:19, 220:3
**seated** [4] - 5:22,
94:22, 99:6, 156:13
**seats** [2] - 8:18, 20:16
**second** [8] - 20:20,
21:4, 39:13, 42:23,
75:1, 163:3, 188:10,
197:2
**seconds** [55] - 105:10,
163:22, 164:17,
166:4, 166:18,
168:7, 168:14,
168:20, 169:9,
169:16, 169:25,
171:19, 171:21,
172:24, 173:20,
173:22, 174:11,
176:2, 176:19,
176:21, 178:8,
178:10, 183:14,
183:15, 183:18,
184:4, 184:8,
184:16, 185:1,
185:15, 186:11,
186:23, 186:25,
187:8, 188:15,

190:22, 191:22,
194:8, 194:10,
194:21, 195:18,
196:6, 198:1,
198:15, 198:24,
201:9, 201:17,
202:25, 203:14,
203:16, 203:24,
204:17, 204:19,
205:17, 205:19
**section** [1] - 10:22
**security** [15] - 100:23,
109:16, 154:14,
159:22, 159:23,
160:6, 160:14,
160:20, 160:23,
161:2, 161:8,
163:24, 164:11,
173:16, 174:24
**Security** [1] - 110:19
**sedated** [1] - 120:19
**see** [71] - 5:10, 8:3,
12:15, 12:17, 29:17,
34:15, 40:25, 41:2,
41:5, 41:22, 42:7,
46:19, 48:17, 50:17,
51:3, 51:20, 63:24,
79:12, 79:20, 80:9,
80:10, 83:18, 85:17,
86:16, 87:18, 89:9,
89:11, 91:1, 91:3,
94:8, 94:20, 95:23,
96:6, 98:11, 101:1,
107:16, 107:20,
112:16, 117:15,
117:18, 121:17,
152:24, 154:13,
154:15, 156:7,
157:9, 163:8,
164:22, 173:10,
173:12, 174:20,
174:25, 177:8,
178:21, 188:23,
190:1, 190:19,
197:22, 206:6,
207:23, 207:25,
208:17, 208:18,
208:20, 208:21,
209:1, 218:6,
218:22, 221:13
**seeing** [2] - 107:24,
165:6
**seek** [1] - 101:13
**seeks** [10] - 130:12,
133:22, 134:25,
137:16, 158:5,
177:22, 196:16,
199:19, 206:24,
208:8
**seem** [1] - 78:16,

99:15, 198:8
**sees** [3] - 109:8,
117:25, 218:23
**select** [2] - 6:13, 19:12
**selecting** [1] - 16:24
**selection** [3] - 17:6,
17:10, 17:15
**self** [1] - 23:8
**self-employed** [1] -
23:8
**semester** [1] - 22:10
**semiprivate** [1] -
19:19
**semitruck** [1] - 48:17
**send** [5] - 5:10, 76:17,
76:20, 82:9, 94:9
**sending** [1] - 107:13
**senior** [3] - 24:20,
31:11, 144:7
**sense** [7] - 57:1,
85:18, 86:9, 88:1,
167:3, 175:18,
175:22
**sentiment** [1] - 36:13
**separate** [5] - 34:3,
92:24, 110:7,
140:25, 213:6
**separately** [1] -
140:21
**sergeant** [1] - 111:23
**serious** [3] - 48:10,
82:19, 145:18
**served** [4] - 18:15,
27:11, 28:11, 42:8
**service** [25] - 9:18,
9:19, 11:12, 11:13,
22:6, 22:12, 23:10,
23:20, 24:11, 24:21,
25:3, 25:13, 25:25,
26:14, 26:19, 27:2,
42:13, 42:21, 74:5,
78:25, 146:22,
147:3, 150:24,
170:6, 170:10
**services** [1] - 66:8
**serving** [3] - 9:23,
10:16, 12:5
**session** [3] - 10:1,
10:9, 89:10
**sessions** [1] - 11:6
**set** [2] - 32:4, 95:24
**seven** [1] - 47:20
**several** [5] - 54:22,
102:6, 144:4, 144:5,
151:4
**severe** [2] - 193:22,
194:3
**severely** [1] - 101:2
**sexual** [3] - 67:16,
77:17, 87:5

**shade** [1] - 109:25
**shake** [1] - 20:8
**Shannon** [4] - 2:9, 3:11, 7:1, 108:18
**share** [1] - 208:17
**shared** [1] - 106:25
**sharing** [6] - 54:22, 66:22, 66:24, 67:23, 72:4, 83:23
**sharp** [4] - 108:2, 117:17, 117:18, 121:17
**sheet** [2] - 21:13, 21:16
**sheriff** [2] - 30:21, 102:24
**Sheriff's** [2] - 13:19, 33:1
**sheriff's** [4] - 67:16, 115:10, 116:15, 124:6
**sheriffs** [2] - 100:10, 108:5
**shift** [1] - 212:4
**shin** [1] - 157:19
**shit** [8] - 115:19, 117:23, 118:6, 186:17, 187:10, 190:24, 190:25, 195:20
**shitting** [1] - 195:21
**shoes** [7] - 59:7, 102:1, 106:6, 112:24, 142:2, 157:7, 219:12
**shooter** [1] - 46:7
**shopping** [1] - 41:15
**short** [3] - 8:18, 9:10, 154:9
**shot** [2] - 208:23, 208:24
**shoulders** [2] - 20:8, 174:20
**show** [27] - 21:14, 89:3, 89:25, 94:19, 100:5, 108:20, 108:24, 109:3, 111:16, 111:18, 112:7, 113:14, 114:3, 120:15, 120:22, 120:25, 121:17, 121:24, 122:2, 148:4, 157:13, 157:16, 179:8, 179:20, 185:11, 206:2, 214:4
**Show** [1] - 114:25
**showed** [5] - 70:17, 71:1, 119:17, 120:19, 185:8

100:4
**Sina** [1] - 212:22
**single** [14] - 18:7, 22:4, 22:11, 24:10, 25:2, 26:12, 26:18, 27:22, 27:24, 28:10, 91:17, 104:11, 107:5, 148:3
**single-lane** [1] - 104:11
**sirens** [1] - 144:24
**sister** [1] - 42:8
**sit** [8] - 3:22, 3:23, 4:1, 20:17, 49:20, 51:23, 134:11, 175:10
**sitting** [7] - 3:17, 3:20, 8:24, 8:25, 18:25, 50:6, 62:7
**situated** [1] - 62:12
**situation** [16] - 61:13, 61:24, 67:20, 69:8, 69:14, 70:15, 70:25, 71:13, 84:13, 109:20, 109:21, 143:4, 144:21, 161:2, 161:12, 162:9
**situations** [3] - 46:5, 59:10, 63:12
**six** [3] - 9:15, 101:1, 128:21
**six-month** [1] - 128:21
**skeptical** [1] - 70:21
**skid** [1] - 22:2
**sleeping** [2] - 109:16, 138:12
**sleepy** [1] - 220:10
**slipped** [1] - 119:15
**slow** [2] - 7:17, 200:7
**slower** [3] - 175:6, 175:9, 177:13
**small** [1] - 162:3
**smaller** [1] - 48:16
**smart** [1] - 51:25
**smell** [1] - 218:20
**snack** [1] - 10:3
**Snapchat** [1] - 80:25
**so..** [2] - 45:4, 53:8
**sobriety** [2] - 139:3, 168:1
**social** [1] - 80:17
**society** [1] - 107:17
**sock** [1] - 159:11
**socks** [2] - 159:6, 159:7
**sole** [2] - 17:1, 122:2
**solely** [2] - 17:8, 77:11
**someone** [15] - 13:11, 34:25, 63:6, 80:2, 80:16, 103:20, 103:21, 103:22,

104:2, 133:20, 135:16, 150:10, 175:14, 175:20, 213:12
**sometimes** [15] - 9:5, 57:3, 70:8, 76:12, 84:16, 84:17, 86:11, 86:12, 89:13, 91:9, 93:22, 99:14, 106:24, 138:8
**somewhere** [4] - 10:24, 206:18, 213:24, 214:16
**son** [6] - 100:15, 106:19, 107:9, 107:19, 107:24, 119:22
**son's** [1] - 107:23
**soon** [3] - 11:19, 49:16, 104:24
**sooner** [1] - 220:8
**sorrow** [1] - 95:7
**sorry** [40] - 16:8, 24:5, 25:7, 40:3, 41:24, 42:12, 43:22, 55:19, 61:4, 66:23, 68:6, 68:24, 71:8, 76:6, 95:5, 129:25, 130:11, 131:24, 134:2, 134:19, 136:3, 137:5, 137:12, 140:3, 142:14, 148:7, 149:8, 158:9, 158:19, 159:25, 163:13, 164:15, 165:1, 167:9, 179:21, 180:12, 183:13, 193:21, 217:18
**sort** [3] - 19:19, 93:25, 185:12
**sound** [2] - 78:11, 165:22
**sounding** [1] - 203:1
**sounds** [3] - 54:23, 179:4, 186:19
**source** [2] - 77:12, 83:1
**speaking** [3] - 122:19, 126:1, 139:2
**speaks** [1] - 80:9
**specialized** [1] - 18:5
**specific** [11] - 33:5, 53:10, 59:8, 103:19, 129:15, 168:11, 180:19, 190:7, 192:18, 195:7, 195:9
**specifically** [8] - 34:20, 58:13,

101:18, 126:17, 144:16, 157:1, 170:9, 213:6
**specificity** [1] - 141:5
**spectators** [1] - 79:16
**speculate** [1] - 92:8
**speculation** [1] - 205:15
**spell** [2] - 122:20, 166:9
**spending** [1] - 29:12
**spent** [2] - 107:11, 175:13
**spit** [1] - 41:15
**spitting** [1] - 63:8
**spoken** [1] - 202:14
**spontaneously** [1] - 107:8
**spot** [6] - 66:23, 103:20, 103:21, 103:22, 195:7, 195:9
**spouse** [8] - 18:10, 18:11, 22:23, 23:11, 23:24, 25:15, 26:5, 79:6
**staff** [6] - 7:10, 12:13, 79:15, 84:5, 123:2, 143:11
**staffing** [1] - 126:13
**stand** [15] - 5:24, 6:23, 8:4, 8:17, 67:10, 75:22, 122:10, 122:12, 131:13, 156:9, 156:14, 169:7, 175:1, 200:6, 221:3
**standard** [4] - 53:22, 55:11, 64:22, 117:16
**standards** [1] - 34:13
**standing** [1] - 176:10
**standpoint** [2] - 202:7
**start** [19] - 6:10, 15:7, 20:16, 21:12, 21:15, 29:17, 38:14, 55:11, 84:4, 93:14, 94:12, 124:11, 125:13, 130:21, 162:1, 183:12, 188:16, 204:16, 211:8
**started** [10] - 7:15, 10:7, 20:15, 113:25, 115:25, 124:11, 136:10, 136:14, 143:24, 164:3
**starting** [3] - 10:6, 42:16, 118:14
**starts** [1] - 186:16
**state** [11] - 3:4, 15:17, 31:7, 34:5, 38:13, 47:3, 51:17, 51:18,

66:4, 77:9, 122:19
**statement** [15] - 99:8,
99:24, 100:1, 100:3,
100:8, 108:15,
111:12, 140:11,
140:14, 165:17,
173:8, 199:16,
215:6, 215:14,
218:15
**Statements** [1] - 88:9
**statements** [15] -
83:21, 94:13, 160:9,
160:13, 165:4,
166:13, 168:10,
171:2, 188:1, 191:2,
196:2, 196:14,
201:25, 202:15,
203:21
states [1] - 172:25
**States** [1] - 6:7
**STATES** [1] - 1:1
**stating** [1] - 96:14
**Station** [9] - 125:3,
125:4, 125:6,
125:11, 125:14,
125:17, 126:3,
126:7, 145:14
station [1] - 126:20
**stations** [2] - 104:14,
217:1
**status** [2] - 5:6, 18:7
**stay** [4] - 10:6, 24:9,
76:17, 80:12
**staying** [3] - 111:17,
114:13, 187:4
**stays** [3] - 116:4,
162:4, 162:5
**steers** [1] - 9:2
**step** [3] - 107:14,
155:5, 220:2
**stepped** [1] - 104:24
**stereotypes** [1] -
77:22
**Steve** [1] - 4:8
**Stever** [1] - 7:2
**still** [23] - 25:24,
41:16, 44:19, 54:13,
111:6, 124:9,
141:15, 154:7,
156:14, 161:14,
164:8, 169:5, 174:6,
182:7, 184:12,
186:15, 194:14,
197:4, 201:24,
203:19, 210:6,
214:10, 216:3
**stint** [1] - 128:9
**stints** [1] - 127:6
**stipulate** [4] - 96:14,
96:17, 155:7, 155:14

stipulated [2] - 221:6,
221:7
**stipulating** [2] - 97:6,
155:18
**stipulation** [5] - 97:9,
97:13, 97:14, 98:4,
180:25
**stop** [8] - 65:21,
103:5, 104:19,
107:7, 170:2,
195:22, 199:12,
219:19
**Stop** [1] - 198:3
**stopped** [7] - 166:15,
168:4, 206:11,
210:1, 210:3, 210:7,
210:22
**stops** [2] - 104:13,
217:8
**stopwatching** [2] -
211:10, 211:13
**stores** [1] - 216:19
**story** [4] - 35:1, 83:6,
106:10, 114:9
**straight** [4] - 39:19,
118:1, 118:12, 164:2
**straighten** [1] - 107:15
**stray** [1] - 95:9
**street** [14] - 31:21,
63:24, 71:17,
101:25, 111:14,
111:17, 112:8,
114:8, 118:22,
171:23, 173:9,
173:10, 173:13,
173:17
**Street** [2] - 1:23, 151:6
**stressful** [1] - 9:2
**stretch** [2] - 8:17,
200:6
**stricken** [2] - 89:13,
189:19
**strike** [1] - 189:18
**stripped** [1] - 113:6
**strong** [2] - 73:19,
205:13
**struck** [1] - 100:17
**struggle** [1] - 44:2
**struggled** [2] - 44:7,
107:10
**struggles** [1] - 45:18
**student** [1] - 27:5
**Studio** [1] - 22:11
**studying** [1] - 22:13
**stuff** [3] - 22:3, 37:25,
45:11
**stumbled** [1] - 119:13
**subject** [7] - 93:3,
93:16, 142:6,
142:22, 150:25,

202:15, 215:2
**Subject** [1] - 215:12
**subjects** [1] - 72:12
**submitted** [4] - 90:18,
93:11, 155:1, 219:23
**submitting** [1] - 221:4
**substantially** [1] -
19:9
**substitute** [2] - 14:4,
51:15
**successful** [1] -
103:25
**sudden** [1] - 32:2
**sued** [1] - 46:23
**suffering** [1] - 95:8
**suffers** [1] - 42:19
**suggest** [1] - 220:11
**suggested** [1] - 88:11
**suggestion** [1] -
205:13
**Suite** [2] - 2:5, 2:10
**summaries** [1] - 149:4
**summary** [7] - 13:13,
146:24, 147:1,
189:3, 189:4, 215:7
**super** [1] - 61:23
**supervision** [1] -
126:8
**supervisor** [2] -
149:24, 150:3
**supervisors** [2] -
149:5, 149:7
**support** [7] - 42:11,
46:4, 46:13, 59:3,
59:11, 60:22, 106:19
**supported** [2] - 45:22,
46:3
**suppose** [1] - 44:14
**supposed** [3] - 33:21,
33:24, 105:18
**surgeries** [1] - 101:5
**surgery** [2] - 101:7,
109:5
**surrounded** [1] -
104:12
**sustained** [6] - 88:20,
134:15, 189:19,
202:22, 205:16,
217:22
**swear** [2] - 5:25, 76:7
**sweating** [1] - 138:10
**swollen** [5] - 101:17,
105:6, 159:2,
164:22, 165:6
**sword** [1] - 40:25
**sworn** [7] - 6:1, 7:14,
17:25, 76:9, 85:8,
122:12, 122:17
**sympathetic** [1] -
44:15

sympathy [4] - 44:10,
62:8, 62:13, 77:20
**symptom** [7] - 132:5,
132:6, 138:11,
138:17, 138:23,
167:22, 198:10
**symptoms** [15] -
112:15, 120:6,
120:8, 120:10,
132:22, 132:24,
133:1, 137:11,
137:13, 137:15,
138:7, 167:19,
193:18, 193:21
**system** [8] - 17:1,
105:22, 119:18,
143:8, 143:17,
146:14, 146:15,
146:17

## T

**table** [3] - 3:23, 4:4,
68:4
**tablet** [1] - 80:21
**tactic** [1] - 115:16
**talks** [1] - 25:12
**Tara** [1] - 212:22
**tasked** [1] - 105:14
**tax** [4] - 28:5, 28:10,
84:6, 84:7
**taxi** [2] - 170:5, 170:10
**Taylor's** [14] - 113:25,
114:1, 114:3,
114:14, 179:5,
179:6, 181:11,
181:16, 181:19,
182:4, 182:13
**teach** [1] - 149:3
**teacher** [3] - 27:19,
30:17, 30:20
**teaching** [1] - 26:12
**teams** [1] - 5:13
**teary** [1] - 68:5
**technically** [1] -
181:17
**television** [2] - 8:14,
82:25
**tendency** [1] - 91:9
**terminated** [1] - 46:22
**termination** [1] - 26:2
**terms** [1] - 63:18
**Terrace** [1] - 125:7
**terrific** [2] - 20:11,
91:11
**terrifying** [1] - 46:12
**Terry** [1] - 21:9
**test** [5] - 139:3, 139:7,
139:11, 139:15
**tested** [2] - 81:22,

82:3
**testified** [4] - 85:19,
86:7, 86:21, 86:25
**testifies** [2] - 37:1,
122:17
**testify** [13] - 36:11,
54:10, 60:5, 87:8,
99:13, 99:15,
112:13, 113:3,
113:8, 119:21,
120:9, 120:25,
212:13
**testifying** [12] - 36:18,
54:15, 67:8, 85:22,
86:3, 130:7, 131:10,
201:4, 213:14,
213:20, 216:23,
220:25
**testimony** [40] - 10:13,
13:4, 13:7, 13:9,
34:12, 35:15, 59:19,
59:20, 59:21, 67:10,
67:15, 77:3, 79:13,
81:22, 85:8, 85:13,
85:16, 86:4, 86:10,
86:18, 86:19, 87:10,
87:13, 90:9, 90:15,
91:8, 91:10, 91:16,
91:19, 91:21, 106:9,
110:20, 111:22,
111:25, 113:15,
133:23, 135:2,
180:5, 207:10
**tests** [5] - 119:17,
119:20, 120:12,
168:1
**text** [4] - 80:22, 107:1,
107:5, 107:6
**THE** [331] - 3:1, 3:7,
3:10, 3:13, 3:16,
3:20, 3:25, 4:6, 4:11,
4:15, 4:22, 5:1, 5:8,
5:12, 5:16, 5:17,
5:18, 5:19, 5:22, 6:2,
6:25, 7:6, 8:6, 14:12,
14:15, 14:20, 14:23,
15:1, 15:22, 15:25,
16:6, 16:10, 16:12,
16:14, 16:16, 20:21,
21:12, 21:20, 21:24,
22:4, 22:6, 22:8,
22:13, 22:15, 22:21,
22:23, 23:1, 23:3,
23:6, 23:11, 23:15,
23:22, 23:24, 24:2,
24:5, 24:7, 24:12,
24:14, 24:22, 25:4,
25:15, 25:19, 26:5,
26:9, 26:15, 26:19,
26:21, 27:3, 27:6,

27:12, 27:14, 27:17, 27:20, 27:25, 28:2, 28:7, 28:12, 28:15, 28:19, 28:21, 28:25, 29:21, 29:23, 30:1, 30:4, 30:9, 30:12, 30:22, 30:24, 31:3, 31:17, 31:20, 31:22, 31:24, 32:3, 32:9, 32:15, 32:20, 33:8, 33:11, 33:17, 33:22, 33:25, 34:8, 34:18, 35:2, 35:6, 35:13, 35:22, 36:14, 36:20, 36:25, 37:5, 37:11, 38:2, 38:4, 38:17, 38:23, 39:1, 39:3, 39:11, 39:23, 40:9, 40:13, 41:10, 41:20, 42:1, 42:12, 42:21, 43:6, 43:10, 43:15, 43:19, 43:25, 44:11, 44:15, 44:21, 45:5, 45:13, 45:19, 46:10, 46:15, 46:21, 46:25, 47:3, 47:6, 47:10, 47:14, 47:17, 47:19, 47:21, 48:3, 48:8, 48:24, 49:1, 49:7, 49:9, 49:12, 49:18, 49:25, 50:4, 50:9, 50:15, 50:21, 50:24, 51:2, 52:16, 53:18, 54:19, 56:9, 56:20, 56:23, 57:3, 57:9, 57:18, 57:23, 57:25, 59:18, 60:4, 60:8, 60:12, 68:22, 69:1, 72:6, 72:25, 73:3, 73:5, 73:8, 73:10, 73:18, 73:22, 73:25, 74:10, 74:13, 74:18, 74:23, 75:5, 75:8, 75:13, 75:18, 75:22, 76:1, 76:5, 76:7, 76:10, 94:17, 94:18, 94:22, 95:15, 95:17, 95:19, 95:23, 96:2, 96:18, 96:23, 97:3, 97:20, 97:25, 98:6, 98:13, 98:18, 98:20, 98:22, 98:23, 98:24, 98:25, 99:3, 99:4, 99:6, 106:13, 108:4, 108:14, 122:7, 122:11, 122:12, 122:18, 122:21, 122:22, 130:16, 130:19, 130:22, 134:1, 134:5, 134:15, 135:3,

136:4, 137:3, 137:5, 137:18, 137:21, 139:8, 140:8, 140:10, 140:15, 140:18, 140:19, 140:20, 140:25, 141:4, 141:9, 141:16, 141:19, 142:3, 150:19, 152:25, 153:4, 153:10, 153:14, 153:15, 153:18, 153:21, 154:23, 155:5, 155:17, 156:6, 156:9, 156:11, 156:13, 157:15, 158:8, 158:12, 162:20, 162:24, 163:1, 163:7, 163:18, 167:6, 167:8, 171:8, 171:10, 171:11, 175:23, 177:25, 178:2, 179:11, 179:15, 179:18, 179:23, 181:3, 189:19, 196:19, 197:19, 197:22, 199:12, 199:15, 199:22, 199:24, 200:3, 200:6, 200:10, 200:21, 200:22, 202:22, 205:16, 206:4, 207:8, 207:11, 207:15, 207:19, 207:21, 208:12, 217:22, 219:19, 219:21, 220:2, 220:7, 220:9, 220:18, 220:23, 221:4, 221:13
**Theaters** [1] - 27:22
**theft** [2] - 47:15, 189:10
**thefts** [2] - 114:20, 116:7
**themselves** [12] - 63:7, 64:4, 65:19, 65:22, 66:2, 103:20, 113:12, 113:13, 134:18, 134:22, 135:8, 143:18
**therapist** [1] - 25:11
**therapy** [1] - 45:11
**therefore** [8] - 17:2, 79:1, 87:23, 90:16, 114:22, 115:23, 118:17, 120:7
**THEREUPON** [1] -

122:14
**Thereupon** [60] - 5:15, 5:20, 6:1, 76:9, 94:21, 96:1, 99:5, 155:4, 156:8, 156:12, 163:20, 164:14, 164:16, 165:13, 166:6, 166:17, 168:6, 168:13, 168:19, 169:15, 169:24, 171:20, 172:23, 173:21, 174:10, 176:1, 176:20, 178:9, 183:17, 184:7, 184:15, 184:25, 185:14, 186:10, 186:24, 187:7, 188:9, 188:14, 190:21, 191:7, 191:21, 194:9, 194:20, 195:16, 196:5, 197:1, 197:25, 198:14, 198:23, 200:25, 201:8, 201:16, 202:24, 203:15, 203:23, 204:13, 204:18, 205:18, 220:1, 221:15
**they've** [1] - 46:5
**thin** [1] - 109:25
**thinks** [2] - 88:17, 97:2
**third** [1] - 101:14
**third-party** [1] - 101:14
**Thomas** [1] - 220:25
**thorough** [2] - 83:4, 83:5
**thoughts** [3] - 60:17, 69:25, 95:25
**threaten** [1] - 116:22
**threatening** [2] - 78:11, 118:3
**three** [13] - 10:2, 48:19, 101:8, 125:24, 126:11, 126:13, 126:24, 127:1, 127:3, 127:5, 128:9, 128:10, 149:16
**three-month** [5] - 126:24, 127:1, 127:5, 128:9, 128:10
**three-year-old** [1] - 48:19
**throughout** [4] - 64:16, 78:18,

110:12, 111:10
**throw** [1] - 174:20
**thrown** [1] - 156:2
**thumb** [1] - 34:6
**tia** [1] - 71:15
**tie** [1] - 162:16
**TikTok** [1] - 80:25
**timeframe** [2] - 176:22, 185:2
**timing** [1] - 220:16
**Timoteo** [7] - 180:9, 214:7, 214:10, 216:7, 216:14, 216:15, 218:4
**tip** [1] - 54:2
**tired** [2] - 138:19, 138:22
**titled** [1] - 221:19
**today** [1] - 10:6, 12:23, 64:6, 72:8, 74:6, 100:12, 100:16, 101:12, 106:15, 134:11, 175:10, 189:13, 213:19
**together** [13] - 22:24, 23:12, 23:25, 25:16, 26:6, 91:18, 93:5, 101:19, 106:23, 106:24, 140:23, 140:24, 141:7, 141:11
**togethers** [1] - 55:2
**tolerance** [1] - 120:4
**tomorrow** [5] - 219:24, 220:14, 220:16, 220:25, 221:14
**took** [8] - 48:19, 55:17, 56:2, 114:7, 160:20, 196:22, 212:1
**top** [4] - 97:22, 110:1, 154:21, 157:18
**topic** [4] - 131:6, 140:16, 141:17, 175:15
**tossed** [1] - 66:11
**total** [1] - 98:4
**totality** [1] - 165:5
**touched** [1] - 71:19
**tours** [1] - 42:18
**toward** [3] - 44:15, 89:3, 90:1
**towards** [17] - 44:9, 48:1, 62:2, 62:8, 62:13, 70:21, 105:12, 114:1, 119:11, 191:12, 205:23, 210:9, 210:16, 210:20,

211:6, 211:14
**town** [1] - 11:6
**Town** [1] - 2:10
**toxic** [1] - 105:22
**toxicologist** [1] - 120:1
**track** [4] - 104:16, 104:18, 106:9, 180:18
**tracking** [1] - 139:7
**tracks** [10] - 49:10, 203:10, 203:13, 205:25, 206:15, 208:2, 209:23, 216:6, 216:10, 216:14
**tradition** [1] - 122:25
**traditional** [1] - 123:1
**traffic** [2] - 166:1, 177:3
**train** [35] - 13:17, 49:5, 49:10, 49:12, 49:19, 50:7, 68:2, 68:7, 68:10, 68:23, 100:17, 104:16, 104:17, 104:19, 105:12, 109:2, 118:14, 118:15, 119:10, 119:11, 119:12, 119:14, 121:16, 122:4, 142:5, 203:1, 203:13, 205:25, 206:15, 208:2, 216:1, 216:3, 216:6, 216:10, 216:13
**trained** [41] - 104:1, 106:4, 112:4, 113:4, 113:9, 131:22, 132:3, 132:10, 132:14, 133:13, 136:19, 137:8, 139:17, 139:25, 140:4, 140:16, 141:11, 141:17, 141:21, 141:24, 142:1, 142:8, 142:12, 142:15, 142:19, 142:25, 143:4, 147:19, 148:9, 148:18, 149:17, 150:13, 167:23, 170:8, 170:11, 175:15, 193:3, 193:11, 193:19, 198:10, 202:4
**trainer** [1] - 144:8
**training** [65] - 11:6, 18:6, 25:2, 29:14,

Case 5:22-cv-01306-DSF-MAR   Document 323   Filed 09/13/24   Page 249 of 251   Page ID #:11015   27

44:25, 103:19,
112:20, 112:25,
128:16, 128:20,
128:24, 129:11,
129:15, 129:16,
129:21, 129:23,
130:4, 130:9,
130:24, 131:5,
131:7, 131:16,
131:17, 131:20,
131:25, 132:7,
132:13, 132:20,
132:23, 133:10,
133:17, 134:7,
134:11, 134:16,
134:21, 135:6,
136:18, 137:8,
137:24, 140:12,
141:1, 143:25,
144:6, 144:11,
144:14, 144:17,
145:2, 145:13,
146:18, 148:9,
148:18, 149:2,
150:7, 150:8, 167:2,
167:13, 167:16,
175:13, 178:23,
192:24, 200:11,
202:6, 202:8, 202:9,
202:12
**TRANSCRIPT** [1] -
1:15
**transcript** [20] - 20:7,
91:7, 91:13, 130:13,
130:19, 162:20,
162:24, 163:5,
163:8, 163:10,
163:11, 163:12,
163:14, 163:22,
177:23, 196:17,
206:25, 207:17,
208:9, 221:18
**transcripts** [1] - 1:25
**translate** [1] - 91:13
**transport** [14] -
120:13, 120:14,
140:2, 142:1, 142:6,
142:12, 142:15,
142:18, 182:20,
183:6, 184:19,
184:20, 193:25,
194:3
**transportation** [1] -
184:23
**transported** [3] -
100:18, 215:2,
215:13
**transports** [1] - 142:8
**trauma** [1] - 48:20
**traumatic** [1] - 50:4

**treat** [3] - 32:11,
32:17, 89:16
**treated** [3] - 31:6,
43:3, 44:6
**treatment** [2] - 101:13,
117:2
**treats** [1] - 120:2
**tree** [1] - 109:25
**trespass** [11] - 109:18,
144:11, 144:18,
144:22, 145:1,
145:3, 145:11,
151:9, 151:12,
160:4, 172:15
**trespassing** [11] -
111:19, 112:12,
115:7, 127:13,
160:5, 161:10,
161:13, 161:17,
170:17, 172:11,
192:20
**trial** [46] - 7:24, 8:8,
8:17, 9:15, 9:22,
10:16, 10:21, 11:18,
17:4, 17:9, 28:11,
43:7, 44:8, 49:20,
68:19, 76:16, 76:25,
77:12, 78:3, 78:18,
79:4, 79:10, 79:22,
81:23, 82:3, 82:11,
82:14, 82:22, 84:8,
85:1, 90:17, 91:2,
91:5, 91:7, 91:23,
93:3, 93:6, 93:7,
93:17, 94:1, 94:12,
99:7, 100:5, 103:23,
110:12, 117:16
**TRIAL** [1] - 1:15
**trials** [3] - 34:1, 93:23,
220:11
**tried** [6] - 39:8, 115:5,
115:15, 119:14,
192:9, 214:19
**triers** [1] - 92:19
**trip** [1] - 205:10
**trips** [1] - 11:6
**trouble** [4] - 8:2, 8:7,
120:20, 169:2
**true** [29] - 85:5, 87:1,
88:11, 128:1,
129:16, 132:4,
133:13, 136:12,
137:1, 137:6, 157:4,
161:22, 171:4,
171:5, 172:15,
175:16, 181:5,
190:18, 194:17,
195:23, 197:5,
197:11, 199:5,
199:7, 213:21,

215:14, 218:25,
219:4
**trust** [1] - 36:14
**trustworthy** [2] - 55:6,
55:7
**truth** [8] - 13:11, 18:1,
36:15, 36:16, 52:12,
52:14, 81:22, 86:25
**truthful** [3] - 149:1,
150:11, 150:15
**truthfully** [1] - 19:15
**try** [34] - 6:13, 8:18,
9:10, 10:19, 20:9,
20:13, 30:8, 37:3,
41:18, 49:24, 50:23,
55:15, 55:23, 55:25,
56:3, 56:19, 56:23,
57:4, 59:12, 61:13,
62:4, 62:15, 62:16,
62:21, 69:11, 69:12,
69:15, 69:17, 80:16,
82:10, 84:21, 122:4,
141:11, 192:6
**trying** [18] - 9:6, 11:9,
19:12, 19:13, 31:13,
41:3, 57:2, 65:12,
71:5, 89:7, 92:4,
96:5, 115:24, 118:8,
164:7, 172:21,
191:3, 220:9
**Tuesday** [1] - 1:18
**turn** [34] - 6:10, 6:12,
51:22, 75:1, 90:17,
104:25, 110:10,
114:4, 116:12,
117:13, 117:16,
117:17, 117:18,
117:25, 118:1,
118:2, 119:7,
121:17, 152:23,
162:5, 162:6,
182:17, 203:7,
203:12, 209:18,
209:22, 209:23,
210:1, 211:19
**turn-by-turn** [2] -
114:4, 116:12
**turned** [3] - 87:21,
104:17, 162:12
**turns** [2] - 104:10,
114:14
**twice** [1] - 37:22
**Twitter** [1] - 80:24
**two** [23] - 22:18, 23:3,
23:19, 25:23, 42:18,
70:16, 86:16, 87:11,
97:22, 98:15, 101:5,
101:8, 114:9, 127:8,
141:6, 141:11,
157:19, 160:24,

190:6, 190:22,
206:18, 216:10,
220:24
**two-hour** [1] - 97:22
**two-story** [1] - 114:9
**type** [16] - 18:17,
28:14, 64:24, 69:19,
105:24, 110:1,
110:4, 120:16,
144:19, 147:7,
147:19, 148:4,
148:11, 148:14,
182:24, 188:16
**typed** [8] - 182:3,
212:7, 212:19,
213:23, 214:11,
214:14, 214:19,
215:2
**types** [2] - 66:21,
144:9
**typically** [2] - 145:25,
148:16
**typing** [3] - 183:21,
183:23, 190:23

# U

**U-turn** [8] - 104:25,
117:17, 119:7,
209:18, 209:22,
209:23, 210:1,
211:19
**U.S** [1] - 1:3
**UCLA** [1] - 25:24
**UCSD** [1] - 120:1
**Ultimate** [2] - 21:18,
21:22
**ultimately** [3] - 101:4,
105:12, 109:1
**um-hum** [1] - 48:24
**unable** [2] - 113:13,
123:14
**unanticipated** [2] -
133:5, 133:11
**unaware** [1] - 189:1
**unbeknownst** [1] -
117:12
**unbiased** [3] - 17:5,
19:12, 82:22
**uncle** [3] - 30:16,
30:19, 44:5
**uncle's** [1] - 19:25
**unclear** [1] - 156:5
**unconditional** [1] -
107:18
**unconscious** [4] -
77:21, 77:22, 77:25,
87:3
**under** [48] - 17:1, 43:3,
80:7, 103:15,

103:21, 108:25,
109:21, 109:25,
111:20, 112:14,
113:22, 117:9,
123:12, 127:21,
129:1, 129:23,
130:5, 130:8,
130:10, 130:25,
131:10, 131:21,
131:22, 132:3,
132:13, 132:17,
133:9, 133:15,
134:8, 134:16,
134:21, 135:7,
138:3, 139:18,
140:1, 140:6,
140:22, 140:24,
141:7, 141:13,
141:22, 141:24,
156:14, 172:15,
191:18, 192:25,
193:4, 193:13
**undergoing** [2] -
136:20, 146:18
**underneath** [1] -
105:13
**understood** [3] - 72:3,
149:10, 177:4
**undertake** [1] - 108:1
**underwent** [1] - 101:5
**undeterred** [1] -
119:13
**unexpected** [3] -
11:18, 133:4, 133:11
**unforeseeable** [2] -
109:1, 122:3
**unfortunate** [2] - 32:3,
53:9
**uniform** [1] - 162:15
**unimportant** [1] -
90:15
**unincorporated** [1] -
125:6
**United** [1] - 6:7
**UNITED** [1] - 1:1
**University** [17] -
100:22, 101:4,
101:13, 109:13,
126:18, 126:20,
127:5, 127:11,
128:1, 144:15,
150:23, 150:25,
151:2, 156:22,
161:21, 180:1, 182:7
**unless** [5] - 8:12, 9:20,
10:11, 20:1, 81:4
**unlikely** [1] - 11:8
**unnatural** [1] - 108:1
**unprejudiced** [1] -
17:5

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

**unrelated** [2] - 10:10, 93:6
**untimely** [1] - 100:14
**untrue** [1] - 86:18
**untruthful** [1] - 148:21
**untruthfully** [2] - 86:21, 86:25
**up** [73] - 4:16, 5:4, 5:10, 6:23, 8:4, 9:21, 11:18, 19:2, 20:18, 20:19, 29:8, 29:9, 40:6, 48:20, 52:9, 53:3, 53:18, 55:16, 58:1, 59:18, 60:16, 70:3, 70:6, 70:17, 70:18, 71:1, 71:4, 76:13, 78:5, 82:6, 87:18, 95:1, 95:3, 95:13, 95:25, 115:5, 115:25, 116:6, 118:4, 118:15, 119:13, 120:3, 121:15, 130:17, 144:7, 148:11, 157:15, 160:10, 164:5, 164:10, 165:11, 165:20, 168:9, 173:5, 174:12, 174:17, 175:1, 176:3, 176:6, 176:8, 176:17, 180:6, 185:2, 188:21, 188:24, 190:2, 191:4, 191:5, 197:19, 209:15, 209:19, 209:21, 211:18
**updating** [1] - 149:14
**urge** [1] - 91:7
**urgently** [1] - 118:24

**V**

**Vaca** [13] - 110:7, 111:4, 151:21, 151:23, 152:9, 153:6, 153:24, 154:6, 166:22, 166:24, 173:8, 174:23, 179:2
**vague** [5] - 136:3, 136:4, 137:2, 167:5, 217:21
**vaguely** [1] - 202:19
**Valley** [2] - 26:11, 124:17
**Van** [1] - 47:1
**varies** [7] - 126:8, 132:19, 133:12, 133:14, 133:18,

137:11, 146:7
**various** [1] - 160:5
**variously** [1] - 126:14
**vary** [6] - 126:9, 132:22, 133:1, 137:11, 137:13, 137:15
**varying** [1] - 114:16
**vehicle** [33] - 102:23, 102:24, 103:5, 103:7, 103:10, 104:25, 110:7, 110:8, 135:12, 146:8, 146:13, 146:14, 147:9, 162:14, 185:19, 186:2, 186:20, 189:10, 194:17, 206:18, 208:24, 209:15, 209:17, 210:4, 210:6, 210:7, 210:10, 210:16, 210:18, 211:11, 211:15, 218:19
**vehicles** [2] - 102:20, 146:6
**verbal** [1] - 219:9
**verdict** [11] - 9:14, 18:18, 22:20, 23:21, 28:23, 77:10, 78:4, 78:18, 82:1, 99:22
**verdicts** [1] - 26:4
**verify** [5] - 114:23, 115:5, 188:23, 202:1, 214:24
**versions** [1] - 86:13
**versus** [1] - 6:14
**vertically** [1] - 157:12
**vested** [2] - 34:20, 34:25
**via** [4] - 80:22, 97:18, 107:5
**victim** [1] - 67:16
**view** [10] - 33:16, 34:3, 41:6, 42:20, 47:24, 67:3, 67:11, 70:20, 81:8, 83:7
**views** [5] - 15:9, 38:11, 40:19, 42:6, 69:6
**violate** [1] - 78:14
**violated** [1] - 108:6
**violates** [1] - 83:25
**violating** [2] - 78:15, 84:21
**violence** [1] - 65:8
**visit** [2] - 37:23, 81:7
**visiting** [1] - 107:13
**voice** [4] - 165:20, 166:21, 166:22,

191:9
**voices** [14] - 8:22, 102:5, 111:7, 111:8, 111:12, 112:19, 112:22, 167:1, 167:11, 167:15, 167:17, 168:8, 171:4, 171:14
**voir** [3] - 5:1, 52:9, 52:12
**volition** [1] - 175:2
**VOLUME** [1] - 1:16
**voluntarily** [1] - 113:21
**volunteered** [1] - 32:23
**vomit** [1] - 138:9
**vote** [2] - 54:13, 57:15
**voting** [1] - 57:20
**vs** [2] - 1:7, 3:2

**W**

**wait** [6] - 7:24, 21:14, 104:19, 104:24, 194:6, 205:8
**waiting** [2] - 8:25, 119:10
**wake** [1] - 87:18
**walk** [35] - 97:22, 101:8, 101:21, 115:5, 119:4, 119:11, 121:2, 122:23, 123:3, 123:14, 142:2, 161:18, 161:21, 164:20, 164:25, 165:2, 165:7, 165:10, 165:11, 168:24, 169:3, 171:23, 171:25, 172:6, 172:9, 172:19, 173:10, 174:21, 175:2, 177:12, 177:19, 178:5, 186:19, 210:18, 211:14
**walked** [10] - 105:12, 110:10, 113:20, 118:21, 122:1, 173:9, 173:13, 210:15, 211:17
**Walking** [1] - 168:22
**walking** [19] - 41:15, 49:6, 49:9, 64:17, 101:16, 105:5, 123:4, 168:23, 169:2, 169:4, 175:8, 175:9, 175:11, 177:5, 177:13,

210:20, 211:5, 211:8, 219:6
**walks** [2] - 123:1, 211:2
**wallet** [2] - 102:3, 159:14
**warrant** [1] - 112:5
**warrants** [1] - 112:9
**waste** [1] - 170:22
**wasted** [2] - 84:6
**watch** [4] - 8:14, 81:15, 93:23, 94:1
**watching** [1] - 210:22
**water** [1] - 87:22
**WATKINS** [1] - 2:9
**waves** [1] - 43:5
**ways** [1] - 53:25
**wealth** [1] - 95:9
**wear** [2] - 80:8, 102:14
**wearing** [9] - 41:16, 79:25, 101:25, 110:1, 154:20, 157:4, 157:6, 159:6, 159:9
**weather** [1] - 110:3
**website** [1] - 80:23
**weeks** [4] - 43:2, 101:1, 144:4, 144:5
**weigh** [1] - 77:6
**weight** [6] - 13:3, 59:22, 87:7, 87:10, 88:4, 88:6
**welcome** [2] - 4:2, 6:7
**well-being** [1] - 43:13
**West** [4] - 1:23, 66:9, 66:10, 124:17
**WESTERN** [1] - 1:2
**wet** [1] - 87:19
**whole** [5] - 61:23, 97:25, 98:1, 140:10, 177:2
**widowed** [1] - 18:7
**wife** [2] - 27:10, 27:17
**wife's** [1] - 27:1
**willing** [10] - 35:14, 96:14, 97:8, 111:19, 112:12, 155:14, 161:16, 172:12, 172:16, 172:18
**Wilshire** [1] - 2:5
**win** [1] - 53:11
**Wireless** [1] - 66:9
**wish** [2] - 41:7, 90:4
**wished** [1] - 3:22
**withdraw** [2] - 212:15, 218:15
**withdrawal** [14] - 104:2, 136:19, 136:20, 137:9, 137:24, 138:4,

138:7, 143:9, 143:14, 192:14, 193:5, 198:11, 200:16, 201:23
**withdrawals** [6] - 199:1, 199:3, 201:19, 202:2, 202:5, 202:11
**withdrawing** [10] - 103:16, 104:6, 106:7, 117:5, 118:24, 196:8, 196:21, 200:12, 201:5, 201:13
**withhold** [1] - 148:23
**witness** [29] - 12:21, 13:1, 34:14, 34:25, 46:18, 47:12, 67:9, 79:18, 85:14, 85:17, 85:18, 85:20, 85:23, 85:25, 86:7, 86:11, 86:20, 86:23, 86:24, 87:13, 88:12, 88:20, 88:23, 91:17, 92:12, 92:21, 92:22, 122:8
**WITNESS** [11] - 122:21, 137:5, 140:10, 140:18, 140:20, 141:19, 153:14, 153:21, 167:8, 171:11, 199:15
**witness's** [3] - 85:22, 86:2, 87:4
**witnessed** [5] - 48:10, 49:5, 68:2, 68:10, 70:13
**witnesses** [33] - 8:8, 12:17, 13:7, 13:9, 35:11, 35:16, 54:17, 79:13, 79:24, 80:10, 81:9, 81:21, 83:2, 85:8, 85:16, 86:13, 87:8, 87:9, 89:12, 90:11, 91:10, 99:10, 99:12, 99:13, 99:15, 101:15, 104:22, 105:1, 105:3, 119:9, 123:3, 220:16, 220:24
**witnessing** [2] - 66:15, 68:21
**Woodland** [1] - 24:16
**word** [7] - 20:6, 62:16, 82:7, 82:8, 160:20, 160:21, 196:22
**words** [5] - 35:18, 51:14, 93:10, 95:16, 115:18
**works** [7] - 24:4, 24:6,

25:11, 25:24, 27:2,
27:4, 155:24
**world** [1] - 66:20
**wrapper** [1] - 185:12
**write** [4] - 91:4, 91:23,
107:2, 146:25
**writes** [1] - 90:14
**writing** [3] - 80:21,
82:10, 91:3
**written** [3] - 90:16,
91:7, 153:18
**wrongful** [1] - 26:2
**www.
amydiazfedreporter
.com** [1] - 1:25

## Y

**Yaamava'** [1] - 125:8
**year** [4] - 34:1, 43:3,
48:19, 124:11
**years** [11] - 20:1,
37:22, 39:16, 47:20,
48:20, 49:8, 63:14,
70:16, 119:22,
124:5, 149:16
**yelling** [1] - 115:9
**yellow** [4] - 179:25,
180:22, 208:5, 209:1
**yesterday** [1] - 5:9
**York** [1] - 19:25
**young** [2] - 44:8,
107:10
**yourself** [6] - 77:19,
84:12, 90:6, 143:10,
148:2, 188:16
**yourselves** [2] - 6:16,
93:4
**YouTube** [1] - 80:24

## Z

**zoomed** [1] - 180:16